# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ | |
| CITIZENS FOR RESPONSIBILITY AND ) | |
| ETHICS IN WASHINGTON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil No. 1:06cv01912 (RBW) |
| ) | |
| U.S. DEPARTMENT OF HOMELAND ) | |
| SECURITY, et al., ) | |
| ) | |
| Defendants. ) | |
| _____) | |

## PLAINTIFF'S MOTION
## <u>FOR A TEMPORARY RESTRAINING ORDER</u>

Pursuant to Rule 65 of the Federal Rules of Civil Procedure and LCvR 65.1, plaintiff

Citizens for Responsibility and Ethics in Washington ("CREW") hereby moves the Court to

enter a temporary restraining order requiring defendants to immediately preserve all records

potentially responsive to CREW's Freedom of Information Act request that is the subject of this

matter.  CREW also moves the Court to order the defendants to immediately refrain from

transferring any records potentially responsive to CREW's request to the White House without

retaining copies.  As grounds for this motion, the Court is respectfully referred to the attached

memorandum of points and authorities.

Respectfully submitted,

_____/s/_____
Anne L. Weismann
(D.C. Bar No. 298190)
Melanie Sloan
(D.C. Bar No. 434584)
Citizens for Responsibility and Ethics
 In Washington
1400 Eye Street, N.W., Suite 450

Washington, D.C.  20005
Phone: (202) 408-5565
Fax: (202) 588-5020

Attorneys for Plaintiff

Dated: February 15, 2007

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____

CITIZENS FOR RESPONSIBILITY AND ) 
ETHICS IN WASHINGTON, )
 )
                Plaintiff, )
 )
             v. )        Civil No. 1:06cv01912 (RBW)
 )
U.S. DEPARTMENT OF HOMELAND )
SECURITY, et al., )
 )
            Defendants. )
_____)

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION
## FOR A TEMPORARY RESTRAINING ORDER

### PRELIMINARY STATEMENT

This is an action under the Freedom of Information ("FOIA") and the Federal Records

Act ("FRA") in which the government has claimed the unilateral right to designate records

generated and maintained by the Secret Service as presidential records subject to disposition at

the unreviewable discretion of the White House.  Plaintiff Citizens for Responsibility and Ethics

in Washington ("CREW") filed a FOIA request with the U.S. Department of Homeland Security

("DHS") for Secret Service documents relating to any visits that specified individuals made to

the White House or the vice president.  When the agency failed to respond, CREW filed this

lawsuit seeking to compel DHS to comply with its obligations under the FOIA and the Archivist

to comply with its obligations under the FRA by ensuring that DHS does not destroy the records

at issue without proper authorization.

It now appears that even with the pendency of this lawsuit, DHS is destroying records,

including those CREW is seeking under the FOIA.  Most recently, in direct response to CREW's

concern that a Rule 26 conference was necessary because the agency might be improperly

destroying documents, the government asserted its right to freely transfer or dispose of the

records at issue simply because it is asserting that the documents are not subject to either the

FOIA or the FRA.  Moreover, it now appears that the Secret Service believes it is freed from an

obligation imposed by the National Archives and Records Administration ("NARA") to maintain

these documents.  Previously, the Secret Service had agreed, in a private memorandum of

understanding with the White House, that at NARA's request it would temporarily retain visitor

records until a "legal determination was made" on their status as presidential records.  Most

recently, however, NARA has taken what appears to be a new position, stating in its answer to

another complaint that Worker and Visitor Entry System ("WAVES") records are, indeed,

presidential records.  Having now obtained what it considers to be a "legal determination," the

Secret Service is apparently no longer retaining the visitor records CREW has requested.

As a result, CREW and the public are being deprived of an important body of historical

evidence.  The documents CREW is seeking will shed light on the influences to which this

administration is subject and will help inform the electorate, both purposes the FOIA was

enacted to further.  Absent the requested relief, CREW will have no way to effectively vindicate

its right to the documents and the public will be deprived of an important body of historical

evidence.      Under these circumstances, as demonstrated more fully below, CREW satisfies

the requirements for a temporary restraining order to prevent any further document destruction.

Absent that injunction, CREW and the public will suffer irreparable harm.  Moreover, CREW is

likely to prevail on the merits of the lawsuit and the balance of harms tips decidedly in CREW's

favor.

2

## **FACTUAL BACKGROUND**

On October 4, 2006, CREW sent a FOIA request to DHS seeking records, regardless of format and including electronic records and information, relating to any visit that any of the following individuals made to the White House or the residence of the vice president from January 1, 2001, to the present:  James Dobson, Gary L. Bauer, Wendy Wright, Louis P. Sheldon, Andrea Lafferty, Paul Weyrich, Tony Perkins, Donald Wildmon, and Jerry Falwell. Letter from Anne L. Weismann to U.S. Secret Service, Freedom of Information and Privacy Acts Branch, Oct. 4, 2006 (attached as Exhibit 1).

CREW also sought a waiver of fees associated with processing its request given that the request concerns the operations of the federal government, the disclosures will likely contribute to a better understanding of relevant government procedures, and the request is primarily and fundamentally for non-commercial purposes.  Id.  Specifically, the requested records are likely to shed light on the influence that conservative Christian leaders have, or attempt to have, on the president in the exercise of his authority.  Id.

Despite repeated phone calls to the Secret Service FOIA office by CREW's counsel to ascertain the status of CREW's request, including specifically when it was received by the Secret Service, the Secret Service refused to disclose to CREW any information about the request. Declaration of Anne L. Weismann, February 15, 2007 (attached as Exhibit 2).[1]  In fact, Secret Service FOIA personnel advised CREW's counsel that they had been instructed specifically not to tell CREW anything about its request, including any information about the status of the

---

[1] *See also* Complaint, ¶ 31.  In their answer, defendants categorically denied the allegations in this paragraph, with no explanation or supplementation.  *See* Answer, ¶ 31.

3

request.  Id.

Having received no response whatsoever to its FOIA request, CREW filed its complaint

in this matter on November 9, 2006.  CREW's complaint challenges the failure of the Secret

Service, a component of DHS, to fulfill CREW's FOIA request.  Complaint, ¶ 1.  In addition,

CREW challenges as contrary to law the policy of the Secret Service to erase federal records,

including Worker and Visitor Entry System ("WAVES") records, once it has transferred the

information on those records to the White House.  Id.  CREW also challenges the failure of the

Archivist to take enforcement action to prevent DHS from unlawfully destroying agency records,

contrary to its statutory mandate under the FRA.  Id., ¶¶ 1, 2.

CREW's challenge to the government's unlawful policy of document destruction was

based in large degree on information made available through other litigation.  On May 16, 2006,

the Secret Service filed a motion to dismiss for lack of subject matter jurisdiction in Judicial

Watch v. U.S. Secret Service, No. 06-310 (JGP) (D.D.C. filed Feb. 22, 2006),  another FOIA

lawsuit challenging the failure of the Secret Service to produce records in response to plaintiff

Judicial Watch's request for all records that reflect the entries and exits of Jack Abramoff to and

from the White House.  As part of its motion, the Secret Service submitted the declaration of

Kathy J. Lyerly ("Lyerly Decl. I"), the Special Agent in Charge of the Liaison Division and the

Freedom of Information and Privacy Acts Office for the Secret Service (attached as Exhibit 3).

Ms. Lyerly attested to the "longstanding practice of the Secret Service to transfer

WAVES records on CD-ROM to the White House every 30 to 60 days."  Lyerly Decl. I, ¶10.

Ms. Lyerly did not explain what she meant by "longstanding practice," but it is CREW's

understanding that this practice postdates January 21, 2001, when the Bush administration came

to power.  *See* Complaint, ¶ 34.  Ms. Lyerly also stated that "once the Secret Service transferred

the WAVES records, the Secret Service ensured that those records were erased from its

computer system."  <u>Id</u>.  According to Ms. Lyerly, beginning in October 2004, "at the request of

the National Archives and Records Administration, the Secret Service began temporarily

retaining its own copy of the WAVES records that it transferred to the White House.  As such,

the Secret Service has in its possession WAVES records dating back only to October 2004."  <u>Id</u>.,

¶ 11.

   On May 17, 2006, the Secret Service entered into a Memorandum of Understanding

("MOU") with the White House Office of Records Management that purports to "govern the

status and handling of records generated through the White House Access Control System."

MOU, ¶ 1 (attached as Exhibit 4).  The MOU states without exception that White House Access

Control System ("WHACS") records, which include records generated by WAVES and the

Access Control Records ["ACR"] System, "are at all times Presidential Records," "are not

Federal Records," and "are not the records of an 'agency' subject to the Freedom of Information

Act."  <u>Id</u>., ¶¶  2, 17a-c.  Further, the MOU provides that WHACS Records are at all times under

the exclusive legal custody and control of the White House."  <u>Id</u>., ¶ 18.   And the MOU makes

clear that the Secret Service is to "regularly transfer all WHACS Records in its possession" to

the White House and that the Secret Service "will not retain its own copies of any WHACS

Records except as is necessary to facilitate the transfer of those records" to the White House.

MOU, ¶ 22.[2]

---

   [2] The government first made public the existence of the MOU on October 25, 2006, when
it sought a stay from the district court's grant of a preliminary injunction in <u>The Washington Post
v. U.S. Dep't of Homeland Security</u>, No. 06-1737 (D.D.C.) (appeal docketed).  DHS included

Most significantly, the Secret Service and the White House entered into this MOU *after* CREW and Judicial Watch had separately filed lawsuits under the FOIA seeking White House visitor records.  *See* <u>Judicial Watch v. U.S. Secret Service</u>, No. 06-310 (JGP) (D.D.C. filed Feb. 22, 2006); <u>CREW v. Dep't of Homeland Security</u>, No. 06-883 (JGP) (D.D.C. filed May 10, 2006).  But even after the legal status of these records had been put at issue the government kept this MOU secret, not revealing its existence until months later when it sought a stay pending appeal in <u>The Washington Post</u> case.

Once in litigation, CREW's counsel contacted government counsel in an attempt to schedule a Rule 26(f) conference.  Plaintiff's Request for Rule 26(f) Conference and Supporting Memorandum (Document 10), ¶ 6.  The government refused to agree to such a conference based on its claim that the issues in the case are purely legal ones and that defendants would shortly be filing a summary judgment motion.  <u>Id.</u>  Based on this refusal, CREW filed a motion with this Court seeking an order compelling the parties to meet and confer, as contemplated by Rule 26(f) of the Federal Rules of Civil Procedure and LCvR 16.3.  CREW justified its motion in part on the "particularly acute need here to establish prompt deadlines for initial disclosures and discovery, given that the conduct at issue includes allegations of improper agency destruction of documents."  <u>Id.</u>, ¶ 7.

On February 8, 2007, the government filed an opposition to this motion arguing that this case is far from the "extraordinary" and "rare" case for which discovery is appropriate. Memorandum of Points and Authorities in Opposition to Plaintiff's Request for Rule 26(f)

---

the MOU in support of its stay request.  Disturbingly, although the status of White House visitor logs created by the Secret Service had already been litigated, the government withheld the MOU -- which it had entered months earlier -- from the district court until it received an adverse ruling.

Conference ("Ds' Oppos."), pp. 1-2, 5. Defendants also asked the Court to put aside plaintiff's

assertions of impropriety and deny discovery based on the yet-to-be-filed declarations of

government officials that defendants apparently intend to submit in the near future. Id., p. 8.

Specifically with respect to plaintiffs' allegations of improper agency destruction of documents

the government asserted:

> Any case in which the parties dispute whether documents constitute
> 'records' under FOIA and the Federal Records Act *may well involve*
> *the transfer or other disposition of documents.* Accepting such an
> allegation as justification for discovery in a FOIA case would, therefore,
> effectively reverse the general rule against discovery in FOIA cases
> where an 'agency records' issue is presented.

Id., pp. 8-9 (emphasis added). In other words, in the face of plaintiff's express and documented

concern that the government is destroying and will continue to destroy records plaintiff is

seeking under the FOIA, the government is claiming the right to transfer or dispose of those

records because it disputes their status as agency records subject to the FOIA.

Shortly after filing this opposition, the government filed its answer in CREW v. NARA,

No. 07-0048 (RBW) (D.D.C. filed Jan. 10, 2007) (attached as Exhibit 5). That suit challenges

NARA's failure to respond fully to CREW's FOIA request for documents relating to NARA's

request of the Secret Service to retain visitor records as of October 2004, as referenced in the

MOU. NARA has refused to disclose to CREW any documents or information that would

delineate or explain NARA's position on the status of the visitor records, even though their

status has been put at issue in multiple cases. Now, however, as set forth in its answer, NARA

claims that "WAVES records are presidential records, and therefore not subject to the Federal

Records Act." Answer, ¶ 17. NARA has offered no explanation for why it now believes these

records are presidential.

## ARGUMENT

Plaintiff is seeking a temporary restraining order to prevent the government from unlawfully destroying documents pending a determination by the Court of their legal status.  The government's claimed right to dispose of these records as it sees fit, notwithstanding plaintiff's legal claims under the FOIA, reflects a blatant disregard for the rule of law.  In view of the prior conduct of the government, its most recent assertions in its opposition to plaintiff's request for a Rule 26(f) conference and answer in CREW v. NARA and the refusal of its counsel to discuss any aspect of this case with CREW, this Court should enter the requested emergency relief.

## I.  CREW IS ENTITLED TO A TEMPORARY RESTRAINING ORDER.

### A.  Legal Standards For Entry of a Temporary Restraining Order.

In ruling on a motion for a temporary restraining order, the Court must consider four factors:  (1) plaintiff's likelihood of success on the merits; (2) the irreparable injury to plaintiff absent a preliminary injunction; (3) the burden on other interested parties that an injunction would impose; and (4) whether the public interest would be furthered by an injunction.  Katz v. Georgetown Univ., 246 F.3d 685, 687-88 (D.C. Cir. 2001).  In numerous cases, courts have recognized the propriety of  such emergency relief in FOIA cases.  Electronic Privacy Info. Ctr. v. Dep't of Justice, 416 F.Supp.2d 30, 35 (D.D.C. 2006).

Although courts are to consider all four factors, a stronger showing on one factor can overcome a lesser showing on another factor.  CityFed Fin. Corp. v. Office of Thrift Supervision, 58 F.3d 738, 747 (D.C. Cir. 1995).  For example, in assessing the likelihood of success on the merits, "the court is not required to find that ultimate success by the movant is a mathematical probability . . ."  Morgan Stanley v. Rothe, 150 F.Supp. 2d 67, 72 (D.D.C. 2001) (quotations

omitted).  Moreover, one of the more salient factors is irreparable injury; a party requesting a

preliminary injunction must "demonstrate at least 'some injury.'"  <u>CitiyFed Fin. Corp.</u>, 53 F.3d

at 747 (quotation omitted).

### B.  <u>CREW is Likely to Prevail on the Merits</u>.

At the heart of plaintiffs' claims is one legal issue:  whether records of White House

visits created by the Secret Service in fulfillment of its statutory mandate to protect the White

House are agency records subject to the Freedom of Information Act.  The unequivocal statutory

language, controlling precedent, and the agency's own conduct compel the conclusion that the

visitor logs CREW seeks are agency records subject to the FOIA.  As a necessary corollary,

DHS's policy of destroying those records without appropriate disposition authority is arbitrary,

capricious and contrary to law.

The Supreme Court has made clear that the agency, not the requester, bears the burden of

proving that the requested records are not "agency records."  <u>U.S. Dep't of Justice v. Tax</u>

<u>Analysts</u>, 492 U.S. 136, 142 n.3, 109 S.Ct. 2841, 2847 n.3 (1989) (citations omitted) ("<u>Tax</u>

<u>Analysts</u>").  <i>See also</i> <u>Consumer Federation of Am. v. Dep't of Agriculture</u>, 455 F.3d 283, 287

(D.C. Cir. 2006).  In examining what constitutes an agency record for FOIA purposes, this

Circuit has been guided by the "general principles that underlie the Act [FOIA] as a whole."

<u>McGehee v. CIA</u>, 697 F.2d 1095, 1106 (D.C. Cir. 1983).  As the court in <u>McGehee</u> observed,

> the central purpose of the FOIA is to 'open[] up the workings of
> government to public scrutiny.'  One of the premises of that
> objective is the belief that 'an informed electorate is vital to the
> proper operation of a democracy.'  A more specific goal implicit
> in the foregoing principles is to give citizens access to the information
> on the basis of which government agencies make their decisions,
> thereby equipping the populace to evaluate and criticize those
> decisions.  Each of these objectives -- and particularly the last –

> would be best promoted by a rule that all records in an agency's
> possession, *whether created by the agency itself or by other*
> *bodies covered by the Act, constitute 'agency records.'*

Id. at 1108-09 (citations omitted) (emphasis in original).

Here, the government has signaled its intent to argue that the records CREW seeks are

not agency records subject to the FOIA but, instead, are presidential and vice presidential

records under the Presidential Records Act ("PRA"). Ds' Oppos., pp. 6-7.  The government

appears to be relying in part on its claim that the requested records are "presidential" under the

PRA as dispositive of their status under the FOIA.  Id., p. 2.  The D.C. Circuit, however, has

explicitly eschewed this approach:

> [W]e reject the government's invitation to hold that the treatment
> of documents for disposal and retention purposes under the various
> federal records management statutes determines their status under
> FOIA.  Those statutes prescribe how federal agencies are to create,
> dispose of, and otherwise manage documents and other material . . .
> However tempting such a "bright line" test may be, it cannot be
> used as the divining rod for the meaning of "agency records"
> under FOIA.

Bureau of Nat'l Affairs v. U.S. Dep't of Justice, 742 F.2d 1484, 1493 (D.C. Cir. 1984) (citations

omitted).  As the court warned, "[r]igid adherence to the records disposal regulations to

determine the status of a document under FOIA . . . would contradict the policy of disclosure

underlying FOIA . . . an agency should not be able to alter its disposal regulations to avoid the

requirements of FOIA."  Id.

The appropriate analysis requires this Court to apply a two-part test enunciated by the

Supreme Court in Tax Analysts:  are the requested records (1) either created or obtained by the

agency, and (2) under agency control at the time the FOIA request is made.  492 U.S. at 145.  As

the Court explained, "[t]he control inquiry focuses on an agency's possession of the requested

materials . . ." Id. at 147.

### 1.  The Records Here Were Created by the Secret Service.

The records at issue here are created by the Secret Service in furtherance of its statutorily mandated protective function. *See* 18 U.S.C. § 3056.[3]  While the president and vice president do not have a choice in who they use for protection, as this is a function statutorily entrusted to the Secret Service, for purposes of the FOIA it is the function, not how it is assigned, that controls. Quite simply, because the Secret Service performs the function of protecting the White House and residence of the vice president, the records it creates in the discharge of that function are subject to disclosure even if they would be exempt when in the possession of the president or vice president.

Nor can it be disputed that, as a component of DHS, the Secret Service is an "agency," not "a unit . . . of the Executive Office of the President whose function is to advise and assist the President." 44 U.S.C. § 2202(2).[4]  Under the express terms of the PRA, which excludes from its coverage "any documentary materials that are . . . official records of an agency (as defined in [the FOIA]," id., the requested documents are created by an agency and on that basis alone not within the reach of the PRA.

The actual practice of the Secret Service confirms this fact.  Ms. Lyerly's declaration

---

[3] That the records include information that originated in the offices of the president or vice president is not at all dispositive as to whether those records are agency records, nor does it transform them into ones created by the president or vice president. *See, e.g.*, Bureau of Nat'l Affairs v. Dep't of Justice, 742 F.2d 1484 (D.C. Cir. 1983).

[4] The PRA defines presidential records as including "documentary materials, or any reasonably segregable portion thereof, created or received by the President, his immediate staff, *or a unit or individual of the Executive Office of the President whose function is to advise and assist the President*." Id. (emphasis added).

(Exhibit 3) describes precisely how the Secret Service controls and monitors access to the White House complex as well as the residence of the vice president and how, in that process, the Secret Service generates WAVES and ACR records based on information submitted to the Secret Service. *See* Lyerly Decl. I, ¶¶ 6-9. Ms. Lyerly also describes how that information is stored in the records and computers of the Secret Service before it is transferred to the White House and where, in processing a prior FOIA request, the agency looked to find responsive documents. Id. at ¶ 9. Thus, there is no legitimate dispute that the visitor records at issue are "created" by the Secret Service, thereby satisfying the first prong of Tax Analysts.

### 2. The Records Are Under the Control of the Secret Service.

Turning to the second prong of Tax Analysts, the Secret Service has exercised control over the requested visitor records sufficient to make them agency records. This Circuit has identified four factors to consider in determining agency control over documents that the agency did not itself create:

> (1) the intent of the document's creator to retain or relinquish control over the records; (2) the ability of the agency to use and dispose of the record as it sees fit; (3) the extent to which agency personnel have read or relied upon the document; and (4) the degree to which the document was integrated into the agency's record system or files.

United We Stand Am., Inc. v. IRS, 359 F.3d 595, 599 (D.C. Cir. 2004) ("United We Stand Am."), *quoting* Burka v. U.S. Dep't of Health and Human Services, 87 F.3d 508, 515 (D.C. Cir. 1996). Where, as here, the agency created and maintained the requested documents in the course of the agency's official duties, at least three of these factors do not apply. United We Stand Am., 359 F.3d at 603.

As applied here, the Secret Service is able to use and dispose of the visitor records in its

possession as it sees fit.  For example, while under the auspices of the U.S. Department of the

Treasury, the Secret Service submitted multiple requests to NARA for authority to dispose of

White House visitor records.  *See* Requests for Records Disposition Authority for 1996, 1993

and 1990 (attached as Exhibit 6).  The Secret Service has also produced these records in the past

in response to discovery requests.  For example, in 1998, in <u>Alexander v. FBI</u>, Civil No. 96-2123

(D.D.C.), the Secret Service produced White House 1996 visitor records to Judicial Watch in

response to a subpoena.[5]  These actions are simply incompatible with the Secret Service's newly

minted claim that it lacks the ability to use and dispose of the records as it sees fit.

More recently, in response to FOIA requests from CREW, the Democratic National

Committee and Judicial Watch, the Secret Service produced WAVES and ACR records,

including records discovered in searches of the hard drives of Secret Service computers.  *See*,

*e.g*., Second Declaration of Kathy J. Lyerly submitted in <u>Judicial Watch v. U.S. Secret Service</u>

(Lyerly Decl. II),  ¶¶ 3, 5-11 (attached as Exhibit 9).  In none of the agency declarations

submitted to support the adequacy of its searches did the Secret Service suggest that it had less

than full control over its use and disposition of the records currently in its possession.  For

example, in describing the search for records responsive to Judicial Watch's FOIA request, the

agency declarant stated:

---

[5] Those records were submitted as Exhibit 4 to Plaintiff's Motion to Compel in <u>Judicial Watch v. Secret Service</u>, Civil No. 06-310, and are attached as Exhibit 7.  The government's prior conduct in that case is also noteworthy.  Once in litigation with Judicial Watch over its FOIA request for certain White House visitor logs, the Secret Service entered into a court-ordered stipulation binding the agency to produce all responsive documents, with no redactions, by a date certain.  Joint Stipulation and Agreed Order (attached as Exhibit 8).  In other words, the Secret Service (and not the White House or some other entity) willingly agreed to be bound by an order compelling it to produce the very kind of records it asserts here are outside of its control.

> the FOI/PA Office conducted a search for responsive information.
> This search was conducted under the direction of the Secret
> Service's Presidential Protective Division *by personnel who
> conduct FOIA searches as part of their regular responsibilities.*

Lyerly Decl. I, ¶ 9 (emphasis added).

Similarly, the Secret Service described its practice of destroying documents, an act that

clearly evidences control over the documents in the first place:

> It has been the longstanding practice of the Secret Service to
> transfer WAVES records on CD-ROM to the White House
> every 30 to 60 days . . . once the Secret Service transferred
> the WAVES records, the Secret Service ensured that
> those records were erased from its computer system.

Id. at ¶ 10.  In other litigation with CREW, the Secret Service has explained that its practice of

destroying its copies of the WAVES and ACR records was not based on a request or directive

from the White House, but the Secret Service's own assessment of the limited long-term utility

these records have for the agency:

> Once a visitor's visit to the White House Complex is complete,
> WAVES and ACR records have no continuing usefulness to
> the Secret Service, the Secret Service has no continuing
> interest in preserving or retaining them . . .

Declaration of Kathy J. Lyerly, submitted in CREW v. U.S. DHS ("Lyerly Decl. III"), ¶ 26

(attached as Exhibit 10).  Completely absent from this or any of the other declarations the Secret

Service submitted in litigation prior to this case is any mention or hint that the White House was

directing this practice in any way.  The weight of this evidence points unmistakably to the

conclusion that the agency is able to use and dispose of these records as it sees fit.

Second, the visitor records have been integrated into the agency's record system or files.

The Secret Service has admitted that at least as of October 2004, it has retained visitor records on

14

CD-ROM in a searchable form. *See, e.g.*, Lyerly Decl. III, ¶ 13. Additional visitor records pre-dating October 2004 reside on the hard drives of at least two Secret Service computers. Id. at ¶ 14. And more generally, for at least some finite period of time, the Secret Service has maintained records of White House complex visits in its files, even though it lacks a "*continuing interest in preserving or retaining them . . .*" Id. at ¶ 26 (emphasis added).

In the absence of discovery, CREW can rely only on the evidence that the government has voluntarily submitted in support of its litigating positions in other related litigation. The currently available evidence, however, provides more than a sufficient basis from which to conclude that the Secret Service exercises control over the visitor records as agency records.

## C. **CREW Will Suffer Irreparable Injury Absent the Requested Injunction.**

In seeking to have the Court order a Rule 26 conference, CREW made clear its concern that the government may be unlawfully destroying agency records. This concern flows from the secret agreement that the White House and the Secret Service entered, in the midst of pending litigation, in an attempt to place the requested records beyond the reach of the public. Of course, this effort cannot succeed as the government may not by private agreement avoid its statutory responsibilities. *See* American Historical Ass'n v. Petterson, 876 F.Supp. 1300 (D.D.C. 1995). In addition, the Secret Service has attested through the declarations of Ms. Lyerly to its past practices of destroying White House visitor logs, apparently without authorization from NARA. And most disturbingly of all, in responding to CREW's request for a Rule 26 conference, defendants made clear their belief that they could properly transfer and/or destroy the requested records at will based on their contention that the records are not subject to the FOIA. *See* Ds' Oppos. at 8-9.

15

In short, left unchecked, there is a very real likelihood that the Secret Service will continue to transfer White House visitor records to the White House and destroy whatever copies remain at the agency. For all we know, the agency has already destroyed all of its copies of the records CREW has requested, acting under its unilateral and unlawful view that it has no legal obligation to preserve the records pending the outcome of this litigation. In these circumstances, a temporary restraining order is plainly warranted to prevent the destruction of documents and in aid of this Court's jurisdiction. Absent such relief, CREW and the public are at risk of losing forever a valuable body of historical evidence.

Defendants may argue here, as they argued unsuccessfully in opposition to a request for a preliminary injunction in <u>The Washington Post v. DHS</u>, that a temporary restraining order is not warranted because all records responsive to CREW's request are being preserved. But, as DHS freely admitted in that case, it was not DHS that was preserving the records, but rather the Office of the Vice President. Even with the pendency of the FOIA request and corresponding lawsuit by *The Washington Post*, the Secret Service continued to transfer records to the White House Office of Records Management ("WHORM") and beyond the reach of the court. Here, too, should DHS argue that the requested relief is unnecessary because the records are being preserved, such an argument would offer little comfort or assistance to CREW or the Court. Neither the Office of the President nor WHORM is a party to this litigation, and DHS will undoubtedly argue that it has no obligation to retrieve documents it no longer possesses in response to a FOIA request. Accordingly, absent a temporary restraining order, the Court will have no way to award effective relief to CREW when it prevails on the merits of this lawsuit.

### D. **The Government Will Not Be Harmed By the Requested Injunction.**

The immediate relief that CREW seeks will require nothing more of the government than what the law already mandates -- preservation of all requested records pending the Courts resolution of this lawsuit.  *See* <u>Judicial Watch v. U.S. Dep't of Commerce</u>, 34 F.Supp.2d 28, 42-43 (D.D.C. 1998).  Requiring the government to comply with the law cannot properly be characterized as a burden.  Courts have recognized that in circumstances similar to those present here, a temporary restraining order requiring document preservation is appropriate "where the parties dispute the adequacy of the government's record keeping procedures and disagree whether records are covered by the [Presidential Records Act]."  <u>Armstrong v. Bush</u>, 807 F.Supp. 816, 823 (D.D.C. 1992); *see also* <u>American Friends Service Committee v. Webster</u>, 485 F.Supp. 222 (D.D.C. (1980).

### E.  <u>The Public Interest Favors the Requested Relief.</u>

The FOIA's underlying purpose of allowing "citizens to know 'what the government is up to'" is "a structural necessity in a real democracy."  <u>NLRB v. Robbins Tire & Rubber Co.</u>, 437 U.S. 214, 242, 98 S.Ct. 2311, 2326, *quoting* <u>U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press</u>, 489 U.S. 749, 773 (1989), *reh'g denied*, No. 02-409, 2004 WL 108633 (U.S. May 17, 2004).  The statute was enacted to "give citizens access to the information on the basis of which government agencies make their decisions, thereby equipping the populace to evaluate and criticize those decisions."  <u>McGehee v. CIA</u>, 697 F.2d at 1108-09.

It is self-evident that when an agency places its records beyond the reach of the FOIA, "[t]he net effect could be wholly to frustrate the purposes of the Act [FOIA]."  <u>Id</u>. at 1109.  This Circuit has specifically warned against the danger posed by an agency that is "seeking to shield documents from the public" by "transfer[ring] the documents for safekeeping to another

government department.  It could thereafter decline to afford requesters access to the materials on the ground that it lacked 'custody' of or 'control' over the records and had no duty to retrieve them."  Id.  The circumstances here suggest this is precisely what the Secret Service, acting in concert with the White House, is attempting to do.

The Secret Service apparently entered an MOU with the White House on May 17, 2006, that purports to memorialize the parties' pre-existing agreement that the visitor records "are at all times Presidential Records," that they "are not Federal Records," and further that they "are not the records of an 'agency' subject to the Freedom of Information Act."  MOU, ¶ 17.  The MOU also purports to memorialize the understanding of the parties that these records are, at all times, "under the legal custody and control of the White House."  Id. at ¶18.

Merely stating that this is the case, however, does not make it so and does not erase years of prior practice to the contrary.  As explained above, for discovery, FOIA and record-keeping purposes, the Secret Service has clearly exercised control over the visitor records and treated them as agency records.  An MOU cannot alter the actual past practices of the agency.

What is especially troubling here is that the Secret Service and the White House entered this MOU *after* CREW and Judicial Watch had filed two separate lawsuits under the FOIA seeking visitor records.  This suggests a conscious attempt to place those records beyond the reach of the FOIA.  At a minimum, removal of a responsive document after the filing of a FOIA request is an improper withholding under the FOIA; at the outer end such conduct is not only illegal, but sanctionable.  *See, e.g.*, Judicial Watch v. U.S. Dep't of Commerce, 34 F.Supp. 2d at 42-43.  The timing of the MOU coupled with the blatant inconsistencies between the position the MOU expresses and the actual agency practice raise a serious issue of whether the government is

18

seeking purposefully to circumvent the FOIA.

Under these circumstances, the public interest favors granting the requested preliminary injunction, which will preserve the status quo as well as the rights of CREW and the public in the requested records.

**CONCLUSION**

For the foregoing reasons, CREW's motion for a temporary restraining order should be granted.  Further, CREW requests, pursuant to Local Rule 65.1(d), that the Court schedule a hearing on this motion at the Court's earliest convenience.

Respectfully submitted,

_____/s/_____
Anne L. Weismann
(D.C. Bar No. 298190)
Melanie Sloan
(D.C. Bar No. 434584)
Citizens for Responsibility and Ethics
 In Washington
1400 Eye Street, N.W., Suite 450
Washington, D.C.  20005
Phone: (202) 408-5565
Fax: (202) 588-5020

Attorneys for Plaintiff

Dated: February 15, 2007

19

**EXHIBIT 1**

# CREW | citizens for responsibility and ethics in washington

October 4, 2006

United States Secret Service
Freedom of Information and Privacy Acts Branch
245 Murray Drive
Building 410
Washington, D.C. 20223

**Re: Freedom of Information Act Request**

Dear Sir/Madam:

Citizens for Ethics and Responsibility in Washington ("CREW") makes this request for records, regardless of format, medium, or physical characteristics, and including electronic records and information, pursuant to the Freedom of Information Act ("FOIA") and U.S. Department of Homeland Security ("DHS") regulations, 6 CFR part 5.

This request is for all records relating to any visit that any and all of the following individuals made to the White House or the residence of the Vice President from January 1, 2001, to the present. As used herein, the term "White House" includes, but is not limited to, any office within the Executive Office of the President, the residence of the President, the Old and New Executive Office Buildings, and any other office or space on the grounds of the White House. Specifically, we seek any record of visits to the White House or the Vice President's residence by the following individuals:

James Dobson
Gary L. Bauer
Wendy Wright
Louis P. Sheldon
Andrea Lafferty
Paul Weyrich
Tony Perkins
Donald Wildmon
Jerry Falwell

We seek records of any and all kind, including electronic records, audiotapes, videotapes, photographs, and computer print-outs. Our request includes any telephone messages, voice mail messages, and daily agenda and calendars.

If it is your position that any portion of the requested records is exempt from disclosure, CREW requests that you provide it with an index of those documents, as required under Vaughn v. Rosen, 484 F.2d 820 (D.C. Cir. 1973), *cert. denied*, 415 U.S. 977 (1972). As you are aware, a Vaughn index must describe each document claimed as exempt with sufficient specificity "to permit a reasoned judgment as to whether the material is actually exempt under FOIA." Founding Church of Scientology v. Bell, 603

F.2d 945, 959 (D.C. Cir. 1979). Moreover, the <u>Vaughn</u> index must "describe each document or portion thereof withheld, and for each withholding it must discuss the consequences of supplying the sought-after information." <u>King v. U.S. Dep't of Justice</u>, 830 F.2d 210, 223-24 (D.C. Cir. 1987).

In the event that some portions of the requested records are properly exempt from disclosure, please disclose any reasonably segregable, non-exempt portions of the requested records. *See* 5 U.S.C. §552(b). If it is your position that a document contains non-exempt segments and that those non-exempt segments are so dispersed throughout the documents as to make segregation impossible, please state what portion of the document is non-exempt, and how the material is dispersed through the document. <u>Mead Data Central v. U.S. Dep't of the Air Force</u>, 455 F.2d 242, 261 (D.C. Cir. 1977). Claims of non-segregability must be made with the same detail as required for claims of exemptions in a <u>Vaughn</u> index. If a request is denied in whole, please state specifically that it is not reasonable to segregate portions of the record for release.

## Fee Waiver Request

In accordance with 5 U.S.C. §552(a)(4)(A)(iii), CREW requests a waiver of fees associated with processing this request for records. The subject of this request concerns the operations of the federal government and the disclosures will likely contribute to a better understanding of relevant government procedures by CREW and the general public in a significant way. Moreover, the request is primarily and fundamentally for non-commercial purposes, pursuant to 5 U.S.C. §552(a)(4)(A)(iii). *See, e.g.*, <u>McClellan Ecological v. Carlucci</u>, 835 F.2d 1282, 1285 (9th Cir. 1987). Specifically, the requested records are likely to contribute to the public's understanding of the influence that *conservative Christian leaders have, or attempt to have, on the President in the exercise* of his authority.

CREW is a non-profit corporation, organized under section 501(c)(3) of the Internal Revenue code. CREW is committed to protecting the citizens' right to be aware of the activities of government officials and to ensuring the integrity of those officials. CREW is dedicated to empowering citizens to have an influential voice in government decisions and in the government decision-making process. CREW uses a combination of research, litigation, and advocacy to advance its mission. The release of information garnered through this request is not in CREW's financial interest. CREW will analyze the information responsive to this request and intends to share its analysis with the public, either through memoranda, reports, or press releases. CREW has an established record of carrying out these types of activities, as evidenced through its website, www.citizensforethics.org. Currently, the CREW website contains links to thousands of pages of documents acquired from multiple FOIA requests. See http://citizensforethics.org/activities/foia.php. Visitors to CREW's website can peruse the FOIA request letters, the responses from government agencies, and a growing number of documents responding to FOIA requests. CREW's virtual reading room provides around-the-clock access to anyone interested in learning about the government activities that were the focus of CREW's FOIA requests. The CREW website also includes documents relating to CREW's FOIA litigation, Internal Revenue Service complaints, and Federal Election Commission complaints.

Under these circumstances, CREW satisfies fully the criteria for a fee waiver.

If you have any questions about this request, or foresee any problems in releasing fully the requested records on an expedited basis, please call Anne Weismann at (202) 408-5565. Also, if CREW's request for a fee waiver is not granted in full, please contact our office immediately upon making such a determination. Please send the requested documents to Anne Weismann, Citizens for Responsibility and Ethics in Washington, 1400 Eye Street, N.W., Suite 450, Washington, D.C. 20005.

Sincerely,

ANNE L. WEISMANN
Chief Counsel
Citizens for Responsibility and Ethics
 in Washington

**EXHIBIT 2**

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil No. 1:06cv01912 (RBW) |
| U.S. DEPARTMENT OF HOMELAND SECURITY, et al., | ) ) ) | |
| Defendants. | ) ) ) | |

## DECLARATION OF ANNE L. WEISMANN

I Anne L. Weismann hereby declare as follows:

1. I am Chief Counsel for Citizens for Responsibility and Ethics in Washington ("CREW"). I have held this position since March 2005.

2. On January 16, 2007, I contacted Scott Simpson, counsel for the defendants in the above-captioned action, for the purpose of scheduling a conference pursuant to Rule 26(f) of the Federal Rules of Civil Procedure. Mr. Simpson refused to hold such a conference in advance of a court order compelling the parties to do so and stated defendants' belief that they need not make initial disclosures.

3. Mr. Simpson also stated that defendants would shortly be filing a summary judgment motion on what he stated was a purely legal issue of whether the records CREW is requesting under the Freedom of Information Act ("FOIA") are agency records. I advised Mr. Simpson of CREW's disagreement with this assessment, particularly in light of the governing case law in the D.C. Circuit that makes the agency record question turn on facts.

4. Defendants refused to attend a Rule 26(f) conference and stated they would not agree to meet and discuss the issues required by Rule 26)(f) and LCvR 16.3 unless and until the Court orders them to do so.

5. On January 25, 2007, I contacted Mr. Simpson to determine whether defendants would agree to this motion. I left a voice mail message requesting that Mr. Simpson advise me by telephone or email whether or not defendants opposed this motion. As of the time of filing this motion, defendants' counsel has not responded to my request.

I declare under penalty of perjury that the following is true and correct.

_____
ANNE L. WEISMANN

Dated: 2-15-07

**EXHIBIT 3**

# UNITED STATES DISTRICT COURT
# DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | Civil Action No. 06-883 (JGP) |
| UNITED STATES DEPARTMENT OF HOMELAND SECURITY, | ) ) ) | |
| Defendant. | ) ) ) | |
| DEMOCRATIC NATIONAL COMMITTEE, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | Civil Action No. 06-842 (JGP) |
| UNITED STATES SECRET SERVICE, | ) ) ) | |
| Defendant. | ) ) ) | |

## DECLARATION OF KATHY J. LYERLY
## SPECIAL AGENT IN CHARGE, LIAISON DIVISION AND
## FREEDOM OF INFORMATION AND PRIVACY ACTS OFFICER,
## UNITED STATES SECRET SERVICE

I, Kathy J. Lyerly, hereby make the following declaration:

1.      I am the Special Agent in Charge of the Liaison Division and the Freedom of

Information and Privacy Acts (FOI/PA) Officer for the United States Secret Service (hereinafter

"Secret Service"), which is a component of the Department of Homeland Security ("DHS").  I

have been the Secret Service FOI/PA Officer since December 28, 2003, and have been employed

with the Secret Service as a Special Agent (GS-1811) since October 26, 1987.

2.        DHS regulations, Title 6, Code of Federal Regulations, Section 5.4, and Appendix

A, II(I)(3), vest authority in the FOI/PA Officer, Secret Service, to make initial determinations as

to whether to grant Freedom of Information Act (FOIA), 5 U.S.C. § 552, requests for Secret

Service records (68 FR 4056, 4058, and 4069).

3.        As the Secret Service's FOI/PA Officer, I am familiar with Citizens for

Responsibility and Ethics in Washington's ("CREW's") FOIA request to the Secret Service.  At

my request, the Secret Service conducted a search for documents responsive to CREW's request.

That search uncovered 356 pages of responsive records which were redacted (to protect

individuals' privacy and the security of the White House Complex) and, on September 20, 2006,

released.  (The White House Complex refers to the White House, the Eisenhower Executive

Office Building ["EEOB"], the secured grounds encompassing the White House and the EEOB,

and the New Executive Office Building.)  A description of the correspondence in this matter and

the processing of CREW's FOIA request is set forth below.

4.        In a letter dated February 2, 2006, and received February 16, 2006, CREW

submitted to the Secret Service, a component of DHS, a FOIA request for "all records relating to

any visit that any and all of the following individuals made to the White House [including any

office, wherever located, in the Executive Office of the President ("EOP")] or the residence of

the Vice President from January 1, 2001, to the present . . . : Jack Abramoff, Michael Scanlon,

Neil Volz, Tony Rudy, Shawn Vassell, Kevin Ring, Edwin Buckham, [and] Patrick Pizzella."

5.        In a letter dated March 1, 2006, I acknowledged receipt of CREW's

2

FOIA request and advised CREW that a search for records responsive to the request was being conducted.

6.      There are two interrelated systems – collectively termed the White House Access Control System – for controlling and monitoring access to the White House Complex: the Worker and Visitor Entrance System ("WAVES") and the Access Control Records System ("ACR"). The Vice President's residence is not a part of the White House Complex, and the Secret Service does not use WAVES or ACR at that site.

7.      ACR records consist of records generated when a pass holder, worker, or visitor swipes his or her permanent or temporary pass over one of the electronic pass readers located at entrances to and exits from the White House Complex.  ACR records include information such as the pass holder's name and badge number, the time and date of the swipe, and the post at which the swipe was recorded.

8.      WAVES records consist of records generated when information is submitted by a White House pass holder to the Secret Service about workers and visitors who need access to the White House Complex to conduct business or attend social events.  WAVES records include the following information submitted by the pass holder: the visitor's name, date of birth, and Social Security number; the time and location of the planned visit; the name of the pass holder submitting the request; and the date of the request.  They may also include limited information from background checks performed by the Secret Service and coded instructions to Secret Service officers.  Once a visit takes place, WAVES records are typically updated electronically with information showing the actual time and place of the visitor's entry into and exit from the White House Complex.

9.     The Secret Service controls and monitors access to the Vice President's residence

through the use of two access lists – a daily access list for individuals with appointments or work

orders, and a permanent access list for those individuals who regularly access the facility. The

Secret Service receives requests from the Vice President's staff to allow entry for individuals

with appointments or work orders at the facility. The Secret Service conducts background

checks on individuals for whom there has been a request for admission, and if there is no

information of protective interest, the Secret Service places the name on a daily access list. A

permanent access list is also maintained listing those individuals who regularly access the

facility. All individuals are logged in by the Uniformed Division officer working at the gate

where the individual arrives.

10.     In response to CREW's February 2, 2006 FOIA request, the Secret Service has

conducted three searches for records. The first two searches were for records of visits to the

White House Complex, and the third search was for records of visits to the Vice President's

residence. The first search was conducted by the Secret Service's Presidential Protective

Division ("the PPD search"). Secret Service employees under the direction of the Secret

Service's Office of Inspection performed the second search ("the Inspection team search").

Secret Service Uniformed Division officers assigned to the Vice President's residence conducted

searches of visits to the Vice President's residence.

11.     The individuals who performed the PPD search conduct FOIA searches as part of

their regular responsibilities. The PPD searched both the ACR records and the WAVES CD-

ROMs for any and all records responsive to CREW's February 2, 2006 FOIA request.

4

12.    The PPD searched for ACR records in a searchable database in which ACR
records are stored. The records are searchable by visitor name. In this case, the Secret Service
searched the ACR database by searching for records that would have been generated from
January 1, 2001 to the date of the search that had the name Michael Scanlon, Neil Volz, Tony
Rudy, Shawn Vasell/Vassell, Kevin Ring, Edwin Buckham, or Patrick Pizzella in the visitor
field.

13.    It has been the longstanding practice of the Secret Service to transfer WAVES
records on CD-ROM to the White House Office of Records Management every 30 to 60 days.
The intent of the Secret Service was to ensure that, once transferred, the records were erased
from its computer system. The Secret Service has temporarily retained, in a searchable form on
CD-ROM, WAVES records generated since October 2004; the records can be searched by visitor
name. In this case, the PPD explored the WAVES CD-ROMs by searching for records that had
the name Michael Scanlon, Neil Volz, Tony Rudy, Shawn Vasell/Vassell, Kevin Ring, Edwin
Buckham, or Patrick Pizzella in the visitor field. The Secret Service did not save on CD-ROM
WAVES records for the relevant period (i.e., from January 2001 to the date of the search)
generated before October 2004.

14.    PPD ran its initial search in March 2006. The search results were reviewed, and
several inconsistencies were noted compared to documents produced to the FOI/PA Office by
PPD in response to search requests for other FOIA requests pertaining to some of the same
individuals. In running an additional search, what appeared to be a WAVES record was
discovered on the hard drive of a Secret Service computer located in the Information Technology
Section of the PPD. Upon further examination, it appeared that certain WAVES data pre-dating

5

October 2004 existed on the hard drive of that computer and the hard drive of a second computer in the same office.

15.    The PPD search yielded ACR and WAVES records for Michael Scanlon, Neil Volz, Shawn Vasell, Kevin Ring, and Patrick Pizzella. The PPD search yielded ACR records for Tony Rudy. The PPD search yielded no records for Shawn Vassell (as spelled in the February 2, 2006 CREW FOIA request) or Edwin Buckham.

16.    The Inspection team searched the hard drives of two computers in the Information Technology Section of the PPD for records regarding visits to the White House Complex. The Inspection team was comprised of the following individuals: an Assistant Inspector in the Inspection Division, whose responsibilities include assessing the effectiveness of operations, quality of management and supervision, and adherence to policies, regulations, and procedures within Secret Service offices and divisions; an Assistant to the Special Agent in Charge in the Criminal Investigative Division (CID), who oversees all Information Technology programs for the Office of Investigations; a Special Agent in the CID and member of the Electronic Crimes Special Agent Program, who is a trained computer specialist and whose duties include forensic examination of computers associated with criminal investigations; and an Information Technology Specialist in the Information Resources Management Division, who is a computer specialist skilled in database design and architecture.

17.    I have been advised that the Inspection team believes that the hard drive of the first computer contains multiple database files of varying degrees of WAVES data that pre-date October 2004. The team believes that the database files contain non-comprehensive WAVES data, with sizeable gaps in the report periods. The team also believes that the hard drive of the

6

second computer contains multiple database files of varying degrees of WAVES data that pre-date October 2004. The team further believes that the database files on this computer contain non-comprehensive WAVES data, with gaps in the report periods. The team believes that the validity of the pre-October 2004 WAVES data found on the hard drives of both computers cannot be assured, because some of the data appear to have been used for testing and development. The Inspection team further believes that the pre-October 2004 WAVES data found on the hard drives of the two computers appear to exist in a separate location from the folder where the WAVES CD-ROMs are made.

18.     In addition, the Inspection team located on the hard drives of both computers WAVES data beginning in October 2004. The Inspection team has not examined these data in detail, but did search the data when the search of all Microsoft Access database files on both computers' hard drives was conducted as described in paragraph 21.

19.     The Inspection team determined that WAVES data are on a server. According to standard procedure, every 30 to 60 days, data from that server are downloaded, along with entry/exit data from ACR records, to the hard drive on one of the PPD computers. This information is then used to create the WAVES CD-ROMs.

20.     The Inspection team has found that the WAVES records on the server, older than 60 days, are purged daily and overwritten on the server. The Inspection team also found, however, that some pre-October 2004 WAVES data downloaded from the server to the two computers' hard drives remain on the hard drives.

21.     The Inspection team searched these computers by conducting an automated

search through all Microsoft Access database files on both computers' hard drives for the names

Michael Scanlon, Neil Volz, Tony Rudy, Shawn Vasell/Vassell, Kevin Ring, Edwin Buckham,

and Patrick Pizzella. The program's search function searched the hard drives for all Microsoft

Access database files, and examined each database file for all records containing the names

Michael Scanlon, Neil Volz, Tony Rudy, Shawn Vasell/Vassell, Kevin Ring, Edwin Buckham,

or Patrick Pizzella. The program created a report of each database file and any data found.

22.     The Inspection team search yielded data/records regarding entry/exit to the White

House Complex for the following individuals: Michael Scanlon, Neil Volz, Tony Rudy, Shawn

Vasell, Kevin Ring, and Patrick Pizzella. No data/records of entry/exit to the White House

Complex for Edwin Buckham or Shawn Vassell (as spelled in the February 2, 2006 CREW

FOIA request) were discovered by the Inspection team.

23.     Neither the PPD search nor the Inspection team search uncovered any WAVES

or ACR data/records for Edwin Buckham or Shawn Vassell for the relevant time period. Both

searches did reveal data/records for Shawn Vasell. Also, the Secret Service released to CREW,

on May 10, 2006 and July 7, 2006, its WAVES and ACR data/records concerning Jack

Abramoff. I have signed two declarations filed in Judicial Watch v. United States Secret Service,

Civil Action No. 06-310, describing that search.

24.     CREW's February 2, 2006 FOIA request asks for records of visits of certain

individuals to the Executive Office of the President ("EOP") whether the visits took place at the

White House Complex or elsewhere. There are some EOP offices located outside of the White

House Complex, but the Secret Service does not maintain or operate access systems at these

sites.

25.    The information in WAVES records submitted by a White House pass holder is provided to the Secret Service temporarily for two limited purposes: (1) to allow the Secret Service to perform background checks to determine whether, and under what conditions, to authorize the visitor's temporary admittance to the White House Complex; and (2) to allow the Secret Service to verify the visitor's admissibility at the time of the visit.

26.    Once a visitor's visit to the White House Complex is complete, WAVES and ACR records have no continuing usefulness to the Secret Service, the Secret Service has no continuing interest in preserving or retaining them – indeed, prior to the temporary WAVES-retention practice begun in October 2004, the Secret Service's intent was to retain WAVES records only long enough to effectuate their orderly transfer to the White House – and the Secret Service does not control or direct the ultimate disposition or use of the records. The White House does have such a continuing interest and therefore the records are turned over to the White House Office of Records Management.

27.    To search for potentially responsive records regarding the Vice President's residence, Secret Service Uniformed Division officers assigned to the Vice President's residence completed three separate computer-based searches and one hand search. First, the file server utilized by the Secret Service command post at the Vice President's residence was searched. This search was done by entering some portion of the requested names at issue and then allowing the system's search feature to run. A portion of the name, rather than the name in its entirety, was used to ensure that spellings close to the spelling provided by the requestor would be captured. Because of the breadth of the records contained on the file server, each name took approximately eight to nine hours to complete. Second, a search was run in Microsoft Outlook

9

on the three computers in the command post for email records potentially responsive to each request. These searches captured any reference to the requested name in the email subject line and the body of the email. For any email with an attachment, the attachment was opened and searched separately. The hard drives of these computers were also searched to determine whether any emails had been saved as separate documents onto the hard drives. Third, the access list database system that generates the daily and permanent access lists used at the gates was searched. This system is housed on the file server, and this third check was done in an effort to verify the results of the search of the file server. The access database was checked by opening up the basic tables it contains, sorting alphabetically by last name and then checking the sorted list against the request. Additionally, the entry logs were searched by hand.

28.     Potentially responsive data then available on the computer system and all entry logs in the possession of the Secret Service were searched. No responsive records were found.

29.     Prior to producing documents to CREW, the Secret Service redacted information from WAVES data/records to protect the privacy of individuals visiting the White House Complex and the security of the Complex. To protect the individuals' privacy, the Secret Service redacted their dates of birth and Social Security numbers from the WAVES data/records. And to protect the security of the Complex, the Secret Service redacted, from WAVES data/records, limited information from background checks performed by the Secret Service and coded instructions to Secret Service officers who work in the Complex.

30.     Entries for Michael Scanlon were also redacted when information in the documents demonstrated that the entries did not refer to the Michael Scanlon referred to in CREW's request.

31.     With the exception of the redactions noted in paragraphs 29 and 30, no document

responsive to CREW's February 2, 2006 FOIA request has been withheld in part or in whole.

32.     On September 20, 2006, all documents responsive to CREW's February 2,

2006 FOIA request with the redactions noted were produced to CREW.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing

statements are true and correct to the best of my knowledge and belief.


_9-21-06_____
Date

_Kathy J. Lyerly_____
Kathy J. Lyerly
Special Agent in Charge, Liaison Division and
Freedom of Information and Privacy Acts Officer
United States Secret Service


11

**EXHIBIT 4**

# MEMORANDUM OF UNDERSTANDING
## Between the White House Office of Records Management and the United States Secret Service Records Management Program Governing Records Generated By the White House Access Control System

### INTRODUCTION

1.  This MEMORANDUM OF UNDERSTANDING between the White House Office of Records Management ("White House") and the United States Secret Service Records Management Program ("the Secret Service") (collectively, "The Parties") memorializes and confirms the agreement governing the status and handling of records generated through the White House Access Control System.

### DEFINITIONS

2.  The White House Access Control System ("WHACS") includes two interrelated systems used by the Secret Service for controlling and monitoring access to the White House Complex:

    a.  The Worker and Visitor Entrance System ("WAVES");

    b.  The Access Control Records System ("ACR").

3.  "WHACS Records" include "WAVES Records" and "ACR Records."

4.  "WAVES Records" consist of records generated when an authorized White House pass holder submits to the Secret Service information about visitors (and workers) whose business requires their presence at the White House Complex.

    a.  WAVES Records include the following information submitted by the pass holder: the visitor's name; the visitor's date of birth; the visitor's Social Security Number; the time and location of the planned visit; the name of the pass holder submitting the request; the date of the request.

    b.  Once a visit takes place, WAVES Records are typically updated electronically with information showing the actual time and place of the visitor's entry into and exit from the White House Complex.

5.  "ACR Records" consist of records generated when a White House pass holder, worker, or visitor swipes his or her permanent or temporary pass over one of the electronic pass readers located at entrances to and exits from the White House Complex.

a.  ACR Records include the following information: the pass holder's name and badge number; the time and date of the swipe; and the post at which the swipe was recorded.

6.  "Federal Records" mean documentary materials subject to the Federal Records Act (44 U.S.C. § 3301 et seq.).

7.  "Presidential Records" mean documentary materials subject to the Presidential Records Act (44 U.S.C. § 2201 et seq.).

8.  "The White House Complex" means the White House and the Eisenhower Executive Office Building, and the secured grounds encompassing them, and the New Executive Office Building.

9.  The "White House Office of Records Management" ("WHORM") means the office in the White House responsible for preserving Presidential Records.

## BACKGROUND

10.  WHACS is operated by the Secret Service in order to control and monitor the entry and exit of persons into and out of the White House Complex.

11.  The information contained in WHACS Records originates with White House pass holders, visitors, and workers as a result of White House business.

a.  Such information reflects the conduct of the President's business by providing details about the comings and goings of staff, workers, and visitors to the White House.

12.  The authorized White House pass holders provide information contained in WAVES Records to the Secret Service temporarily for two limited purposes:

a.  To allow the Secret Service to perform background checks to determine whether, and under what conditions, to authorize the visitor's temporary admittance to the White House Complex;

b.  To allow the Secret Service to verify the visitor's admissibility at the time of the visit.

13.  Once the visit ends, the information contained in WAVES Records and ACR Records has no continuing usefulness to the Secret Service.

14.  It has been the longstanding practice of the Secret Service to transfer WAVES Records on CD-ROM to WHORM every 30 to 60 days. Except as noted in paragraph 16 below, once the Secret Service transferred the WAVES Records, the Secret Service ensured that those records were erased from its computer system.

   a.     Under this practice, the Secret Service has retained WAVES Records for completed visits for only a brief period, and solely for the purpose of facilitating an orderly and efficient transfer of those records to WHORM.

15.    The Secret Service historically has retained ACR Records in its computer system without transferring those records to WHORM. In 2004, however, the Secret Service and the White House recognized and agreed that ACR Records should be treated in a manner consistent with the treatment of WAVES Records, and concluded that ACR Records should be transferred to WHORM and eliminated from the Secret Service's files. The Secret Service has continued to maintain ACR Records pending a legal determination of their status as Presidential Records.

16.    In October 2004, at the request of the National Archives and Records Administration ("NARA"), the Secret Service began retaining its own copy of the WAVES Records that it transferred to the White House.

   a.     The Secret Service agreed to NARA's request on the understanding that it would be a temporary practice maintained until a legal determination was made confirming the propriety of handling WHACS Records as Presidential Records.

## UNDERSTANDING AND AGREEMENT

17.    The purpose of this Memorandum of Understanding is to express and embody The Parties' understanding and agreement that WHACS Records whenever created:

   a.     are at all times Presidential Records;

   b.     are not Federal Records; and

   c.     are not the records of an "agency" subject to the Freedom of Information Act (5 U.S.C. § 552).

18.    The Parties understand and agree that all WHACS Records are at all times under the exclusive legal custody and control of the White House.

   a.     Although the Secret Service may at times have physical possession of WHACS Records, such temporary physical possession does not alter the legal status of those records, and does not operate in any way to divest the White House of complete and exclusive legal control.

19.    The Parties understand and agree that any information provided to the Secret Service for the creation, or in the form, of WHACS Records is provided under an express reservation of White House control.

20. The Parties understand and agree that the White House, but not the Secret Service, has a continuing interest in WHACS Records and that the White House continues to use the information contained in such records for various purposes. Specifically:

    a. WAVES Records have historical and other informational value to the White House as evidence of who has been invited and/or granted admission to the White House to meet with the President or members of his staff.

    b. ACR Records have historical or other informational value to the White House, as evidence of the comings and goings of staff, visitors, and workers at the White House Complex in the conduct of White House business.

21. The Parties understand and agree that, once a visitor's visit to the White House Complex is complete, the Secret Service has no continuing interest in preserving or retaining WAVES Records. The Parties also understand and agree that the Secret Service has no interest whatsoever in preserving or retaining ACR Records.

    a. WHACS Records are therefore not appropriate for preservation by the Secret Service either as evidence of the Secret Service's activities or for their informational value.

22. The Secret Service understands and agrees that it will regularly transfer all WHACS Records in its possession to WHORM, and that it will not retain its own copies of any WHACS Records except as is necessary to facilitate the transfer of those records to WHORM.

    a. Any temporary retention of WHACS Records by the Secret Service after the visit, entrance, or exit memorialized by those records is solely for the purpose of facilitating an orderly and efficient transfer of those records, and does not operate in any way to divest the White House of complete and exclusive legal control.

23. The understandings and agreements expressed herein apply to:

    a. Any and all WHACS Records currently in the possession or custody of the Secret Service;

    b. Any and all WHACS Records that may be generated at any time subsequent to the execution of this Memorandum of Understanding.

24. It is specifically intended by The Parties that the understandings and agreements set forth herein serve as evidence that the White House at all times asserts, and the Secret Service disclaims, all legal control over any and all WHACS Records subject to this Memorandum of Understanding.

a.    The foregoing is not intended, and should not be construed, to suggest that WHACS Records in the possession or custody of the Secret Service before the execution of this Memorandum of Understanding were under the legal control of the Secret Service.

_____
Director, White House Office
of Records Management

_____
Chief Records Officer,
United States Secret Service

Dated: S - 17 , 2006

**EXHIBIT 5**

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 07-0048 (RBW) |
| NATIONAL ARCHIVES AND RECORDS ADMINISTRATION | ) ) ) | |
| Defendant. | ) ) ) | |

## DEFENDANT'S ANSWER

Defendant National Archives and Records Administration ("NARA") answers plaintiff's

Complaint for declaratory and injunctive relief as follows:

### FIRST DEFENSE

Plaintiff is not entitled to compel the production of records protected from disclosure by

one or more exemptions to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552.

### SECOND DEFENSE

The court lacks subject matter jurisdiction over Plaintiff's request for relief to the extent

that the request exceeds relief authorized by the FOIA.

### THIRD DEFENSE

Plaintiff's Complaint fails to state a claim upon which relief can be granted.

### FOURTH DEFENSE

Defendant answers the numbered paragraphs of plaintiff's Complaint as follows:

1.    This paragraph sets forth plaintiff's characterization and summary of this action,

to which no response by the defendant is required.

2.      This paragraph sets forth plaintiff's characterization of the relief sought in this action, to which no response by the defendant is required.

## JURISDICTION AND VENUE

3.      This paragraph sets forth plaintiff's conclusions of law regarding jurisdiction and venue, to which no response by the defendant is required.

## PARTIES

4-5.      Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in these paragraphs.

6.      Defendant specifically denies that it has failed to comply with the Freedom of Information Act.  Defendant lacks knowledge or information sufficient to form a belief as to the truth of the other allegations in this paragraph.

7.      Defendant admits allegations of this paragraph.

## STATUTORY FRAMEWORK

8-15.      These paragraphs set forth plaintiff's characterizations of certain statutory provisions and regulations, to which the Court is respectfully referred for a full and accurate statement of their contents.

## ALLEGED FACTS PURPORTEDLY

## GIVING RISE TO PLAINTIFF'S CLAIMS FOR RELIEF

16.      Defendant denies the allegations of this paragraph.

17.      Defendant denies the first sentence of paragraph 17, except to note that WAVES records are presidential records, and therefore not subject to the Federal Records Act.  Defendant

denies the second sentence of paragraph 17, except to note that the United States Secret Service

is currently maintaining copies of WAVES records that remain at all times under the control of

the White House Office (or the Office of the Vice President, where applicable).

18.     This paragraph purports to characterize filings in *The Washington Post v. U.S.

Dep't of Homeland Security*, Civ. Action No. 06-1737 (D.D.C.), to which the Court is

respectfully referred for a full and accurate statement of their contents.

19-21.  Defendant admits that it received a FOIA request dated September 27, 2006 from

the plaintiff and that Exhibit A to plaintiff's Complaint is a copy of such request.  The remainder

of these paragraphs set forth plaintiff's characterizations and summaries of the request, to which

the Court is respectfully referred for a full and accurate statement of its contents.

22.     Defendant admits that it sent plaintiff a letter dated October 20, 2006, and that

Exhibit B to plaintiff's Complaint is a copy of such letter.  The remainder of this paragraph sets

forth plaintiff's characterizations and summaries of that letter, to which the Court is respectfully

referred for a full and accurate statement of its contents.

23.     Defendant admits that it sent plaintiff a letter dated October 24, 2006, and that

Exhibit C to plaintiff's Complaint is a copy of such letter.  The remainder of this paragraph sets

forth plaintiff's characterizations and summaries of that letter, to which the Court is respectfully

referred for a full and accurate statement of its contents.  Defendant further avers that the October

24, 2006 letter may not have accurately reflected the number of pages that had in fact been

originally identified and segregated as responsive to plaintiff's FOIA request.  A small number of

additional pages, some or all of which may be duplicative of the 336 pages identified as

responsive, should also have been included in the overall number of pages identified in the letter

as being responsive to the FOIA request but that were being withheld under FOIA Exemption

(b)(5).

24-25.  Defendant admits that it received a letter dated October 25, 2006 from the plaintiff

and that Exhibit D to plaintiff's Complaint is a copy of such letter.  The remainder of these

paragraphs set forth plaintiff's characterizations and summaries of that letter, to which the Court

is respectfully referred for a full and accurate statement of its contents.

26-27.  Defendant admits that it sent plaintiff a letter dated November 28, 2006, and that

Exhibit E to plaintiff's Complaint is a copy of such letter.  The remainder of these paragraphs set

forth plaintiff's characterizations and summaries of that letter, to which the Court is respectfully

referred for a full and accurate statement of its contents.  Defendant specifically denies the

portion of the third sentence of paragraph 26 alleging that defendant located an additional 336

pages of responsive material.  Defendant avers that the Exhibit E states that defendant located

only an additional 50 pages of responsive documents.

28.    This paragraph sets forth plaintiff's conclusions of law regarding exhaustion, to

which no response by the defendant is required.

**PLAINTIFF'S CLAIM FOR RELIEF**

**PLAINTIFF'S CLAIM ONE**

(Alleged Failure to Produce Records Under the FOIA)

29.    Defendant incorporates by reference all preceding paragraphs.

30-32.  These paragraphs set forth plaintiff's conclusions of law, to which no response by

the defendant is required. Nevertheless, defendant specifically denies (1) that it failed to conduct

a reasonable search, and (2) that it withheld non-exempt records requested by the plaintiff.

-4-

## PLAINTIFF'S PRAYER FOR RELIEF

This section of the Complaint sets forth plaintiff's prayer for relief, to which no response by the defendant is required. To the extent a response is deemed required, this section is denied.

Each and every allegation of the Complaint not heretofore expressly admitted or denied is hereby denied.

WHEREFORE, having fully answered, defendant prays that:

1. This Court enter judgment for defendant and dismiss this action with prejudice; and

2. Defendant be granted such further relief as this Court may deem just and proper.

February 12, 2007                           Respectfully submitted,

                                            PETER D. KEISLER
                                            Assistant Attorney General

                                            JEFFERY A. TAYLOR
                                            United States Attorney

                                            ELIZABETH J. SHAPIRO
                                            Assistant Branch Director
                                            D.C. Bar No. 418925

                                            /s/ Michael P. Abate
                                            MICHAEL P. ABATE
                                            IL Bar No. 6285597
                                            Trial Attorney, U.S. Department of Justice
                                            Civil Division, Federal Programs Branch
                                            Mailing Address
                                            P.O. Box 883
                                            Washington, D.C. 20044
                                            Delivery Address
                                            20 Massachusetts Ave., N.W., Room 7302
                                            Washington, D.C. 20001
                                            Telephone:    (202) 616-8209
                                            Facsimile:    (202) 616-8470

                                            Attorneys for Defendant

-5-

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 12th day of February 2007, I caused the foregoing Defendant's Answer to be served on plaintiff's counsel of record electronically by means of the Court's ECF system.


/s/ Michael P. Abate

**EXHIBIT 6**

# REQUEST FOR RECORDS DISPOSITION AUTHORITY

*(See Instructions on reverse)*

TO: NATIONAL ARCHIVES and RECORDS ADMINISTRATION (NIR)
WASHINGTON, DC 20408

**1. FROM (Agency or establishment)**

Department of the Treasury

**2. MAJOR SUBDIVISION**

United States Secret Service

**3. MINOR SUBDIVISION**

Management & Organization Division

**4. NAME OF PERSON WITH WHOM TO CONFER** | **5. TELEPHONE**

Ann Parker | (202) 435-7013

| LEAVE BLANK (NARA use only) |
| --- |
| JOB NUMBER |
| N1-087-93-03 |
| DATE RECEIVED |
| MAR 2 8 1996 |
| NOTIFICATION TO AGENCY |
| In accordance with the provisions of 44 U.S.C. 3303a the disposition request, including amendments, is approved except for items that may be marked "disposition not approved" or "withdrawn" in column 10. |
| DATE | ARCHIVIST OF THE UNITED STATES |
| 9-23-02 | **WITHDRAWN** |

**6. AGENCY CERTIFICATION**

I hereby certify that I am authorized to act for this agency in matters pertaining to the disposition of its records and that the records proposed for disposal on the attached ___2___ page(s) are not now needed for the business of this agency or will not be needed after the retention periods specified; and that written concurrence from the General Accounting Office, under the provisions of Title 8 of the GAO Manual for Guidance of Federal Agencies,

[ X ]   is not required;   [ ]   is attached; or   [ ]   has been requested.

| DATE | SIGNATURE OF AGENCY REPRESENTATIVE | TITLE |
| --- | --- | --- |
| 3/26/96 | *John Machado* | PARS/Branch Chief |

| 7. ITEM NO. | 8. DESCRIPTION OF ITEM AND PROPOSED DISPOSITION | 9. GRS OR SUPERSEDED JOB CITATION | 10. ACTION TAKEN (NARA USE ONLY) |
| --- | --- | --- | --- |
| | WHITE HOUSE DIVISION'S WHITE HOUSE COMPLEX (WAVES) RECORDS DISPOSITION SCHEDULE | NC1-87-76-3 #18 | |
| | This schedule covers U. S. Secret Service official files generated by the Workers and Visitors Entrance System (WAVES) maintained by the White House Division under the jurisdiction of the Assistant Director, Office of Protective Operations. | | |
| | The Secret Service protects the President and Vice President of the United States and their immediate families, the White House and grounds, and any building in which Presidential offices are located; the Treasury Building and grounds; the temporary official residence of the Vice President and grounds in the District of Columbia; foreign diplomatic missions in the United States, its territories and possessions as specified in Title 3, Section 202, of the United States Code. | | |

1.      Worker and Visitors (Appointments) Entrance System Files (WAVES)

Consists of workers and visitors lists, request for appointments, expired work orders, agency reports, movement logs, WAVES printouts and tapes. Records pertain to appointments for workers, tradesmen, and visitors cleared for official access into the White House Complex by the Secret Service. Documents are used for protective security purposes.

a.    Paper Records.

    1.    WAVES Monthly Printout.

      PERMANENT.    Break file monthly and transfer to White House Office of Records Management. Maintain in the White House Office of Records Management for the duration of each presidential administration. Transfer to the National Archives at the conclusion of each presidential administration in accordance with 36 CFR 1228.188.

    2.    All other paper records.

      Destroy when no longer needed.

b.    WAVES Database.

    1.    Data downloaded from other law enforcement databases used for checking entrants to the White House complex.

      Delete prior to copying records to tape.

    2.    All other data elements.

      Copy to tape at the conclusion of each month. Delete on-line version when copying is completed.

    3.    Monthly Tapes.

      a.    Tape copy of BADHIST, HITS, LARGEREQ, NAME and VAREQ tables.

        Permanent. Break file monthly and transfer to White House Office of Records Management. Maintain in the White House Office of Records Management for the duration of each presidential administration. Transfer to the National Archives at the conclusion of each presidential administration in accordance with 1228.188.

b. Tape copies of all other tables.

Destroy when no longer needed.

c. Associated system documentation.

Permanent. Transfer to the National Archives
with related records.

2.       Workers and Visitors (Appointments) Entrance System Files
(WAVES) - Treasury Building

Records pertain to appointments for workers, tradesmen, and
visitors cleared for official access into the Treasury Building by
the Secret Service.

a.     Paper Records.

(1).     WAVES Monthly Printout.

Destroy printout at the end of each month.

b.     WAVES Database.

(1)     Monthly Tapes.

Destroy when no longer needed, not to exceed
one year.

# REQUEST FOR RECORDS DISPOSITION AUTHORITY
### (See instructions on reverse)

LEAVE BLANK (NARA use only)

JOB NUMBER
N1-87-93-3

DATE RECEIVED
FEB 9 1993

TO: NATIONAL ARCHIVES and RECORDS ADMINISTRATION (NIR)
WASHINGTON, DC 20408

FROM (Agency or establishment)
Department of the Treasury

NOTIFICATION TO AGENCY

2. MAJOR SUBDIVISION
United States Secret Service

3. MINOR SUBDIVISION
Management & Organization Division

In accordance with the provisions of 44 U.S.C. 3303a the disposition request, including amendments, is approved except for items that may be marked "disposition not approved" or "withdrawn" in column 10.

4. NAME OF PERSON WITH WHOM TO CONFER
Ann Parker

5. TELEPHONE
(202) 435-7013

DATE

ARCHIVIST OF THE UNITED STATES

## 6. AGENCY CERTIFICATION

I hereby certify that I am authorized to act for this agency in matters pertaining to the disposition of its records and that the records proposed for disposal on the attached ___2___ page(s) are not now needed for the business of this agency or will not be needed after the retention periods specified; and that written concurrence from the General Accounting Office, under the provisions of Title 8 of the GAO Manual for Guidance of Federal Agencies.

[X] is not required;    [ ] is attached; or    [ ] has been requested.

DATE
2/4/93

SIGNATURE OF AGENCY REPRESENTATIVE

TITLE
Chief - Management & Organization Division

| 7. ITEM NO. | 8. DESCRIPTION OF ITEM AND PROPOSED DISPOSITION | 9. GRS OR SUPERSEDED JOB CITATION | 10. ACTION TAKEN (NARA USE ONLY) |
|---|---|---|---|
| | UNIFORMED DIVISION'S WHITE HOUSE COMPLEX (WAVES) RECORDS DISPOSITION SCHEDULE | NC1-87-76-3 #18 | |

This schedule covers U. S. Secret Service official files generated by the Workers and Visitors Entrance System (WAVES) maintained by the Uniformed Division under the jurisdiction of the Assistant Director, Office of Protective Operations.

The Uniformed Division protects the President and Vice President of the United States and their immediate families, the White House and grounds, and any building in which Presidential offices are located; the Treasury Building and grounds; the temporary official residence of the Vice President and grounds in the District of Columbia; foreign diplomatic missions in the United States, its territories and possessions as specified in Title 3, Section 202, of the United States Code.

Worker and Visitors (Appointments) Entrance System Files (WAVES)

Consists of workers and visitors lists, request for appoints, expired work orders, agency reports, movement logs, WAVES printouts and tapes. Records pertain to appointments for workers, tradesmen, and visitors cleared for official access into the White House Complex by the Secret Service. Documents are used for protective security purposes.

115-109    NSN 7540-00-634-4064
PREVIOUS EDITION NOT USABLE

STANDARD FORM 115 (REV. 3-91)
Prescribed by NARA
36 CFR 1228

| REQUEST FOR RECORDS DISPOSITION AUTHORITY — CONTINUATION | JOB NUMBER | PAGE 2 OF 2 |
|---|---|---|
| **7.**  **8. DESCRIPTION OF ITEM AND PROPOSED DISPOSITION** | **9. GRS OR SUPERSEDED JOB CITATION** | **10. ACTION TAKEN (NARA USE ONLY)** |

a.   Paper Records.

　　1.   WAVES monthly printout.

　　　　Transfer to the White House Office of Records Management at the end of the month.

b.   WAVES Database.

　　1.   Data downloaded from other law enforcement databases used for checking entrants to White House complex.

　　　　Delete prior to copying records to tape.

　　2.   All other data elements.

　　　　Copy to tape monthly.   Delete on-line version when copying is completed.

　　3.   Monthly Tapes.

　　　　Transfer to White House Office of Records Management.

Two copies, including original, to be submitted
to the National Archives and Records Administration.

STANDARD FORM 115-A (REV. 3-91)
Prescribed by NARA

| REQUEST FOR RECORDS DISPOSITION AUTHORITY — CONTINUATION | JOB NUMBER | PAGE 2 OF 2 |
|---|---|---|

| 7. ITEM NO. | 8. DESCRIPTION OF ITEM AND PROPOSED DISPOSITION | 9. GRS OR SUPERSEDED JOB CITATION | 10. ACTION TAKEN (NARA USE ONLY) |
|---|---|---|---|
| | a.   Paper Records. | | |
| |    1.   WAVES Monthly Printout. | | |
| |       Disposition: Transfer to the White House Office of Records Management at the end of the month. | | |
| | b.   WAVES Database. | | |
| |    1.   Data downloaded from other law enforcement databases used for checking entrants to the White House complex. | | |
| |       Disposition: Delete prior to copying records to tape. | | |
| |    2.   All other data elements. | | |
| |       Disposition: Copy to tape monthly.   Delete on-line version when copying is completed. | | |
| |    3.   Monthly Tapes. | | |
| |       Disposition: Transfer to White House Office of Records Management. | | |
| 2. | Workers and Visitors (Appointments) Entrance System Files (WAVES) - Treasury Building | | |
| | Records pertain to appointments for workers, tradesmen, and visitors cleared for official access into the Treasury Building by the Secret Service. | | |
| | a.   Paper Records. | | |
| |    (1).   WAVES Monthly Printout. | | |
| |       Disposition: Destroy printout at the end of each month. | | |
| | b.   WAVES Database. | | |
| |    (1)   Monthly Tapes. | | |
| |       Disposition: Destroy when 6 months old. | | |

| REQUEST FOR RECORDS DISPOSITION AUTHORITY (See Instructions on reverse) | LEAVE BLANK | |
|---|---|---|
| | JOB NO. NI-87-90-1 | |

**TO:** GENERAL SERVICES ADMINISTRATION
NATIONAL ARCHIVES AND RECORDS SERVICE, WASHINGTON, DC 20408

DATE RECEIVED 1/22/90

**1. FROM** (Agency or establishment)
Department of the Treasury

NOTIFICATION TO AGENCY

In accordance with the provisions of 44 U.S.C. 3303a the disposal request, including amendments, is approved except for items that may be marked "disposition not approved" or "withdrawn" in column 10. If no records are proposed for disposal, the signature of the Archivist is not required.

**2. MAJOR SUBDIVISION**
United States Secret Service

**3. MINOR SUBDIVISION**
Management & Organization Division

| **4. NAME OF PERSON WITH WHOM TO CONFER** Darnelle M. Speed Management Analyst | **5. TELEPHONE EXT.** 535-6046 | **DATE** 6-20-91 | **ARCHIVIST OF THE UNITED STATES** WITHDRAWN |
|---|---|---|---|

**6. CERTIFICATE OF AGENCY REPRESENTATIVE**

I hereby certify that I am authorized to act for this agency in matters pertaining to the disposal of the agency's records; that the records proposed for disposal in this Request of ____3____ page(s) are not now needed for the business of this agency or will not be needed after the retention periods specified; and that written concurrence from the General Accounting Office, if required under the provisions of Title 8 of the GAO Manual for Guidance of Federal Agencies, is attached.

A. GAO concurrence: ☐ is attached; or ☒ is unnecessary.

| B. DATE | C. SIGNATURE OF AGENCY REPRESENTATIVE W. E. Keefe Jr. | D. TITLE Chief - Management & Organization Division |
|---|---|---|

| 7. ITEM NO. | 8. DESCRIPTION OF ITEM (With Inclusive Dates or Retention Periods) | 9. GRS OR SUPERSEDED JOB CITATION | 10. ACTION TAKEN (NARS USE ONLY) |
|---|---|---|---|
| | WHITE HOUSE COMPLEX RECORDS DISPOSITION SCHEDULE (UNIFORMED DIVISION) (WAVES) Records have been given previous disposition authorization under NARA Job No. NC-1-87-76-3, item #18. It has been determined that certain records can be more properly scheduled and, therefore, it is necessary to break out individual series from the general description for a more efficient disposition and essentially treat them as new series. This schedule covers U. S. Secret Service official files generated by Uniformed Division and maintained under the jurisdiction of the Assistant Director, Office of Protective Operations. | | WITHDRAWN |

| REQUEST FOR RECORDS DISPOSITION AUTHORITY — CONTINUATION | | JOB NO. | PAGE OF |
|---|---|---|---|
| 7. ITEM NO. | 8. DESCRIPTION OF ITEM (With Inclusive Dates or Retention Periods) | 9. GRS OR SUPERSEDED JOB CITATION | 10. ACTION TAKEN (NARS USE ONLY) |
| | The Uniformed Division protects the President and Vice President of the United States and their immediate families, the White House and grounds, and any building in which Presidential offices are located; the Treasury Building and grounds; the temporary official residence of the Vice President and grounds in the District of Columbia; foreign diplomatic missions in the United States, its territories and possessions as specified in Title 3, Section 202, of the United States Code. | | |

WHITE HOUSE COMPLEX RECORDS DISPOSITION SCHEDULE (UNIFORMED DIVISION) (WAVES)

| DESCRIPTION OF RECORD | AUTHORIZED DISPOSITION |
|---|---|

1. <u>Workers and visitors (Appointments) Entrance System Files (WAVES)</u>.  Consist of workers and visitors lists, requests for appointments, expired work orders, agency reports, movement logs, WAVES printouts and tapes.  Records pertain to appointments for workers, tradesman, and visitors cleared for official access into the White House Complex by Secret Service.  Documents are used for protective security purposes. (Broken out from NC1-87-76-3, #18.  Recommends new description and disposition instruction).

   a.  Paper records

   Cut off at the end of each month and transfer to legal custody of Presidential Records, the White House.  These records are transferred to the Presidential Libraries (NARA) at the end of the President's term.

   b.  Waves Computer Tapes. Consists of workers and visitors data collectively entered into the WAVES computer system.  A printout summary of monthly data is provided to the White House Records Office at the end of each month.

   Cut off at the end of each month and recycle tape locally.

3

# REQUEST FOR RECORDS DISPOSITION AUTHORITY
*(See Instructions on reverse)*

LEAVE BLANK

JOB NO.

$N1-87-90-2$

TO: GENERAL SERVICES ADMINISTRATION
NATIONAL ARCHIVES AND RECORDS SERVICE, WASHINGTON, DC 20408

DATE RECEIVED
$2-22-90$

1. FROM *(Agency or establishment)*

Department of the Treasury

2. MAJOR SUBDIVISION

United States Secret Service

3. MINOR SUBDIVISION

Management & Organization Division

NOTIFICATION TO AGENCY

In accordance with the provisions of 44 U.S.C. 3303a the disposal request, including amendments, is approved except for items that may be marked "disposition not approved" or "withdrawn" in column 10. If no records are proposed for disposal, the signature of the Archivist is not required.

| 4. NAME OF PERSON WITH WHOM TO CONFER | 5. TELEPHONE EXT. | DATE | ARCHIVIST OF THE UNITED STATES |
|---|---|---|---|
| Darnelle M. Sneed<br>Management Analyst | 535-6046 | 6.20.91 | WITHDRAWN |

6. CERTIFICATE OF AGENCY REPRESENTATIVE

I hereby certify that I am authorized to act for this agency in matters pertaining to the disposal of the agency's records; that the records proposed for disposal in this Request of ____4____ page(s) are not now needed for the business of this agency or will not be needed after the retention periods specified; and that written concurrence from the General Accounting Office, if required under the provisions of Title 8 of the GAO Manual for Guidance of Federal Agencies, is attached.

A. GAO concurrence: ☐ is attached; or ☐ is unnecessary.

| B. DATE | C. SIGNATURE OF AGENCY REPRESENTATIVE | D. TITLE |
|---|---|---|
| | W. R. Moore, Jr. | Chief<br>Management & Organization Division |

| 7. ITEM NO. | 8. DESCRIPTION OF ITEM<br>*(With Inclusive Dates or Retention Periods)* | 9. GRS OR SUPERSEDED JOB CITATION | 10. ACTION TAKEN *(NARS USE ONLY)* |
|---|---|---|---|
| | WHITE HOUSE COMPLEX RECORDS DISPOSITION SCHEDULE (UNIFORMED DIVISION) (WAVES)<br><br>Records have been given previous disposition authorization under NARA Job No. NC-1-87-76-3, item #18 and 19. It has been determined that certain records can be more properly scheduled and, therefore, it is necessary to break out individual series from the general description for a more efficient disposition and essentially treat them as new series.<br><br>This schedule covers U. S. Secret Service official files generated by Uniformed Division and maintained under the jurisdiction of the Assistant Director, Office of Protective Operations. | | WITHDRAWN |

115-108

## REQUEST FOR RECORDS DISPOSITION AUTHORITY – CONTINUATION

| 7. ITEM NO. | 8. DESCRIPTION OF ITEM *(With Inclusive Dates or Retention Periods)* | 9. GRS OR SUPERSEDED JOB CITATION | 10. ACTION TAKEN *(NARS USE ONLY)* |
|---|---|---|---|
| | The Uniformed Division protects the President and Vice President of the United States and their immediate families, the White House and grounds, and any building in which Presidential offices are located, the Treasury Building and grounds; the temporary official residence of the Vice President and grounds in the District of Columbia; foreign diplomatic missions in the United States, its territories and possessions as specified in Title 3, Section 202, of the United States Code. | | |

JOB NO.                    PAGE          OF

1. **Appointment and Security Control Logs.**  Control and accountability logs pertaining to appointments at the White House Complex, New Executive Office Building, Vice President's residence and other facilities designated for Secret Service protective security. (Broken out from NC-1-87-76-3, #18.  Recommends new description and shorter disposition standards).

   a.  Individual Name Check Logs         Cut off at the end of each month
       for Vice President's               and destroy.
       Residence and New Executive
       Offices Building

   b.  After Hours Arrival and            Cut off at the end of each month
       Departure Logs Note:  Record       and immediately destroy.
       series closed March 1989.

   c.  Cruiser Activity Reports           Cut off at the end of each month
                                          and immediately destroy.

   d.  Key Logs                           Cut off at the end of each month
                                          and destroy when 6 months old.

   e.  K-5 Delivery Logs                  Cut off at the end of each
                                          month.  Destroy when one year
                                          old.

2. **Alarm Logs.**  Printouts of alarms    Cut off monthly and forward to
   installed in facilities              Uniformed Division Central
   designated for Secret Service        Files.  Destroy 3 years after
   protective security.  Records        the end of the current
   reflect location, date, time,        administration.
   room, type of alarm, individual
   who accessed area or who secured
   alarm, etc.

3

3.  **Special Events Logs.**  Record book          Cut off at the end of the
    of events occurring at the White            calendar year.  Destroy when 3
    House Complex, e.g., the                    years old.
    President's movements into or out
    of the White House grounds,
    helicopter landings, receptions,
    press conferences, or other
    special residence or grounds
    activities.  Information reflects
    date, time and location of
    event.

    Note: Record series closed in 1988
    since the same information is
    reported under a newly revised
    schedule.

4.  **Picket Report File.**  Records of         Cut off at the end of the
    picket activity which has been              month.  Retire to custody of
    authorized to take place in front           Uniformed Division Central
    of the White House.  Record                 Files.  Destroy when 3 years old.
    reflects activity and number of
    individuals authorized, arrival
    and departure times, permit
    number and related information.
    (Broken out from NC-1-87-76-3,
    #19.  Recommends a new
    description and retention
    standard).

5.  **Deputy Chief's Uniformed Division**       Cut off at the end of the
    **White House Branch File.**                 calendar year.  Retire to
    Contains mixture of duplicate               custody of Uniformed Division
    copies as well as originals of              Central Files when 2 years old.
    internal and external                       Review and destroy when 3 years
    correspondence, memoranda and               old.
    reports pertaining to Secret
    Service, Uniformed Division, and
    White House Branch activities.

**EXHIBIT 7**

PAGE 1

HGRPT
08/07/96        07:39:01 AM    SEARCH REQUEST FOR DEC93        WAVES CENTER

| date | LNAME | FNAME | dob | VISITEE | REQUESTOR | ARRIVE TIME | BADGE # | ROOM |
|------|-------|-------|-----|---------|-----------|-------------|---------|------|
| 931213 | LIVINGSTONE | ELLEN | | ZWALLY | ZWALLY | 0926 | 000582 | 350 |
| 931207 | LIVINGSTONE | CRAIG | | POTUS | SPANGLER | 1923 | 000000 | RESIDENCE |

SEARCHED BADGE HISTORY FOR LIVINGSTONE/MARCECA ENTRY IN DEC93

MATERIAL REDACTED

004954

MATERIAL
REDACTED

```
MORPT
08/07/96        02:49:14  PM    SEARCH REQUEST FOR OCT94
                                                          HAVES CENTER
                                                                                                              PAGE 1

date      LNAME      FNAME    dob    VISITEE    REQUESTOR    ARRIVE TIME    BADGE #    ROOM

941018  LIVINGSTONE  CRAIG            VP         DUNN          1342         000000     450
941018  LIVINGSTONE  CRAIG            POTUS      SPANGLER      1618         000000     RESIDENCE

SEARCHED BADGE HISTORY FOR LIVINGSTONE/MARCECA ENTRY IN OCT94
```

CC4926

PAGE 1

MDRPT
08/08/96    11:59:24 AM    SEARCH REQUEST FOR MAR96    WAVES CENTER

| date | LNAME | FNAME | dob | VISITEE | REQUESTOR | ARRIVE TIME | BADGE # | ROOM |
|------|-------|-------|-----|---------|-----------|-------------|---------|------|
| 960306 | LIVINGSTONE | DAVID | | POTUS | SPANGLER | 1615 | 000000 | RESIDEN |
| 960314 | LIVINGSTONE | REGINA | | LIVINGSTONE | LIVINGSTONE | 1913 | 34E326 | HH |
| 960327 | MARCECA | ANDREA | | MARCECA | MARCECA | 2050 | 34D746 | 457 |
| 960327 | MARCECA | DAVID | | MARCECA | MARCECA | 2050 | 34DBA6 | 457 |
| 960327 | MARCECA | DONNIE | | MARCECA | MARCECA | 2050 | 34D95E | 457 |

SEARCHED BADGE HISTORY FOR LIVINGSTONE/MARCECA ENTRY IN MAR96

004875

MATERIAL REDACTED

```
MGRPT            07:38:43  AM    SEARCH REQUEST FOR DEC93        HAYES CENTER
08/07/96
```

| date | LNAME | FNAME | dob | VISITEE | REQUESTOR | ARRIVE TIME | BADGE # | ROOM |
|------|-------|-------|-----|---------|-----------|-------------|---------|------|
| 931205 | LANGSLET | CRAIG | | LIVINGSTONE | LIVINGSTONE | 1101 | 521521 | 04 |
| 931205 | PRUE | LINDA | | LIVINGSTONE | LIVINGSTONE | 1101 | 521521 | 04 |
| 931206 | BISH | TERRY | | LIVINGSTONE | LIVINGSTONE | 1108 | 014733 | 23 |
| 931218 | FREEH | BRENDON | | LIVINGSTONE | WETZL | 1449 | 269063 | 04 |
| 931218 | FREEH | CONNOR | | LIVINGSTONE | ANDERSON | 1449 | 434364 | 04 |
| 931218 | FREEH | LOUIS | | LIVINGSTONE | ANDERSON | 1449 | 434353 | 04 |
| 931218 | FREEH | SEAN | | LIVINGSTONE | ANDERSON | 1449 | 153159 | 04 |
| 931218 | FREEH | MARILYN | | LIVINGSTONE | ANDERSON | 1449 | 447343 | 04 |
| 931218 | FREEH | JUSTIN | | LIVINGSTONE | ANDERSON | 1449 | 865436 | 04 |
| 931228 | LEACH | RICHARD | | LIVINGSTONE | LIVINGSTONE | 1332 | 063100 | 04 |
| 931201 | DAING | HARRY | | MARCECA | MARCECA | 0947 | 000077 | 04 |
| 931214 | ALLEN | DAVID | | MARCECA | MARCECA | 1200 | 014117 | 04 |
| 931215 | CARR | EDWIN | | MARCECA | MARCECA | 1216 | 754744 | 04 |
| 931216 | LEE | WILLIAM | | MARCECA | MARCECA | 0903 | 654654 | 04 |
| 931216 | REFFE | PAIGE | | MARCECA | MARCECA | 1433 | 014389 | 04 |
| 931217 | REAMES | CARLA | | MARCECA | MARCECA | 1246 | 000296 | 04 |
| 931221 | BREWERCARLS | NANCY | | MARCECA | MARCECA | 0903 | 000104 | 04 |
| 931222 | REFFE | PAIGE | | MARCECA | MARCECA | 1622 | 014857 | 04 |
| 931223 | OFFERMAN | DOUG | | MARCECA | MARCECA | 1248 | 019900 | 04 |
| 931230 | LINDSAY | JAMES | | MARCECA | MARCECA | 1412 | 000145 | 04 |

SEARCHED LIVINGSTONE/MARCECA'S APPOINTMENTS FOR DEC93

MATERIAL
REDACTED

004952



MDRPT
08/06/96    11:54:43 AM    SEARCH REQUEST FOR MAR93    HAVER CENTER    PAGE 1

| date | LNAME | FNAME | dob | VISITEE | REQUESTOR | ARRIVE TIME | BADGE # | ROOM |
|---|---|---|---|---|---|---|---|---|
| 930306 | LIVINGSTON | CRAIG | | BROWN ANDERSON | BROWN ANDERSON | 0904 | 000000 | 480 |
| 930323 | MARCECA | TONY | | | | 1432 | 009877 | B4 |

SEARCHED BADGE HISTORY FOR LIVINGSTONE/MARCECA ENTRY IN MAR93

MATERIAL REDACTED

001070

| date | LNAME | FNAME | dob | VISITEE | REQUESTOR | ARRIVE TIME | BADGE # | ROOM |
|------|-------|-------|-----|---------|-----------|-------------|---------|------|
| 931012 | MARCECA | ANTHONY | | MARCECA | MARCECA | 1121 | 000000 | B4 |
| 931003 | MARCECA | NATHAN | | MARCECA | MARCECA | 1212 | 001269 | B4 |
| 931003 | MARCECA | ANDREA | | MARCECA | MARCECA | 1212 | 004530 | B4 |

SEARCHED BADGE HISTORY FOR LIVINGSTONE/MARCECA ENTRY IN OCT93

MATERIAL REDACTED

004960

MGRPT
08/07/96        08:14:05 AM    SEARCH REQUEST FOR JAN94

HAYES CENTER

PAGE 1

| date | LNAME | FNAME | Job | VISITEE | REQUESTOR | ARRIVE TIME | BADGE # | ROOM |
|------|-------|-------|-----|---------|-----------|-------------|---------|------|
| 940124 | TOOHEY | JOHN | | LIVINGSTONE | LIVINGSTONE | 1015 | 752013 | B4 |
| 940126 | BLUMBERG | PAUL | | LIVINGSTONE | MARCICA | 1330 | 000007 | B4 |
| 940126 | MCARRON | DAN | | LIVINGSTONE | MARCICA | 1330 | 000017 | B4 |
| 940119 | REFFE | PAIGE | | MARCECA | MARCECA | 1138 | 000350 | B4 |
| 940124 | HICKS | GREGORY | | MARCECA | MARCECA | 0943 | 000705 | B4 |
| 940125 | HICKS | CREO | | MARCECA | MARCECA | 0854 | 000003 | B4 |
| 940126 | BROWN | JEROME | | MARCECA | MARCECA | 1407 | 987354 | B4 |
| 940128 | MARENCHIN | ERNEST | | MARCECA | MARCECA | 1709 | 010263 | B4 |
| 940128 | HOPKINS | RICHARD | | MARCECA | MARCECA | 1707 | 012665 | B4 |
| 940128 | MOORE | RONALD | | MARCECA | MARCECA | 1709 | 012753 | B4 |

SEARCHED LIVINGSTONE/MARCECA'S APPOINTMENTS FOR JAN94

MATERIAL
REDACTED

004949

HDRPT
08/07/96          08.12.07 AM   SEARCH REQUEST FOR FEB94        WAVES CENTER

| date | LNAME | FNAME | Job | VISITEE | REQUESTOR | ARRIVE TIME | BADGE # | ROOM |
|------|-------|-------|-----|---------|-----------|-------------|---------|------|
| 940208 | REFFE | PAIGE | | LIVINGSTONE | ANDERSON | 1158 | 465465 | B4 |
| 940208 | KHATZAEV | ALMAZ | | LIVINGSTONE | ANDERSON | 1158 | 984665 | B4 |
| 940208 | KAZYKHANOV | ERZHAN | | LIVINGSTONE | ANDERSON | 1158 | 987987 | B4 |
| 940214 | BUCHHOLZ | MARY | | LIVINGSTONE | LIVINGSTONE | 1304 | 456365 | B4 |
| 940221 | SOWELL | RODIN | | LIVINGSTONE | LIVINGSTONE | 1411 | 000836 | W4 |
| 940203 | DUPLICKI | EUGENE | | MARCECA | MARCECA | 1127 | 004525 | B4 |
| 940210 | HICKS | GREGORY | | MARCECA | MARCECA | 1003 | 000201 | B4 |
| 940211 | HICKS | GREGORY | | MARCECA | MARCECA | 0810 | 000442 | B4 |

SEARCHED LIVINGSTONE/MARCECA'S APPOINTMENTS FOR FEB94

MATERIAL REDACTED

004946

HDRPT
08/07/95        09:06:22  AM    SEARCH REQUEST FOR MAR94          WAVES CENTER

| date | LNAME | FNAME | Job | VISITEE | REQUESTOR | ARRIVE TIME | BADGE # | ROOM |
|------|-------|-------|-----|---------|-----------|-------------|---------|------|
| 940203 | HUGHES | EDWARD | | LIVINGSTONE | ANDERSON | 1607 | 000135 | G4 |
| 940209 | GOLDIE | CAROLINE | | LIVINGSTONE | LIVINGSTONE | 1310 | 000565 | G4 |
| 940213 | LIVINGSTONE | STEVE | | LIVINGSTONE | LIVINGSTONE | 1150 | 000258 | B4 |
| 940213 | HINDLE | SUZANNE | | LIVINGSTONE | LIVINGSTONE | 1303 | 111215 | C4 |
| 940313 | REFFE | PAIGE | | LIVINGSTONE | LIVINGSTONE | 1303 | 152561 | D3 |
| 940313 | HINDLE | PEGGY | | LIVINGSTONE | LIVINGSTONE | 1303 | 512512 | D4 |
| 940314 | STEINBERG | SUE | | LIVINGSTONE | LIVINGSTONE | 1204 | 012547 | G3 |
| 940315 | DOLAN | CHARLES | | LIVINGSTONE | LIVINGSTONE | 1315 | 322222 | IH |
| 940315 | CHALMERS | WALTON | | LIVINGSTONE | WETZEL | 1315 | 987456 | WH |
| 940317 | LINDSAY | JAMES | | LIVINGSTONE | WETZEL | 1250 | 000116 | B4 |
| 940318 | BERNDAVM | JEN | | LIVINGSTONE | LIVINGSTONE | 1216 | 000965 | D3 |
| 940318 | FERARA | EVA | | LIVINGSTONE | LIVINGSTONE | 1216 | 000994 | B4 |
| 940318 | BERNDAVM | JEN | | LIVINGSTONE | LIVINGSTONE | 2111 | 489076 | B4 |
| 940318 | FERARA | EVA | | LIVINGSTONE | LIVINGSTONE | 2111 | 546565 | B4 |
| 940319 | DIETZ | DWIGHT | | LIVINGSTONE | LIVINGSTONE | 1323 | 000000 | WH |
| 940319 | LIVINGSTONE | DAVID | | LIVINGSTONE | LIVINGSTONE | 1323 | 111111 | IH |
| 940323 | PETTIT | LAWRENCE | | LIVINGSTONE | LIVINGSTONE | 1155 | 653421 | WH |
| 940324 | WILLIAMS | MEGAN | | LIVINGSTONE | LIVINGSTONE | 1200 | 258852 | WH |
| 940330 | WILEY | ROBIN | | LIVINGSTONE | LIVINGSTONE | 1311 | 009795 | B4 |
| 940300 | EDHARDSEN | CHARLES | | MARCECA | MARCECA | 1856 | 022221 | D4 |

SEARCHED LIVINGSTONE/MARCECA'S APPOINTMENTS FOR MAR94

MATERIAL REDACTED

004943

PAGE 1

MORPT
08/07/96      11:37:38 AM    SEARCH REQUEST FOR AUG94
                                                    HAVES CENTER

| date | LNAME | FNAME | dob | VISITEE | REQUESTOR | ARRIVE TIME | BADGE N | ROOM |
|------|-------|-------|-----|---------|-----------|-------------|---------|------|
| 940801 | LIVINGSTONE | RACHAEL | | THIERWECHTE | THIERWECHTE | 1026 | 34D5C5 | 6236 |
| 940804 | MARCECA | ANTHONY | | ABRAMS | ABRAMS | 1039 | 132D3D | 91 |
| 940826 | MARCECA | ANTHONY | | ABRAMS | ABRAMS | 1633 | 545777 | 91 |

SEARCHED BADGE HISTORY FOR LIVINGSTONE/MARCECA ENTRY IN AUG94

MATERIAL
REDACTED

004931

PAGE 1

MATERIAL
REDACTED

MORPT
08/07/94          12:32:34   PM   SEARCH REQUEST FOR SEP94          WAVES CENTER

| date | LNAME | FNAME | dob | VISITEE | REQUESTOR | ARRIVE TIME | BADGE # | ROOM |
|------|-------|-------|-----|---------|-----------|-------------|---------|------|
| 940902 | LIVINGSTONE | GLORIA | | LIVINGSTONE | LIVINGSTONE | 1132 | 464641 | WH |
| 940902 | LIVINGSTONE | MARJORIE | | LIVINGSTONE | LIVINGSTONE | 1132 | 614651 | WH |
| 940902 | LIVINGSTONE | STEVEN | | LIVINGSTONE | LIVINGSTONE | 1132 | 616164 | WH |
| 940902 | LIVINGSTONE | DAVID | | LIVINGSTONE | LIVINGSTONE | 1132 | 654445 | WH |
| 940921 | LIVINGSTONE | STEVEN | | SHEKETOFF | DURMINKEL | 1526 | 000000 | 450 |
| 940901 | MARCECA | ANTHONY | | WETZEL | WETZEL | 1514 | 687236 | B4 |

SEARCHED BADGE HISTORY FOR LIVINGSTONE/MARCECA ENTRY IN SEP94

004928

```
MDRPT
08/07/96      03:40:33 PM    SEARCH REQUEST FOR DEC94          HAVEB CENTER                    PAGE 1
```

| date | LNAME | FNAME | dob | VISITEE | REQUESTOR | ARRIVE TIME | BADGE # | ROOM |
|---|---|---|---|---|---|---|---|---|
| 941214 | MARCECA | DAVID | | WETZL | WETZL | 1045 | 000454 | B4 |
| 941214 | MARCECA | DONNIE | | WETZL | WETZL | 1046 | 000907 | B4 |
| 941226 | MARCECA | DONNIE | | ABRAMS | ABRAMS | 1506 | 464646 | 91 |
| 941226 | MARCECA | NATHAN | | ABRAMS | ABRAMS | 1506 | 541313 | 91 |

SEARCHED BADGE HISTORY FOR LIVINGSTONE/MARCECA ENTRY IN DEC94

MATERIAL REDACTED

004920

HDRPT
08/07/96          07:30:01  PM    SEARCH REQUEST FOR MAY95          HAVES CENTER

| date | LNAME | FNAME | dob | VISITEE | REQUESTOR | ARRIVE TIME | BADGE # | ROOM |
|---|---|---|---|---|---|---|---|---|
| 950404 | TURK | RANDALL | | LIVINGSTONE | HUGHES | 1047 | 689859 | B4 |
| 950413 | CLIFFORD | SUSAN | | LIVINGSTONE | HUGHES | 1250 | 111110 | B4 |
| 950413 | DECOURSEY | ARTHUR | | LIVINGSTONE | HUGHES | 1250 | 777700 | B4 |
| 950505 | TURK | RANDY | | LIVINGSTONE | LIVINGSTONE | 1313 | 001200 | B4 |
| 950505 | COHEN | DAVID | | LIVINGSTONE | LIVINGSTONE | 1316 | 256222 | B4 |
| 950509 | WERNER | JAMES | | LIVINGSTONE | LIVINGSTONE | 1223 | 745674 | B4 |
| 950515 | RICHARD | PAUL | | LIVINGSTONE | LIVINGSTONE | 1103 | 002618 | B4 |
| 950531 | LIVINGSTONE | GLORIA | | LIVINGSTONE | LIVINGSTONE | 1412 | 000000 | HH |
| 950531 | NICOLA | AMY | | LIVINGSTONE | LIVINGSTONE | 1412 | 000000 | HH |
| 950531 | NICOLA | LEAH | | LIVINGSTONE | LIVINGSTONE | 1413 | 000000 | HH |
| 950531 | PERKINS | DONNIE | | LIVINGSTONE | LIVINGSTONE | 1412 | 000000 | HH |

SEARCHED LIVINGSTONE/MARCECA'S APPOINTMENTS FOR MAY95

MATERIAL REDACTED

004904

```
HORPT
08/07/96          08:16:33  PM   SEARCH REQUEST FOR JUN95        HAVER CENTER                                        PAGE 1

date    LNAME      FNAME      dob    VISITEE       REQUESTOR     ARRIVE TIME   BADGE #   ROOM
------  --------   -------    ----   -----------   -----------   -----------   -------   ----
950601  LEVY       JAMES             LIVINGSTONE   LIVINGSTONE   1057          001376    B4
950607  WILLHITE   SUMMER            LIVINGSTONE   HETZL         2001          061578    B4
950607  WILLHITE   PIPER             LIVINGSTONE   HETZL         2001          906805    B4
950607  WILLHITE   DEBORAH           LIVINGSTONE   HETZL         2001          908955    B4
950607  WILLHITE   BRANDI            LIVINGSTONE   HETZL         2001          968960    B4
950607  FOX        SUSAN             LIVINGSTONE   HETZL         2001          985795    B4
950613  DENBO      JAMES             LIVINGSTONE   LIVINGSTONE   1112          000013    B4

SEARCHED LIVINGSTONE/MARCECA'S APPOINTMENTS FOR JUN95
```

MATERIAL
REDACTED

004901

PAGE 1

MGRPT
08/08/96        10:53:11 AM    SEARCH REQUEST FOR JUL95            WAVES CENTER

| date | LNAME | FNAME | dob | VISITEE | REQUESTOR | ARRIVE TIME | BADGE # | ROOM |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| 950719 | MARCECA | NATHAN | | ABRAMS | ABRAMS | 1253 | 34E407 | 91 |
| 950719 | MARCECA | NATHAN | | ABRAMS | ABRAMS | 1408 | 34Q672 | 91 |

SEARCHED BADGE HISTORY FOR LIVINGSTONE/MARCECA ENTRY IN JUL95

MATERIAL
REDACTED

004899

MGRPT
08/08/96          10:24:00 AM    SEARCH REQUEST FOR OCT95          HAVER CENTER                    PAGE 1

| date | LNAME | FNAME | dob | VISITEE | REQUESTOR | ARRIVE TIME | BADGE # | ROOM |
|------|-------|-------|-----|---------|-----------|-------------|---------|------|
| 951027 | LIVINGSTONE | WILLIAM | | SHECK | SHECK | 0953 | 34A291 | 8002 |
| 951023 | MARCECA | NATHAN | | BERRY | PETERS | 0835 | 34B3DE | 4013 |
| 951006 | MARCECA | NATHAN | | POTUS | WALKER | 1205 | 000000 | B. GROUNDS |
| 951006 | MARCECA | TONY | | POTUS | WALKER | 1205 | 000000 | B. GROUNDS |

SEARCHED BADGE HISTORY FOR LIVINGSTONE/MARCECA ENTRY IN OCT95

MATERIAL REDACTED

004891

HDRPT
08/08/96    11:20:11 AM    SEARCH REQUEST FOR DEC95    WAVES CENTER

PAGE 1

| date | LNAME | FNAME | dob | VISITEE | REQUESTOR | ARRIVE TIME | BADGE # | ROOM |
|---|---|---|---|---|---|---|---|---|
| 951214 | LIVINGSTONE | GLORIA | | DENIO | DENIO | 1241 | 34074C | B4 |
| 951216 | LIVINGSTONE | CRAIG | | POTUS | WIDDESS | 1854 | 000000 | STATE F |
| 951216 | LIVINGSTONE | CRAIG | | POTUS | WIDDESS | 1911 | 000000 | STATE F |
| 951211 | LIVINGSTONE | DEANNA | | POTUS | WIDDESS | 1727 | 000000 | STATE F |
| 951203 | MARCECA | NATHAN | | POTUS | WIDDESS | 1636 | 000000 | RESIDENCE |

SEARCHED BADGE HISTORY FOR LIVINGSTONE/MARCECA ENTRY IN DEC95

MATERIAL REDACTED

CC4885

**EXHIBIT 8**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JUDICIAL WATCH, INC.,                )
                                     )
            Plaintiff,               )
                                     )
        v.                           )        Case No. 1:06-CV-00310 (JGP)
                                     )
UNITED STATES SECRET SERVICE,        )
                                     )
            Defendant                )
_____)

## JOINT STIPULATION AND AGREED ORDER

The parties, by counsel, hereby stipulate and agree as follows:

1.      Plaintiff hereby withdraws its pending motion for summary judgment;

2.      Defendant shall produce any and all documents responsive to Plaintiff's January 20, 2006 Freedom of Information Act request, without redactions or claims of exemption, on or before May 10, 2006.

3.      Defendant shall have until and including May 15, 2006 to file any answer or otherwise respond to the Complaint.

I

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

KENNETH L. WAINSTEIN
United States Attorney

CARL NICHOLS
Deputy Assistant Attorney General

JOSEPH H. HUNT
Branch Director

ELIZABETH J. SHAPIRO
Assistant Director
D.C. Bar No. 418925
Federal Programs Branch

_____/s/_____          _____/s/_____
JUSTIN M. SANDBERG                 PAUL J. ORFANEDES
Trial Attorney                     D.C. Bar No. 429716
(Ill. Bar No. 6278377)             Judicial Watch, Inc.
U.S. Department of Justice         501 School Street, S.W.
Civil Division, Federal Programs Branch   Suite 500
Mailing Address                    Washington, D.C. 20024
P.O. Box 883 Ben Franklin Station  Telephone: (202) 646-5172
Washington, D.C. 20044             Facsimile: (202) 646-5199
Delivery Address
20 Massachusetts Avenue, N.W., Rm. 7224   *Attorneys for Plaintiff*
Washington, D.C. 20001
Telephone: (202) 514-3489
Facsimile: (202) 616-8202

*Attorneys for Defendant*

        IT IS SO ORDERED.

Dated: _April 25, 2006_

_____
The Hon. John Garrett Penn, U.S.D.J.

2

**EXHIBIT 9**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JUDICIAL WATCH, )<br><br>Plaintiff, )<br><br>v. )<br><br>UNITED STATES SECRET SERVICE, )<br><br>Defendant. ) | Civil Action No. 06-310 (JGP) |

SECOND DECLARATION OF KATHY J. LYERLY
SPECIAL AGENT IN CHARGE, LIAISON DIVISION AND
FREEDOM OF INFORMATION AND PRIVACY ACTS OFFICER,
UNITED STATES SECRET SERVICE

I, Kathy J. Lyerly, hereby make the following declaration:

1.     I am submitting this declaration to supplement and modify my May 16, 2006,

declaration regarding the United States Secret Service (Secret Service)'s Worker and Visitor

Entrance System ("WAVES") records, based on additional information that has become

available to me since that declaration.

2.     In paragraphs 10 and 11 of my May 16, 2006, declaration, I stated: "It has been

the longstanding practice of the Secret Service to transfer WAVES records on CD-ROM to the

White House every 30 to 60 days.  Except as noted in paragraph 11 below, once the Secret

Service transferred the WAVES records, the Secret Service ensured that those records were

erased from its computer system.  In October 2004, at the request of the National Archives and

Records Administration, the Secret Service began temporarily retaining its own copy of the

WAVES records that it transferred to the White House. As such, the Secret Service has in its possession WAVES records dating back only to October 2004." Further, I stated in paragraph 13 of my May 16, 2006, declaration that "the Secret Service only has in its possession WAVES records dating from October 2004."

3.      In the course of conducting a Freedom of Information Act (FOIA) search recently regarding a FOIA request not at issue in this litigation, what appeared to be a WAVES record was discovered on the hard drive of a Secret Service computer located in the Information Technology Section of the Secret Service's Presidential Protective Division (PPD). Upon further examination, it appeared that certain WAVES data pre-dating October 2004 existed on the hard drive of that computer and the hard drive of a second computer in the same office.

4.      The Secret Service then assembled a team of independent Secret Service representatives under the direction of the Secret Service's Office of Inspection, and I have been informed of the team's findings to date.

5.      First, the Inspection team reviewed both the first (older) and second (more recent) PPD computers to determine what, if any, WAVES data pre-dating October 2004 were located on those computers, and the location and time periods of any such data. The review process was accomplished by searching each computer's hard drive for WAVES-related information contained within Microsoft Access database files. The review of these Microsoft Access database files revealed that some WAVES data are in fact stored in these files. The team's review revealed that the only place WAVES data were stored was in Microsoft Access database files. Each Microsoft Access database file was opened manually to determine if it contained

2

WAVES-related data. If it did, the team documented the location of the database file on the hard drives as well as the report periods of this data (report periods are based upon time of arrival).

6.      I have been advised that the Inspection team believes that the hard drive of the first computer contains multiple database files of varying degrees of WAVES data that pre-date October 2004. The team believes that the database files contain non-comprehensive WAVES data, with sizeable gaps in the report periods. The team also believes that the hard drive of the second computer contains multiple database files of varying degrees of WAVES data that pre-date October 2004. The team further believes that the database files on this computer contain non-comprehensive WAVES data, with gaps in the report periods. The team believes that the validity of the pre-October 2004 WAVES data found on the hard drives of both computers cannot be assured, because some of the data appear to have been used for testing and development. The team believes the pre-October 2004 data have certain elements of WAVES information. The Inspection team further believes that the pre-October 2004 WAVES data found on the hard drives of the two computers appear to exist in a separate location from the folder where the WAVES CD-ROMs are made.

7.      In addition, the Inspection team located on the hard drives of both computers what appear to be WAVES data beginning in October 2004. The Inspection team has not examined these data in detail, but did search the data when the search of all Microsoft Access database files on both computers' hard drives was conducted as described in paragraph 8.

8.      Second, under the direction of the Inspection team, an automated search was conducted through all Microsoft Access database files on both computers' hard drives for the name Jack Abramoff. An automatic search function was designed, developed, and deployed for

3

this purpose. The program's search function searched the hard drives for all Microsoft Access database files, and examined each database file for all records containing the name Jack Abramoff. The program created a report of each database file and any data found. The search function was designed to show results in the format that it is currently stored in the database level (raw); a manual review of the search results was also conducted by the team.

9.    I have been advised that the Inspection team has found what appear to be WAVES data containing appointment information for Jack Abramoff. This information would appear to reflect six appointment dates. The Inspection team further found what appear to be additional repeated data entries of WAVES appointment information for Jack Abramoff for these same dates. The WAVES data for one of these dates appear to correspond with the date of one of the two Access Control Record System (ACR) entries/exits previously produced in this case. The Inspection team also found what appear to be two ACR entries/exits reflecting the same dates and times as the records previously produced in this case. In that regard, please see paragraph 14 of my May 16, 2006, declaration. The Inspection team further found what appear to be additional repeated data entries of ACR information for these same dates. The Inspection team believes that it has located all WAVES and ACR data on the two computers with the name Jack Abramoff.

10.    The Inspection team determined that WAVES data are on a server. According to standard procedure, every 30 to 60 days, data from that server are downloaded, along with entry/exit data from ACR records, to the hard drive on one of the PPD computers. This information is then used to create the CD-ROMs referenced in paragraphs 10, 11, and 13 of my May 16, 2006, declaration.

4

11.    In paragraph 10 of my earlier declaration, I stated that "once the Secret Service transferred the WAVES records [to the White House], the Secret Service ensured that those records were erased from its computer system." The Inspection team has found that the WAVES records on the server, older than 60 days, are purged daily and overwritten on the server. The Inspection team also found, however, that some WAVES data downloaded from the server to the two computers' hard drives remain on the hard drives.

12.    I have been advised that the Inspection team's interviews to date of Secret Service employees who were the primary executors of both the WAVES CD-ROMs data transfer process and FOIA requests associated with these records revealed that these executors appear to have followed written download procedures; however, these procedures did not provide guidance on the maintenance of any data left behind in the computers' hard drives. As such, many of the executors were unaware of their existence. The Inspection team's interviews revealed that the individual who currently runs the Information Technology Section of PPD, and his predecessor who served in an interim capacity, did not know that the office computers contained pre-October 2004 WAVES data. Therefore, neither individual had a knowledge or an intent to retain that data.

13.    Attached as Exhibit 2 are copies of what appear to be WAVES data concerning Mr. Abramoff printed from a hard drive of one of the computers by a PPD employee prior to the involvement of the Inspection team. Attached as Exhibit 3 are copies of the WAVES and ACR data concerning Mr. Abramoff found in the search by the Inspection team. Exhibit 3 contains the same information as in Exhibit 2, plus additional information. Attached as Exhibit 4 are three one-page summaries prepared by the Inspection team of the WAVES and ACR data found in the

5

team's search.  On one of these pages, the last listing of appointment data has been scratched out.
I have been advised that a member of the Inspection team indicated that he scratched out this
listing because it appeared to be a duplicate of the first listing of appointment data on that same
page.  Lastly, attached as Exhibit 5 is a spreadsheet which presents data contained in Exhibit 3 in
a different format.  In the interest of protecting Mr. Abramoff's privacy, the Social Security
number and date of birth have been redacted from the documents in all four exhibits.  This is the
only information redacted from the data.

14.    In paragraph 16 of my May 16, 2006, declaration, I explained that there are a
variety of reasons why ACR records are not comprehensive as to entries and exits.  In that regard,
it is noted that turnstiles are not the only source of protection for the White House Complex.
Prior to being granted entry, visitors must undergo security checks, provide proper identification,
and go through magnetometers as well as other platforms of security.

15.    The information contained in WAVES records is provided to the Secret Service
temporarily for two limited purposes: (a) to allow the Secret Service to perform background
checks to determine whether, and under what conditions, to authorize the visitor's temporary
admittance to the White House Complex; and (b) to allow the Secret Service to verify the
visitor's admissibility at the time of the visit.

16.    Once a visitor's visit to the White House Complex is complete, WAVES and
ACR records have no continuing usefulness to the Secret Service, the Secret Service has no
continuing interest in preserving or retaining them, and the Secret Service does not control or
direct the ultimate disposition or use of the records.  The White House does have such a

6

continuing interest and therefore the records are turned over to the White House Office of Records Management.

17.     No other documents responsive to plaintiff's FOIA request were found in the search.

18.     No document located in response to plaintiff's request has been withheld in part or in whole, except as noted in paragraph 13.


I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing statements are true and correct to the best of my knowledge and belief.


_____
Date

_____
Kathy J. Lyerly
Special Agent in Charge, Liaison Division and
Freedom of Information and Privacy Acts Officer
United States Secret Service

7

**EXHIBIT 10**

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 06-883 (JGP) |
| UNITED STATES DEPARTMENT OF HOMELAND SECURITY, | ) ) ) | |
| Defendant. | ) ) | |
| DEMOCRATIC NATIONAL COMMITTEE, | ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 06-842 (JGP) |
| UNITED STATES SECRET SERVICE, | ) ) | |
| Defendant. | ) ) | |

## DECLARATION OF KATHY J. LYERLY
## SPECIAL AGENT IN CHARGE, LIAISON DIVISION AND
## FREEDOM OF INFORMATION AND PRIVACY ACTS OFFICER,
## UNITED STATES SECRET SERVICE

I, Kathy J. Lyerly, hereby make the following declaration:

1.     I am the Special Agent in Charge of the Liaison Division and the Freedom of

Information and Privacy Acts (FOI/PA) Officer for the United States Secret Service (hereinafter

"Secret Service"), which is a component of the Department of Homeland Security ("DHS").  I

have been the Secret Service FOI/PA Officer since December 28, 2003, and have been employed

with the Secret Service as a Special Agent (GS-1811) since October 26, 1987.

2.      DHS regulations, Title 6, Code of Federal Regulations, Section 5.4, and Appendix

A, II(I)(3), vest authority in the FOI/PA Officer, Secret Service, to make initial determinations as

to whether to grant Freedom of Information Act (FOIA), 5 U.S.C. § 552, requests for Secret

Service records (68 FR 4056, 4058, and 4069).

3.      As the Secret Service's FOI/PA Officer, I am familiar with Citizens for

Responsibility and Ethics in Washington's ("CREW's") FOIA request to the Secret Service.  At

my request, the Secret Service conducted a search for documents responsive to CREW's request.

That search uncovered 356 pages of responsive records which were redacted (to protect

individuals' privacy and the security of the White House Complex) and, on September 20, 2006,

released.  (The White House Complex refers to the White House, the Eisenhower Executive

Office Building ["EEOB"], the secured grounds encompassing the White House and the EEOB,

and the New Executive Office Building.)  A description of the correspondence in this matter and

the processing of CREW's FOIA request is set forth below.

4.      In a letter dated February 2, 2006, and received February 16, 2006, CREW

submitted to the Secret Service, a component of DHS, a FOIA request for "all records relating to

any visit that any and all of the following individuals made to the White House [including any

office, wherever located, in the Executive Office of the President ("EOP")] or the residence of

the Vice President from January 1, 2001, to the present . . . : Jack Abramoff, Michael Scanlon,

Neil Volz, Tony Rudy, Shawn Vassell, Kevin Ring, Edwin Buckham, [and] Patrick Pizzella."

5.      In a letter dated March 1, 2006, I acknowledged receipt of CREW's

2

FOIA request and advised CREW that a search for records responsive to the request was being

conducted.

6.      There are two interrelated systems – collectively termed the White House Access

Control System – for controlling and monitoring access to the White House Complex: the

Worker and Visitor Entrance System ("WAVES") and the Access Control Records System

("ACR"). The Vice President's residence is not a part of the White House Complex, and the

Secret Service does not use WAVES or ACR at that site.

7.      ACR records consist of records generated when a pass holder, worker, or visitor

swipes his or her permanent or temporary pass over one of the electronic pass readers located at

entrances to and exits from the White House Complex. ACR records include information such

as the pass holder's name and badge number, the time and date of the swipe, and the post at

which the swipe was recorded.

8.      WAVES records consist of records generated when information is submitted by a

White House pass holder to the Secret Service about workers and visitors who need access to the

White House Complex to conduct business or attend social events. WAVES records include the

following information submitted by the pass holder: the visitor's name, date of birth, and Social

Security number; the time and location of the planned visit; the name of the pass holder

submitting the request; and the date of the request. They may also include limited information

from background checks performed by the Secret Service and coded instructions to Secret

Service officers. Once a visit takes place, WAVES records are typically updated electronically

with information showing the actual time and place of the visitor's entry into and exit from the

White House Complex.

3

9.      The Secret Service controls and monitors access to the Vice President's residence

through the use of two access lists – a daily access list for individuals with appointments or work

orders, and a permanent access list for those individuals who regularly access the facility.  The

Secret Service receives requests from the Vice President's staff to allow entry for individuals

with appointments or work orders at the facility.  The Secret Service conducts background

checks on individuals for whom there has been a request for admission, and if there is no

information of protective interest, the Secret Service places the name on a daily access list.  A

permanent access list is also maintained listing those individuals who regularly access the

facility.  All individuals are logged in by the Uniformed Division officer working at the gate

where the individual arrives.

10.     In response to CREW's February 2, 2006 FOIA request, the Secret Service has

conducted three searches for records.  The first two searches were for records of visits to the

White House Complex, and the third search was for records of visits to the Vice President's

residence.  The first search was conducted by the Secret Service's Presidential Protective

Division ("the PPD search").  Secret Service employees under the direction of the Secret

Service's Office of Inspection performed the second search ("the Inspection team search").

Secret Service Uniformed Division officers assigned to the Vice President's residence conducted

searches of visits to the Vice President's residence.

11.     The individuals who performed the PPD search conduct FOIA searches as part of

their regular responsibilities.  The PPD searched both the ACR records and the WAVES CD-

ROMs for any and all records responsive to CREW's February 2, 2006 FOIA request.

4

12.     The PPD searched for ACR records in a searchable database in which ACR records are stored. The records are searchable by visitor name. In this case, the Secret Service searched the ACR database by searching for records that would have been generated from January 1, 2001 to the date of the search that had the name Michael Scanlon, Neil Volz, Tony Rudy, Shawn Vasell/Vassell, Kevin Ring, Edwin Buckham, or Patrick Pizzella in the visitor field.

13.     It has been the longstanding practice of the Secret Service to transfer WAVES records on CD-ROM to the White House Office of Records Management every 30 to 60 days. The intent of the Secret Service was to ensure that, once transferred, the records were erased from its computer system. The Secret Service has temporarily retained, in a searchable form on CD-ROM, WAVES records generated since October 2004; the records can be searched by visitor name. In this case, the PPD explored the WAVES CD-ROMs by searching for records that had the name Michael Scanlon, Neil Volz, Tony Rudy, Shawn Vasell/Vassell, Kevin Ring, Edwin Buckham, or Patrick Pizzella in the visitor field. The Secret Service did not save on CD-ROM WAVES records for the relevant period (i.e., from January 2001 to the date of the search) generated before October 2004.

14.     PPD ran its initial search in March 2006. The search results were reviewed, and several inconsistencies were noted compared to documents produced to the FOI/PA Office by PPD in response to search requests for other FOIA requests pertaining to some of the same individuals. In running an additional search, what appeared to be a WAVES record was discovered on the hard drive of a Secret Service computer located in the Information Technology Section of the PPD. Upon further examination, it appeared that certain WAVES data pre-dating

5

October 2004 existed on the hard drive of that computer and the hard drive of a second computer in the same office.

15.     The PPD search yielded ACR and WAVES records for Michael Scanlon, Neil Volz, Shawn Vasell, Kevin Ring, and Patrick Pizzella.  The PPD search yielded ACR records for Tony Rudy.  The PPD search yielded no records for Shawn Vassell (as spelled in the February 2, 2006 CREW FOIA request) or Edwin Buckham.

16.     The Inspection team searched the hard drives of two computers in the Information Technology Section of the PPD for records regarding visits to the White House Complex.  The Inspection team was comprised of the following individuals: an Assistant Inspector in the Inspection Division, whose responsibilities include assessing the effectiveness of operations, quality of management and supervision, and adherence to policies, regulations, and procedures within Secret Service offices and divisions; an Assistant to the Special Agent in Charge in the Criminal Investigative Division (CID), who oversees all Information Technology programs for the Office of Investigations; a Special Agent in the CID and member of the Electronic Crimes Special Agent Program, who is a trained computer specialist and whose duties include forensic examination of computers associated with criminal investigations; and an Information Technology Specialist in the Information Resources Management Division, who is a computer specialist skilled in database design and architecture.

17.     I have been advised that the Inspection team believes that the hard drive of the first computer contains multiple database files of varying degrees of WAVES data that pre-date October 2004.  The team believes that the database files contain non-comprehensive WAVES data, with sizeable gaps in the report periods.  The team also believes that the hard drive of the

second computer contains multiple database files of varying degrees of WAVES data that pre-date October 2004. The team further believes that the database files on this computer contain non-comprehensive WAVES data, with gaps in the report periods. The team believes that the validity of the pre-October 2004 WAVES data found on the hard drives of both computers cannot be assured, because some of the data appear to have been used for testing and development. The Inspection team further believes that the pre-October 2004 WAVES data found on the hard drives of the two computers appear to exist in a separate location from the folder where the WAVES CD-ROMs are made.

18.    In addition, the Inspection team located on the hard drives of both computers WAVES data beginning in October 2004. The Inspection team has not examined these data in detail, but did search the data when the search of all Microsoft Access database files on both computers' hard drives was conducted as described in paragraph 21.

19.    The Inspection team determined that WAVES data are on a server. According to standard procedure, every 30 to 60 days, data from that server are downloaded, along with entry/exit data from ACR records, to the hard drive on one of the PPD computers. This information is then used to create the WAVES CD-ROMs.

20.    The Inspection team has found that the WAVES records on the server, older than 60 days, are purged daily and overwritten on the server. The Inspection team also found, however, that some pre-October 2004 WAVES data downloaded from the server to the two computers' hard drives remain on the hard drives.

21.    The Inspection team searched these computers by conducting an automated

7

search through all Microsoft Access database files on both computers' hard drives for the names
Michael Scanlon, Neil Volz, Tony Rudy, Shawn Vasell/Vassell, Kevin Ring, Edwin Buckham,
and Patrick Pizzella. The program's search function searched the hard drives for all Microsoft
Access database files, and examined each database file for all records containing the names
Michael Scanlon, Neil Volz, Tony Rudy, Shawn Vasell/Vassell, Kevin Ring, Edwin Buckham,
or Patrick Pizzella. The program created a report of each database file and any data found.

22.    The Inspection team search yielded data/records regarding entry/exit to the White
House Complex for the following individuals: Michael Scanlon, Neil Volz, Tony Rudy, Shawn
Vasell, Kevin Ring, and Patrick Pizzella. No data/records of entry/exit to the White House
Complex for Edwin Buckham or Shawn Vassell (as spelled in the February 2, 2006 CREW
FOIA request) were discovered by the Inspection team.

23.    Neither the PPD search nor the Inspection team search uncovered any WAVES
or ACR data/records for Edwin Buckham or Shawn Vassell for the relevant time period. Both
searches did reveal data/records for Shawn Vasell. Also, the Secret Service released to CREW,
on May 10, 2006 and July 7, 2006, its WAVES and ACR data/records concerning Jack
Abramoff. I have signed two declarations filed in Judicial Watch v. United States Secret Service,
Civil Action No. 06-310, describing that search.

24.    CREW's February 2, 2006 FOIA request asks for records of visits of certain
individuals to the Executive Office of the President ("EOP") whether the visits took place at the
White House Complex or elsewhere. There are some EOP offices located outside of the White
House Complex, but the Secret Service does not maintain or operate access systems at these
sites.

25.     The information in WAVES records submitted by a White House pass holder is provided to the Secret Service temporarily for two limited purposes: (1) to allow the Secret Service to perform background checks to determine whether, and under what conditions, to authorize the visitor's temporary admittance to the White House Complex; and (2) to allow the Secret Service to verify the visitor's admissibility at the time of the visit.

26.     Once a visitor's visit to the White House Complex is complete, WAVES and ACR records have no continuing usefulness to the Secret Service, the Secret Service has no continuing interest in preserving or retaining them – indeed, prior to the temporary WAVES-retention practice begun in October 2004, the Secret Service's intent was to retain WAVES records only long enough to effectuate their orderly transfer to the White House – and the Secret Service does not control or direct the ultimate disposition or use of the records. The White House does have such a continuing interest and therefore the records are turned over to the White House Office of Records Management.

27.     To search for potentially responsive records regarding the Vice President's residence, Secret Service Uniformed Division officers assigned to the Vice President's residence completed three separate computer-based searches and one hand search. First, the file server utilized by the Secret Service command post at the Vice President's residence was searched. This search was done by entering some portion of the requested names at issue and then allowing the system's search feature to run. A portion of the name, rather than the name in its entirety, was used to ensure that spellings close to the spelling provided by the requestor would be captured. Because of the breadth of the records contained on the file server, each name took approximately eight to nine hours to complete. Second, a search was run in Microsoft Outlook

9

on the three computers in the command post for email records potentially responsive to each request. These searches captured any reference to the requested name in the email subject line and the body of the email. For any email with an attachment, the attachment was opened and searched separately. The hard drives of these computers were also searched to determine whether any emails had been saved as separate documents onto the hard drives. Third, the access list database system that generates the daily and permanent access lists used at the gates was searched. This system is housed on the file server, and this third check was done in an effort to verify the results of the search of the file server. The access database was checked by opening up the basic tables it contains, sorting alphabetically by last name and then checking the sorted list against the request. Additionally, the entry logs were searched by hand.

28. Potentially responsive data then available on the computer system and all entry logs in the possession of the Secret Service were searched. No responsive records were found.

29. Prior to producing documents to CREW, the Secret Service redacted information from WAVES data/records to protect the privacy of individuals visiting the White House Complex and the security of the Complex. To protect the individuals' privacy, the Secret Service redacted their dates of birth and Social Security numbers from the WAVES data/records. And to protect the security of the Complex, the Secret Service redacted, from WAVES data/records, limited information from background checks performed by the Secret Service and coded instructions to Secret Service officers who work in the Complex.

30. Entries for Michael Scanlon were also redacted when information in the documents demonstrated that the entries did not refer to the Michael Scanlon referred to in CREW's request.

10

31.     With the exception of the redactions noted in paragraphs 29 and 30, no document responsive to CREW's February 2, 2006 FOIA request has been withheld in part or in whole.

32.     On September 20, 2006, all documents responsive to CREW's February 2, 2006 FOIA request with the redactions noted were produced to CREW.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing statements are true and correct to the best of my knowledge and belief.


_9-21-06_
Date

Kathy J. Lyerly
Special Agent in Charge, Liaison Division and
Freedom of Information and Privacy Acts Officer
United States Secret Service

11

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON,<br><br>        Plaintiff,<br><br>        v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, et al.,<br><br>        Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)    Civil No. 1:06cv01912 (RBW)<br>)<br>)<br>)<br>)<br>)<br>) |

**CERTIFICATE OF COUNSEL**

I, Anne L. Weismann, am counsel for the plaintiff in the above-captioned case. On February 15, 2007, at 9:30 a.m., I contacted Scott Simpson, counsel for the defendants, to advise him that plaintiff was filing a temporary restraining order. I was not able to reach Mr. Simpson, but left a message on his voice mail about the filing, including the fact that he would be served electronically through the court's ECF system.

_____
ANNE L. WEISMANN

Dated: 2-15-07

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

CITIZENS FOR RESPONSIBILITY AND  )
ETHICS IN WASHINGTON,            )
                                 )
            Plaintiff,           )
                                 )
            v.                   )          Civil No. 1:06cv01912 (RBW)
                                 )
U.S. DEPARTMENT OF HOMELAND      )
SECURITY, et al.,                )
                                 )
            Defendants.          )
_____)

## [PROPOSED] ORDER

The Court having considered plaintiff's request for a temporary restraining order,

defendants' opposition thereto, and the entire record herein, it is hereby ORDERED that

plaintiff's motion is GRANTED, and defendants are ORDERED to immediately preserve any

and all records that are potentially responsive to plaintiff's Freedom of Information Act request

at issue in this case.  Defendants are further ORDERED not to transfer any records that are

potentially responsive to the request unless and until defendants have retained copies.


Dated: _____          _____
                                  REGGIE B. WALTON
                                  United States District Judge