## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

CITIZENS FOR RESPONSIBILITY AND ) 
ETHICS IN WASHINGTON, )

Plaintiff, )

v. )      Civil No. 1:06cv01912 (JGP)

U.S. DEPARTMENT OF HOMELAND )
SECURITY, et al., )

Defendants. )

---

### PLAINTIFF'S RESPONSE TO DEFENDANTS' NOTICE OF FILING
### AND DECLARATION OF PAUL S. MORRISSEY

Under the terms of the Court's Order of February 16, 2007, defendants were ordered to file an agency declaration that "would be in complete conformity" with the "verbal representations" defendants' counsel made to the Court on February 16, 2007, and that would "set forth Defendants' document retention policy." Order of February 16, 2007, p. 2. Defendants have now filed the Declaration of Paul S. Morrissey, Deputy Assistant Director, United States Secret Service ("Morrissey Decl."). As outlined below, the agency declaration neither gives the Court the necessary assurances for which it was intended nor conforms fully to the prior representations of defendants' counsel. Accordingly, the Court should enter an order mandating full and adequate document preservation pending the outcome of this litigation.

The agency declaration was proffered to back up defendants' claim that a temporary restraining order was unnecessary here because, according to defendants' counsel,

> the Secret Service has preserved and will continue to preserve
> during the pendency of this litigation records or copies of records
> in its possession that are the subject of this lawsuit.

Transcript of Motions Hearing Before the Honorable Senior Judge John G. Penn, February 16,
2006 ("Transcript"), p. 8 (attached as Exhibit A).  Counsel elaborated that these records included
"[t]he WAVES and ACR records at the White House, the various kinds of records in relation to
the vice president's residence, most notably entry logs, yes, they will be preserved and are being
preserved."  Id. at 9.  And in response to the Court's request that counsel confirm that what the
agency will preserve are "any and all records that are potentially responsive to the Plaintiff's
Freedom of Information Act request at issue in this case,"[1] counsel responded "that is the
representation that we make."  Id. at 25.

　　　　Mr. Morrissey's declaration does not back up these representations fully.  First, Mr.
Morrissey accounts only for records that exist as of some time "shortly after the filing of the
complaint."  Morrissey Decl., ¶ 3.  The preservation obligations of the U.S. Department of
Homeland Security ("DHS"), however, date back to its receipt of CREW's Freedom of
Information Act ("FOIA") request made in early October 2006.[2]  See, e.g., U.S. Dep't of Justice
v. Tax Analysts, 492 U.S. 136, 149 (1989).  DHS's failure to account for responsive records in
its possession after CREW filed its FOIA request, but before CREW filed this lawsuit, renders its
declaration incomplete and raises the very disturbing possibility that the agency has destroyed or
transferred records improperly.

　　　　Second, Mr. Morrissey describes the universe of potentially responsive records as

---

[1] Id. at 24.

[2] CREW sent its FOIA request to DHS on October 4, 2006.  The Secret Service has
refused to advise CREW when the agency received the request.  See Declaration of Anne L.
Weismann, ¶ 4 (submitted as Exhibit 2 to Plaintiff's Memorandum in Support of its Motion for a
Temporary Restraining Order).

2

"extend[ing] to records of visits to any office within the Executive Office of the President,"

which he has defined as including "the White House, the Eisenhower Executive Office Building

("EEOB"), the grounds encompassing the EEOB and the White House and the New Executive

Office Building . . ."  Morrissey Decl., ¶ 4.  Conspicuously absent from this description is any

reference of records of visits to the residence of the vice president, even though CREW's request

expressly sought records of visits that specified individuals made "to the White House *or the*

*residence of the Vice President*."  Letter of October 4, 2006, from Anne L. Weismann to U.S.

Secret Service (attached as Exhibit B) (emphasis added).  The promise of defendants' counsel

that DHS was preserving "the various kinds of records in relation to the vice president's

residence," Transcript at 9, has not been backed up by the agency declaration, in direct

contravention of this Court's order.

Third, Mr. Morrissey's declaration accounts only for the records of the Office of

Protective Operations ("OPO").  *See* Morrissey Decl., ¶ 3 (explaining that OPO has been

instructed "to retain all records related to CREW's request.").  Mr Morrissey never states,

however, that only OPO has responsive records.  Indeed, Mr. Morrissey's careful and narrow

choice of words contrasts sharply with declarations he has executed for use in other litigation.

For example, in The Washington Post v. U.S. Dep't of Homeland Security, No. 06-1736

(D.D.C.) (appeal docketed), the government submitted a declaration of Mr. Morrissey as part of

its opposition to a motion for a preliminary injunction in which he described the kinds of

electronic visitor records that *the Secret Service* maintains as well as the document retention

policy of the Secret Service with respect to these records.  Declaration of Paul S. Morrissey,

October 13, 2006 (attached as Exhibit C).  Similarly, in a supplemental declaration of Mr.

Morrissey submitted in <u>The Washington Post</u> case as part of the government's motion for a stay pending appeal, Mr. Morrissey described the record keeping practices of *the Secret Service* as well as the various Secret Service records that are potentially responsive to The Washington Post's FOIA request for certain visitor records.  Supplemental Declaration of Paul S. Morrissey, October 25, 2006 (attached as Exhibit D).  By contrast, in this case Mr. Morrissey has addressed only the records of the OPO,  raising the specter that the agency is preserving only a narrow subset of potentially responsive records, contrary to its obligations under the FOIA and the representations defendants' counsel made to this Court.

Equally troubling, Mr. Morrissey never identifies the kinds of records that are potentially responsive to CREW's FOIA request.  So, for example, although CREW sought "records of any and all kind," there is nothing in Mr. Morrissey's declaration confirming that the agency has directed the preservation of both electronic and paper records.  More fundamentally, the complete absence of any explanation by Mr. Morrissey of the kinds of records the Secret Service has that may be responsive gives neither CREW nor the Court any assurance that the Secret Service is preserving the full universe of potentially responsive records.

Finally, Mr. Morrissey states:  "I am advised that the White House Office and the Office of the Vice President have approved this action [of preservation] by the Secret Service . . ." Morrissey Decl., ¶ 5.  Mr. Morrissey does not identify the source of this advice and otherwise provides no basis for the Court to test its accuracy.  Moreover, the government has not provided any declaration from any knowledgeable White House official confirming its approval.  These are not mere oversights; defendants have made clear that they do not want to be subject to a court order that would mandate preservation pending the outcome of this litigation.  *See, e.g.*,

Transcript at 7-11.  But without such an order there is no assurance that the Secret Service, even

if it intends to preserve the records, will not yield to some future order of the White House to

turn over all copies of visitor records to the Offices of the President or Vice President.  The

government has made clear its legal position that these records are, at all times, presidential

records under the exclusive custody and control of the White House.  Without a court order,

CREW and this Court have no protection against an order from the White House mandating that

the Secret Service transfer these records to the White House out of the reach of the FOIA and

this Court.

## CONCLUSION

The court-ordered declaration of Mr. Morrissey does not give the Court sufficient

assurances that all of the records potentially responsive to CREW's FOIA request are being

preserved and will continue to be preserved pending the outcome of this litigation.  Accordingly,

the Court should enter an order mandating such preservation.

Respectfully submitted,

_____/s/_____

Anne L. Weismann
(D.C. Bar No. 298190)
Melanie Sloan
(D.C. Bar No. 434584)
Citizens for Responsibility and Ethics
 In Washington
1400 Eye Street, N.W., Suite 450
Washington, D.C.  20005
Phone: (202) 408-5565
Fax: (202) 588-5020

Attorneys for Plaintiff

Dated: February 26, 2007

**EXHIBIT A**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

```
UNITED STATES OF AMERICA        .
                Plaintiff,      .
vs.                             .  Docket No. CR 06-1912
                                .
U.S. DEPARTMENT OF              .
HOMELAND SECURITY, ET. AL.,     .
                                .  Washington, D.C.
                                .
                Defendant.      .  February 16, 2006
. . . . . . . . . . . . . . . . .
```

TRANSCRIPT OF MOTIONS HEARING

BEFORE THE HONORABLE SENIOR JUDGE JOHN G. PENN

UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:  ANNE WEISMANN, ESQUIRE
                    1400 I Street, N.W.
                    Washington, D.C. 20530


For the Defendant:  W. SCOTT SIMPSON
                    U.S. Department of Justice
                    20 Massachusetts Avenue, N.W.


Court Reporter:  Cathryn J. Jones, RPR
                 Official Court Reporter
                 Room 6427, U.S. District Court
                 333 Constitution Avenue, N.W.
                 Washington, D.C. 20001


Proceedings recorded by machine shorthand, transcript
produced by computer-aided transcription.

Page 2

1                P R O C E E D I N G S

2         THE DEPUTY CLERK:  This is Civil Action 06-1912,

3    Citizens for Responsibility and Ethics in Washington versus

4    U.S. Department of Homeland Security, et.al.

5         Ms. Weismann for the Plaintiff.  Mr. Simpson for

6    the Defendant.

7         THE COURT:  Good afternoon, counsel.

8         MS. WEISMANN:  Good afternoon, Your Honor.

9         THE COURT:  As you know, this case has just been

10   reassigned to me.  And apparently, at that time there was

11   also filed a motion for a TRO.  I will be candid with you,

12   I've looked very quickly at the motion for a TRO.  But I

13   wanted to bring counsel together to see whether or not --

14   well, first, where we stand in the case, whether counsel

15   have had further chance to discuss this matter.  And whether

16   counsel have been able to enter into any type of agreement

17   with respect to a stay, to maintain the status quo until

18   such time as we hear it on motion for a preliminary

19   injunction or a motion for a TRO.

20         I mention the motion for a TRO because I gather

21   that the government has not yet filed its full response to

22   the motion for a TRO.  So where do we stand?

23         MS. WEISMANN:  Good afternoon, Your Honor.  And

24   thank you for hearing us on such quick notice.  Your Honor,

25   I very much appreciate that you have not had an opportunity

Page 3

1   to review our briefs thoroughly.  And I think for purposes

2   of today there really is one issue and one issue only.  And

3   that is that while government counsel has been willing to

4   represent that pending this litigation not just the

5   resolution of the temporary restraining order of the motion,

6   but pending this litigation the Secret Service will preserve

7   all documents.

8           The government has been unwilling to enter a

9   stipulation to that effect.  And it's our position, Your

10  Honor, that based on the background to this case and other

11  related cases that with all due respect to Mr. Simpson, who

12  is a former -- whom I am a former colleague of the

13  representations --

14          THE COURT:  You're former colleagues?

15          MS. WEISMANN:  Yes, we are, Your Honor.  I was at

16  the department for many years.  But that the representations

17  of counsel, I'm not questioning whether or not they're made

18  in bad faith or good faith, but that it's simply not enough.

19  We don't have any declarations from the agency.  And I think

20  for our purposes, and I've conveyed this to government

21  counsel, we would be willing to withdraw our motion

22  altogether if they are willing to enter into a court ordered

23  stipulation, stipulating to the representations that the

24  government counsel has made.  Namely, that they will, the

25  Secret Service will preserve all records that are responsive

Page 4

1    or potentially responsive to our FOIA request and that are

2    at issue here pending the final outcome of this litigation.

3          And that's really the relief that we're seeking

4    through our temporary restraining order.  And I think it can

5    be easily resolved if we can get such a stipulation, which

6    we are ready to enter into today, this afternoon and have

7    the court enter.  But what we are not willing to accept,

8    Your Honor, as I said are simply the representations of

9    counsel.  And I'd be happy to talk further about this, but

10   if you want to hear from government counsel first, I don't

11   know how you want to proceed.

12         THE COURT:  Let's see if, let me hear from

13   government counsel and see if there's a way we can reach

14   some sort of an agreement without having an order entered

15   granting or denying it, the motion for temporary restraining

16   order.

17         MS. WEISMANN:  Just to be clear, Your Honor, as I

18   said if we can get from our prospective the appropriate

19   stipulation in place we will withdraw our motion.  We're not

20   asking to have a resolution on the merits of our motions and

21   all of the issues it raises if we can get a stipulation to

22   preservation that I mentioned.  Thank you.

23         THE COURT:  Okay.  It's mister --

24         MR. SIMPSON:  Simpson.  Actually I'm sure you

25   don't remember me, Your Honor, but you actually judged a

'

Page 5

1   moot court in my law school once many years ago.

2              THE COURT:  Which law school is that?

3              MR. SIMPSON:  Brigham Young University, Your

4   Honor.

5              THE COURT:  I did?

6              MR. SIMPSON:  It was about 1985 or so.

7              THE COURT:  Was it that Brigham Young University?

8              MR. SIMPSON:  I believe so, Your Honor.  I might

9   be remembering incorrectly.

10             THE COURT:  I think your memory --

11             MR. SIMPSON:  I apologize.

12             THE COURT:  -- is faulty, but it has been a few

13  years.

14             MR. SIMPSON:  It has been a few years.

15             THE COURT:  I recall meeting who was it, Mr. Lee.

16             MR. SIMPSON:  Yes, Rex Lee.

17             THE COURT:  Who was I think at one point the

18  president.

19             MR. SIMPSON:  He was the dean of the law school at

20  one time.

21             THE COURT:  Dean, yeah.  So it wasn't me, but I've

22  been to small cities.  It's a beautiful place.

23             MR. SIMPSON:  All right.  Well, Your Honor,

24  obviously the court has seen the letter that was sent to

25  Ms. Weismann, so the government has committed that these

Page 6

1    records won't be transferred or destroyed pending the

2    outcome of this litigation.

3          We would submit, Your Honor, that there's no

4    reason to doubt that representation.  And, in fact, we would

5    submit also, Your Honor, that, that not taking that

6    representation at face value would present an issue as to

7    lack of respect for a coequal branch of the government.  The

8    executive has said they'll do this.  And it shouldn't be

9    necessary for a court to order it to do something that the

10   government has already committed to do.

11         Ms. Weismann has said that she's not satisfied

12   with the representations of counsel even though it's in

13   writing.  I suppose the next step beyond that if the court

14   feels it necessary would be, I'm sure we could get a

15   declaration from the Secret Service basically indicating

16   what we said in our letter, that is, that the records will

17   be retained pending the litigation if the court were to see

18   that necessary.

19         Additionally, as the court has already indicated,

20   Your Honor, we haven't had a chance to respond to the motion

21   in full.  So if the court feels that there's more treatment

22   necessary we would request the opportunity to do that.

23         THE COURT:  Well, what's wrong with a written

24   agreement between the parties that you'll do what you say

25   you'll do?  What's the problem?  What's wrong?

Page 7

1              MR. SIMPSON:  Your Honor, I'm not sure how it

2    would be a written agreement between the parties.  Thinking

3    back to my law school days it wouldn't be anything that the

4    Plaintiff would be giving us in turn.  There's no kind of

5    contract.  All they need, all that they said they need is

6    for the government to give adequate assurances that the

7    records won't be transferred or destroyed.  We believe we've

8    already done that.  Certainly again as I say, Your Honor,

9    we're willing to provide a declaration if more assurance is

10   needed.  I don't see that an agreement is needed because

11   there's nothing that they're agreeing to.

12             THE COURT:  Why are you so hesitant to do it by

13   either a stipulation or an agreed order or whatever?

14             MR. SIMPSON:  I'm sorry, Your Honor, we are not

15   anxious to do it by an agreed order.

16             THE COURT:  Why is that?

17             MR. SIMPSON:  Why do we not want a court order,

18   Your Honor?

19             THE COURT:  Right.

20             MR. SIMPSON:  Again, number one, because it's not

21   necessary.  Number two, because the government needs to keep

22   its options open as to, as to what it's going to do in

23   relation to what might happen in this case in relation to

24   appeal.  Again, we believe that an order is unnecessary.

25   And we would submit uncalled for in this kind of situation.

Page 8

1              THE COURT:  You have read the proposed order

2     submitted by the Plaintiff, I take it?

3              MR. SIMPSON:  Yes, I believe I did yesterday.

4              THE COURT:  You at this point are opposed to the

5     entry of that order --

6              MR. SIMPSON:  We are, Your Honor.

7              THE COURT:  -- is that correct?  Well, would you

8     state on the record what the government's position is on

9     this date as to this motion?

10             MR. SIMPSON:  Well, Your Honor, I can state on the

11    record what we said in the letter in our response, which is

12    that the Secret Service has preserved and will continue to

13    preserve during the pendency of this litigation records or

14    copies of records in its possession that are the subject of

15    this lawsuit.  That is our position on, on the fact that

16    there is no irreparable harm here.

17             Obviously, as the court is aware a preliminary --

18             THE COURT:  There's no irreparable harm --

19             MR. SIMPSON:  Correct.

20             THE COURT:  -- as long as you maintain the status

21    quo?

22             MR. SIMPSON:  That's correct, Your Honor.  And as

23    we point out in our brief response obviously the most

24    important consideration in a motion for injunctive relief,

25    and I would submit particularly in a motion for a temporary

Page 9

1  restraining order, is that clear showing of irreparable harm

2  which because of the government's commitment not to transfer

3  or destroy the records just does not exist.

4         And we also submit, Your Honor -- I'm sure the

5  court has heard before the case law to the effect that

6  preliminary injunctive relief is a drastic remedy.  It's an

7  extraordinary remedy.  And particularly in this kind of

8  situation where the government has already said it's doing

9  what the motion seeks that that kind of drastic remedy isn't

10  needed here and is not appropriate.

11         THE COURT:  So you are representing to the court

12  as an officer of the court and representative of the

13  government that those papers or those records would be

14  preserved, and that you would also preserve any records that

15  might potentially be responsive to the FOIA request?

16         MR. SIMPSON:  That's correct, Your Honor.  The

17  WAVES and ACR records at the White house, the various kinds

18  of records in relation to the vice president's residence,

19  most notably entry logs, yes, they will be preserved and are

20  being preserved.  And, in fact, I should say, Your Honor, as

21  we said in the letter and as I said yesterday in meeting the

22  voice mail from Ms. Weismann those records have already been

23  made preserved, that that has been the government's policy

24  throughout these various cases involving the White House and

25  vice president's residence, entry records, visitors records.

'

1    THE COURT:  And are you also representing that on

2  behalf of the government that none of the records will be

3  transferred?  Is that a yes?

4    MR. SIMPSON:  That is correct, Your Honor.  They

5  will not be transferred.  Although I should say some of them

6  are being transferred, but in transferring them the Secret

7  Service is keeping a copy of the things that is transferred.

8    THE COURT:  Everything that is being transferred?

9    MR. SIMPSON:  Exactly.  The Secret Service is

10  keeping a copy of everything that is being transferred and

11  that will continue.

12    THE COURT:  Well, can you take a moment again and

13  explain to me if you're really going that far and gone that

14  far on the record, which is part of the record now, why

15  can't the parties agree to just reduce that to writing or an

16  agreed order on everything?

17    MR. SIMPSON:  Well, Your Honor, we have reduced it

18  to writing --

19    THE COURT:  Because in this way, of course, the

20  court has really not addressed a motion for a TRO.  And I'm

21  sure you would rather have that addressed later on maybe by

22  way of a preliminary injunction.

23    MR. SIMPSON:  Well, Your Honor, actually our first

24  position on the motion is that she be denied for lack of

25  that irreparable injury, that irreparable harm.

'

1    THE COURT:  Well I guess if the records are gone

2    they're gone and that would possibly be irreparable injury.

3    MR. SIMPSON:  But they're not gone, Your Honor.

4    The Secret Service is holding onto them.  And again, that is

5    the government's representation.  And where that

6    representation has been made there's no need for an order.

7    And we would submit that an order to the court, an order to

8    the government to do what its already being done would

9    violate the respectiscity [sic] to a coequal branch of the

10   government.

11   As I said, Your Honor, we would be more than glad

12   to prepare to submit a declaration setting forth what we

13   said in our letter, a declaration signed by someone from the

14   Secret Service if there's more assurance needed.

15   THE COURT:  When can that be submitted to the

16   court?

17   MR. SIMPSON:  It's always frightening to submit to

18   a time frame when it's not under my control entirely.

19   THE COURT:  I know what you mean.

20   MR. SIMPSON:  But, Your Honor, if it's fairly

21   short I would think by next Thursday or so we can easily do

22   that.  I should emphasize, Your Honor, that in the meantime

23   nothing is changing here.  Obviously the time frame for a

24   TRO generally is ten days subject to extension by the court

25   for an additional ten days.  Nothing is going to change in

Page 12

1    that time.

2          As I said the records are being held and nothing

3    is going to change.

4          THE COURT:  What is the next step that you would

5    like to see in this case?  Assuming that you do what you

6    just said you're going to do, what would be the next step?

7          MR. SIMPSON:  We are preparing a motion for

8    summary judgment which we'll be submitting shortly.  And it

9    will address the issue as to whether these are agency

10   records.  Our position is that they are presidential records

11   now subject to the FOIA.  And that will, of course, include

12   a declaration setting forth all the facts about the records

13   that we believe show that they are presidential records.

14         THE COURT:  Has a motion for a preliminary

15   injunction also been filed?

16         MR. SIMPSON:  No, Your Honor, in this case it has

17   not been.

18         THE COURT:  All right.  Let me hear from counsel

19   for the Plaintiff.

20         MS. WEISMANN:  Your Honor, I think it's

21   extraordinary that while government is so willing to make

22   proffers he's unwilling to provide any evidence to this

23   court.  And I want to be clear because I was very troubled

24   by the government's filing last night.  They filed the

25   letter, but they failed to even mention much less file with

Page 13

1   it the fact that we had sent them a response to their

2   letter.  And even before their letter was sent I had made a

3   request of them that in lieu of a letter agreement they

4   submit agency declarations.  And that we put this on a track

5   toward a court ordered stipulation and they have completely

6   ignored my requests.

7          And counsel has really not been able to offer for

8   this court any single, tangible good faith reason why it is

9   that in lieu of representations by counsel the government

10  itself can't come forward with the requisite evidence to

11  back up its claims.  I'm sure as the court is aware it's

12  improper for counsel to through its own, his or her own

13  declarations submit substantive evidence in a case and yet

14  that's essentially what counsel is doing here.

15         If in fact it is the government that is going to

16  be preserving these records and not counsel then I think

17  it's imperative given our motion that we hear from the

18  government whether it be in the form of agency declaration

19  or some other agreement between the parties.  And the notion

20  that such an agreement would lack legal effect because we're

21  not giving up anything is frankly ludicrous.

22         Your Honor, we're not trying to be difficult here.

23  But from our prospective the government's conduct and not

24  just in this case, but in about three or four related cases

25  has been anything but above board.  And I'm not talking

Page 14

1    about the conduct of the counsel.  I'm talking about the

2    conduct of the White House and the Secret Service.

3         You may recall Your Honor that we have another

4    case with you, the first Secret Service case that we filed

5    seeking similar records.  In May of 2006, while that case

6    was pending, well, the DNC case that was part of that case

7    was pending that was consolidated and while judicial watch's

8    case was pending the White House and Secret Service entered

9    into a secret memorandum of understanding, which we have put

10   in the record here as part of our motion papers.  In which

11   they said for purposes, for all time these records have been

12   presidential.  They will be presidential.  They shall be

13   presidential henceforth.  Making no mention of the fact that

14   there were legal claims by at least three separate parties

15   to those records.

16        There was another case filed by the Washington

17   Post.  They sought injunctive relief in that case.

18             THE COURT:  That's on appeal, is it not?

19             MS. WEISMANN:  The appeal has been docketed, yes,

20   Your Honor.  And in that case one of the grounds by no means

21   the only ground, but one of the grounds the Washington Post

22   put forth to justify the injunction was to preserve the

23   records.  And the government's response was they're being

24   preserved, but they're declarations that they were being

25   preserved by the White House not the Secret Service.

1      The White House is not a party to these cases.

2  And it's the government's position as they point out that

3  the White House is not subject to the FOIA.  It's just not

4  good enough.  We've been told there's another secret

5  agreement that exist between the vice president and the

6  Secret Service.  We'd love to know when we're going to see

7  that one.  In fact, the MOU, Your Honor, wasn't even offered

8  to Judge Urbina during the entire briefing on the PI motion

9  until the government lost and sought a stay.

10      So this is not the conduct of an agency that's

11  been above board.  But rather an agency that's wanted to act

12  in secret.  And that's why we submit, Your Honor, with all

13  due respect to government counsel we're asking for not from

14  counsel but from the government as an alternative if this

15  court feels that counsel's representations are sufficient

16  then you could based on those representations issue an order

17  today.

18      At least until they come forward with the evidence

19  you should order that no records be destroyed.  This is the

20  lawyers.  These are not the clients themselves.  We just

21  don't think that's an adequate substitute.

22      THE COURT:  Was the MO --

23      MS. WEISMANN:  Memorandum of understanding.

24      THE COURT:  Right.  Was that entered into or

25  signed prior to Judge Urbina's ruling or after?

,

Page 16

1          MS. WEISMANN:  Yes, it was entered into before.

2     It was entered into in May of 2006.  And Judge Urbina issued

3     his ruling in October of 2006, I believe it was.  And the

4     MOU was never entered into evidence until the government

5     lost and was seeking a stay pending appeal.  I think that's

6     extraordinary.  We'll let the record speak for itself.  But

7     it's just one indicia we believe that the government is not

8     operating above board.  And we're very troubled by that

9     obviously.

10          Now you had asked to lead into another question

11     the government's position on once we get passed this hurdle

12     where do we go next.  We have pending a request for a Rule

13     26(f) conference, Your Honor.  And the reason is that I

14     called up --

15          THE COURT:  In this case?

16          MS. WEISMANN:  In this case, yes.

17          THE COURT:  Please understand that I've just

18     received --

19          MS. WEISMANN:  Oh, absolutely and I'm not faulting

20     you at all.  I'm pleased that you were able to accommodate

21     us this afternoon.  I bring it up Your Honor because I

22     called government counsel and said I think we should have a

23     conference as the rules contemplate.  He said, well, we

24     think the case should be resolved on summary judgment

25     motions.  I said well, we differ.  And there's a factual

Page 17

1   inquiry about what constitutes agency control for purposes

2   of the FOIA and we think we need discovery.  He wouldn't

3   even agree -- the government would not even agree to sit

4   down and talk about our respective positions.  And that's

5   why we filed a motion with the court.  It was then before

6   Judge Walton.

7          When this case was at the administrative stage

8   before we were in litigation and we filed our FOIA request,

9   I couldn't get the agency to return my calls.  And I finally

10  got through to someone who told me we've been directed not

11  to answer any of your questions including my question about

12  when the government, when the agency received my Freedom of

13  Information Act request.

14         So this is a record that has been anything but

15  above board.  And again, that goes back to why we are deeply

16  troubled.  We were deeply troubled that the Secret Service

17  was not retaining the documents.  We filed our motion for a

18  temporary restraining order.  The relief we're seeking in

19  that is just that the documents be preserved until we can

20  resolve the legal issues.  We think it's appropriate in

21  light of that for the government to come forward with

22  evidence in the form of declarations or be willing to have a

23  court ordered stipulation entered.

24         THE COURT:  All right.

25         MS. WEISMANN:  Thank you.

Page 18

1              THE COURT:  Mr. Simpson.

2              MR. SIMPSON:  Just a few more things, Your Honor.

3     Counsel has pointed to the fact that of course other cases

4     regarding these types of records are pending.  And I should

5     point out to the court that it is exactly because of that,

6     exactly because of those other FOIA requests and other cases

7     in the court that the Secret Service has been holding onto

8     these records.  My understanding is that the Secret Service

9     is holding onto these records not just the records involved

10    in this case but just these WAVES and ACR records in

11    general.

12             Your Honor, I would encourage the court in

13    thinking about the request for a 26(f) conference to look at

14    our response to that motion, of course.  As we point out

15    there the reason, the focus of a 26(f) conference obviously

16    is to prepare for discovery.  And that's the obvious reason

17    why Plaintiff asked for an order requiring a 26(f)

18    conference because they cannot propound discovery until

19    after such a conference.

20             As the court is probably aware discovery is very

21    rare in FOIA cases.  And for the reasons stated in our

22    opposition to that motion, we don't believe this is such a

23    rare case for discovery.  As I said we plan on filing soon a

24    motion for summary judgment.  And it is only after looking

25    at that motion that the court according to the precedent

Page 19

1   could look at our papers and decide whether discovery is

2   needed after that point.

3            THE COURT:  Is there anything else that you would

4   wish to file with respect to the motion now pending before

5   the court?

6            MR. SIMPSON:  Your Honor, if the court believes

7   that's necessary and, of course, that is lawyer speak for if

8   the court is otherwise inclined to consider granting the

9   motion then yes, we do believe that we would like to file

10  something additional in response to the motion.

11           THE COURT:  When can I have it?

12           MR. SIMPSON:  Your Honor, what I would suggest is

13  since nothing is going to change in the meantime that we be

14  allowed to respond pursuant to the local rules, pursuant to

15  the time provided by the local rules.

16           THE COURT:  Can we have something by Wednesday?

17           MR. SIMPSON:  Your Honor, we could try although

18  that would be difficult because, this would be difficult

19  doing it by Wednesday because addressing obviously one of

20  the arguments in a motion for temporary restraining order is

21  likelihood of success on the merits.  And that would require

22  completing a declaration obviously that contains quite a few

23  facts regarding several different categories of records.  So

24  doing it by next Wednesday would be extremely difficult.

25           THE COURT:  When would you be prepared to file it?

Page 20

1    MR. SIMPSON:  I didn't look before I came to the

2 court with the, what the date would be under the local

3 rules.  The motion was filed yesterday, the 15th.  And the

4 rule is in this district if I remember correctly is 10 days

5 for a response.  I practice in many districts, Your Honor,

6 so it's hard for me to remember which, which time period

7 applies here.

8    THE COURT:  It is 10, I believe.

9    MR. SIMPSON:  And then, of course, three days

10 under Rule (6)(e), so what would that be, taking into

11 account of the holiday on Monday.  I actually didn't bring

12 my personal data system here with me because I didn't want

13 it going off while I was here.  I suppose if it were not for

14 the holiday on Monday, we'd be talking about two weeks from

15 yesterday.  And then the holiday would make it the following

16 day and three days under Rule (6)(e) would make it what, the

17 following Monday after that.

18    MS. WEISMANN:  Your Honor, I'd just like to point

19 out that the government in previous pleadings represented

20 that it was prepared to file a summary judgment motion on

21 February 10th and today is the 16th.  So I'm a little

22 perplexed as to why the government needs such an

23 extraordinary amount of time.

24    MR. SIMPSON:  It would be March 5th, Your Honor.

25    THE COURT:  These records at the present time are

'

Page 21

1    in the possession of the Secret Service?

2           MR. SIMPSON:  Yes, Your Honor or copies of them.

3           THE COURT:  Or copies?

4           MR. SIMPSON:  Yes.

5           THE COURT:  And with respect to the MOU, some of

6    these records may, what's going to happen to these records?

7           MR. SIMPSON:  My understanding --

8           THE COURT:  What may happen to these records?

9           MR. SIMPSON:  Were it not for the litigation they

10   would have been turned over to the White House and the

11   Secret Service's copies of them would have been deleted.

12          THE COURT:  So they're not going to be turned over

13   to the White House or the office of the vice president or

14   anyone else?

15          MR. SIMPSON:  That is correct except that to the

16   extent they are the Secret Service is retaining copies of

17   them.

18          THE COURT:  And I take it speaking now to the

19   Plaintiff that as long as the -- is it your position that as

20   long as you have the copies of them even if they are turned

21   over that is sufficient?

22          MS. WEISMANN:  Yes, Your Honor.  Because that is

23   all we're entitled to under the FOIA as long as we can be

24   assured that copies are being retained and they're being

25   retained in a way that are easily accessible.

Page 22

1    Frankly, Your Honor, I think March 5th is an

2    extraordinarily long time.  If the court were to enter an

3    order that required the Secret Service to retain the copies

4    in the interim then we would have no objection to that time

5    frame however.

6    THE COURT:  And what the government appears to be

7    saying to the court as I understand it, and correct me if

8    I'm wrong Mr. Simpson, is that that's what you're going to

9    do?  I have to remind you -- would you come back over to the

10   microphone.  I have to remind you that, you know, don't play

11   games with the court.  Because you're standing before the

12   court as the representative of the United States.  That's a

13   proud possession to be in because I've been in that same

14   position with the Department of Justice.

15   But you're representing to the court that those

16   records are going to be maintained with the Secret Service,

17   and either the records or copies of those records as of this

18   moment?

19   MR. SIMPSON:  That's correct.  I take that

20   responsibility very seriously.  I will convey the

21   seriousness of that to my client.

22   MS. WEISMANN:  Your Honor, I don't mean to sound

23   like a broken record, but I do believe the court would have

24   the authority based on representations of counsel to so

25   order.

Page 23

1    I mean the other thing I'd like to point out is I

2  would be concerned if counsel is using the responsibility to

3  respond to our TRO motion essentially an opportunity to file

4  summary judgment motion.  Counsel's represented that they're

5  going to be shortly filing that.  They previously

6  represented to the court that they were going to be filing

7  that on February 10th.  So again, I mean --

8    THE COURT:  February 10th has --

9    MS. WEISMANN:  Is come and gone.

10    THE COURT:  Yes.  That was represented in this

11  case?

12    MS. WEISMANN:  Yes, it was, Your Honor, when they

13  sought -- they sought an extension of their time to answer.

14  And now they're suggesting that they need until March 5th.

15  Obviously we want to move in this court.  Counsel is correct

16  that we do believe discovery is appropriate.

17    I think the purpose of a 26(f) motion is not

18  simply to address discovery, but for the court to understand

19  what the respective parties' positions are on how the case

20  should proceed.  And it's precisely where you have as you do

21  here parties that believe that the case should proceed in

22  two entirely different tracks that I think a Rule 26(f)

23  motion is especially helpful to the court.

24    And so I realize you're not prepared to deal with

25  that motion today, but --

Page 24

1          THE COURT:  No.

2          MS. WEISMANN:  -- and I respect that, Your Honor.

3    We are troubled that under the guise of responding to a TRO

4    motion in fact, what the government is likely to do is to

5    come in with a combined response and summary judgment

6    motion.  And we think that would be entirely inappropriate

7    in this instance to, when we've come in on an emergency

8    basis.  And I think while the rules generally do provide for

9    10 days, I think on a TRO situation the court can always

10   shorten that time.

11         We're not asking that the time be shortened, but

12   we certainly do object to such a lengthy period of time.

13   Again, if the court were to put an order in place that

14   required the government to preserve all those records

15   pending the determination of this motion then we would

16   reluctantly agree to that schedule.

17         THE COURT:  Well the court is going to take the

18   government at its word.  I will file an order.  And I want

19   to make sure that we are in complete agreement.  The

20   government, the United States will, the agency has

21   represented to this court on the record that the Defendants

22   will preserve, and please correct me if I'm wrong

23   Mr. Simpson, any and all records that are potentially

24   responsive to the Plaintiff's Freedom of Information Act

25   request at issue in this case.

Page 25

1    And further, that the Defendants will not transfer
2    any records that are potentially responsive to this request
3    unless and until the Defendants have retained copies of
4    those documents.   Is that a fair statement?
5              MR. SIMPSON:   Could I have a moment, Your Honor?
6              [Brief pause.]
7              MR. SIMPSON:   Your Honor, that is accurate.
8              THE COURT:   I have to ask you to come over to the
9    microphone.
10             MR. SIMPSON:   I'm sorry, Your Honor.   That is
11   accurate, Your Honor.   And we do, that is the representation
12   that we make.   However, if I could point out Your Honor if
13   the court's going to put that in the record I'm not sure we
14   see any need to address the TRO motion at all, but the way
15   the court has stated our representation is correct.
16             THE COURT:   Well, we can just say pending the --
17   the court is really holding the motion for a TRO in abeyance
18   based upon your representation to the court.   Because what
19   has happened is that you're maintaining the status quo at
20   this point.   And so the Plaintiff and the Defendant can be
21   fully heard on the motion for preliminary injunction or the
22   motion for a summary judgment or the motion relating to Rule
23   26.
24             MR. SIMPSON:   I understand that, Your Honor.
25             THE COURT:   Is that the agreement?

Page 26

1          MR. SIMPSON:  Yes, Your Honor.

2          THE COURT:  And I would think that that being the

3    case then I think I would feel comfortable in not addressing

4    the TRO at this point.

5          MR. SIMPSON:  So just to be clear, Your Honor, the

6    court envisions simply putting in an order the fact that we

7    have made that representation to the court on the record?

8          THE COURT:  I am making, putting in the court is

9    not going to address it based upon your representation that

10   those things will happen.

11         MR. SIMPSON:  That's fine, Your Honor.  Thank you.

12         THE COURT:  Does the Plaintiff have any problem

13   with that?

14         MS. WEISMANN:  I'm just concerned that the

15   government seems so reluctant to have this framed as

16   anything that sounds like an order of the court.  I just

17   wish I could understand what is behind that.  Because I

18   don't think if it's framed as an order it should have any

19   different effect than what counsel has represented will

20   happen.

21         And so I have to tell you I have a very queasy

22   feeling here.  And I wish I could --

23         THE COURT:  You think the government might do

24   what?

25         MS. WEISMANN:  I don't know, Your Honor, because

Page 27

1    what I don't have are any declaration to back up the

2    representations of counsel.  I mean again if the court

3    envisions an order that says based on the representations of

4    counsel, I hereby order that the status quo be maintained,

5    and it's my understanding that the status quo is that no

6    records, et cetera, then we're comfortable if it's done in

7    the form of an order based on counsel's representations.

8         As we've said we think the preferable course would

9    have been to get direct affirmations from the agency or a

10   stipulation that both parties signed.  What we do want in

11   the form of an order, and I don't mean to sound so highly

12   technical about it, but I'm just troubled and I'm perplexed

13   as to why the government seems so reluctant to have an order

14   imposed on it.

15        Mr. Simpson did say earlier that they wanted to

16   keep all their options open.  I'm not sure what they mean by

17   that frankly.  If one of their options is changing their

18   mind I mean that's certainly not something that we would

19   willingly go along with.  So I think the court can properly

20   craft an order -- if the court is comfortable with relying

21   on the representations of counsel I think the court can

22   craft an order around that.  And if that were to happen we

23   would agree that there would be no need at this time to

24   address our TRO.

25        THE COURT:  Mr. Simpson.

1    MR. SIMPSON:  If I can just make clear, Your

2  Honor, about my statement about keeping our options open.

3  The government's desire is that if there were to be an order

4  that there would be the possibility of being able to appeal

5  it.  We would rather not have to face that decision.  So as

6  I said Your Honor an order isn't necessary here.  An order

7  would be a bigger deal if I can say it that way.  And then

8  we would have to face, we would face the issue, the question

9  as to whether to appeal.

10    And once again, Your Honor, if the representation

11  of counsel in writing in a letter and in open court and as,

12  as described in the court's order if that representation is

13  not sufficient then we could provide a declaration if that's

14  needed by the court.

15    THE COURT:  Well let me ask you, when do you

16  intend to provide the declaration?

17    MR. SIMPSON:  And again just to make clear what

18  we're talking about if this is needed by the court I would

19  envision --

20    THE COURT:  Well I don't see any reason why it

21  can't be done frankly.  Why are we --

22    MR. SIMPSON:  Certainly, Your Honor.  We can file

23  a declaration basically setting forth what was said in the

24  letter.  It would be filed, I would envision a simple notice

25  of filing.  We can provide that sometime next week.

Page 29

1        THE COURT:  Next week, when next week?

2        MR. SIMPSON:  Next Thursday.

3        THE COURT:  All right.  All right.  Now the

4    Plaintiff is still not satisfied with that as I understand

5    it; is that right?

6        MS. WEISMANN:  Well, we certainly would look

7    forward to seeing the declaration, Your Honor, but the

8    government has made it clear it doesn't want to be bound by

9    a court order.  And if that's the case then it does seem to

10   us the government wants to reserve the right to change its

11   mind on whether or not it's going to preserve the records.

12       THE COURT:  If the government is going to change

13   its mind it must in the, what I will write will provide that

14   if there is any change the government must give five days

15   notice to the court and counsel for the Plaintiff.

16       MS. WEISMANN:  One of the concerns we have is when

17   you're talking about documents and that's what this case is

18   all about once they're gone we have no effective way to get

19   them back.  And that's why typically this is the kind of

20   irreparable harm that a TRO addresses.  I just haven't heard

21   a single cogent reason of counsel as to why it is they don't

22   want to be subject to a court order and that is very

23   troubling to us.

24       The whole reason why we're seeking a TRO is that

25   we don't want to have this issue left to the whim of the

Page 30

1  government and have to litigate it every time they want to

2  change their mind.  We think it's ripe for litigation.  And

3  so we're happy to see what they file on Wednesday, but if

4  they're not willing to be bound by a court order I think it

5  would be our view that we would want to see the TRO proceed.

6          THE COURT:  Mr. Simpson, in your letter of

7  February 15th, I know it's written by you as senior trial

8  counsel, but is that on behalf of the Attorney General?

9          MR. SIMPSON:  On behalf of the Attorney General, I

10  don't know about that, Your Honor.

11          THE COURT:  I don't want Mr. Gonzales to come

12  marching into this court and telling me that he's, you did

13  something that you couldn't do.

14          MR. SIMPSON:  If I can say this this way, Your

15  Honor, I was not the only person who saw this letter before

16  it went out.

17          THE COURT:  There's no indication of that on the

18  letter.

19          MR. SIMPSON:  Again, Your Honor, I would hope that

20  our filing of the declaration would take care of any concern

21  as to the authority for making these statements.  As I said

22  the letter was widely reviewed as I'm sure the declaration

23  will be as well.

24          THE COURT:  All right.  Then I will accept that

25  representation.  You're going to file a declaration on or

Page 31

1    before Wednesday of next week?

2              MR. SIMPSON:  Your Honor, I believe the day that I

3    represented to the court was Thursday.

4              THE COURT:  All right, Thursday of next week.

5              MR. SIMPSON:  Thank you, Your Honor.

6              THE COURT:  I'm going to go along with that

7    because I would hope that I wouldn't see the day when a

8    representative of the United States would deliberately

9    mislead the court.  And the court is withholding taking

10   action based upon that representation.

11             Counsel have anything else?

12             MS. WEISMANN:  No, we do not, Your Honor.

13             THE COURT:  Are there any other dates we need to

14   set now?

15             MS. WEISMANN:  Well Your Honor if they file on

16   Thursday I guess we would like until the following Monday to

17   respond depending on when they file.

18             THE COURT:  All right.  In the meantime the motion

19   for a TRO will be held in abeyance.

20             MS. WEISMANN:  Right.  And again our understanding

21   is that in the meantime also that the status quo will be as

22   counsel has represented it.

23             THE COURT:  Yes.  Agreed?

24             MR. SIMPSON:  Yes, Your Honor.

25             THE COURT:  All right.  Then the court will enter

Page 32

1    that order.  And madam court reporter, I would like the

2    transcript of this proceeding.  Counsel, have anything else?

3              MS. WEISMANN:  Not today, Your Honor.  Thank you

4    again.

5              THE COURT:  Have a nice weekend.

6              [Thereupon, the proceedings adjourned at 3:55

7              p.m.]

8                          CERTIFICATE

9              I, Cathryn J. Jones, an Official Court Reporter

10   for the United States District Court of the District of

11   Columbia, do hereby certify that I reported, by machine

12   shorthand, the proceedings had and testimony adduced in the

13   above case.

14             I further certify that the foregoing 31 pages

15   constitute the official transcript of said proceedings as

16   transcribed from my machine shorthand notes.

17             In witness whereof, I have hereto subscribed my

18   name, this the 20th day of February, 2007.

19

20

21

22

23   _____

                      Cathryn J. Jones, RPR
24                    Official Court Reporter

25

**EXHIBIT B**

# CREW | citizens for responsibility and ethics in washington

October 4, 2006

United States Secret Service
Freedom of Information and Privacy Acts Branch
245 Murray Drive
Building 410
Washington, D.C. 20223

## Re: Freedom of Information Act Request

Dear Sir/Madam:

Citizens for Ethics and Responsibility in Washington ("CREW") makes this request for records, regardless of format, medium, or physical characteristics, and including electronic records and information, pursuant to the Freedom of Information Act ("FOIA") and U.S. Department of Homeland Security ("DHS") regulations, 6 CFR part 5.

This request is for all records relating to any visit that any and all of the following individuals made to the White House or the residence of the Vice President from January 1, 2001, to the present. As used herein, the term "White House" includes, but is not limited to, any office within the Executive Office of the President, the residence of the President, the Old and New Executive Office Buildings, and any other office or space on the grounds of the White House. Specifically, we seek any record of visits to the White House or the Vice President's residence by the following individuals:

> James Dobson
> Gary L. Bauer
> Wendy Wright
> Louis P. Sheldon
> Andrea Lafferty
> Paul Weyrich
> Tony Perkins
> Donald Wildmon
> Jerry Falwell

We seek records of any and all kind, including electronic records, audiotapes, videotapes, photographs, and computer print-outs. Our request includes any telephone messages, voice mail messages, and daily agenda and calendars.

If it is your position that any portion of the requested records is exempt from disclosure, CREW requests that you provide it with an index of those documents, as required under Vaughn v. Rosen, 484 F.2d 820 (D.C. Cir. 1973), *cert. denied*, 415 U.S. 977 (1972). As you are aware, a Vaughn index must describe each document claimed as exempt with sufficient specificity "to permit a reasoned judgment as to whether the material is actually exempt under FOIA." Founding Church of Scientology v. Bell, 603

F.2d 945, 959 (D.C. Cir. 1979). Moreover, the <u>Vaughn</u> index must "describe each document or portion thereof withheld, and for each withholding it must discuss the consequences of supplying the sought-after information." <u>King v. U.S. Dep't of Justice</u>, 830 F.2d 210, 223-24 (D.C. Cir. 1987).

In the event that some portions of the requested records are properly exempt from disclosure, please disclose any reasonably segregable, non-exempt portions of the requested records. *See* 5 U.S.C. §552(b). If it is your position that a document contains non-exempt segments and that those non-exempt segments are so dispersed throughout the documents as to make segregation impossible, please state what portion of the document is non-exempt, and how the material is dispersed through the document. <u>Mead Data Central v. U.S. Dep't of the Air Force</u>, 455 F.2d 242, 261 (D.C. Cir. 1977). Claims of non-segregability must be made with the same detail as required for claims of exemptions in a <u>Vaughn</u> index. If a request is denied in whole, please state specifically that it is not reasonable to segregate portions of the record for release.

### Fee Waiver Request

In accordance with 5 U.S.C. §552(a)(4)(A)(iii), CREW requests a waiver of fees associated with processing this request for records. The subject of this request concerns the operations of the federal government and the disclosures will likely contribute to a better understanding of relevant government procedures by CREW and the general public in a significant way. Moreover, the request is primarily and fundamentally for non-commercial purposes, pursuant to 5 U.S.C. §552(a)(4)(A)(iii). *See, e.g.*, <u>McClellan Ecological v. Carlucci</u>, 835 F.2d 1282, 1285 (9th Cir. 1987). Specifically, the requested records are likely to contribute to the public's understanding of the influence that conservative Christian leaders have, or attempt to have, on the President in the exercise of his authority.

CREW is a non-profit corporation, organized under section 501(c)(3) of the *Internal Revenue code*. CREW is committed to protecting the citizens' right to be aware of the activities of government officials and to ensuring the integrity of those officials. CREW is dedicated to empowering citizens to have an influential voice in government decisions and in the government decision-making process. CREW uses a combination of research, litigation, and advocacy to advance its mission. The release of information garnered through this request is not in CREW's financial interest. CREW will analyze the information responsive to this request and intends to share its analysis with the public, either through memoranda, reports, or press releases. CREW has an established record of carrying out these types of activities, as evidenced through its website, www.citizensforethics.org. Currently, the CREW website contains links to thousands of pages of documents acquired from multiple FOIA requests. See http://citizensforethics.org/activities/foia.php. Visitors to CREW's website can peruse the FOIA request letters, the responses from government agencies, and a growing number of documents responding to FOIA requests. CREW's virtual reading room provides around-the-clock access to anyone interested in learning about the government activities that were the focus of CREW's FOIA requests. The CREW website also includes documents relating to CREW's FOIA litigation, Internal Revenue Service complaints, and Federal Election Commission complaints.

Under these circumstances, CREW satisfies fully the criteria for a fee waiver.

If you have any questions about this request, or foresee any problems in releasing fully the requested records on an expedited basis, please call Anne Weismann at (202) 408-5565.  Also, if CREW's request for a fee waiver is not granted in full, please contact our office immediately upon making such a determination.  Please send the requested documents to Anne Weismann, Citizens for Responsibility and Ethics in Washington, 1400 Eye Street, N.W., Suite 450, Washington, D.C.  20005.

Sincerely,

ANNE L. WEISMANN
Chief Counsel
Citizens for Responsibility and Ethics
 in Washington

3

**EXHIBIT C**

## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| THE WASHINGTON POST,<br><br>    Plaintiff,<br><br>    v.<br><br>UNITED STATES DEPARTMENT OF<br>HOMELAND SECURITY,<br><br>    Defendant. | )<br>)<br>)<br>)<br>)<br>)    Civil Action No. 06-1737 (RMU)<br>)<br>)<br>)<br>)<br>)<br>) |

## DECLARATION OF PAUL S. MORRISSEY
## DEPUTY ASSISTANT DIRECTOR
## UNITED STATES SECRET SERVICE

I, Paul S. Morrissey, hereby make the following declaration:

1.     I am the Deputy Assistant Director of the Office of Protective Operations for the United States Secret Service (hereinafter "Secret Service"), which is a component of the Department of Homeland Security ("DHS"). I have held this position since September, 2006, and have been a special agent with the Secret Service since January, 1983.

2.     The Secret Service is a protective and law enforcement agency operating under the provisions of Title 18 of the United States Code, Sections 3056 and 3056A. Pursuant to Section 3056, the Secret Service is charged with the protection of the President and Vice President of the United States and their immediate families; major candidates for President and Vice President of the United States and their spouses; the President-elect and Vice President-elect and their immediate families; former Presidents of the United States, their spouses and

minor children; visiting foreign heads of state and heads of government; and other individuals as directed by the President of the United States. Additionally, the Secret Service is authorized to provide security for the White House and the Vice President's official residence; foreign embassies and missions in the Washington, D.C. area, and certain other locations within the United States; designated events of national significance, including National Special Security Events; as well as other locations.

3.     The Office of Protective Operations is one of eight directorates that manage various operational and support functions within the Secret Service. It is responsible for establishing policies related to the Secret Service's protective mission and for overseeing the operational divisions that protect the persons, places and events we are authorized by statute and Executive Order to protect.

4.     The "White House Complex" as secured by the Secret Service includes the White House, the Eisenhower Executive Office Building ("EEOB"), and the grounds encompassing the EEOB and the White House, and the New Executive Office Building. Housed in the White House and the EEOB are the offices of various staff of the Executive Office of the President as well as offices for the staff of the Office of the Vice President, including the Executive Branch office of the Vice President himself. The secured area of the White House Complex also includes all of the office space used by the Office of the Vice President on the White House Complex.

5.     It is my understanding that there has been a request by the Washington Post for information concerning visitor access to the Office of the Vice President, including Access Control Records ("ACR") and Worker and Visitor Entrance System ("WAVES") records. These

2

same systems are used in connection with the monitoring of access of visitors to the White House Complex, including the Executive Office of the President and the Office of the Vice President.

6.     ACR records consist of records generated when a pass holder, worker, or visitor swipes his or her pass over one of the electronic pass readers located at entrances to and exits from the White House Complex. ACR records include information such as the pass holder's name and badge number, the time and date of the swipe, and the post at which the swipe was recorded. ACR records do not include information about who the entrant is visiting in the Complex.

7.     WAVES records consist of records generated when information is submitted by an authorized White House pass holder to the Secret Service about workers and visitors who need access to the White House Complex to perform work, conduct business, or attend events. Authorized White House pass holders include members of both the President's and Vice President's staff. WAVES records include the following information submitted by the authorized pass holder: the visitor's name, date of birth, and Social Security number; the time and location of the planned visit; the name of the pass holder submitting the request; and the date of the request. They may also include limited information from background checks performed by the Secret Service and coded instructions to Secret Service officers. Once a visit takes place, WAVES records are typically updated electronically with information showing the actual time and place of the visitor's entry into and exit from the White House Complex.

8.     Since at least 2001, it has been the practice of the Secret Service to transfer newly-generated WAVES records on CD-ROM to the White House Office of Records Management (the "WHORM") every 30 to 60 days. It was the intent of the Secret Service that once transferred to

3

the WHORM, the records were to be erased from its computer system. With regard to the time period at issue in the Washington Post's request (October 2004 to present), in October 2004, at the request of the National Archives and Records Administration, the Secret Service began temporarily retaining a copy of the WAVES records that it transferred to the WHORM.

9.    The information in WAVES records submitted by an authorized White House pass holder is provided to the Secret Service temporarily for two limited purposes: (1) to allow the Secret Service to perform background checks to determine whether, and under what conditions, to provide for the visitor's temporary admittance to the White House Complex; and (2) to allow the Secret Service to verify the visitor's admissibility at the time of the visit.

10.    Once a visitor's visit to the White House Complex is complete, the Secret Service has no continuing interest sufficient to justify preservation or retention of WAVES records, and the Secret Service does not control or direct the ultimate disposition or use of the records. Both the White House and the Office of the Vice President, respectively, do have such a continuing interest and therefore the records are turned over to the WHORM.

11.    The Vice President's residence, located at One Observatory Circle, Washington, D.C., is not part of the White House Complex, and the Secret Service does not use the WAVES or ACR systems at that site. The Secret Service provides security for the Vice President at the Vice President's residence. The Secret Service monitors and controls access to the Vice President's residence through the use of two lists: a daily access roster for individuals with appointments or work orders, and a permanent access list for those individuals who regularly come to the residence such as OVP staff members, contractors, military personnel, and the Vice President's family members. The Secret Service receives requests from the Vice President's staff

4

or from authorized Naval personnel to screen individuals for entry. The Secret Service conducts background checks on individuals for whom there has been a request for admission (using personal identifiers provided by the requester, including name, date of birth and Social Security number), and the name then appears on the daily access roster or the permanent access list. Both the permanent access list and the daily access roster are provided to Secret Service officers at entrances to the residence's grounds and reflect that the individual requested for entry has been screened by the Secret Service. The names of individuals who actually enter on a particular day are handwritten on an entry log by the officer working at the gate where the individual arrives. The entry log is the ultimate record created from the initial request for entry.

12. It has been the Secret Service's consistent practice to transfer the entry logs to the OVP on a monthly basis since 2001. Information contained in the daily access list database, which generates the daily access roster, has been maintained by the Secret Service in electronic form for thirty (30) calendar days. Historically, on the thirty-first (31st) day, this daily access information was manually purged from the computer on which it was stored. Similarly, the Secret Service disposed of the daily access roster on a daily basis. The permanent access list has been maintained on a computer database on an ongoing basis and updated to reflect changes in authorized personnel. On June 19, 2006, the Secret Service issued a memorandum directing that records concerning access to the Vice President's residence be maintained. The records were to be maintained pending a judicial determination of their status.

13. It is the understanding between the Secret Service and the OVP that the OVP exercises exclusive control over materials generated in the visitor clearance and entry process to

5

the residence for the OVP, other than materials containing information of protective interest to the Secret Service, such as NCIC criminal history check results. The Secret Service has no continuing interest sufficient to justify preservation or retention of the daily access list data, permanent access lists, daily access rosters, and post entry logs.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing statements are true and correct to the best of my knowledge and belief.

_10/13/06_
Date

Paul S. Morrissey
Deputy Assistant Director
Office of Protective Operations
United States Secret Service

6

**EXHIBIT D**

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

|  |  |
|---|---|
| THE WASHINGTON POST, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Civil Action No. 06-1737 (RMU) |
| UNITED STATES DEPARTMENT OF | ) |
| HOMELAND SECURITY, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## SUPPLEMENTAL DECLARATION OF PAUL S. MORRISSEY
### DEPUTY ASSISTANT DIRECTOR
### UNITED STATES SECRET SERVICE

I, Paul S. Morrissey, hereby make the following declaration:

1.     I previously submitted a declaration in this action dated October 13, 2006.  The statements made herein are based on my personal knowledge or information made available to me in my official capacity.

2.     I am the Deputy Assistant Director of the Office of Protective Operations for the United States Secret Service (hereinafter "Secret Service"), which is a component of the Department of Homeland Security ("DHS").  I have held this position since September, 2006 and have been a special agent with the Secret Service since January, 1983.

3.     The Secret Service is a protective and law enforcement agency operating under the provisions of Title 18 of the United States Code, Sections 3056 and 3056A.  Pursuant to Section 3056, the Secret Service is charged with the protection of the President and Vice President of the United States and their immediate families; major candidates for President and

Vice President of the United States and their spouses; the President-elect and Vice President-elect and their immediate families; former Presidents of the United States, their spouses and minor children; visiting foreign heads of state and heads of government; and other individuals as directed by the President of the United States. Additionally, the Secret Service is authorized to provide security for the White House and the Vice President's official residence; foreign embassies and missions in the Washington, D.C. area, and certain other locations within the United States; designated events of national significance, including National Special Security Events; as well as other locations.

4.    The Office of Protective Operations is one of eight directorates that manage various operational and support functions within the Secret Service. It is responsible for establishing policies related to the Secret Service's protective mission and for overseeing the operational divisions that protect the persons, places and events that the Secret Service is authorized by statute and Executive Order to protect.

5.    The Washington Post filed a Freedom of Information Act ("FOIA") request with the Secret Service for records generated since October 2004 reflecting visits by any persons to (i) the Vice President and any of twelve named staff members in the Office of the Vice President (also "OVP") and (ii) the Vice President's Residence, except for visits made by members of the Vice President's family. It is my understanding that the Court has ordered the Secret Service to produce these records unless they are exempt under the FOIA.

6.    The "White House Complex" (also "Complex") as secured by the Secret Service includes the White House, the Eisenhower Executive Office Building ("EEOB"), the grounds encompassing the EEOB and the White House, and the New Executive Office Building. Housed

2

in the White House and the EEOB are the offices of various staff of the Executive Office of the

President (also "EOP") as well as offices for the staff of the OVP, including the Executive

Branch office of the Vice President himself.   The secured area of the White House Complex also

includes all of the office space used by the OVP in the White House Complex.

## White House Complex Records Request

7.      The Washington Post's FOIA request at issue in this case specifically requests

disclosures of Worker and Visitor Entrance System ("WAVES") and Access Control Records

("ACR").   As I explained in my earlier declaration, the ACR system and the WAVES are used to

monitor the access of visitors to the White House Complex, including the EOP and the OVP.

These same systems are used whether visits pertain to the EOP or the OVP.

8.      ACR records consist of records generated when a pass holder, worker, or visitor

swipes his or her pass over one of the electronic pass readers located at entrances to and exits

from the White House Complex.   ACR records include information such as the pass holder's

name and badge number, the time and date of the swipe, and the post at which the swipe was

recorded.   ACR records do not include information about who the pass holder is visiting in the

Complex, the visitor's affiliation to the Vice President, the OVP, or any outside organization, or

the reason for a person's visit.

9.      WAVES records consist of records generated when information is submitted by

an authorized White House pass holder to the Secret Service about workers and visitors who

need access to the White House Complex to perform work, conduct business, or attend events.

Authorized White House pass holders include members of both the President's and Vice

President's staffs.   WAVES records include the following information submitted by the

3

authorized pass holder: the visitor's name, date of birth, and Social Security number; the time

and location of the planned visit; the name of the pass holder submitting the request; the name of

the person to be visited; the date of the request; and the general category into which the visitor

falls – worker, member of the press, individual on an access list (such as a volunteer, courier, or

temporary staff member), or individual with an appointment. They may also include limited

information from background checks performed by the Secret Service and coded instructions to

Secret Service officers. Once a visit takes place, WAVES records are typically updated

electronically with information showing the actual time and place of the visitor's entry into and

exit from the White House Complex.

      10.     WAVES records as they exist after a visit include a visitor's information from

ACR records such as the badge number, the date and time of entry and exit, and the place of

entry and exit. The remaining ACR fields are strictly internal to the system. One such field is

the "Access Log Id," which is a sequential number of the record in the table.

      11.     Since at least 2001, it has been the practice of the Secret Service to transfer newly-

generated WAVES records on CD-ROM to the White House Office of Records Management (the

"WHORM") every 30 to 60 days. (In May 2006, the Secret Service entered into a memorandum

of understanding ("MOU") that both documented past practice regarding WAVES and ACR

records and formalized the recognition of the legal status of those records and WHORM's

management and custody of those ACR and WAVES records. A true and accurate copy of the

MOU is attached hereto as Exhibit 1.) It was the intent of the Secret Service that once

transferred to the WHORM, the records were to be erased from its computer system. With

regard to the time period at issue in the Washington Post's request (October 2004 to present), in

October 2004, because of a request from the National Archives and Records Administration, the Secret Service began temporarily retaining a copy of the WAVES records that it transferred to the WHORM. Thus, at the time of the Washington Post's FOIA request, the Secret Service had WAVES and ACR records for the period relevant to the Post's request.

12.     The information in WAVES records submitted by an authorized White House pass holder is provided to the Secret Service temporarily for two limited purposes: (1) to allow the Secret Service to perform background checks to determine whether, and under what conditions, to provide for the visitor's temporary admittance to the White House Complex; and (2) to allow the Secret Service to verify the visitor's admissibility at the time of the visit. Once a visitor's visit to the White House Complex is complete, the Secret Service has no continuing interest sufficient to justify preservation or retention of WAVES or ACR records, and the Secret Service does not control or direct the ultimate disposition or use of the records.

13.     I have been advised that the Secret Service released WAVES and ACR records in Judicial Watch v. United States Secret Service, 06-CV-310 (D.D.C.); Democratic National Committee ("DNC") v. United States Secret Service, 06-CV-842 (D.D.C.), and Citizens for Responsibility and Ethics in Washington ("CREW") v. Department of Homeland Security, 06-CV-883 (D.D.C.). I understand that the Secret Service's releases were made only after the Office of the President, in the exercise of its discretion, expressly authorized these releases.

14.     In specific regards to ACR records, ACR records do not indicate who a person entering the Complex is scheduled to visit. Therefore, there is no way of determining, from their face, which ACR records reflect a visit by someone to see the Vice President or a member of his staff. Locating the ACR records that correspond to WAVES records responsive to the

5

Washington Post's FOIA request would be an enormously time-consuming task.

15.    It is estimated that for the relevant time period, there are approximately 65,000

WAVES records, encompassing an estimated 9,983 pages, that reflect visits to the Vice President

or one of the twelve staff members named in the request. Some of these WAVES records may be

duplicates. It is estimated that these records involve 2,964 unique visitor names. Relatedly, there

are probably tens of thousands of ACR records that correspond to these WAVES records.

16.    The Secret Service has searched for and gathered the WAVES records responsive

to the Washington Post's FOIA request which include the information from ACR records other

than which is strictly internal to the system. However, the Secret Service has not gathered the

additional ACR record information. In order to locate the ACR records corresponding to the

responsive WAVES records in this case, the Secret Service would need to use the following

procedure. First, it would import the information from the WAVES records into a program that

would allow it to determine how many unique visitors there are in the records sought. This has

been done and it is estimated that there are approximately 2,964 unique visitor names. Second,

the Secret Service would search the entry/exit records (ACR and WAVES) by the visitor's name.

Presently, ACR records cannot be electronically searched by simultaneously using multiple

criteria, such as visitor name and time of visit. It is estimated that it would take an individual

approximately 25 weeks to complete the second step of this process even with the assistance of

an automated search program. This estimate is based on the assumptions of 20 minutes per

unique visitor's name, 2,964 unique visitor names, and 40 hours of work per week. It is noted

that at best, no more than a few searches may be run simultaneously, and that running

simultaneous searches may run the risk of computer failure. Third, the records yielded by the

6

search conducted in step 2 could include records of visits to people other than those listed in the

Washington Post's FOIA request. Therefore, it would then be necessary to sort through the

entry/exit records pertaining to each unique visitor name to determine which of the ACR records

correspond to the responsive WAVES records generated through the Washington Post's FOIA

request. To accomplish the matching, the Secret Service would need to conduct a careful manual

examination, comparing the ACR records produced through step 2 to the WAVES records

responsive to the Washington Post's FOIA request. The matching would be a comparison of

criteria such as date and time.

      17.    In addition to the ACR records search, in order to process WAVES records, the

Secret Service would need to refer the WAVES records to the OVP. WAVES records reflect the

general category within which a visitor to the Complex falls, but for individuals with

appointments, WAVES records do not reflect the purpose of the appointment, or the visitor's

affiliations to the Vice President, the OVP, or outside organizations. In other words, the records

do not state whether a person is coming to the Complex for a social visit or to talk about policy

matters. The purpose of a person's appointment, moreover, is not the Secret Service's concern;

the Secret Service's sole concern is whether the person presents a security risk, and it can assess

this without knowing the purpose of an appointment. There are some limited exceptions to

WAVES records not stating the reason for a person's appointment, such as the records

occasionally reflect that a person is being admitted to the Complex for a holiday party, departure

photo, or some other large group function. Therefore, it is my understanding that if there are

FOIA exemptions applicable to these records that depend on the nature of the appointment -

whether for official business, or to pay a social call - then the Secret Service Freedom of

Information and Privacy Acts (FOI/PA) Office would need to refer the records to the OVP for review.

## Vice President's Residence Records Request

18.     The Secret Service does not use the WAVES or ACR systems for access control purposes at the Vice President's Residence.  The Secret Service has, however, identified essentially seven categories of records responsive to the Washington Post's request for records concerning visits to the Vice President's Residence:  (i) permanent access lists of those individuals who regularly enter the Residence complex, including OVP staff, military personnel, contractors, service workers, and members of the Vice President's family; (ii) daily access lists of individuals having appointments to meet with OVP staff, military personnel, the Vice President, or his family, as well as service workers requiring access to the complex to perform non-routine services, maintenance, and repairs; (iii) a database containing information regarding individuals seeking access, used for generating both the permanent and daily access lists; (iv) requests for access, from OVP staff, military and Secret Service personnel, received primarily by electronic mail and occasionally by facsimile or other means; (v) post entry logs recording the names of the persons who enter the Residence complex on a particular date, with their times of entry; (vi) daily Watch Commander Journals containing a variety of information not requested by the Washington Post, but which from time to time also note the entry of particular individuals to the Vice President's Residence; and (vii) lists of invited guests and workers pertaining to special events.

19.     As I noted in paragraph 12 of my earlier declaration, it has been the consistent practice of the Secret Service to update the permanent access list (which is maintained on a

8

computer database) as changes are made in authorized personnel; to dispose of daily access lists

on a daily basis while purging the daily access database of information every 30 days; and to

transfer post entry logs to the OVP on a monthly basis.  On June 19, 2006, however, the Secret

Service directed that records concerning access to the Vice President's Residence be maintained.

The records were to be maintained pending the ultimate resolution of FOIA requests, including

the Washington Post's FOIA request.  Consequently, the Secret Service has several months'

worth of permanent access lists, daily access lists, post entry logs, and computer database entries

potentially responsive to the Washington Post's request.  The Secret Service also has Watch

Commander Journals dating for the full period of the Washington Post's request, electronic mail

requests dating to April 2006, and some special event lists and faxed access requests within the

time period.

     20.     It is estimated that together, the permanent access lists, daily access lists, post

entry logs, and responsive Watch Commander Journal entries total approximately 1,000 pages.

In addition, it is estimated that there are approximately 1,000 electronic mail and/or facsimile

requests for access.  These access requests are divided between requests from OVP staff, the

military, and the Secret Service.  The e-mails may also have attachments listing multiple

individuals for whom access is requested.

     21.     Generally speaking, many of the records concerning visitor access to the Vice

President's Residence contain personal information, such as visitors' dates of birth and Social

Security numbers, as well as law enforcement sensitive information.  This information would

have to be redacted before the records could be disclosed.  The majority of the redactions would

need to be done on a line-by-line basis.

9

22.    It is my understanding that a practical obstacle to processing these records would

be the determination of which FOIA exemptions apply to them.  As a general rule, when military

personnel make a request for visitor access, they provide some explanation of the visitor's

purpose, such as grounds maintenance or equipment repair.  This is not the practice, however,

with OVP staff, who generally provide no information about a visitor's purpose in coming to the

Residence, or with whom the visitor is scheduled to meet.  They do not indicate whether visitors

have appointments with the Vice President or his staff to discuss official business, are friends or

family members arriving for a personal visit, or are service workers scheduled to perform

maintenance or repairs on the Residence.  Therefore, OVP requests for visitor access to the

Residence generally provide the Secret Service with no information from which it could tell why

particular appointments were made, or determine the affiliations of visiting persons with the Vice

President, his family, his staff, or any outside organizations.  As a result, in order to determine

which FOIA exemptions apply to these records, the Secret Service would have to refer the

records to the OVP.  In addition to referral to the OVP, it is my understanding that e-mails and

other access requests from the military may potentially need to be referred to the originating

agency for FOIA processing.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing

statements are true and correct to the best of my knowledge and belief.

_10/25/06_
Date

Paul S. Morrissey
Deputy Assistant Director
Office of Protective Operations
United States Secret Service

10