# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

CITIZENS FOR RESPONSIBILITY AND ) 
ETHICS IN WASHINGTON, )
                             )
          Plaintiff, )
                             )      CIVIL ACTION NO.
       v. )      1:06-cv-01912-JGP
                             )
U.S. DEPARTMENT OF HOMELAND )
SECURITY, et al., )
                             )
         Defendants. )

---

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The defendants, by their undersigned counsel, hereby move that summary judgment in their favor be granted under Rule 56 of the Federal Rules of Civil Procedure, on the grounds that there is no genuine issue as to any material fact and that defendants are entitled to judgment as a matter of law.

The grounds for this motion are more fully set forth in the accompanying Memorandum of Points and Authorities in Support of Defendants' Motion for Summary Judgment and Defendants' Statement of Material Facts as to Which There Is No Genuine Issue.

Dated: May 25, 2007

                            Respectfully submitted,

                            PETER D. KEISLER
                            Assistant Attorney General

                            CARL J. NICHOLS
                            Deputy Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

ELIZABETH J. SHAPIRO, D.C. Bar 418925
Assistant Director

JOHN R. TYLER, D.C. Bar 297713
Senior Trial Counsel

_____

W. SCOTT SIMPSON, Va. Bar 27487
Senior Trial Counsel

Attorneys, Department of Justice
Civil Division, Room 7210
Post Office Box 883
Washington, D.C. 20044
Telephone:  (202) 514-3495
Facsimile:   (202) 616-8470
E-mail: scott.simpson@usdoj.gov

COUNSEL FOR DEFENDANTS

2

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 1:06-cv-01912-JGP |
| | ) | |
| U.S. DEPARTMENT OF HOMELAND SECURITY, et al., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

PETER D. KEISLER
Assistant Attorney General

CARL J. NICHOLS
Deputy Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

ELIZABETH J. SHAPIRO, D.C. Bar 418925
Assistant Director

JOHN R. TYLER, D.C. Bar 297713
Senior Trial Counsel

W. SCOTT SIMPSON, Va. Bar 27487
Senior Trial Counsel

COUNSEL FOR DEFENDANTS

TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

    I.      Records Regarding Visitors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

            A.       White House Complex Records . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

                    1.       White House Access Control System . . . . . . . . . . . . . . . . . . . . .  5

                    2.       Secret Service's Security-Related Records . . . . . . . . . . . . . . . . . . .  9

            B.       Vice President's Residence Records . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

    II.     Plaintiff's FOIA Request and this Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

STATUTORY BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

    I.      White House and VPR Visit Records Are Not "Agency Records"
          Subject to the Freedom of Information Act . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

            A.       The Provision of Visitor Information to the Secret Service
                    Does Not Divest the President and Vice President of Control
                    Over Records of Visitors to the White House and VPR . . . . . . . . . . . . .  19

            B.       Alternatively, the FOIA Must Be Construed as Not Reaching
                    the Subject Records in Order to Avoid Serious Questions as
                    to Its Constitutionality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  27

    II.     If the Subject Records Are Not "Agency Records" Under
          the FOIA, Then They Are Also Not Federal Records Under
          the Federal Records Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  32

III.    The Secret Service's Additional Security-Related Records
     Are Exempt from Disclosure Under the FOIA . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

     A.    The Additional Security-Related Records Are
           Protected by FOIA Exemption 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

     B.    The Additional Security-Related Records Are
           Protected by FOIA Exemption 7(E) . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

     C.    The Additional Security-Related Records Are
           Protected by FOIA Exemption 7(F) . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  43

INTRODUCTION

This case is about the effective functioning of the Presidency and Vice Presidency under the Constitution, which requires that the President and Vice President be able to receive advice in confidence. Invoking the Freedom of Information Act ("FOIA"),[1] plaintiff seeks to compel the United States Secret Service to disclose records of visitors to the White House Complex and the Vice President's Residence ("VPR"). Plaintiff seeks these documents not to understand the internal workings of the Secret Service — the purpose promoted by FOIA — but rather to examine the "influences" to which the President and Vice President, both of whom are excluded from the coverage of FOIA, "ha[ve] been subject."[2]

FOIA does not afford the relief that plaintiff seeks. With respect to the key records at issue here — Worker and Visitor Entrance System ("WAVES") records and Access Control Records System ("ACR") records at the White House Complex, and access requests, access lists, entry logs, and event lists at the VPR — the Secret Service does not have the "exclusive control" over these records necessary to make them "agency records" subject to the FOIA.[3] These records exist only because the President and Vice President are directed by statute to accept protection from the Secret Service — which is also responsible for protecting the White House Complex and the VPR — and the Secret Service is, therefore, informed of expected visitors to enable it to carry out these functions.[4] The Secret Service, moreover, uses the records only briefly, and, after the visits to which they pertain, has no continuing interest in them sufficient to justify their

---

[1] 5 U.S.C. § 552.

[2] See Complaint ¶ 48.

[3] United We Stand Am., Inc. v. IRS, 359 F.3d 595, 600 (D.C. Cir. 2004).

[4] 18 U.S.C. §§ 3056(a), 3056A(a).

preservation or retention.  The President and Vice President, in contrast, have a continuing operational and historical interest in the records at issue and have exercised exclusive control over them, to the exclusion of the Secret Service.

Under well-established authority, these records are not agency records subject to FOIA.[5] Instead, the records are preserved by the President and Vice President under the Presidential Records Act ("PRA"), which protects them from public disclosure for a period of years after the President and Vice President leave office.[6]  Preserving these records under the PRA, rather than subjecting them to the possibility of immediate disclosure under the FOIA, is necessary to preserve the "expectation of confidentiality of executive communications" and to avoid chilling "the frankness of advice" that the President and Vice President must expect.[7]  If records of visitors to the White House and VPR like those sought here were available under the FOIA, that expectation of confidentiality would be violated, and Congress's purpose in excluding the President and Vice President from the scope of FOIA would be frustrated.

Indeed, the necessary implication of plaintiff's theory is that <u>every</u> entry record of <u>every</u> visit to anyone in the White House Complex or the VPR — not just the records responsive to plaintiff's request — would be subject to FOIA.  Subjecting these records to disclosure under FOIA would expose the deliberations and daily practices of the President, the Vice President, and their closest advisors, thereby undermining the confidentiality necessary for the effective functioning of the Presidency and Vice Presidency.  Such a result would, therefore, encroach upon "separation of powers concerns" that, in the words of the D.C. Circuit, require "ensur[ing]

---

[5] <u>See</u>, <u>e.g.</u>, <u>United We Stand Am., Inc.</u>, 359 F.3d at 600.

[6] 44 U.S.C. §§ 2201-07.

[7] H.R. Rep. No. 95-1487, at 8 (1978), reprinted in 1978 U.S.C.C.A.N. 5732, 5739.

executive branch control over presidential records during the President's term of office."[8]  Thus, even assuming the correct outcome in this case were not apparent as a statutory matter, the FOIA must be construed not to cover these records in order to avoid serious questions as to the statute's constitutionality.  Those constitutional concerns are especially strong where, as here, (1) the subject records exist only because the Secret Service is informed of the President's and Vice President's official visitors and other visitors to the White House Complex and VPR, in order to permit fulfillment of its statutorily directed protective function, and (2) plaintiff seeks the records not to learn anything about a FOIA-covered agency, but rather to intrude into the very Presidential and Vice Presidential confidentiality protected by the Constitution and the FOIA.

In addition to its FOIA claims, plaintiff pleads claims under the Federal Records Act ("FRA"),[9] which governs the preservation and disposal of agency records.  Plaintiff challenges the Secret Service's transfer of visit records to the White House and the Secret Service's alleged deletion of its copies of such records, and plaintiff seeks to compel the Archivist of the United States to ask the Attorney General to initiate legal action, purportedly under the FRA, to prevent the Secret Service from transferring the subject records.  But this claim fails for the same reason: an Executive Branch record that is not an "agency record" under the FOIA is also not a "record" under the FRA.

Almost all of the records that are potentially responsive to plaintiff's request are not agency records for the foregoing reasons.  Plaintiff's FOIA request does, however, reach certain other types of records that are "agency records" because of the Secret Service's creation, use, and continuing control of these records.  Although the Secret Service has located nineteen pages of

---

[8] Armstrong v. Bush, 924 F.2d 282, 290 (D.C. Cir. 1991).

[9] 44 U.S.C. §§ 3101-07, 3301-14.

3

such records, all of the responsive information is covered by various FOIA exemptions.  Most

notably, these Secret Service records are "related solely to the internal personnel rules and

practices" of the Secret Service, their disclosure would reveal "techniques and procedures for law

enforcement investigations" — that is, the agency's techniques and procedures in carrying out its

protective and security functions — and their disclosure would, correspondingly, "endanger the

life and physical safety" of one or more Secret Service protectees.[10]

Therefore, because nearly all of the records sought by the plaintiff are not "agency

records" subject to FOIA (or "federal records" under the FRA), and because nineteen pages of

responsive agency records are covered by FOIA exemptions, defendants' motion for summary

judgment should be granted and this action dismissed with prejudice.

BACKGROUND

I.     Records Regarding Visitors

Because the safety of the President and Vice President implicates national security and

other governmental interests of the highest order, Congress has directed that both of these

constitutional officers receive protection from the United States Secret Service.  See 18 U.S.C.

§ 3056(a).  No other official (except the President-elect and Vice President-elect) is required by

law to accept such protection.  The Secret Service's protection extends not only to the physical

persons of the President and Vice President, but also to the places where they live and work,

including the White House Complex,[11] which contains the offices of the President and his staff

---

[10] 5 U.S.C. § 552(b)(2), (b)(7)(E), (b)(7)(F).

[11] The "White House Complex" includes the White House itself along with the
Eisenhower Executive Office Building, the New Executive Office Building, and the grounds
encompassing the White House and the Eisenhower Executive Office Building.  See Third
Declaration of Paul S. Morrissey, Deputy Assistant Director, United States Secret Service ¶ 5
(continued...)

4

and offices for the Vice President and his staff, as well as the VPR. See id. § 3056A(a)(1), (2), (4), (6); Third Declaration of Paul S. Morrissey, Deputy Assistant Director, United States Secret Service ¶¶ 3, 5, 6 (May 23, 2007) (Attachment 1 hereto) [hereinafter Third Morrissey Decl.].

     As part of its function to provide security for the White House Complex and the VPR, the Secret Service clears proposed visitors for entry, and controls the entry and exit of visitors at both locations. Id. ¶¶ 8, 10-12, 32. To enable the Secret Service's performance of this protective function, authorized personnel (including Presidential and Vice Presidential staff at the Complex and the VPR) provide identifying information regarding proposed visitors to the Secret Service. Id. ¶¶ 10-12, 32. This information is provided confidentially and temporarily, for the sole purpose of conducting background checks to determine whether, and under what conditions, a visitor should be admitted, and to allow the Secret Service to verify the visitor's admissibility at the time of the visit. Id.; Declaration of Philip C. Droege ¶¶ 5, 13 (May 23, 2007) (Attachment 2 hereto) [hereinafter Droege Decl.]; Declaration of Claire M. O'Donnell, Assistant to the Vice President and Deputy Chief of Staff, Office of the Vice President ¶¶ 11, 17, 20, 21 & Ex. A (May 23, 2007) (Attachment 3 hereto) [hereinafter O'Donnell Decl.].

     A.     White House Complex Records

          1.     White House Access Control System

     Authorized White House pass holders, including Presidential and Vice Presidential staff, usually provide information on future visitors to the Secret Service by entering the information into a White House computer, which automatically transmits it (through a server) to a Secret Service terminal. See Third Morrissey Decl. ¶ 11; Droege Decl. ¶ 6; O'Donnell Decl. ¶ 12. A

_____

[11](...continued)
(May 23, 2007) (Attachment 1 hereto).

Secret Service employee then verifies that the requestor is authorized to make appointments for the location requested, adds any other information that may be necessary (such as for a back-ground check), and transmits the information electronically to the Secret Service's White House Access Control System, which includes the Worker and Visitor Entrance System ("WAVES"). See Third Morrissey Decl. ¶¶ 8, 11; O'Donnell Decl. ¶ 12. White House pass holders may also provide visitor information by telephone, fax, e-mail, or on paper, in which case Secret Service personnel may enter the information into the WAVES system manually. See Droege Decl. ¶ 6; Third Morrissey Decl. ¶ 11. The information provided to the Secret Service includes the proposed visitor's name, date of birth, Social Security number, the time and location of the planned visit, the name of the official or employee submitting the request, the name of the person to be visited, the date of the request, and the type of visitor, such as whether the visitor is a worker, a member of the press, an individual with an appointment, or an individual on an access list. Id. ¶ 10.

The Secret Service uses the information it is provided to determine whether there is any protective concern with admitting the proposed visitor to the White House Complex, as well as to verify the visitor's admissibility at the time of the visit. Id. ¶ 12. Some WAVES records are annotated by Secret Service personnel, in note and comment fields, with limited information from background checks or instructions, including coded instructions to Secret Service officers. Id. ¶ 13. Once a visit takes place, WAVES records are typically updated electronically with information showing the time and place of the visitor's entry into and exit from the White House Complex. Id. ¶ 15.

Once an individual is cleared into the White House Complex, the visitor usually receives an electronic pass, which is swiped over one of the pass readers at entrances to and exits from the

Complex.  Id. ¶ 14.  Swiping a pass automatically creates a record in the Access Control Records System ("ACR").  Id.  An ACR record includes the entrant's name and badge number, the time and date of the swipe, and the post at which the swipe was recorded; such a record does not indicate the entrant's destination within the White House Complex.  Id.  The WAVES and ACR systems, together, comprise the White House Access Control System ("WHACS").  Id. ¶ 8.

Both the Secret Service and the offices of the President and Vice President recognize that the President and Vice President exercise exclusive legal control over WAVES and ACR records.  Id. ¶¶ 18, 21-22, 37 & Ex. B; Droege Decl. ¶¶ 8-12; O'Donnell Decl. ¶¶ 7-9, 13-15. After a visitor's visit is complete, the Secret Service has no continuing interest in the White House Complex visit records involved here sufficient to justify their preservation or retention, other than materials containing information of protective interest, such as records resulting from background checks.  See Third Morrissey Decl. ¶¶ 18, 21-22, 24 & Ex. B.  The President and Vice President, in contrast, have a continuing interest in such records for their operational and historical value.  Id. ¶ 21 & Ex. B; Droege Decl. ¶ 12; O'Donnell Decl. ¶ 22.[12]

Consistent with this understanding, it has been the practice of the Secret Service, since at least 2001, to transfer newly-generated WAVES records on CD-ROM to the White House Office of Records Management ("WHORM") every 30 to 60 days.  See Third Morrissey Decl. ¶ 18; Droege Decl. ¶ 9; O'Donnell Decl. ¶ 14.[13]  Upon the turnover of each batch of WAVES records, a WHORM employee typically signs a form acknowledging receipt of the records.  See Third

---

[12] Indeed, the Secret Service typically sends a copy of the President's scheduled appointments to the President's diarist at the end of each day.  See Third Morrissey Decl. ¶ 25.

[13] The Secret Service also transfers paper requests for access to the White House Complex to the WHORM, but has begun retaining these materials, or copies of them, due to pending litigation and FOIA requests.  See Third Morrissey Decl. ¶ 24.

Morrissey Decl. ¶ 18 & Ex. A.  The intent of the Secret Service has been to ensure that, once transferred, the WAVES records are erased from the WAVES computer system; indeed, the Secret Service servers on which WAVES records are held purge and overwrite all such records that are older than sixty days.  Id.  In November 2004, however, because of a request from the National Archives and Records Administration, the Secret Service began temporarily retaining a copy or copies of the WAVES records that it transferred to the WHORM.  Id. ¶ 19.[14]

At least as early as 2001, and upon revisiting the issue in 2004, the Secret Service and the White House recognized and agreed that ACR records should be treated in a manner generally consistent with the treatment of WAVES records.  Id. ¶ 22.  Thus, the Secret Service and the White House have determined that ACR records should be transferred to the WHORM and deleted from the Secret Service's computers like WAVES records.  Id.  In May 2006, the Secret Service transferred to the WHORM the ACR records covering the period from January 2001 to April 2006.  Id. ¶ 22; Droege Decl. ¶ 14.  Since that time, the Secret Service has continued to transfer ACR records to the WHORM.  See Third Morrissey Decl. ¶ 22.  Nevertheless, the Secret Service currently continues to maintain one or more copies of the ACR records solely because of pending FOIA requests and litigation (including this action).  Id.; see [Defendants'] Opposition to Plaintiff's Motion for Temporary Restraining Order (docket #21) (describing Secret Service's preservation of record categories that may include records responsive to the subject FOIA request).

_____

[14] Until July 2006, the Secret Service was removing the note and comment fields from WAVES records before transferring the records to the WHORM.  See Third Morrissey Decl. ¶ 19.  In that month, the Secret Service retroactively provided WAVES records to the WHORM that contained these fields for the period from October 12, 2004, to July 10, 2006.  Id.

In May 2006 (well before the plaintiff submitted its FOIA request), the Secret Service and the WHORM entered into a Memorandum of Understanding ("MOU"), which both "document[s] past practice" regarding WAVES and ACR records and "formalize[s] recognition of [their] legal status" and of WHORM's management and custody of them.[15]  See Third Morrissey Decl. ¶ 21 & Ex. B.  The MOU provides, among other things, that White House entities, but not the Secret Service, have a continuing interest in WAVES and ACR records, and that White House entities continue to use the information contained in such records for various historical and informational purposes.  Id.  The MOU reflects that White House entities "at all times assert[ ], and the Secret Service disclaims, all legal control over any and all [WAVES and ACR] Records."  Id.  The Secret Services acknowledges in the MOU that its temporary retention of such records after an individual's visit to the White House Complex is solely for the purpose of facilitating an orderly and efficient transfer of the records to the WHORM.  Id.

### 2.     Secret Service's Security-Related Records

The Secret Service itself sometimes creates other, highly sensitive records relating to the background investigation and security process in connection with visitors or scheduled visitors to the White House Complex (hereinafter referred to as "Additional Security-Related Records").  Id. ¶ 17.  These records are created in the course of conducting additional background checks and other security-related activities regarding certain visitors, chosen based on certain details in their backgrounds and/or the circumstances of their visits.  Id.  Included in these records are the names and other identifying information concerning such visitors (including, in some cases, their birth dates and/or Social Security numbers) and background information on them or information

---

[15] WHORM has historically managed records of the Office of the Vice President as OVP's agent in accordance with the Vice Presidential provisions of the Presidential Records Act.  44 U.S.C. § 2207; see O'Donnell Decl. ¶ 14.

regarding their visits to the Complex, which may include criminal history and/or other security-related information.  Id.  Unlike the WAVES and ACR records, these records contain substantial security-related information developed by the Secret Service, which maintains control over them and does not transfer them to the WHORM or the OVP.  Id.  These "Additional Security-Related Records" are, therefore, "agency records" subject to the FOIA.  See infra text & notes at 34-43.

       B.    Vice President's Residence Records

Secret Service protection of the Vice President's Residence likewise requires that security protocols be followed for visitors to the Residence.  When the Vice President wishes to arrange for a visitor, staff in the OVP sends an access request to the Secret Service, providing the visitor's identifying information (including name, date of birth, and Social Security number) and the expected date and time of arrival.  See Third Morrissey Decl. ¶ 32; O'Donnell Decl. ¶ 17.  This information is usually provided to the Secret Service by e-mail, but may also be provided by facsimile or other means.  See Third Morrissey Decl. ¶ 34.

Once the Secret Service performs a background check, the information supplied by OVP enters a computer database that is used to generate a permanent access list (for people who regularly enter the Residence) and a daily access list (for persons requiring access only at particular times).  Id. ¶¶ 32, 34, 39.  Secret Service officers stationed at entrances to the Residence receive copies of both access lists for the purpose of admitting authorized visitors.  Id. ¶ 33.  For particular events at the VPR, the Secret Service clears certain visitors using an event list rather than a daily access list or permanent access list.  Id. ¶¶ 34, 41.

The actual entry and exit of a visitor to the VPR is noted by the gatehouse officer in a handwritten post entry log.  Id. ¶ 33.  The post entry log records the names of persons who enter

on a particular day, along with their times of entry.  Id.  This is the final record generated as the result of a request for a visitor's entry to the VPR.  Id.

The understanding between the OVP and the Secret Service regarding records of entry to the Residence is similar to the understanding regarding WAVES and ACR records at the White House Complex.  The OVP identifies visitors to the Secret Service confidentially, and with the understanding that that information — and any materials derived from it that do not relate to the Secret Service's ongoing protective function — remain in the exclusive ownership, custody, and control of the OVP.  See O'Donnell Decl. ¶¶ 18, 20, 21 & Ex. A.  After an individual's visit to the VPR, the Secret Service has no continuing interest in visit records sufficient to justify their preservation or retention — other than materials such as records resulting from background checks — and recognizes that such records are under the exclusive legal control of the Vice President.  See Third Morrissey Decl. ¶¶ 37, 39-42 & Ex. D.

Since 2001, the Secret Service's consistent practice has been to transfer all handwritten post entry logs to the OVP, generally on a monthly basis.  Id.; O'Donnell Decl. ¶ 18.  After receiving each periodic batch of entry logs, an OVP employee typically signs a form acknow-ledging receipt of the records.  Id.; Third Morrissey Decl. ¶ 37 & Ex. C.  More recently, the Secret Service now follows the same practice with respect to requests for access from the OVP, access lists, and event lists at the VPR.  Id. ¶¶ 39-41.[16]  The OVP's "consistent practice of

---

[16] Due to the pendency of litigation and FOIA requests, the Secret Service began, based on a directive issued in June 2006, to retain copies of entry logs, access lists, the access list database, event lists, and access requests.  In the course of conducting a search for records potentially responsive to a different FOIA request, the Secret Service has located some paper copies of access requests and daily access lists predating June 2006, in locations where such documents would not normally be placed, but these records are from sporadic dates and are not comprehensive.  See Third Morrissey Decl. ¶ 39 n.2.  The retention of these documents was not in accordance with the normal practice at the VPR.  Id.

exercising exclusive control" over documents relating to visitors at the VPR was "confirm[ed]

and reiterate[d]" by Counsel to the Vice President in a letter to the Secret Service Chief Counsel

on September 13, 2006 — well before the FOIA request at issue here.  See O'Donnell Decl. ¶ 20

& Ex. A.  The OVP preserves all such records as Vice Presidential executive records under the

Presidential Records Act.  Id. ¶¶ 9, 19.

II.    Plaintiff's FOIA Request and this Litigation

By letter dated October 4, 2006, the plaintiff, Citizens for Responsibility and Ethics in

Washington, submitted to the Secret Service a FOIA request for —

> [A]ll records relating to any visit that any and all of the following individuals
> made to the White House or the residence of the Vice President from January 1,
> 2001, to the present.  As used herein, the term "White House" includes, but is not
> limited to, any office within the Executive Office of the President, the residence
> of the President, the Old and New Executive Office Buildings, and any other office
> or space on the grounds of the White House.  Specifically, we seek any record of
> visits to the White House or the Vice President's residence by the following
> individuals:
>
> James Dobson
> Gary L. Bauer
> Wendy Wright
> Louis P. Sheldon
> Andrea Lafferty
> Paul Weyrich
> Tony Perkins
> Donald Wildmon
> Jerry Falwell

See Complaint, Ex. A.  Plaintiff filed suit to enforce this request on November 9, 2006.

The Secret Service has searched the "Additional Security-Related Records" described

above — those that reflect the conduct of additional background checks and other security-

related activities regarding certain visitors — and has located nineteen pages of responsive

records among them.  See Third Morrissey Decl. ¶¶ 17, 29.  Some of those pages contain

notations and information provided by other federal agencies.  See Declaration of Kathy J.

Lyerly, Special Agent in Charge, Liaison Division and Freedom of Information and Privacy Acts

Officer, United States Secret Service ¶ 15 (May 24, 2007) (Attachment 4 hereto).[17]

## STATUTORY BACKGROUND

Both the FOIA, which applies to federal agency records, and the Presidential Records

Act, which applies to Presidential and Vice Presidential records, provide for the disclosure of

Executive Branch records, but the timing and circumstances of disclosure differ under the two

statutes.  The FOIA provides for the disclosure, subject to certain exemptions, of records of an

"agency."  5 U.S.C. § 552(a).  Generally, an agency must respond to a request for records under

FOIA within twenty working days, and must "make a determination with respect to any appeal

within twenty [working] days."  Id. § 552(a)(6).  These time limitations may, in "unusual

circumstances," be extended for up to ten working days.  Id.

The Supreme Court has made clear, however, that the term "agency" under the FOIA does

not encompass "the President's immediate personal staff or units in the Executive Office whose

sole function is to advise and assist the President."  Kissinger v. Reporters Comm. for Freedom

of the Press, 445 U.S. 136, 156 (1980) (quoting H.R. Conf. Rep. No. 93-1380, at 15 (1974))

---

[17] Apart from the records referred to above, the Third Declaration of Paul S. Morrissey submitted herewith describes three other categories of records — specifically, Secret Service Form 1888s in relation to proposed workers and visitors to the White House Complex, and hit reports and Watch Commander Journals in relation to the VPR.  See Third Morrissey Decl. ¶¶ 16, 35, 36.  Without conceding the status of these records as "agency records," the Secret Service has searched these three categories of records for any records responsive to plaintiff's request, and has found none.  Id. ¶¶ 27, 45.  These types of records are not, therefore, at issue in this case.  These searches covered the period from January 1, 2001 (or some later date, depending on what records still existed), until January 25, 2007.  Id. ¶¶ 27, 45.  This ending date accords with the applicable regulations of the Department of Homeland Security, which provide that, in response to a FOIA request, "a component ordinarily will include only records in its possession as of the date the component begins its search for them." 6 C.F.R. § 5.4(a).

(records of telephone calls made by Assistant to the President for Natural Security Affairs are not subject to FOIA) [hereinafter Reporters Comm.]; see Armstrong v. Executive Office of the President, 90 F.3d 553, 558 (D.C. Cir. 1996) (records of National Security Council ("NSC") are not subject to FOIA, because NSC is "more . . . like the White House Staff, which solely advises and assists the President" than "an agency to which substantial independent authority has been delegated").  Owing in part to the Vice President's role as a close presidential advisor, the Vice President and his staff also are not subject to FOIA.  See Armstrong v. Bush, 924 F.2d 282, 286 n.2 (D.C. Cir. 1991) (distinguishing Office of the Vice President from agencies that create "federal records"); Schwarz v. U.S. Dep't of the Treasury, 131 F. Supp. 2d 142, 147-48 (D.D.C. 2000) (Office of the Vice President not subject to the FOIA), aff'd, 2001 WL 674636 (D.C. Cir. 2001).

While FOIA governs the disclosure of agency records, the Federal Records Act governs the preservation and disposal of the records of federal agencies.  44 U.S.C. § 3301.  Records subject to the FRA are preserved at either "a records center maintained and operated by the Archivist [of the United States], or, when approved by the Archivist, [at] a center maintained and operated by the head of the Federal agency." Id. § 3103.  A federal agency must normally secure the approval of the Archivist to dispose of records subject to the FRA.  Id. §§ 3303, 3303a.

The Presidential Records Act ("PRA") sets forth a different scheme for the preservation, disclosure, and disposal of Presidential and Vice Presidential records. Under the PRA, records reflecting "the activities, deliberations, decisions, and policies" of the Presidency or Vice Presidency are "maintained as Presidential [or Vice Presidential] records." 44 U.S.C. 2203(a); see id. § 2207 ("Vice-Presidential records shall be subject to the provisions of this chapter in the same manner as Presidential records.").  As the D.C. Circuit has recognized, records subject to the

14

PRA do not include "agency records" as that term is used in the FOIA, or federal "records" as used in the Federal Records Act. See Armstrong v. Executive Office of the President, 90 F.3d at 556. Thus, "no record is subject to both the FRA and the PRA." Id.

Under the terms of the PRA, while in office, a President or Vice President may not dispose of even "Presidential [or Vice Presidential] records that no longer have administrative, historical, informational, or evidentiary value," without first (1) consulting with the Archivist and giving the Archivist an opportunity to consult with Congress on the proposed disposition, and (2) submitting a schedule for the disposal to Congress at least sixty days before the "proposed disposal date." 44 U.S.C. § 2203(c), (d), (e). When a President or Vice President leaves office, the Archivist of the United States "assume[s] responsibility for the custody, control, and preservation of, and access to" the Presidential or Vice Presidential records of the departing officer. Id. § 2203(f)(1).

The PRA imposes upon the Archivist "an affirmative duty to make [Presidential and Vice Presidential] records available to the public as rapidly and completely as possible," subject to the conditions set forth in the statute. Id. Absent specific action by the President or Vice President, the Archivist must generally make records covered by the PRA available under the FOIA five years after the President or Vice President leaves office. Id. § 2204(b)(2), (c)(1). However, the President or Vice President may, before leaving office, "specify durations, not to exceed 12 years, for which access shall be restricted with respect to information" in specified categories of PRA records, such as "confidential communications requesting or submitting advice, between the President and his advisers, or between such advisers." Id. § 2204(a); see Armstrong v. Executive Office of the President, 90 F.3d at 556 (PRA records "are to be made publicly available five years after [the President or Vice President] leaves office, except that national defense and certain other

15

information is to be made available no later than 12 years after the end of a [P]resident's [or Vice President's] term.").  Thus, all Presidential and Vice Presidential records become subject to potential disclosure no later than twelve years after the officeholder leaves office.

The legislative history of the PRA explains the rationale behind the delayed disclosure of Presidential and Vice Presidential records as opposed to agency records under the FOIA.  In passing the bill that became the PRA, Congress recognized that "premature disclosure" of Presidential or Vice Presidential records could have a "chilling effect on presidents and the frankness of advice they could expect from their staffs."  See H.R. Rep. No. 95-1487, at 8 (1978), reprinted in 1978 U.S.C.C.A.N. 5732, 5739.  Indeed, Congress recognized that seeking to require premature disclosure "might eventually diminish the completeness of the written record created and left by chief executives."  Id.  And Congress acknowledged the need to consider "the expectation of confidentiality of executive communications to avoid the prospect of a constitutional infirmity."  Id.  The PRA thus reflects an attempt to balance these important considerations against the desire for "ready availability" of Presidential and Vice Presidential records.  Id.; see id. at 15, reprinted in 1978 U.S.C.C.A.N. at 5746 (noting that Congress sought to balance "the objectives of assuring early availability with the concern that the premature disclosure of sensitive presidential records will eventually result in less candid advice being placed on paper and a depleted historical record").  In short, Congress has decided that "important historical evidence" regarding the activities of the President and Vice President, see Complaint ¶ 9, should be made public under the procedures set forth in the PRA.

16

## ARGUMENT

The President and Vice President (as well as their staffs) are not covered by the Freedom of Information Act, but these officers are statutorily directed to accept protection from the United States Secret Service — an agency that is subject to FOIA — which also protects the White House Complex and the Vice President's Residence. 18 U.S.C. §§ 3056(a), 3056A(a). To facilitate that protective function, Presidential and Vice Presidential staff and other authorized personnel give the Secret Service information on proposed visitors to the White House Complex and the VPR. Plaintiff seeks to use that fact to convert Presidential and Vice Presidential records concerning those visitors into "agency records" subject to the FOIA. But the statute, the governing case law, and the Constitution foreclose such an interpretation.

The unique security requirements imposed on the President and Vice President by statute do not derogate the confidentiality afforded these constitutional officers under the Constitution, the FOIA, and the PRA. These statutes need not and should not be construed to place their goals in tension and to create unintended paradoxes. Any rationale for requiring disclosure of the subject records under FOIA would, moreover, apply not just to the records sought in this case, but would logically expose the confidential deliberations of Presidents and Vice Presidents in general by requiring the disclosure of the entry records for all meetings — deliberations whose confidentiality Congress sought to protect by excluding the records of the President and his closest advisors, including the Vice President, from immediate disclosure under FOIA.[18] The

---

[18] Even if these types of records were agency records under the FOIA, most or all of them would be protected by one or more FOIA exemptions, most notably Exemption 5, which encompasses the common law discovery privileges. Therefore, should the courts somehow conclude that the materials in question are "agency" records subject to FOIA, defendants respectfully reserve the right to assert any applicable exemption claim(s) prior to disclosure, and to litigate further any such exemption claims.

17

disclosure contemplated by the plaintiff would reveal a composite of sensitive details regarding the operation of the Presidency and Vice Presidency, and would significantly and impermissibly encroach on the confidential communications of the President, the Vice President, and their staffs.

Alternatively, even if the correct outcome of this case were not so clear as a statutory matter, the principle of "constitutional avoidance" would require construing the FOIA as not reaching the records at issue. If a statute is fairly subject to two potential interpretations, one of which raises "serious constitutional problems" and the other of which does not, the courts are "obligated to construe the statute to avoid such problems." INS v. St. Cyr, 533 U.S. 289, 299-300 (2001). Subjecting the records of visitors to the White House and VPR to immediate disclosure under the FOIA would violate the very constitutional concerns that prompted Congress to exclude those records from FOIA and eventually to adopt a different scheme for the preservation and disclosure of Presidential and Vice Presidential records. See Ryan v. Department of Justice, 617 F.2d 781, 788 n.19 (D.C. Cir. 1980) ("Failure to exempt presidential staff from the FOIA would raise a constitutional issue of separation of powers.").

As for the nineteen pages of "Additional Security-Related Records" that contain responsive information, a number of express FOIA exemptions preclude their production. In particular, all of these records are "related solely to the internal personnel rules and practices" of the Secret Service, and their disclosure would reveal "techniques and procedures for law enforcement investigations" and "could reasonably be expected to endanger the life or physical safety" of one or more protectees of the Secret Service. 5 U.S.C. § 552(b)(2), (b)(7)(E), (b)(7)(F). Moreover, disclosure of certain portions of these Secret Service records — most notably the Social Security numbers and birth dates of visitors — would constitute a "clearly unwarranted

invasion of personal privacy," id. § 552(b)(6), (7)(C), and are exempt from disclosure for that reason as well.

I.    White House and VPR Visit Records Are Not "Agency Records" Subject to the Freedom of Information Act

    A.    The Provision of Visitor Information to the Secret Service Does Not Divest the President and Vice President of Control Over Records of Visitors to the White House and VPR

The plaintiff seeks records of visitors to the White House and the Vice President's Residence — records that obviously reflect "the activities [and] deliberations" of the Presidency and Vice Presidency. 44 U.S.C. § 2203(a). The Secret Service uses such records, for a brief time, in fulfillment of its statutory duties to protect the President, the Vice President, and the places where they live and work. Accommodating the Secret Service's statutory protective function does not divest the President and Vice President of control over these records — neither as a matter of fact nor as a matter of law under the FOIA — and the records remain Presidential and Vice Presidential records under the PRA rather than agency records under FOIA. Congress plainly did not intend to diminish the confidentiality of Presidential and Vice Presidential records under the PRA by mandating Secret Service protection, and governing principles of FOIA analysis make clear that Congress did not do so.

The Supreme Court has held that documents constitute "agency records" subject to FOIA if they are (1) created or obtained by an agency, and (2) in the agency's control. See U.S. Dep't of Justice v. Tax Analysts, 492 U.S. 136, 144-46 (1989). The D.C. Circuit uses a four-factor analysis to determine whether an agency exercises "sufficient control" over a record to render it an "agency record" under FOIA:

[1] the intent of the document's creator to retain or relinquish control over the records; [2] the ability of the agency to use and dispose of the record as it sees fit;

[3] the extent to which agency personnel have read or relied upon the document; and [4] the degree to which the document was integrated into the agency's record system or files.

Tax Analysts v. U.S. Dep't of Justice, 845 F.2d 1060, 1069 (D.C. Cir. 1988) (quoting Lindsey v. U.S. Bureau of Prisons, 736 F.2d 1462, 1465 (11th Cir. 1984)), aff'd on other grounds, 492 U.S. 136 (1989).

Presidential and Vice Presidential Control Over Visitor Records
and Non-integration into Secret Service Files

The most important factor is the first — that is, what entity exercises "control" over a particular record. For example, when a document is transferred from a non-agency (such as Congress, the President, or the Vice President) to an agency, it becomes an agency record only if "under all the facts of the case the document has passed from the control of [the non-agency] and become property subject to the free disposition of the agency with which the document resides." Goland v. CIA, 607 F.2d 339, 347 (D.C. Cir. 1978), vacated in part on other grounds, 607 F.2d 367 (D.C. Cir. 1979) (per curiam). A similar analysis applies with respect to records originally created by an agency, but over which a non-FOIA entity (that is, Congress, the President, or Vice President) asserts control. See Paisley v. CIA, 712 F.2d 686, 695-96 (D.C. Cir. 1983) (applying the legal standard set out in Goland to records created by an agency in connection with a congressional investigation), vacated in part on other grounds, 724 F.2d 201 (D.C. Cir. 1984) (per curiam).

In United We Stand America, Inc. v. IRS, the D.C. Circuit explained that the non-FOIA entity's "intent to control" and "the agency's ability to control 'fit together in standing for the general proposition that the agency to whom the FOIA request is directed must have **exclusive control** of the disputed documents . . .'" in order for the records to be considered agency records

20

subject to FOIA.  359 F.3d 595, 600 (D.C. Cir. 2004) (emphasis added) (quoting Paisley, 712 F.2d at 693).  Thus, if "[the non-FOIA entity] has manifested its own intent to retain control, then the agency — by definition — cannot lawfully 'control' the documents."  Id. at 600 (quoting Paisley, 712 F.2d at 693).

Under these standards, records of visitors to the White House Complex and the Vice President's Residence (other than information of protective interest to the Secret Service, such as records from background checks) are undeniably Presidential and Vice Presidential records rather than "agency records" under the FOIA.  Most significantly, the President and Vice President have exercised control over these records, and the Secret Service has acknowledged that the offices of the President and Vice President have "exclusive legal control" over WAVES and ACR records.[19]  See Third Morrissey Decl. ¶¶ 18, 21-22, 37 & Ex. B; Droege Decl. ¶¶ 5, 11-13; O'Donnell Decl. ¶¶ 7-9, 13-15; see also Tax Analysts, 845 F.2d at 1069.  In fact, information identifying visitors is provided by Presidential and Vice Presidential staff confidentially and only to permit the Secret Service's protection of the President and Vice President and of the places where they live and work.  See Third Morrissey Decl. ¶¶ 10-12, 32; Droege Decl. ¶¶ 5, 13; O'Donnell Decl. ¶¶ 11, 17, 20, 21 & Ex. A; see also 18 U.S.C. §§ 3056(a), 3056A(a).  WAVES records regarding proposed visitors to the White House Complex consist primarily of information supplied — usually electronically — by authorized White House pass holders, including Presidential and Vice Presidential personnel, and ACR records are created automatically by the

---

[19] The Secret Service's current retention of visit records, in light of pending litigation and FOIA requests, has been undertaken with the approval of the White House and the Office of the Vice President.  See Third Morrissey Decl. ¶¶ 26, 44.

entry or exit of a visitor or other entrant.  See Third Morrissey Decl. ¶¶ 9-11, 14.[20]  This case, then, presents the antithesis of the "exclusive control" by the "agency" that the D.C. Circuit has held is necessary to find that a document is an "agency record" subject to FOIA.  See United We Stand Am., Inc., 359 F.3d at 600; see also Katz v. NARA, 68 F.3d 1438 (D.C. Cir. 1995) (holding that autopsy records in Archivist's possession were not agency records as they were controlled by President Kennedy's estate); Goland, 607 F.2d at 347 (noting that CIA held a congressional document as a "trustee" for Congress).

Even assuming the Secret Service could be considered the "creator" of the subject records — a dubious assumption since the information they contain is provided primarily by Presidential and Vice Presidential personnel — the Secret Service's obvious "intent" is to "relinquish" to such personnel any "control" over the records that it ever has.  See Tax Analysts, 845 F.2d at 1069; see also Third Morrissey Decl., Ex. B (Secret Service "disclaims" all legal control over WAVES and ACR records).  Necessarily, therefore, the records are not "integrated into the [Secret Service's] record system or files," since they are not retained at all (except in light of recent pending litigation and FOIA requests).  See Tax Analysts, 845 F.2d at 1069.

<u>Lack of Disposal Authority within the Secret Service</u>

The Secret Service's conduct, moreover, reflects the agency's intent to relinquish whatever control it might have had over these records, as well as its inability to "dispose of the

---

[20] The fact that the information contained in WAVES and ACR records comes primarily from Presidential and Vice Presidential staff, and other authorized White House pass holders, readily distinguishes them from the record involved in United We Stand America, Inc.  The letter sought in that case was created in the first instance by the IRS, based on information provided by IRS personnel.  359 F.3d at 597.  That letter, the D.C. Circuit held, was subject to FOIA even though it was created in response to a congressional inquiry.  Id. at 597, 600-03.  The court also held, however, that non-agency information contained in the letter — specifically, those portions of the letter that reflected the content of the congressional inquiry — was not subject to FOIA and should be redacted.  Id. at 601, 603-04.

record[s] as it sees fit." See Tax Analysts, id. Since at least 2001, the Secret Service's practice

has been to transfer newly-generated WAVES records to the White House Office of Records

Management every 30 to 60 days (while currently retaining copies due to pending litigation and

FOIA requests). See Third Morrissey Decl. ¶ 18; Droege Decl. ¶ 9; O'Donnell Decl. ¶ 14. After

transfer, the intent of the Secret Service is to erase WAVES records from its computer system;

indeed, the servers purge and overwrite WAVES records that are older than 60 days. See Third

Morrissey Decl. ¶ 18. ACR records, reflecting actual entry into and exit from the White House

Complex, are also transferred to the WHORM. Id. ¶ 22. Those practices and the mutual under-

standing that USSS does not control WAVES and related entry records were confirmed in the

May 2006 MOU between WHORM and USSS. Id. ¶ 21 & Ex. B.

　　　　With respect to the VPR, the Secret Service has, since 2001, periodically transferred entry

logs — the final record generated due to a request to admit a visitor — to the Office of the Vice

President. Id. ¶ 37; O'Donnell Decl. ¶ 18. More recently, the same procedure is now followed

with respect to other records of visitors to the VPR. See Third Morrissey Decl. ¶¶ 39-41. The

OVP controls these records and preserves them as Vice Presidential executive records subject to

the Presidential Records Act, as confirmed by the September 13, 2006, letter from Counsel to the

Vice President to Chief Counsel of the USSS. See O'Donnell Decl. ¶¶ 9, 19, 20 & Ex. A. Again,

the Secret Service does not exercise the kind of "exclusive control" over VPR visitor records

necessary for them to be considered agency records. See United We Stand Am., Inc., 359 F.3d at

600.

<u>The Secret Service's Limited Use of Visitor Records</u>

　　　　The limited extent to which — and the limited purpose for which — the Secret Service

relies on visit records also demonstrates their Presidential and Vice Presidential status. See Tax

23

Analysts, 845 F.2d at 1069.  It is well-established that the mere fact that an agency has used a record "is not dispositive," see Bureau of National Affairs, Inc. v. U.S. Dep't of Justice, 742 F.2d 1484, 1492 (D.C. Cir. 1984), and the Supreme Court has held that a record's temporary physical location within a federal agency does not itself render it an "agency record" subject to FOIA.  See Reporters Comm., 445 U.S. at 157 ("We simply decline to hold that the physical location of the notes of telephone conversations renders them 'agency records.'  The papers were not in the control of the State Department at any time.").

The information in question is quintessentially Presidential and Vice Presidential.  These officers necessarily carry out much of their constitutional responsibility by meeting and consulting with visitors.  Congress did not (and, as discussed below, could not) require the President and Vice President to make their appointment calendars available for immediate public inspection under FOIA.  The President and Vice President and their staffs and other authorized personnel identify visitors to the Secret Service only to facilitate the agency's protective function, and the Secret Service uses the information for that purpose.  See Third Morrissey Decl. ¶¶ 12, 32, 37; Droege Decl. ¶¶ 5, 13; O'Donnell Decl. ¶¶ 11, 17, 20, 21 & Ex. A.  After a visitor leaves the White House or VPR, the Secret Service has no continuing interest in the visit records involved here — other than information of protective interest to the Secret Service, such as records resulting from background checks — sufficient to justify preserving or retaining them.  See Third Morrissey Decl. ¶¶ 18, 24, 37, 39-41.  The Secret Service recognizes, in contrast, that the President and Vice President have a continuing interest, both operationally and historically, in records reflecting who has visited the White House Complex and the VPR.  See id. ¶ 21 & Ex. B; see also Droege Decl. ¶ 12; O'Donnell Decl. ¶ 22.  Thus, "the extent to which [Secret Service] personnel have read or relied upon" the subject visit records is highly limited both in time and in

purpose.  See Tax Analysts, 845 F.2d at 1069; see also United We Stand Am., Inc., 359 F.3d at

600 (evaluating the "indicia of . . . intent to control" based upon "the circumstances surrounding

the [agency]'s creation and possession of the documents"); Goland, 607 F.2d at 347 (concluding

that the requested document was not an agency record based "both on the circumstances attend-

ing the document's generation and the conditions attached to its possession by the [agency]").

The Secret Service's limited use of visit records does not convert this quintessentially Presiden-

tial and Vice Presidential information into an agency record.

   The recent decision of Judge Urbina in Washington Post v. Department of Homeland

Security — subsequently stayed by the D.C. Circuit on appeal and vacated after voluntary

dismissal by the plaintiff — erred in concluding that such records are subject to FOIA.  459

F. Supp. 2d 61, 70-72 (D.D.C. 2006), vacated per voluntary dismissal, No. 06-5337 (D.C. Cir.

Feb. 27, 2007).  As an initial matter, even Judge Urbina held that three of the four Tax Analyst

factors supported a determination that the records were not "agency records."  As for the court's

singular reliance on the Secret Service's (very limited) use of White House and VPR visit records

to reach the opposite conclusion, the court's analysis turned the D.C. Circuit precedents on their

head.  The court of appeals has stressed that the determinative inquiry is whether a non-FOIA

entity — such as the President, the Vice President, or Congress — has clearly manifested its

intent to control the records and has circumscribed their use by the agency.  The court has never

suggested that records should be deemed agency records merely because they are used by the

agency in some limited respect.  Rather, as noted above, the court has expressly held that "[u]se

alone . . . is not dispositive."  Bureau of Nat'l Affairs, Inc., 742 F.2d at 1492.

   The Court in Washington Post also erred in concluding that the "use" factor was

determinative because "the very purpose of the WAVES records is limited."  459 F. Supp. 2d at

70-71.  In other words, the Court believed that the Secret Service's use of the records was deter-

minative because the records are "generated solely for their use by the Secret Service in protect-

ing the [White House Complex]."  Id. at 71.  But that holding ignored precisely what prompts the

creation of these records:  the scheduling of meetings with the President, the Vice President, their

staffs, and other White House Complex and VPR personnel, the record of which has important

historical value.  The Secret Service transfers White House visit records to the WHORM after the

visits to which they pertain because the President and Vice President have a continuing interest in

the records, both operationally and historically.  See Third Morrissey Decl. ¶¶ 21 & Ex. B;

Droege Decl. ¶ 12; O'Donnell Decl. ¶ 22.  Thus, it is manifestly incorrect to conclude that the

records cannot be used for any other purpose than that for which the Secret Service briefly uses

them.  In any event, the visit records are of limited use to the Secret Service precisely because

that agency's protective function is merely ancillary to the Presidential and Vice Presidential

business that the records facilitate.

        Plaintiff's own allegations reinforce the Presidential and Vice Presidential status of these

records and the limited nature of the Secret Service's use of them.  The complaint acknowledges

that plaintiff's intent is not to cast light on the conduct of an agency subject to FOIA — the Secret

Service — but to "open . . . to the light of public scrutiny" the activities of the Presidency and

Vice Presidency, which are not covered by FOIA.  See Department of the Air Force v. Rose, 425

U.S. 352, 372 (1976).  In seeking to support its continuing interest in records of visitors to the

White House Complex and VPR, plaintiff admits that it seeks such records because they are

"likely to shed light on the influence that conservative Christian leaders have, or attempt to have,

on the President."  See Complaint ¶ 29.  And in alleging that it is harmed by defendants' failure to

provide the records, plaintiff alleges that that failure has deprived it of "a critical part of the

evidentiary record concerning the influences to which the Bush administration is subject." <u>Id</u>. ¶ 8.

As the Supreme Court has observed, however, the "basic purpose" of the FOIA is "to open <u>agency</u> action to the light of public scrutiny." <u>Rose</u>, 425 U.S. at 372 (emphasis added). Thus, in holding that disclosure of certain information under the FOIA would constitute "an unwarranted invasion of personal privacy," the Court observed that the focus of the statute is on requiring the disclosure of "[o]fficial information that sheds light on an <u>agency's</u> performance of its statutory duties." <u>See</u> <u>U.S. Dep't of Justice v. Reporters Comm. for Freedom of Press</u>, 489 U.S. 749, 773 (1989) (emphasis added). By plaintiff's own allegations, however, these records are not sought for the purpose of revealing anything about the Secret Service.

B.    Alternatively, the FOIA Must Be Construed as Not Reaching
        the Subject Records in Order to Avoid Serious Questions as
        to Its Constitutionality

Even if it were not apparent as a statutory matter that these visitor records are not "agency records" subject to the FOIA, constitutional considerations would require the Court to construe the FOIA in a manner that would not cover these records. Pursuant to well-established principles of statutory construction, if one potential interpretation of a statute would raise "serious constitutional problems" whereas another interpretation without constitutional problems is "fairly possible," the courts are "<u>obligated</u> to construe the statute to avoid such problems." <u>INS v. St. Cyr</u>, 533 U.S. 289, 299-300 (2001) (emphasis added). This principle "not only reflects the prudential concern that constitutional issues not be needlessly confronted, but also recognizes that Congress, like [the courts], is bound by and swears an oath to uphold the Constitution." <u>Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council</u>, 485 U.S. 568, 575 (1988); <u>see</u> <u>Public Citizen v. U.S. Dep't of Justice</u>, 491 U.S. 440, 466 (1989) ("It has long

been an axiom of statutory interpretation that where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress.") (internal quotation marks omitted).

As noted above, Congress chose to treat Presidential and Vice Presidential records differently from agency records in order to avoid "premature disclosure" of the former, in light of both "the expectation of confidentiality of executive communications" and the fact that premature disclosure may chill "the frankness of advice [that Presidents and Vice Presidents] could expect from their staffs." See H.R. Rep. No. 95-1487, at 8 (1978), reprinted in 1978 U.S.C.C.A.N. 5732, 5739. Congress expressly acknowledged that Presidential and Vice Presidential records must be treated differently "to avoid the prospect of a constitutional infirmity." Id.

The Supreme Court and the D.C. Circuit have also recognized the separation-of-powers concerns inherent in piercing the confidentiality afforded the President and Vice President by the Constitution. For example, in vacating the D.C. Circuit's initial refusal to issue a writ of manda-mus against an order requiring the Vice President to respond to discovery, the Supreme Court observed that "separation-of-powers concerns" allow the Executive to maintain the confidential-ity of its communications: "[S]pecial considerations control," said the Court, "when the Execu-tive Branch's interests in maintaining the autonomy of its office and safeguarding the confiden-tiality of its communications are implicated." Cheney v. U.S. Dist. Ct., 542 U.S. 367, 383, 385 (2004). Addressing the same case after remand, the Court of Appeals, en banc, acknowledged that "separation-of-powers concerns" mandate permitting the President, "in making decisions on personnel and policy, and in formulating legislative proposals . . . to seek confidential informa-tion from many sources, both inside the government and outside." In re Cheney, 406 F.3d 723,

728 (D.C. Cir. 2005); see Nixon v. Adm'r of Gen. Servs., 433 U.S. 425, 448-49 (1977) ("Unless

he can give his advisers some assurance of confidentiality, a President could not expect to receive

the full and frank submissions of facts and opinions upon which effective discharge of his duties

depends."). The President's "unique position in the constitutional scheme" even shields the

President from "vexatious litigation that might distract [him] from the energetic performance of

[his] constitutional duties." See Cheney, 542 U.S. at 382. The Cheney Court held, therefore, that

a plaintiff is not entitled to discovery relating to persons with whom the Vice President and his

staff have met in formulating the President's national energy policy.

The Court of Appeals has held that the courts are obligated to apply these considerations

in FOIA cases. The court has observed, for example, that "[f]ailure to exempt presidential staff

from the FOIA would raise a constitutional issue of separation of powers." Ryan v. Department

of Justice, 617 F.2d 781, 788 n.19 (D.C. Cir. 1980). Similarly, in reviewing the interrelationship

between FOIA and the PRA, the court has stated that "Congress was . . . keenly aware of the

separation of powers concerns that were implicated by legislation regulating the conduct of the

President's daily operations," and thus "sought assiduously to minimize outside interference with

the day-to-day operations of the President and his closest advisors and to ensure executive branch

control over presidential records during the President's term of office." Armstrong v. Bush, 924

F.2d 282, 290 (D.C. Cir. 1991).

These cases demonstrate that this Court cannot interpret FOIA to apply to these visitor

records: Subjecting such records to immediate disclosure under FOIA would strike at the heart

of the constitutional concerns expressed by Congress and the courts. Immediate disclosure of the

identity of the President's and Vice President's visitors could reveal the nature of initiatives under

consideration or suggest how the President or Vice President may decide pending issues, before

29

the decisions are made.   See O'Donnell Decl. ¶¶ 8, 22 (describing harm to Vice Presidential

deliberations).  Such interference in ongoing decisionmaking processes would impede the ability

of the President and Vice President to receive "full and frank submissions of facts and opinions"

and to "seek confidential information from many sources, both inside the government and

outside."  See Nixon v. Adm'r of Gen. Servs., 433 U.S. at 448-49; In re Cheney, 406 F.3d at 728.

Disclosure of these records revealing who visited the White House Complex or the VPR, and

when, would undermine the congressionally acknowledged "expectation of confidentiality of

executive communications."  See H.R. Rep. No. 95-1487, at 8, reprinted in 1978 U.S.C.C.A.N. at

5739.

        These constitutional concerns apply with particular force here, given that the subject

records exist only because of the Secret Service's statutorily mandated protection of the

President, the Vice President, and the White House Complex and VPR.  Congress has chosen to

exclude records of the President, the Vice President, and their respective staffs from the reach of

FOIA.  But if plaintiff were to prevail, any FOIA requestor would be able to circumvent that

choice simply because the President and Vice President are required to accept the Secret

Service's protection.  Imposing the FOIA regime upon records of visitors to the White House and

VPR would leave the President and Vice President with no apparent practicable means to prevent

records of their official and personal visitors from becoming a matter of agency record.

        This case is not, therefore, one in which the President and Vice President have a "choice

between using [their] staff[s] to perform a function and using an agency to perform it."  See

Ryan, 617 F.2d at 789.  As the Assistant to the Vice President and Deputy Chief of Staff states:

        Short of refusing to cooperate with the Secret Service and exposing the Vice
        President (and with respect to the White House Complex, the President) to
        unnecessary risks (which the OVP would not do), the Office of the Vice President

> has taken all reasonable measures to protect and preserve the confidentiality of the information provided to the Secret Service and documents generated from that information while respecting the Secret Service's need to protect the President and Vice President.

See O'Donnell Decl. ¶ 21.  This is a case where Congress has directed the Secret Service protection that is facilitated by the records at issue.  Given the importance of this protective function and the manner in which the President and Vice President have chosen to facilitate it, "it is not for a court to burden that practice when not under statutory compulsion."  Judicial Watch, Inc. v. Department of Energy, 412 F.3d 125, 132 (D.C. Cir. 2005) (holding that OVP practice of accepting detailees and assignees from agencies did not convert documents created by those employees into agency records).  These statutes should not — and need not — be read to require that anomalous result.

Finally, subjecting the records of visitors to the White House Complex and Vice President's Residence to immediate disclosure under FOIA would impose a burden on the President and Vice President and their staffs far beyond the specific request at issue here.  A large portion of the visit records would likely be protected by exemptions, such as discovery privileges or privacy considerations.  See Judicial Watch, Inc. v. Department of Justice, 365 F.3d 1108, 1113-14 (D.C. Cir. 2004); see also 5 U.S.C. § 552(b)(5) (incorporating discovery privileges as FOIA exemption).  Because the Secret Service often does not know the reason for any particular meeting, determining the applicability of any privileges for purposes of invoking a FOIA exemption would require consulting with the President, the Vice President, and/or their staffs or other entities.  See O'Donnell Decl. ¶ 23 (describing need for Secret Service to consult with OVP).  Engaging in that consultation would impose an undue, unnecessary, and inappropriate burden upon sitting Presidents, Vice Presidents, and their staffs, particularly because a determination that

records of visitors' access to the White House Complex and the VPR are "agency records" would undoubtedly prompt the submission of dozens of similar FOIA requests from other interested groups and media outlets. Such a holding would, therefore, "constitute[ ] an unwarranted impairment of another branch in the performance of its constitutional duties" — an impairment that Congress sought to avoid by excluding the President and Vice President from the reach of FOIA. See Cheney, 542 U.S. at 390.

II.     If the Subject Records Are Not "Agency Records" Under
        the FOIA, They Are Also Not Federal Records Under
        the Federal Records Act

In addition to its FOIA claims, plaintiff challenges, under the Federal Records Act, the Secret Service's transfer of visit records to the White House and its alleged deletion of its copies of such records. See Complaint ¶¶ 45-49. Plaintiff seeks to compel the Archivist of the United States to ask the Attorney General to initiate legal action, purportedly under the FRA, to prevent the Secret Service from transferring the subject records. Id. ¶ 50-53. Aside from any other issues raised by these claims, a finding that the records in question are not agency records under the FOIA also compels a finding that they are not federal records under the FRA, thus eliminating an essential element of the FRA claims.[21]

Like the FOIA, the Federal Records Act does not apply to Presidential and Vice Presidential records. See Nixon v. United States, 978 F.2d 1269, 1283 (D.C. Cir. 1992) ("While the FRA made it clear that Congress regarded the ownership of agency records to be in the United States, it specifically excepted presidential materials for different treatment.") (emphasis in original); Armstrong v. Bush, 924 F.2d at 286 n.2 (President and Vice President subject only

---

[21] If the records in question were found subject to the FOIA and the FRA, defendants would reserve the right to address other issues raised by plaintiffs' FRA claims, such as whether any federal records have been "unlawfully removed." 44 U.S.C. § 3106.

to Presidential Records Act, not Federal Records Act).  In the context of distinguishing FRA and

FOIA records from Presidential and Vice Presidential records, the D.C. Circuit has held that

"coverage of the FRA is coextensive with the definition of 'agency' in the FOIA."  Armstrong v.

Executive Office of the President, 90 F.3d 553, 556 (D.C. Cir. 1996).  Thus, an Executive Branch

document that is not an "agency record" under the FOIA is also not a "record" under the FRA,

and a finding that the records in question here are subject to the PRA rather than the FOIA would

also constitute an essential finding against the plaintiff on the FRA claims.[22]  Accordingly, since

the records in question are not, as shown above, "agency records" under FOIA, they are also not

federal records under the FRA, and plaintiff's FRA claims must be dismissed.

In any event, neither the plaintiff nor any other private party has standing to raise these

claims under the FRA in the present circumstances.  Although the Court of Appeals has held that

a private party has standing, under the FRA and the PRA, to challenge the proposed destruction

of records, see Armstrong, 924 F.2d at 287-88, this case does not involve any such destruction.

Standing in Armstrong was based on Congress's intent that "federal and presidential records" be

preserved "to ensure that private researchers and historians would have access to the documen-

tary history of the federal government."  Id. at 287.  Here, in contrast, plaintiff challenges the

mere classification of records as Presidential or Vice Presidential records under the PRA, arguing

that they should, instead, be classified as federal records under the FRA and agency records

_____

[22] Moreover, in light of the significant constitutional considerations described above, even if the status of the subject records were not so clear as a statutory matter — that is, if this case presented a close question as to whether the records are covered by the PRA, on one hand, or the FRA — the courts should defer to the Executive's designation of the records as Presidential or Vice Presidential, given that those officers and their designees necessarily know whether a record was "created or received . . . in the course of conducting activities which relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President [or Vice President]."  See 44 U.S.C. § 2201(2); see also Droege Decl. ¶¶ 12, 15 (stating that visitor records are maintained under PRA).

under FOIA.  Under either classification, however, the records will be preserved for "researchers and historians."

III.    The Secret Service's Additional Security-Related Records
        Are Exempt from Disclosure Under the FOIA

        Finally, express FOIA exemptions protect from disclosure nineteen pages of security-related records created by the Secret Service in relation to certain visitors and visits selected based on Secret Service criteria.  As described above, after receiving visitor information from Presidential or Vice Presidential staff and other authorized White House pass holders, the Secret Service creates various records in the course of determining whether any visitor poses a security risk and in otherwise protecting the security of the White House Complex.  Unlike the Presidential and Vice Presidential records addressed above, which reflect the identification of visitors by Presidential and Vice Presidential staff and other pass holders and the entry and exit of those visitors, these records, created by the Secret Service of its own accord, contain substantial security-related information developed by the Secret Service, which maintains control over them and does not transfer them to the WHORM or the OVP.  Certain of these Secret Service records — the "Additional Security-Related Records," see supra text at 9-10 — are law enforcement records related solely to the Secret Service's internal rules and practices, whose disclosure would reveal law enforcement techniques and procedures and could, therefore, "endanger the life or physical safety" of one or more Secret Service protectees.  These records are, therefore, protected from disclosure by sections (b)(2), (b)(7)(E), and (b)(7)(F) of the FOIA — that is, Exemptions 2, 7(E), and 7(F).[23]  See Lyerly Decl. ¶¶ 18-21.[24]

_____

        [23] In addition to withholding these records in their entirety under Exemptions 2 and 7(E), the Secret Service is withholding, under Exemptions 6 and 7(C), the names and telephone numbers of individual Secret Service officers, the Social Security numbers and birth dates of

(continued...)

A.     The Additional Security-Related Records Are
       Protected by FOIA Exemption 2

Exemption 2 of FOIA applies to "matters that are . . . related solely to the internal

personnel rules and practices of an agency."  5 U.S.C. § 552(b)(2).  This exemption applies not

only to "trivial administrative matters of no genuine public interest" such as internal file numbers

and employee leave policies — referred to as "low 2" records — see Long v. U.S. Dep't of

Justice, 450 F. Supp. 2d 42, 54-57 & n.16 (D.D.C. 2006), but also, in some circumstances, to

more substantive records "designed to establish rules and practices for agency personnel," known

as "high 2" records.  Crooker v. Bureau of Alcohol, Tobacco & Firearms, 670 F.2d 1051, 1073

---

[23](...continued)
visitors contained in the records, and an item of personal history regarding one of the visitors or
another person with the same name.  See Lyerly Decl. ¶¶ 21-26.  Birth dates and Social Security
numbers are typical of the sensitive personal information whose disclosure would "constitute a
clearly unwarranted invasion of personal privacy," see 5 U.S.C. § 552(b)(6), (b)(7)(C), and
plaintiff can show no legitimate interest in their disclosure here.  See, e.g., Judicial Watch, Inc. v.
U.S. Dep't of Commerce, 337 F. Supp. 2d 146 (D.D.C. 2004) ("[T]he disclosure of [dates of birth
and other personal] information has little to do with the public's understanding of the manner in
which the DOC conducts business."); Hertzberg v. Veneman, 273 F. Supp. 2d 67, 86 n.13
(D.D.C. 2003) ("The Court agrees with defendant . . . that there is a significant privacy interest in
social security numbers, and no legitimate purpose would be served by their release."); Kuffel v.
U.S. Bureau of Prisons, 882 F. Supp. 1116, 1122-23 (D.D.C. 1995) (upholding exemption of "the
social security numbers of Plaintiff's prospective visitors in prison").

[24] As noted earlier, some of the nineteen pages covered by the above-referenced exemp-
tions contain notations and information provided by other federal agencies.  See Lyerly Decl.
¶ 15.  One of those agencies has classified as "Confidential" the four pages that contain its
notations regarding certain of the persons listed in plaintiff's FOIA request.  Id.  Those pages,
therefore, are also protected from disclosure under FOIA's Exemptions 1 and 3, see 5 U.S.C.
§ 552(b)(1), (b)(3).  Briefing this issue, however — or otherwise revealing the identity of the
federal agency involved — would disclose information protected by Exemption 7(E).  See Lyerly
Decl. ¶ 15.  Nevertheless, defendants are submitting in camera, on the same day as the filing of
this memorandum, an ex parte, classified declaration from the agency in question, explaining
why its information is protected by Exemptions 1 and 3.  See Jifry v. FAA, 370 F.3d 1174, 1182
(D.C. Cir. 2004) ("court has inherent authority to review classified material ex parte, in camera as
part of its judicial review function"); see also 5 U.S.C. § 552(a)(4)(B) ("the court . . . may
examine the contents of such agency records in camera to determine whether such records or any
part thereof shall be withheld under any of the exemptions").

(D.C. Cir. 1981) (en banc).  Specifically, "high 2" records are exempt from disclosure if they are

"predominantly internal" and their disclosure would "significantly risk[ ] circumvention of

agency regulations or statutes."  Wiesenfelder v. Riley, 959 F. Supp. 532, 535 (D.D.C. 1997)

(quoting Crooker, 670 F.2d at 1074).

The effect of a record need not be limited to agency personnel for the record to be

considered "predominantly internal."  In the law enforcement context, for example, "agency

guidelines for conducting investigations and identifying law violators" are treated as "predomi-

nantly internal" even though they "directly affect[ ] the public at large."  Wiesenfelder, id. at

535-36; cf. Institute for Policy Studies v. Department of the Air Force, 676 F. Supp. 3, 5 (D.D.C.

1987) (acknowledging that Exemption 2 applies to "law enforcement records," among other

types).  The D.C. Circuit has held, for example, that Exemption 2 covers an ATF training manual

regarding surveillance of suspects, finding that the manual was "predominantly internal" because

its purpose was not "to modify or regulate public behavior [but] only to observe it for illegal

activity."  Crooker, 670 F.2d at 1075.  Similarly, another judge of this Court has held that

Exemption 2 covers "trigger figures" and "error rates" used by the Department of Education to

determine when an educational institution may not be in compliance with federal guidelines in

student financial aid programs.  See Wiesenfelder, 959 F. Supp. at 534-36.  The Court rejected a

contention that these benchmarks constituted "secret law" governing the agency's "dealings with

the public."  Id. at 536.  Public behavior, the Court observed, was governed by the statute; the

trigger figures and error rates, in contrast, were used internally to "alert the Department . . . for

enforcement purposes" and to enable the Department "to most closely scrutinize the institutions

exhibiting the most serious violations."  Id. at 536-37.

Nor is Exemption 2 limited to the actual text of agency "rules or practices." Rather, as stated in the statutory language, it extends to matters "related" to internal rules and practices. Thus, as the D.C. Circuit has held, Exemption 2 protects records whose "disclosure could lead to disclosure of the rule or practice itself." Schwaner v. Department of Air Force, 898 F.2d 793, 796 (D.C. Cir. 1990) (emphasis added). Thus, for example, another judge of this Court has held that Exemption 2 covers informant numbers and file numbers used in FBI records to protect the identity of informants. See Brunetti v. FBI, 357 F. Supp. 2d 97, 104 & n.4 (D.D.C. 2004). Although disclosure of the numbers, alone, would not reveal informant identities, the Court noted that their disclosure could lead to that result:

> Because these unique identifiers are used consistently across FBI records, it would be possible, with access to the numbers, to discern patterns of information associated with particular sources. An individual with knowledge of the people and facts would be able to deduce the identities of these sources, putting the sources at risk of exposure and potentially placing them in danger. Accordingly, the Court concludes that the release of the numbers would risk revealing the identities of informants in circumvention of FBI policies and practices related to information gathering and protecting confidential informants.

Id. at 104.

The requirement that disclosure of a "high 2" record would "significantly risk[ ] circumvention of agency regulations or statutes" is met where disclosure would endanger the safety of agency personnel or of persons under their protection. For example, a judge of this Court has held that Exemption 2 protects an "internal investigation document used by the Secret Service to analyze and profile factual information concerning individuals" who are "potential threat[s] toward a Secret Service protectee." Dorsett v. U.S. Dep't of the Treasury, 307 F. Supp. 2d 28, 36 (D.D.C. 2004) . "As such," said the Court, "the documents could be used to

37

gain insight into the methods and criteria the Secret Service utilizes to identify and investigate persons of interest, and could alter such individuals' behavior to avoid detection" — thus presenting a "significant risk" of circumvention of statutes.  Id.  Similarly, another judge has held that the exemption applies to guidelines used by an agency security office in protecting the head of the agency, where disclosure would increase the potential for "unlawful attacks."  Judicial Watch, Inc. v. U.S. Dep't of Commerce, 337 F. Supp. 2d 146, 166 (D.D.C. 2004).

Under this precedent, the Additional Security-Related Records involved here fall squarely within the protection of Exemption 2.  Like the Department of Education "trigger figures" and "error rates" at issue in Wiesenfelder, these records are designed to "alert" the Secret Service to potential security threats and to "most closely scrutinize" those White House visitors and visits that might present "the most serious" risk and to assess the level of that risk.  See 959 F. Supp. at 536-37.  Although disclosing the names of persons whose visits have prompted the Secret Service to undertake additional security activities would not, alone, expose the nature of those activities, revealing that information — especially when combined with the implied disclosure that certain other visitors had not prompted those activities — would allow someone "with knowledge of the people and facts" to "deduce" the nature of those additional security activities. Brunetti, 357 F. Supp. 2d at 104.  Like the records held properly exempt in Brunetti, therefore, disclosing the Secret Service's Additional Security-Related Records could "lead to" disclosure of certain aspects of the agency's fulfillment of its protective functions.  See id.; see also Schwaner, 898 F.2d at 796.  Finally, like the records withheld in Dorsett, the records in question here "could be used to gain insight into the methods and criteria the Secret Service utilizes" to secure the White House and its protectees; disclosure, therefore, would "significantly risk[ ] circumvention" of statutes.  307 F. Supp. 2d at 36.

B.      The Additional Security-Related Records Are
        Protected by FOIA Exemption 7(E)

"Exemption 7(E) provides categorical protection to information related to law enforce-

ment techniques." Smith v. Bureau of Alcohol, Tobacco & Firearms, 977 F. Supp. 496, 501

(D.D.C. 1997).  Records "compiled for law enforcement purposes" may be withheld under this

exemption if release of the information "would disclose techniques and procedures for law

enforcement investigations." 5 U.S.C. § 552(b)(7)(E).  The D.C. Circuit applies a "deferential

standard to a claim that information was compiled for law enforcement purposes when the claim

is made by an agency whose primary function involves law enforcement." Tax Analysts v. IRS,

294 F.3d 71, 77 (D.C. Cir. 2002); see Blanton v. U.S. Dep't of Justice, 63 F. Supp. 2d 35, 44

(D.D.C. 1999) ("Law enforcement agencies . . . face a lesser burden with regard to showing a

legitimate law enforcement purpose behind the compilation of such records than do other

agencies.").  Specifically, in order to show that information was "compiled for law enforcement

purposes," a law enforcement agency must show that (1) the activity that gave rise to the docu-

ments is related to the enforcement of federal laws or the maintenance of national security; and

(2) the nexus between the activity and one of the agency's law enforcement duties is based on

information sufficient to support at least a "colorable claim" of its rationality.  See Pratt v.

Webster, 673 F.2d 408, 420-21 (D.C. Cir. 1982); Blanton, 63 F. Supp. 2d at 44.  Thus, "a court

can accept less exacting proof from [a law enforcement] agency that the purpose underlying

disputed documents is law enforcement." See Tax Analysts, 294 F.3d at 77.

        In examining an Exemption 7 claim, the courts are sensitive to the inherent limitations on

describing the purposes of law enforcement records, given that such a description may itself

disclose law enforcement techniques and procedures.  Therefore, "[i]n justifying the application

of Exemption 7(E), the agency may describe the general nature of the technique while withhold-

ing the full details." Boyd v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, Civil Action

No. 05-1096 (RMU), 2006 WL 2844912, at *9 (D.D.C. Sept. 29, 2006). In fact, "in some cases

it may not even be possible for an agency to describe its law enforcement techniques in general

terms without disclosing the very information it seeks to protect." Morley v. CIA, 453

F. Supp. 2d 137, 156 (D.D.C. 2006). When a declaration filed in support of an Exemption 7

claim is inadequate, the appropriate course is to direct the in camera submission of a supple-

mental declaration. See Smith, 977 F. Supp. at 503; National Sec. Archive v. FBI, 759 F. Supp.

872, 885 (D.D.C. 1991).

Under these standards, the "Additional Security-Related Records" withheld by the Secret

Service in this case are protected by Exemption 7(E). As a threshold matter, the Secret Service's

protective function constitutes "law enforcement" for purposes of Exemption 7. See 18 U.S.C.

§ 3056A(a) (referring to Secret Service Uniformed Division as a "permanent police force"). As

another judge of this Court has said, in holding that the Secret Service's protective function is a

"law enforcement" activity under Exemption 7:

> The Secret Service is unique in that its law enforcement efforts are geared
> primarily towards prevention rather than apprehension. . . . While most law
> enforcement agencies investigate suspected or on-going criminal activities, the
> Secret Service must protect persons such as the President from both known and
> unknown threats. Accordingly, many of its most important techniques and
> procedures are preventative rather than investigative. It is inconceivable,
> however, that Congress meant to afford these activities any less protection from
> disclosure simply because they do not fit within the traditional notion of investiga-
> tive law enforcement techniques. Indeed, it is difficult to imagine agency proce-
> dures or techniques more deserving of protection.

U.S. News & World Report v. Department of the Treasury, Civil Action No. 84-2303, 1986 U.S.

Dist. LEXIS 27634, at *6-7 (D.D.C. Mar. 26, 1986); see Moorefield v. U.S. Secret Service, 611

F.2d 1021, 1024 (5th Cir. 1980) (holding that Secret Service records were "compiled for law

enforcement purposes" where they "were prepared to help the Service fulfill its duty under 18

40

U.S.C. § 3056 (1976) [of] ensuring the lives and safety of the President, members of his family, and certain other persons"); see also Dorsett, 307 F. Supp. 2d at 38-40 (upholding Secret Service's invocation of Exemption 7(C)); Fitzgibbon v. U.S. Secret Service, 747 F. Supp. 51, 59 (D.D.C. 1990) (upholding Secret Service's invocation of Exemptions 7(C) and (D)).

Obviously, therefore, the Additional Security-Related Records involved here were "compiled for law enforcement purposes." 5 U.S.C. § 552(b)(7)(E). They were created and used in the course of conducting background checks and other security-related activities regarding certain visitors to the White House Complex, in furtherance of the Secret Service's statutory duties. See Third Morrissey Decl. ¶ 17; Lyerly Decl. ¶ 20; see also Pratt, 673 F.2d at 420-21; Blanton, 63 F. Supp. 2d at 44. Like the records involved in Moorefield, cited above, these records were "prepared to help the Service fulfill its [protective] dut[ies]." 611 F.2d at 1024; see 18 U.S.C. §§ 3056, 3056A.

Furthermore, disclosing these records "would disclose techniques and procedures" used by the Secret Service in carrying out these duties. 5 U.S.C. § 552(b)(7)(E). As explained by the Secret Service, these records were created in conducting additional background checks and other security-related activities regarding visitors who were chosen based on certain details in their backgrounds and/or the circumstances of their visits. See Third Morrissey Decl. ¶ 17; Lyerly Decl. ¶ 20. Disclosing these records could, among other things, reveal the criteria — not generally known to the public — that the Secret Service uses in choosing visitors for these additional background checks and other security-related activities. Id.; Third Morrissey Decl. ¶ 17.

Under these circumstances, the Additional Security-Related Records are protected from disclosure by FOIA Exemption 7(E).

C.     The Additional Security-Related Records Are
       Protected by FOIA Exemption 7(F)

Exemption 7(F) of FOIA exempts from disclosure "records or information compiled for law enforcement purposes," the disclosure of which "could reasonably be expected to endanger the life or physical safety of any individual." 5 U.S.C. § 552(b)(7)(F). "While courts generally have applied Exemption 7(F) to protect law enforcement personnel or other specified third parties, by its terms, the exemption is not so limited; it may be invoked to protect 'any individual' reasonably at risk of harm." Long, 450 F. Supp. 2d at 79. "In evaluating the validity of an agency's invocation of Exemption 7(F), the court should within limits, defer to the agency's assessment of danger." Peter S. Herrick's Customs & Inter'l Trade Newsletter v. U.S. Customs & Border Protection, Civil Action No. 04-00377 (JDB), 2006 WL 1826185, at *9 (D.D.C. June 30, 2006) (internal quotation marks omitted). This exemption "does not require a balancing of interests, but rather focuses on the potential harm to the third party." Brunetti, 357 F. Supp. 2d at 109 n.9.

The Secret Service's factual submissions in this case establish that the "Additional Security-Related Records" withheld here are protected by Exemption 7(F). As discussed above in relation to Exemption 7(E), disclosure of these records would reveal certain "techniques and procedures" used by the Secret Service in securing the White House Complex, by revealing when various security checks and security measures are taken in connection with individuals seeking entrance into the Complex. See Lyerly Decl. ¶¶ 20, 27. Disclosing those techniques and procedures would permit an individual or organization to attempt to avoid certain security checks, potentially impeding the Secret Service's efforts to identify persons who may be a threat to its protectees. Id. Since one purpose of those efforts is obviously to protect certain persons,

42

disclosing these records "could reasonably be expected to endanger the life or physical safety" of one or more Secret Service protectees.  5 U.S.C. § 552(b)(7)(F); <u>see</u> Lyerly Decl. ¶¶ 20, 27.

CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment should be granted, and this action dismissed with prejudice.

Dated: May 25, 2007

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

CARL J. NICHOLS
Deputy Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

ELIZABETH J. SHAPIRO, D.C. Bar 418925
Assistant Director

JOHN R. TYLER, D.C. Bar 297713
Senior Trial Counsel

_____
W. SCOTT SIMPSON, Va. Bar 27487
Senior Trial Counsel

Attorneys, Department of Justice
Civil Division, Room 7210
Post Office Box 883
Washington, D.C. 20044
Telephone:  (202) 514-3495
Facsimile:   (202) 616-8470
E-mail: scott.simpson@usdoj.gov

COUNSEL FOR DEFENDANTS

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

| | |
|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| U.S. DEPARTMENT OF HOMELAND SECURITY, et al., | ) |
| | ) |
| | ) |
| Defendants. | ) |

CIVIL ACTION NO.
1:06-cv-01912-JGP

---

**DEFENDANTS' STATEMENT OF MATERIAL FACTS
AS TO WHICH THERE IS NO GENUINE ISSUE**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 7(h), the defendants, by their undersigned counsel, submit the following statement of material facts as to which there is no genuine issue, in relation to their motion for summary judgment:

I.    **Presidential and Vice Presidential Records**

A.    **The White House Complex**

1.    The United States Secret Service provides security for the White House Complex, and monitors and controls access to the Complex.  See Third Declaration of Paul S. Morrissey, Deputy Assistant Director, United States Secret Service ¶¶ 3, 5, 7 (May 23, 2007) [hereinafter Third Morrissey Decl.].

2.    There are two interrelated electronic systems — collectively termed the White House Access Control System ("WHACS") — for controlling and monitoring access to the White House Complex:  the Worker and Visitor Entrance System ("WAVES") and the Access Control Records System ("ACR").  Id. ¶ 8.

3.    The process for entry of a proposed visitor into the White House Complex begins when an authorized White House pass holder (such as a member of the President's or Vice President's staff) advises the Secret Service that the entrance of a particular individual, or group of individuals, is anticipated for a particular date.  Id. ¶ 9.

4.    Authorized White House pass holders usually provide visitor information to the Secret Service electronically, by entering the information into a computer terminal connected to the White House Appointment Request Server, which automatically transmits it to the Secret Service's WAVES Center, where a Secret Service employee verifies that the requestor is authorized to make appointments for the specific location requested and fills in any additional information that may be necessary (such as for a background check), then transmits the information electronically to the WHACS server.  Id. ¶ 11; Declaration of Philip C. Droege ¶ 6 (May 23, 2007) [hereinafter Droege Decl.]; Declaration of Claire M. O'Donnell, Assistant to the Vice President and Deputy Chief of Staff, Office of the Vice President ¶ 12 (May 23, 2007) [hereinafter O'Donnell Decl.].

5.    WAVES records regarding visitors to the White House Complex consist primarily of information that an authorized White House pass holder has provided to the Secret Service. See Third Morrissey Decl. ¶ 11.

6.    Presidential and Vice Presidential personnel provide visitor information to the Secret Service on a confidential and temporary basis, solely to enable the Secret Service to perform background checks to determine whether, and under what conditions, to provide for the visitor's temporary admittance to the Complex and to allow the Secret Service to verify the visitor's admissibility at the time of the visit.  See Droege Decl. ¶ 5; O'Donnell Decl. ¶¶ 11, 21.

The Secret Service uses the information so provided for these purposes.  <u>See</u> Third Morrissey Decl. ¶ 12.

7.    Upon arrival, a visitor to the White House Complex is generally issued an appropriate pass.  ACR records are generated when a visitor — or a Secret Service officer on a visitor's behalf — swipes the visitor's pass over one of the electronic pass readers located at entrances to and exits from the Complex.  <u>Id</u>. ¶ 14.

8.    The understanding among the White House, the Office of the Vice President ("OVP"), and the Secret Service is that WAVES and ACR records and the visitor information contained in them are subject to the Presidential Records Act and remain under the legal control of the White House and OVP.  <u>See</u> O'Donnell Decl. ¶¶ 9, 13, 21; Droege Decl. ¶¶ 8, 9.

9.    Once a visitor's visit to the White House Complex is complete, the Secret Service has no continuing interest sufficient to justify preservation or retention of WAVES or ACR records, and the Secret Service recognizes that such records are under the exclusive legal control of the President and Vice President.  <u>See</u> Third Morrissey Decl. ¶ 18.

10.    Since at least 2001, it has been the practice of the Secret Service to transfer newly-generated WAVES records on CD-ROM to the White House Office of Records Management ("WHORM") every 30 to 60 days.  <u>Id</u>.; Droege Decl. ¶ 9; O'Donnell Decl. ¶ 14.  The WHORM preserves these records in accordance with the Presidential Records Act.  <u>See</u> O'Donnell Decl. ¶ 14.  WAVES records on the Secret Service's computer servers, older than 60 days, are purged daily and overwritten on the servers.  <u>See</u> Third Morrissey Decl. ¶ 18.

11.    In May 2006, the Secret Service Records Management Program entered into a Memorandum of Understanding ("MOU") with the White House Office of Records Management that confirmed the legal status of WAVES and ACR records and of WHORM's management and

custody of them under the Presidential Records Act.  Id. ¶ 21 & Ex. B.  The MOU provides, among other things, that White House entities, but not the Secret Service, have a continuing interest in WAVES and ACR records, and that White House entities continue to use the information contained in such records for various historical and informational purposes.  Id.  The MOU reflects that White House entities "at all times assert[ ], and the Secret Service disclaims, all legal control over any and all [WAVES and ACR] Records."  Id.  The Secret Services acknowledges in the MOU that its temporary retention of such records after an individual's visit to the White House Complex is solely for the purpose of facilitating an orderly and efficient transfer of the records to the WHORM.  Id.

12.    At least as early as 2001 (at the end of the Clinton Administration), and upon revisiting the issue in 2004, the Secret Service and the White House recognized and agreed that ACR records should be treated in a manner generally consistent with the treatment of WAVES records.  See Third Morrissey Decl. ¶ 22; Droege Decl. ¶ 10.  In May 2006, the Secret Service transferred to the WHORM the ACR records covering the period from 12:00 p.m. on January 20, 2001, to April 30, 2006, and has continued, since that time, to transfer ACR records to the WHORM.  See Third Morrissey Decl. ¶ 22; see also Droege Decl. ¶ 14.

13.    The Secret Service also transfers to the WHORM, typically every 30 to 60 days, certain paper records regarding visitors to the White House Complex.  These records include requests for access to the Complex, such as large event lists, facsimiles, and e-mails, as well as lists and checklists relating to large group appointments.  Once a visitor's visit to the Complex is complete, the Secret Service has no continuing interest in these materials sufficient to justify their preservation or retention.  See Third Morrissey Decl. ¶ 24.

B.     **<u>The Vice President's Residence</u>**

14.     The Secret Service provides security for the Vice President's Residence ("VPR"), and monitors and controls access to the VPR.  <u>Id</u>. ¶¶ 7, 32.

15.     The Secret Service receives requests for entry to the VPR from the Vice President's staff to screen individuals for entry.  <u>Id</u>. ¶ 32; O'Donnell Decl. ¶ 17.  The Secret Service conducts background checks on individuals for whom there has been a request for admission, and, if there is no information of protective interest, the name is placed on either a permanent access list or a daily access list.  <u>See</u> Third Morrissey Decl. ¶ 32.  An electronic database is used to generate the permanent and daily access lists.  <u>Id</u>. ¶ 34.  The Secret Service also uses event lists for controlling access to the VPR during a particular event.  <u>Id</u>. ¶ 41.  The names of individuals who enter the VPR on a particular day are handwritten on an entry log by the officer working at the gate where the individual arrives.  <u>Id</u>. ¶ 33; <u>see</u> O'Donnell Decl. ¶ 17.

16.     OVP provides information on VPR visitors to the Secret Service with the understanding that the information and any materials derived from it (except those which relate to Secret Service's ongoing protective function, such as the results of background checks) remain in the exclusive ownership, custody, and control of the OVP.  <u>See</u> O'Donnell Decl. ¶ 18.

17.     Once a visitor's visit to the Vice President's Residence is complete, the Secret Service has no continuing interest sufficient to justify preservation or retention of records of such visitors — other than materials containing information of protective interest to the Secret Service, such as records resulting from background checks — and the Secret Service recognizes that such records (with the exception noted) are under the exclusive legal control of the Vice President.  <u>See</u> Third Morrissey Decl. ¶ 37.

18.     Since 2001, the Secret Service's consistent practice has been to transfer to the OVP, generally on a monthly basis, all handwritten post entry logs from the VPR.  Id. ¶ 37; O'Donnell Decl. ¶ 18.

19.     The Secret Service has transferred to the OVP all existing permanent access lists and daily access lists from the VPR, which date back to July 2006 (along with some earlier, non-comprehensive lists, back to August 2005, that had not been discarded), and will continue to transfer permanent and daily access lists on a monthly basis in connection with the transfer of post entry logs.  The Secret Service has also transferred to the OVP an electronic copy of the access list database with data retained from on or about June 27, 2006 (the database had been purged periodically before that date), and will continue to transfer such electronic copies on a monthly basis.  See Third Morrissey Decl. ¶ 39.

20.     The Secret Service has transferred to the OVP all existing electronic and paper requests for access from the VPR, which date back to April 2006 (along with some earlier, non-comprehensive paper requests, back to June 2002, that had not been discarded), and will continue to transfer such records on a monthly basis in connection with the transfer of post entry logs.  Id. ¶ 40.

21.     The Secret Service has transferred to the OVP all existing event lists from the VPR, which date back to June 2006 (along with some earlier, non-comprehensive event lists, back to February 2005, that had not been discarded), and will continue to transfer event lists on a monthly basis in connection with the transfer of post entry logs.  Id. ¶ 41.

22.     The OVP has a continuing interest in the records of visitors to the VPR, in recognition of their contemporary and historic value.  See O'Donnell Decl. ¶ 22.  The OVP

preserves all entry and access control records periodically returned by the Secret Service to OVP under the Presidential Records Act.  Id. ¶ 19.

23.    The handling of entry records relating to the Vice President's Residence was addressed in a September 13, 2006, letter from Shannen W. Coffin, Counsel to the Vice President, to Donald Personette, Chief Counsel to the Secret Service.  See Third Morrissey Decl. ¶ 42 & Ex. D; O'Donnell Decl. ¶ 20 & Ex. A.

## II.    **The Secret Service's Additional Security-Related Records**

24.    The Secret Service sometimes creates records that relate to the background investigation and security process conducted in connection with certain individuals entering or scheduled to enter the White House Complex (hereinafter referred to as "Additional Security-Related Records").  These records are created in the course of conducting additional background checks and other security-related activities regarding certain visitors, who are chosen by the Secret Service based on certain details in their backgrounds and/or the circumstances of their visits.  See Third Morrissey Decl. ¶ 17.

25.    The Secret Service has searched the Additional Security-Related Records for information concerning the individuals listed in the FOIA request at issue in this case.  This search produced nineteen pages of records that include the names of some of those individuals (hereinafter referred to as "nineteen pages").  Id. ¶ 29.

26.    All of the responsive information in the nineteen pages was compiled for law enforcement purposes.  All of the information had been gathered and utilized by the Secret Service in connection with its statutory responsibilities for protection and security.  See Declaration of Kathy J. Lyerly, Special Agent in Charge, Liaison Division and Freedom of

Information and Privacy Acts Officer, United States Secret Service ¶ 16 (May 24, 2007)

[hereinafter Lyerly Decl.].

A.    **Exemption 2 (Internal Rules and Practices) and Exemption 7(E) (Law Enforcement Techniques and Procedures)**

27.    Releasing responsive information in the nineteen pages would disclose information related to when and if the Secret Service undertakes various security checks and security measures in connection with individuals seeking entrance into the White House Complex. The name of the program as shown on the documents themselves reveals security-related information concerning when certain checks are, or are not, conducted. Id. ¶ 20.

28.    In the context of the nineteen pages, revealing the name of and personal identifying information concerning a visitor to the White House Complex, and who they were visiting, could suggest when additional security checks are conducted and when certain security measures are not, or are unlikely, to be taken. Id.

29.    The release of the information in the nineteen pages would reveal techniques and criteria used by the Secret Service to gather additional information in certain circumstances and in regard to certain individuals. Disclosing the documents could reasonably be expected to enable individuals to circumvent the law by revealing information regarding the circumstances that trigger when certain security steps are taken, and the manner through which those additional security checks are taken or information is gathered. Id.

30.    The information at issue is internal to the Secret Service, and release of the information would reveal information not known to the general public. Id.

31.    Information in the nineteen pages also includes the appointment letter/number sequence assigned to an appointment by the computer, and a letter/number sequence associated with an Access Control Officer. These pieces of information are strictly internal and provide no

information to the public, and are generally meaningless other than to the computer which

generates the number, or to the internal workings of the Secret Service.  See Lyerly Decl. ¶ 19.

      B.      **Exemption 7(F) (Endanger Life or Physical Safety)**

    32.    Disclosure of responsive information in the nineteen pages would disclose

information related to when and if various security checks and security measures are taken in

connection with individuals seeking entrance into the White House Complex.  One purpose of

those security checks and security measures is to protect the life and physical safety of one or

more protectees of the Secret Service.  Disclosing the Secret Service's techniques and procedures

in that regard would permit an individual or organization to attempt to avoid certain security

checks, potentially impeding the Secret Service's efforts to identify persons who may be a threat

to its protectees, and thus potentially endangering the life and physical safety of one or more

Secret Service protectees.  Id. ¶ 27.

      C.      **Exemptions 6 and 7(C) (Privacy)**

    33.    Information in the nineteen pages includes names and telephone numbers of Secret

Service Access Control Officers and others making requests under the security program at issue;

the name, Social Security numbers, dates of birth, and other personal identifying information for

certain individuals seeking access to the White House Complex; and the investigative status of

third parties as it appears on the nineteen pages.  Id. ¶ 22.

    34.    In making its determination to withhold this information under Exemptions (6) and

(7)(C), the Secret Service balanced the public's interest in disclosure against the rights of the

individuals named to personal privacy, and determined that the privacy rights of third parties

outweighed any public interest in disclosure.  Id. ¶ 23.

35.    There would be little public interest in the names of Access Control Officers and others making requests and their work telephone numbers.  The release of such information could invade the individual's privacy by causing him/her public attention or subjecting the individual to unnecessary and unwanted telephone contact.  See Lyerly Decl. ¶ 24.

36.    Disclosure of the date of birth or Social Security number of an individual seeking entrance into the White House Complex, combined with the individual's name, could lead to various forms of criminal activity against these named individuals, such as identity theft or fraud. Id. ¶ 25.

D.    **Exemptions 1 and 3**

37.    Some of the nineteen pages contain notations and information that originated with other federal agencies.   Revealing the identity of those agencies would disclose certain "techniques and procedures" used by the Secret Service in conducting background checks and other security-related activities regarding visitors and proposed visitors to the White House Complex.  One of those other federal agencies has classified as "Confidential" the four pages that contain its notations.  Id. ¶ 15.

Dated: May 25, 2007

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

CARL J. NICHOLS
Deputy Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

ELIZABETH J. SHAPIRO, D.C. Bar 418925
Assistant Director

10

JOHN R. TYLER, D.C. Bar 297713
Senior Trial Counsel


_____

W. SCOTT SIMPSON, Va. Bar 27487
Senior Trial Counsel

Attorneys, Department of Justice
Civil Division, Room 7210
Post Office Box 883
Washington, D.C. 20044
Telephone:  (202) 514-3495
Facsimile:  (202) 616-8470
E-mail: scott.simpson@usdoj.gov

COUNSEL FOR DEFENDANTS

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, | ) ) ) | |
| Plaintiff, | ) ) | CIVIL ACTION NO. |
| v. | ) ) | 1:06-cv-01912-JGP |
| U.S. DEPARTMENT OF HOMELAND SECURITY, et al., | ) ) ) | |
| Defendants. | ) ) | |

THIRD DECLARATION OF PAUL S. MORRISSEY
DEPUTY ASSISTANT DIRECTOR
UNITED STATES SECRET SERVICE

I, Paul S. Morrissey, hereby declare as follows:

1.    I am the Deputy Assistant Director of the Office of Protective Operations for the

United States Secret Service ("Secret Service"), which is a component of the Department of

Homeland Security ("DHS").  I have held this position since September 2006, and have been a

special agent with the Secret Service since January 1983.  The statements made herein are based

on my personal knowledge or on information made available to me in my official capacity.

2.    This declaration supplements my prior declarations in this case, which were

executed on February 21 and March 5, 2007.

### Functions of the Secret Service

3.    The Secret Service is a protective and law enforcement agency operating under

the provisions of Title 18 of the United States Code, Sections 3056 and 3056A.  Pursuant to

Section 3056, the Secret Service is charged with the protection of the President and Vice

President of the United States and their immediate families; major candidates for President and Vice President of the United States and their spouses; the President-elect and Vice President-elect and their immediate families; former Presidents of the United States, their spouses, and minor children; visiting foreign heads of state and heads of government; and certain other individuals as directed by the President of the United States. By statute, the Secret Service's protection of the President and Vice President (as well as the President-elect and Vice President-elect) is mandatory. Additionally, the Secret Service is authorized to provide security for the White House Complex and the Vice President's official residence; foreign diplomatic missions in the Washington, D.C., area, and certain other locations within the United States; designated events of national significance; as well as other locations.

    4.    The Office of Protective Operations ("OPO") is one of eight directorates in the Secret Service that manage various operational and support functions. The OPO is responsible for establishing policies related to the Secret Service's protective mission and for overseeing the operational divisions that protect the persons, places, and events that the Secret Service is authorized to protect. In my capacity as the Deputy Assistant Director of the OPO, the representations made in this declaration are made on behalf of the Secret Service as an agency and not solely on behalf of the OPO.

    5.    The "White House Complex" (also "Complex"), as secured by the Secret Service, includes the White House; the Eisenhower Executive Office Building ("EEOB"), which is also known as the "Old Executive Office Building"; the grounds encompassing the EEOB and the White House; and the New Executive Office Building ("NEOB"). Housed in the White House, the EEOB and the NEOB are the offices of various staff of the Executive Office of the President

("EOP"), as well as offices for the staff of the Office of the Vice President ("OVP") including the

Executive Branch office of the Vice President himself.  The secured area of the White House

Complex also includes all of the office space used by the OVP in the White House Complex.

6.    The Vice President's Residence ("VPR") is located at One Observatory Circle,

Washington, D.C., on the grounds of the United States Naval Observatory.  The Secret Service

provides security for the Vice President at the VPR.

7.    As part of its function to provide security for the White House Complex and the

VPR, the Secret Service monitors and controls access to both locations.

### Records Regarding the White House Complex

**A.    Record Types**

8.    There are two interrelated electronic systems – collectively termed the White

House Access Control System ("WHACS") – for controlling and monitoring access to the White

House Complex:  the Worker and Visitor Entrance System ("WAVES") and the Access Control

Records System ("ACR").

9.    The process for entry of a proposed worker or visitor into the White House

Complex begins when an authorized White House pass holder (including, but not limited to,

members of the President's and Vice President's staffs) advises the Secret Service that the

entrance of a particular individual, or group of individuals, is anticipated for a particular date.

10.    At that time, the authorized pass holder provides the Secret Service with

information such as the proposed visitor's identifying information (name, date of birth, and

Social Security number), the time and location of the planned visit, the name of the official or

employee submitting the request, the name of the person to be visited, the date of the request, and

3

the type of visitor – that is, worker, member of the press, individual with an appointment, or individual on an access list (such as a volunteer, courier, or "awaiting pass" staff member).

11.     Usually, this information is provided to the Secret Service electronically, when an authorized pass holder enters the information into a computer terminal connected to the White House Appointment Request Server, which automatically transmits it to the WAVES Center, where a Secret Service employee verifies that the requestor is authorized to make appointments for the specific location requested, and fills in any additional information that may be necessary, such as for a background check, then transmits the information electronically to the WHACS server. Authorized pass holders may also provide visitor information to the Secret Service in other ways, such as by telephone, facsimile, e-mail, or by dropping off a list, in which case Secret Service personnel may enter the information manually. Therefore, WAVES records regarding workers and visitors to the White House Complex consist primarily of information that an authorized White House pass holder has provided to the Secret Service.

12.     The Secret Service uses the information provided to perform background checks to determine whether, and under what conditions, to provide for the visitor's temporary admittance to the Complex and to allow the Secret Service to verify the visitor's admissibility at the time of the visit.

13.     WAVES records contain various fields, two of which, the note field and the comment field, may be annotated by Secret Service personnel with limited information from background checks performed by the Secret Service and instructions including coded instructions to Secret Service officers. The note field and the comment field may contain security information, and may occasionally note under what circumstances a visitor is to be admitted.

4

The comment field may also occasionally note that a person is being admitted for a holiday party, departure photo, or some other large group function.

14.    Upon arrival, a visitor to the Complex is generally issued an appropriate pass (although passes are often not issued for large groups).  ACR records are generated when a pass holder, worker, visitor, or Secret Service officer on an individual's behalf swipes his or her pass over one of the electronic pass readers located at entrances to and exits from the White House Complex.  ACR records include information such as the entrant's name and badge number, the time and date of the swipe, and the post at which the swipe was recorded.  ACR records do not include information about who the entrant (pass holder, worker, or visitor) is visiting on the Complex, or who requested the visitor's entrance.

15.    Once a visit takes place, WAVES records are typically updated electronically with information showing the time and place of the visitor's entry into and exit from the White House Complex.  This information is ACR information, although the time of arrival may differ slightly between the WAVES and ACR records.  The after-visit records are commonly referred to as WHACS records.

16.    Apart from the above-described records, the Secret Service itself sometimes creates and/or uses certain records, known as Secret Service Form ("SSF") 1888s, as part of the background investigation process to determine whether, and under what conditions, an individual should be admitted to the White House Complex.  An SSF 1888 is created for (1) workers (that is, persons coming to the Complex in relation to a work order, such as to fix a broken copier), (2) visitors who the Secret Service determines, on the basis of a limited background check, have certain criminal histories or other information of protective interest, and for whom, therefore, a

5

decision is made to deny admittance altogether or to grant admittance only with an escort, and (3) individuals who were previously permitted access to the Complex but who the Executive Office of the President Security Office or the White House Military Office have subsequently requested be excluded from the Complex. There are also related paper files and work orders associated with SSF 1888 information. The Secret Service does not transfer this information to the WHORM or the OVP.

17.    Beyond the SSF 1888s and related paper records, the Secret Service sometimes creates other records that relate to the background investigation and security process conducted in connection with certain individuals entering or scheduled to enter the White House Complex (hereinafter referred to as "Additional Security-Related Records"). These records are created in the course of conducting additional background checks and other security-related activities regarding certain visitors, who are chosen by the Secret Service based on certain details in their backgrounds and/or the circumstances of their visits. The records include the names and other identifying information concerning such visitors (including, in some cases, their birth dates and/or Social Security numbers) and background information on them or information regarding their visits to the Complex, which may include criminal history and/or other security-related information. Like the SSF 1888s and related paper records, the Secret Service does not transfer these records to the WHORM or the OVP. The persons whose visits to the White House are reflected in these records should also be reflected in WAVES records.

**B.**    **White House and OVP Control over White House Access**
**Records and the Maintenance of these Records**

18.    Once a visitor's visit to the White House Complex is complete, the Secret Service

has no continuing interest sufficient to justify preservation or retention of WAVES or ACR

records, and the Secret Service recognizes that such records are under the exclusive legal control

of the President and Vice President.  Since at least 2001, it has been the practice of the Secret

Service to transfer newly-generated WAVES records on CD-ROM to the White House Office of

Records Management ("WHORM") every 30 to 60 days.  Upon the turnover of a periodic batch

of WAVES records, a WHORM employee typically signs a form acknowledging receipt of the

records.  (A sample of that receipt form is attached hereto as Exhibit A.)  I have been advised that

prior to July 2006, the Secret Service was removing the note and comment fields from the

WAVES records before transferring the records to the WHORM.   It was the intent of the Secret

Service that, once transferred, the WAVES records were to be erased from its computer system.

Indeed, I have been informed that the WAVES records on the servers, older than 60 days, are

purged daily and overwritten on the servers.

19.    I have been further advised that in November 2004 (beginning with October 2004

records), because of a request from the National Archives and Records Administration, the Secret

Service began temporarily retaining a copy or copies of the WAVES records that it transferred to

the WHORM.  The retained Secret Service copies included the note and comment fields that

were not being provided to the WHORM.  In July 2006, the Secret Service ceased the practice of

removing the note and comment fields when transferring WAVES records to the WHORM, and

retroactively provided WAVES records to the WHORM that contained these fields for the period

from October 12, 2004, to July 10, 2006. From July 2006 forward, the Secret Service has provided these fields to the WHORM when transferring WAVES records. The Secret Service continues to retain one or more copies of transferred WAVES records, due to pending litigation and FOIA requests.

20.     Notwithstanding the above-described practice, the Secret Service discovered, in the course of conducting a search pursuant to a Freedom of Information Act ("FOIA") request in June 2006, that some WAVES data predating October 2004 remained on the hard drives of two Secret Service computers located in the Information Technology Section of the Presidential Protective Division. I am informed that the two computers are believed to contain multiple database files of varying degrees of non-comprehensive WAVES data predating October 2004, with gaps in the report periods. I am also informed of the belief that the validity of the data cannot be assured, because some of the data appear to have been used for testing and development, and that the data appear to exist in a separate location from the folder where the WAVES CD-ROMS are made. The hard drives also contain post-October 2004 WAVES records. The Secret Service continues to retain one or more copies of the WAVES data and records found on the hard drives, due to pending litigation and FOIA requests.

21.     In May 2006, the Secret Service Records Management Program entered into a Memorandum of Understanding ("MOU") with the White House Office of Records Management that both documented past practice regarding WAVES and ACR records, and confirmed the legal status of those records and of WHORM's management and custody of them under the Presidential Records Act. A true and correct copy of the MOU is attached hereto as Exhibit B.

22.     At least as early as 2001 (at the end of the Clinton Administration), and upon revisiting the issue in 2004, the Secret Service and the White House recognized and agreed that ACR records should be treated in a manner generally consistent with the treatment of WAVES records. The White House and the Secret Service have determined that ACR records should be transferred to the WHORM and deleted from the Secret Service's computers like WAVES records. In May 2006, the Secret Service transferred to the WHORM the ACR records covering the period from 12:00 p.m. on January 20, 2001, to April 30, 2006. (The Secret Service has also transferred, to the National Archives and Records Administration, the ACR records covering the period from 12:00 p.m. on January 20, 1993, to 12:00 p.m. on January 20, 2001.) However, the Secret Service continued to retain one or more copies of the ACR records due to pending litigation and FOIA requests. Since the time of these transfers, the Secret Service has continued to transfer ACR records to the WHORM, but continues to retain one or more copies of ACR records, due to pending litigation and FOIA requests. The Secret Service also continues to retain one or more copies of pre-January 20, 2001, ACR records, due to pending litigation and FOIA requests.

23.     I have been advised that WAVES and ACR records were released in <u>Judicial Watch v. United States Secret Service</u>, 06-CV-310 (D.D.C.); <u>Democratic National Committee v. United States Secret Service</u>, 06-CV-842 (D.D.C.); and <u>Citizens for Responsibility and Ethics in Washington v. Department of Homeland Security</u>, 06-CV-883 (D.D.C.). I understand that these releases were made only after the Office of the President and the Office of the Vice President, in the exercise of discretion, expressly authorized these releases.

24.    In addition, the Secret Service has been transferring to the WHORM certain paper records regarding workers and visitors for some time, typically every 30 to 60 days. In general, these paper records consist of certain types of requests for access to the White House Complex that have been entered into WAVES, such as large event lists, facsimiles, and e-mails. The Secret Service also has certain other lists and checklists relating to large group appointments dating back to October 2006, which have now been transferred to the WHORM and will be transferred going forward on the same 30- to 60-day schedule. As with WAVES and ACR records, once a visitor's visit to the Complex is complete, the Secret Service has no continuing interest in these materials sufficient to justify their preservation or retention. The Secret Service began retaining these materials, or copies of these materials, in the fall of 2006, due to pending litigation and FOIA requests.[1]

25.    In addition, at the end of each day, WAVES Center personnel typically send a copy of the President's scheduled appointments for that particular day to his diarist.

---

[1] I have been advised that, in the course of an office move at the White House Complex, the Secret Service discovered a number of paper access requests and other paper records regarding visitors and workers, covering the period from March 2001 through October 2001, in an unexpected location. The Secret Service has now transferred those records to the WHORM, but retained a copy due to pending litigation and FOIA requests. Also, I am advised that, in the course of preparing information for this declaration, the Secret Service discovered electronic versions of certain visitor records on the appointment/visitor system. These records were being created automatically by software that was copying visitor data submitted by authorized White House pass holders and dumping the data into a spreadsheet format. This set of records, dating back to September 2006, consists of information submitted to the White House Appointment Request Server by authorized White House pass holders, along with alphanumeric identifiers used only within the system. This set of records exists only in electronic format (that is, they have not generally been printed). The Secret Service has now transferred this set of records to the WHORM, but retained a copy due to pending litigation and FOIA requests.

26.    I am advised that the White House Office and the Office of the Vice President have approved the above-described retention of records by the Secret Service, though expressly without prejudice to the control of the subject records by the President and the Vice President under the Presidential Records Act.

## C.    FOIA Request and Search

27.    I am advised that the Secret Service has received a FOIA request for records relating to any visit to the White House, from January 1, 2001, to the present, by James Dobson, Gary L. Bauer, Wendy Wright, Louis P. Sheldon, Andrea Lafferty, Paul Weyrich, Tony Perkins, Donald Wildmon, or Jerry Falwell.  In regard to the FOIA request and pursuant to instructions, the OPO has searched the SSF 1888s for information concerning the above-listed individuals. This search included the period of January 1, 2001, until January 25, 2007.  This search produced no information concerning the named individuals.  It therefore was unnecessary to search the paper documents related to the 1888s.

28.    I am informed that the subject FOIA request defines "White House" as including "any office within the Executive Office of the President, the residence of the President, the Old and New Executive Office Buildings, and any other office or space on the grounds of the White House."  In regard to the definition, I note that some EOP offices exist outside the White House Complex, but the Secret Service does not maintain or operate access systems at those sites.

29.    The Secret Service has also searched the Additional Security-Related Records described above for information concerning the individuals listed in the subject FOIA request. This search produced nineteen pages of records that include the names of some of those individuals, and those pages were reviewed for possible release under the FOIA.  The handling of

11

these records in relation to the subject FOIA request is further addressed in the "Declaration of Kathy J. Lyerly" submitted in this case.

30.     Apart from the above-described records of visitors, the Secret Service has records of public, self-guided tours of the White House that do not involve visiting any Presidential or Vice Presidential personnel.  As of June 2006, approximately 48,400 persons participate in these tours each month.  As a security measure, the Secret Service takes the names and other identifying information of persons who participate in such tours, but these records were not uniformly retained until early 2007.  The Secret Service does not understand the subject FOIA request as applying to records of such tours.

## Records Regarding the Vice President's Residence

### A.     Record Types

31.     The WAVES and ACR systems are not used at the VPR.

32.     The Secret Service monitors and controls access to the VPR through the use of two access lists – a daily access list for individuals with appointments or work orders, and a permanent access list for individuals who regularly enter the facility, including staff members of the Office of the Vice President, military personnel, contractors, service workers, and members of the Vice President's family.  The Secret Service receives requests from the Vice President's staff or from authorized military personnel to screen individuals for entry.  The Secret Service conducts background checks on individuals for whom there has been a request for admission (using personal identifiers provided by the requester, including name, date of birth, and Social Security number), and, if there is no information of protective interest, the name is then placed on the permanent access list or daily access list.

33.     Both the permanent access list and the daily access list are provided to Secret Service officers at entrances to the VPR's grounds and reflect that the individual requested for entry has been screened by the Secret Service.  The names of individuals who enter on a particular day, along with the time and date, are handwritten on an entry log by the officer working at the gate where the individual arrives.  The post entry logs exist only on paper.  The post entry log is the ultimate record created from the initial request for entry.

34.     In addition to the permanent access lists, daily access lists, and post entry logs, the Secret Service, in controlling access to the VPR, uses (1) an electronic database containing information regarding individuals seeking access, which is used for generating both the permanent and daily access lists; (2) requests for access, from OVP staff, military and Secret Service personnel, received primarily by e-mail and occasionally by facsimile or other means; and (3) lists from the OVP of invited guests and workers for special events.

35.     Apart from the above-described records regarding visitors to the VPR, the Secret Service itself creates and uses certain records known as "hit" reports as part of the background investigation process to determine whether, and under what conditions, an individual should be admitted to the VPR.  These records are created when an individual's background check returns information of protective interest or criminal history information.  The Secret Service Uniformed Division officer completing the background check creates a cover memorandum regarding the results as well as a determination regarding whether, and under what conditions, the individual is to be given access to the VPR.  This memorandum is attached to the background check results and filed as a "hit" report.

36.    Also apart from "hit" reports, the Secret Service officer commanding each shift at the VPR creates a Watch Commander Journal to record security-related incidents as well as the arrivals and departures of the Vice President and Mrs. Cheney, and, in some instances, other visitors to the residence. The Watch Commander Journals are created to provide situational awareness for watch commanders between shifts and to provide a means for them to apprise themselves of what went on at the residence in their absence. Supervisors occasionally refer back to them to review the activities/incidents occurring at the VPR in order to make staffing level assessments. The Watch Commander Journals are created and used in electronic format, separately from the records described in the preceding paragraphs.

**B.    OVP Control over VPR Records and the Maintenance of these Records**

37.    Once a visitor's visit to the Vice President's Residence is complete, the Secret Service has no continuing interest sufficient to justify preservation or retention of records of such visitors — other than materials containing information of protective interest to the Secret Service, such as records resulting from background checks and the Watch Commander Journals — and the Secret Service recognizes that such records (with the exception noted) are under the exclusive legal control of the Vice President. Since 2001, the Secret Service's consistent practice has been to transfer to the OVP, generally on a monthly basis (dating back to January 2001), all handwritten post entry logs from the VPR. After an individual's visit to the VPR, the Secret Service has no continuing interest sufficient to justify preservation or retention of the post entry logs. Once each periodic batch of post entry logs is received, an OVP employee typically signs a

14

form acknowledging receipt of the records. (A sample of that receipt form is attached hereto as Exhibit C.)

38.    In June 2006, the Secret Service Special Agent in Charge, Liaison Division, who is also the agency's Freedom of Information and Privacy Acts Officer ("FOI/PA Officer"), directed that records concerning access to the VPR be retained. The Secret Service then began retaining a copy of each post entry log that it transfers to the OVP, pending a judicial determination of their legal status.

39.    It has been the practice of the Secret Service to update the access list database as changes are made in persons who are authorized for permanent access, to dispose of printed daily access lists on a daily basis, to dispose of printed permanent access lists as changes are made in persons authorized for permanent access, and to purge the access list database each day of information reflecting persons from the daily access list who have not been authorized to enter the VPR for over thirty days. Once an individual's visit to the VPR is over, the Secret Service has no continuing interest sufficient to justify preservation or retention of these records. As stated above, however, the Secret Service Special Agent in Charge, Liaison Division, directed in June 2006 that records concerning access to the VPR be retained, and the Secret Service began retaining permanent access lists and daily access lists, and has ceased purging information from the access list database.[2] The Secret Service has now transferred to the OVP all existing

---

[2] In the course of conducting a search for records potentially responsive to a different FOIA request, the Secret Service discovered some paper copies of daily access lists, as well as requests for access, a number of which pre-date the June 2006 direction from the FOI/PA Officer, in places where such documents are not normally stored. These records are from sporadic dates and are not comprehensive. The retention of these documents was not in accordance with the normal practice at the VPR. In accordance with the FOI/PA Officer's direction, these documents have

(continued...)

permanent access lists and daily access lists from the VPR back to July 2006 (along with some earlier, non-comprehensive lists, back to August 2005, that had not been discarded), and will continue to transfer permanent and daily access lists on a monthly basis in connection with the transfer of post entry logs.  The Secret Service has also transferred to the OVP an electronic copy of the access list database with data retained from on or about June 27, 2006, and will continue to transfer such electronic copies on a monthly basis.  The Secret Service has, however, retained copies of these lists and database versions due to pending litigation and FOIA requests.

40.    The Secret Service's practice with respect to e-mails requesting access to the VPR has been to print out the requests and then to destroy them after 15 to 30 days.  Access requests received by other means, such as by facsimile, have historically been destroyed at the same time.  As with the daily access lists, the permanent access lists, and the post entry logs, the Secret Service has no continuing interest sufficient to justify preservation or retention of these records after an individual's visit is over.   However, the FOI/PA Officer directed, in June 2006, that all such materials be retained, and they have been retained.  E-mails dating back to April 2006 exist in electronic form on a computer hard drive.  The Secret Service has now transferred to the OVP all existing electronic and paper requests for access from the VPR back to April 2006 (along with some earlier, non-comprehensive paper requests, back to June 2002, that had not been discarded), and will continue to transfer such records on a monthly basis in connection with the transfer of post entry logs.  The Secret Service has, however, retained copies of these records due to pending litigation and FOIA requests.

---

[2](...continued)
been retained.

16

41.     The Secret Service also uses event lists for controlling access to the VPR during a particular event.  These lists contain information such as the names of invited guests and workers, their companies, forms of entry, instructions to Secret Service officers at point of arrival and at other officer posts, and event arrangements, parking and arrival schedules.  After the event has concluded, the Secret Service has no continuing interest sufficient to justify preservation or retention of the event lists.  Until June 2006, event lists were not consistently retained.  However, after receipt of the FOI/PA Officer's direction in June 2006, such records are being retained.  The Secret Service has now transferred to the OVP all existing event lists from the VPR back to June 2006 (along with some earlier, non-comprehensive event lists, back to February 2005, that had not been discarded), and will continue to transfer event lists on a monthly basis in connection with the transfer of post entry logs.  The Secret Service has, however, retained copies of these lists due to pending litigation and FOIA requests.

42.     The handling of entry records relating to the Vice President's Residence was addressed in a September 13, 2006, letter from Shannen W. Coffin, Counsel to the Vice President, to Donald Personette, Chief Counsel to the Secret Service (copy attached hereto as Exhibit D).

43.     Watch Commander Journals and those records created by the Secret Service in connection with its background investigations of those seeking access to the VPR have not been turned over to the WHORM or the OVP.

44.     I am advised that the OVP has approved the above-described retention of records by the Secret Service, though expressly without prejudice to the control of the subject records by the Vice President under the Presidential Records Act.

17

C.    **FOIA Request and Search**

45.    I am advised that the Secret Service has received a FOIA request for records

relating to any visit to the VPR, from January 1, 2001, to the present, by James Dobson, Gary L.

Bauer, Wendy Wright, Louis P. Sheldon, Andrea Lafferty, Paul Weyrich, Tony Perkins, Donald

Wildmon, or Jerry Falwell.  Pursuant to instructions, the OPO has searched "hit" reports.  This

search was for the period of January 1, 2001, until January 25, 2007, and produced no informa-

tion concerning the named individuals (although not all hit reports that were created during this

period still exist).  Also pursuant to instructions, Watch Commander Journals were searched for

the period of October 1, 2004, until January 25, 2007.  (Watch Commander Journals predating

October 1, 2004, no longer exist.)  This search produced no information concerning the named

individuals.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 23rd, 2007.

PAUL S. MORRISSEY



**DEPARTMENT OF HOMELAND SECURITY**
UNITED STATES SECRET SERVICE
WASHINGTON, D.C. 20223

January 27, 2006

TO      :   PHILIP DROEGE
            DIRECTOR
            WHITE HOUSE OFFICE OF RECORDS MANAGEMENT

FROM    :   NICHOLAS TROTTA
            SPECIAL AGENT IN CHARGE
            PRESIDENTIAL PROTECTIVE DIVISION

SUBJECT :   Transmittal of Archived WHACS WAVES Data – December, 2005

Reference is made to the memorandum of July 1, 2002 detailing the transmittal of archived Waves data on CD-ROM and specifying the format of that data.
This memorandum is to confirm your receipt of the WAVES data for December 2005. Accordingly, your office has received two CD-ROMS, specifically:
ALL FILE, VISITOR SUMMARY, WORKER, PRESS and ACCESS LIST ENTRIES.

If you have any questions you may contact ASAIC Chris Stanley or me at 757-2572.

Received by: _Phil Droege_
Date: _1-30-06_

Exhibit A

# MEMORANDUM OF UNDERSTANDING
## Between the White House Office of Records Management and
## the United States Secret Service Records Management Program
## Governing Records Generated By the White House Access Control System

### INTRODUCTION

1.  This MEMORANDUM OF UNDERSTANDING between the White House Office of Records Management ("White House") and the United States Secret Service Records Management Program ("the Secret Service") (collectively, "The Parties") memorializes and confirms the agreement governing the status and handling of records generated through the White House Access Control System.

### DEFINITIONS

2.  The White House Access Control System ("WHACS") includes two interrelated systems used by the Secret Service for controlling and monitoring access to the White House Complex:

    a.  The Worker and Visitor Entrance System ("WAVES");

    b.  The Access Control Records System ("ACR").

3.  "WHACS Records" include "WAVES Records" and "ACR Records."

4.  "WAVES Records" consist of records generated when an authorized White House pass holder submits to the Secret Service information about visitors (and workers) whose business requires their presence at the White House Complex.

    a.  WAVES Records include the following information submitted by the pass holder: the visitor's name; the visitor's date of birth; the visitor's Social Security Number; the time and location of the planned visit; the name of the pass holder submitting the request; the date of the request.

    b.  Once a visit takes place, WAVES Records are typically updated electronically with information showing the actual time and place of the visitor's entry into and exit from the White House Complex.

5.  "ACR Records" consist of records generated when a White House pass holder, worker, or visitor swipes his or her permanent or temporary pass over one of the electronic pass readers located at entrances to and exits from the White House Complex.

# Exhibit B

a.   ACR Records include the following information: the pass holder's name and badge number; the time and date of the swipe; and the post at which the swipe was recorded.

6.   "Federal Records" mean documentary materials subject to the Federal Records Act (44 U.S.C. § 3301 et seq.).

7.   "Presidential Records" mean documentary materials subject to the Presidential Records Act (44 U.S.C. § 2201 et seq.).

8.   "The White House Complex" means the White House and the Eisenhower Executive Office Building, and the secured grounds encompassing them, and the New Executive Office Building.

9.   The "White House Office of Records Management" ("WHORM") means the office in the White House responsible for preserving Presidential Records.

## BACKGROUND

10.  WHACS is operated by the Secret Service in order to control and monitor the entry and exit of persons into and out of the White House Complex.

11.  The information contained in WHACS Records originates with White House pass holders, visitors, and workers as a result of White House business.

a.   Such information reflects the conduct of the President's business by providing details about the comings and goings of staff, workers, and visitors to the White House.

12.  The authorized White House pass holders provide information contained in WAVES Records to the Secret Service temporarily for two limited purposes:

a.   To allow the Secret Service to perform background checks to determine whether, and under what conditions, to authorize the visitor's temporary admittance to the White House Complex;

b.   To allow the Secret Service to verify the visitor's admissibility at the time of the visit.

13.  Once the visit ends, the information contained in WAVES Records and ACR Records has no continuing usefulness to the Secret Service.

14.  It has been the longstanding practice of the Secret Service to transfer WAVES Records on CD-ROM to WHORM every 30 to 60 days. Except as noted in paragraph 16 below, once the Secret Service transferred the WAVES Records, the Secret Service ensured that those records were erased from its computer system.

a.    Under this practice, the Secret Service has retained WAVES Records for completed visits for only a brief period, and solely for the purpose of facilitating an orderly and efficient transfer of those records to WHORM.

15.    The Secret Service historically has retained ACR Records in its computer system without transferring those records to WHORM. In 2004, however, the Secret Service and the White House recognized and agreed that ACR Records should be treated in a manner consistent with the treatment of WAVES Records, and concluded that ACR Records should be transferred to WHORM and eliminated from the Secret Service's files. The Secret Service has continued to maintain ACR Records pending a legal determination of their status as Presidential Records.

16.    In October 2004, at the request of the National Archives and Records Administration ("NARA"), the Secret Service began retaining its own copy of the WAVES Records that it transferred to the White House.

a.    The Secret Service agreed to NARA's request on the understanding that it would be a temporary practice maintained until a legal determination was made confirming the propriety of handling WHACS Records as Presidential Records.

## UNDERSTANDING AND AGREEMENT

17.    The purpose of this Memorandum of Understanding is to express and embody The Parties' understanding and agreement that WHACS Records whenever created:

a.    are at all times Presidential Records;

b.    are not Federal Records; and

c.    are not the records of an "agency" subject to the Freedom of Information Act (5 U.S.C. § 552).

18.    The Parties understand and agree that all WHACS Records are at all times under the exclusive legal custody and control of the White House.

a.    Although the Secret Service may at times have physical possession of WHACS Records, such temporary physical possession does not alter the legal status of those records, and does not operate in any way to divest the White House of complete and exclusive legal control.

19.    The Parties understand and agree that any information provided to the Secret Service for the creation, or in the form, of WHACS Records is provided under an express reservation of White House control.

20.    The Parties understand and agree that the White House, but not the Secret Service, has a continuing interest in WHACS Records and that the White House continues to use the information contained in such records for various purposes.  Specifically:

    a.    WAVES Records have historical and other informational value to the White House as evidence of who has been invited and/or granted admission to the White House to meet with the President or members of his staff.

    b.    ACR Records have historical or other informational value to the White House, as evidence of the comings and goings of staff, visitors, and workers at the White House Complex in the conduct of White House business.

21.    The Parties understand and agree that, once a visitor's visit to the White House Complex is complete, the Secret Service has no continuing interest in preserving or retaining WAVES Records.  The Parties also understand and agree that the Secret Service has no interest whatsoever in preserving or retaining ACR Records.

    a.    WHACS Records are therefore not appropriate for preservation by the Secret Service either as evidence of the Secret Service's activities or for their informational value.

22.    The Secret Service understands and agrees that it will regularly transfer all WHACS Records in its possession to WHORM, and that it will not retain its own copies of any WHACS Records except as is necessary to facilitate the transfer of those records to WHORM.

    a.    Any temporary retention of WHACS Records by the Secret Service after the visit, entrance, or exit memorialized by those records is solely for the purpose of facilitating an orderly and efficient transfer of those records, and does not operate in any way to divest the White House of complete and exclusive legal control.

23.    The understandings and agreements expressed herein apply to:

    a.    Any and all WHACS Records currently in the possession or custody of the Secret Service;

    b.    Any and all WHACS Records that may be generated at any time subsequent to the execution of this Memorandum of Understanding.

24.    It is specifically intended by The Parties that the understandings and agreements set forth herein serve as evidence that the White House at all times asserts, and the Secret Service disclaims, all legal control over any and all WHACS Records subject to this Memorandum of Understanding.

a.     The foregoing is not intended, and should not be construed, to suggest that WHACS Records in the possession or custody of the Secret Service before the execution of this Memorandum of Understanding were under the legal control of the Secret Service.

_____
Director, White House Office
of Records Management

_____
Chief Records Officer,
United States Secret Service

Dated: _____5 ~ 17_____, 2006

# United States Secret Service Uniformed Division
## Naval Observatory Branch
### Vice President's Residence
# RECORDS REQUEST

As requested, please find attached records showing the names of persons who visited the Vice President's Residence for the period(s) listed below:

May, 2004

These **official** records are hereby submitted to the custody of the Office of the Vice President. These Records were released on Wednesday, June 2, 2004.

These records were accumulated by the United States Secret Service Uniformed Division (Naval Observatory Branch) in connection with providing security for the Vice President of the United States, his family, and the official Vice Presidential Residence located within the US Naval Observatory Complex.

**Signature of Recipient:**

**Date:**

Exhibit C



### THE VICE PRESIDENT

#### WASHINGTON

September 13, 2006

Don Personette
Chief Counsel
United States Secret Service
958 H Street, N.W.
Suite 8300
Washington, D.C. 20223

BY FAX: (202) 406-6544

Dear Don:

I write today with respect to pending ("FOIA") requests directed to the United States Secret Service ("USSS") and seeking certain documents relating to visitors to the Vice President's Residence ("VPR"). I want to take this opportunity to confirm and reiterate our consistent practice of exercising exclusive control over any and all documents and information held by the USSS relating to visitors to the VPR, including those originated by the Office of the Vice President ("OVP") staff and those derived from those original OVP records.

At least since January 2001, OVP has made available to the USSS, on a temporary basis and on the condition of confidentiality, documents and information relating to individuals scheduled to visit the VPR – including the name and identifying information of individuals scheduled to visit the VPR and information regarding the date and time of the scheduled visit – for the limited purpose of enabling USSS to perform its protective function with respect to the Vice President, his family and the VPR. All such documents and information, and any documents derived from the information provided by OVP for the purpose of facilitating USSS's protective function are and shall remain subject to the exclusive ownership, custody and control of OVP, and the USSS shall maintain the confidentiality of the documents and information and shall have neither any proprietary or other interest in OVP materials nor custody or control thereof. To the extent required by law, such documents shall be maintained by OVP as Vice Presidential executive records pursuant to the Presidential Records Act, 44 U.S.C. § 2207.

Such materials and information, and any documents derived from them for the purpose of facilitating USSS's protective function, shall be maintained in good order by USSS and shall be returned to OVP on a periodic basis. USSS shall not retain any copy of these documents and information upon return to OVP. As per our pre-existing arrangement, I understand that such

Exhibit D

documents have been returned to OVP on a monthly basis.   If any documents remain in your possession, please return them to OVP as soon as possible.

OVP materials subject to this practice and understanding shall include, but not be limited to: a) all communications, including emails, faxes and other writings from OVP staff to USSS providing personal information on visitors scheduled to visit the VPR; (b) cleared visitor lists derived from the visitor information provided by OVP to USSS; (c) visitor logs compiled by USSS from visitor information provided by OVP.

Thank you for your continued cooperation in this matter.

Cordially,

Shannen W. Coffin
Counsel to the Vice President

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, )<br><br>Plaintiff, )<br><br>v. )<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, et al., )<br><br>Defendants. ) | CIVIL ACTION NO.<br>1:06-cv-01912-JGP |

**DECLARATION OF PHILIP C. DROEGE**

I, Philip C. Droege, hereby declare as follows:

1.  I am the Director of the White House Office of Records Management. In this capacity, I am responsible for managing, preserving, and forwarding to the National Archives and Records Administration ("NARA") at the appropriate time the records reflecting the business of the Presidency and Vice Presidency in accordance with the Presidential Records Act. I have held this position since July 2004, and have been an employee of the White House Office since July 1990. The statements made herein are based on my personal knowledge and on information made available to me in my official capacity.

## I. The White House and Presidential Records

2.  The United States Secret Service provides security for the White House Complex, which encompasses the White House, the Eisenhower Executive Office Building, and the New Executive Office Building. The White House Complex includes office space for the President

1

and his closest advisors and staff in the White House Office, as well as office space for the Vice President and his closest advisors and staff in the Office of the Vice President.

3. Throughout the presidency of George W. Bush, it has been the policy of the White House Office, in accordance with the Presidential Records Act, 44 U.S.C. §§ 2201, *et seq.*, to retain and maintain legal control over all Presidential Records as defined in that Act. This includes, but is not limited to, records documenting the movements, appointments, and schedule of the President and his advisors and staff, as well as records of visitors gaining access to the White House Complex.

## II. Records of Visitors to the White House Complex

4. The Secret Service utilizes two interrelated computer systems — collectively termed the White House Access Control System ("WHACS") — for controlling and monitoring access to the White House Complex: (a) the Worker and Visitor Entrance System ("WAVES"); and (b) the Access Control Records System ("ACR").

### a. WAVES Records

5. Staff assigned to the White House Complex arrange entry for a visitor into the White House Complex by providing the Secret Service with the proposed visitor's identifying information (name, date of birth, and Social Security number), the time and location of the planned visit, the name of the staff member submitting the request, the date of the request, and the type of visitor — that is, worker, member of the press, individual with an appointment, or individual on an access list (such as a volunteer, courier, or "awaiting pass" staff member). This identifying information regarding proposed visitors is provided on a confidential and temporary basis to the

2

Secret Service for two limited purposes: (1) to enable the Secret Service to perform background checks to determine the existence of any protective concern, that is, whether, and under what conditions, to provide for a visitor's admittance to the Complex; and (2) to enable the Secret Service to verify the visitor's admissibility at the time of the visit.

6. Ordinarily, this identifying information is provided to the Secret Service electronically. An authorized White House pass holder simply enters the information into a computer that automatically forwards it to the Secret Service for electronic posting on the WAVES system. On occasion, the information may also be provided to the Secret Service by telephone, fax, e-mail or by delivery of a list, in which case Secret Service personnel may enter the information directly into WAVES.

### b. ACR Records

7. Once an individual is cleared into the White House Complex, the visitor is generally issued an appropriate badge. An ACR record is generated whenever a pass holder or visitor swipes his or her permanent or temporary badge over one of the electronic pass readers located at entrances to and exits from the White House Complex. ACR records include information such as the pass holder's name and badge number, the date and time of the swipe, and the post at which the swipe was recorded.

### III. Treatment of WAVES/ACR Records

8. It has been the understanding between the White House and the Secret Service that the WAVES and ACR records, which contain information relating to visitors entering the White

House Complex to conduct Presidential and Vice Presidential business, are subject to the Presidential Records Act.

9. Since at least 2001, it has been the practice of the Secret Service to transfer newly-generated WAVES records to the White House Office of Records Management ("WHORM") on CD-ROM every 30 to 60 days. The WHORM understands that the Secret Service's regular procedure is to electronically delete the WAVES records from Secret Service servers after transfer to the WHORM. This procedure is consistent with the understanding with the Secret Service that the WAVES records reflect visitors cleared to enter the White House Complex for purposes of conducting Presidential and Vice Presidential business. It is also consistent with the understanding with the Secret Service that these records are at all times subject to the Presidential Records Act and are not transformed into agency records subject to the FOIA by virtue of the Secret Service's temporary physical possession of them. However, the WHORM also understands that, beginning in October 2004, the Secret Service has retained on CD-ROMs a copy of the data that it transfers to the White House due to the pending litigation and other FOIA requests.

10. Despite being subject to the Presidential Records Act, ACR records historically have not been transferred by the Secret Service to the WHORM. At least as early as 2001 (at the end of the Clinton Administration), and upon revisiting the issue in 2004, the Secret Service and the White House recognized and agreed that ACR records should be treated in a manner generally consistent with the treatment of WAVES records.

4

11. In May 2006, the WHORM entered into a Memorandum of Understanding ("MOU") (attached hereto at Exhibit A) with the Secret Service that documented this longstanding practice regarding transfer of WAVES records. The MOU also formalized recognition of the status of WAVES and ACR records and of WHORM's management and custody of them, subject to the Presidential Records Act.

12. The MOU expressly acknowledges the "White House . . . has a continuing interest in [the WAVES and ACR] Records" in connection with pass holder or visitor access to the White House Complex. This is true because such records reflect the activities and official functions of the Presidency and Vice Presidency and the White House continues to use the information contained in such records for various historical and informational purposes. Accordingly, WAVES and ACR records of visitors, like other records that reflect the activities of the Presidency and Vice Presidency, are maintained as records subject to the Presidential Records Act.

13. In contrast, the USSS has expressly disclaimed "all legal control over any and all WHACS Records subject to the [MOU]." Exhibit A at ¶ 24. The MOU also expressly acknowledges that the Secret Service has no continuing interest in preserving or retaining WAVES or ACR records upon completion of a visit. Indeed, the MOU acknowledges that the Secret Service's temporary retention of such records after an individual's visit to the White House Complex is solely for the purpose of facilitating an orderly and efficient transfer of the records to the WHORM.

14.  Shortly after execution of the MOU, the Secret Service transferred to the WHORM the ACR records covering the period from January 2001 to April 2006.  Since the time of that transfer, the Secret Service's typical practice has been to transfer ACR records to the WHORM every 30 to 60 days, similar to the transfer of WAVES records.  Nevertheless, the White House Office understands that the Secret Service currently continues to maintain a copy of the ACR records, due to the pending litigation and other FOIA requests.

15.  At the conclusion of a Presidential Administration, it is the practice of the WHORM to transfer to NARA all WHACS records the WHORM has received during the course of that Administration.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May $\underline{23}$ , 2007.

**PHILIP C. DROEGE, DIRECTOR**
WHITE HOUSE OFFICE OF RECORDS
MANAGEMENT

## MEMORANDUM OF UNDERSTANDING
### Between the White House Office of Records Management and
### the United States Secret Service Records Management Program
### Governing Records Generated By the White House Access Control System

### INTRODUCTION

1.      This MEMORANDUM OF UNDERSTANDING between the White House Office of Records Management ("White House") and the United States Secret Service Records Management Program ("the Secret Service") (collectively, "The Parties") memorializes and confirms the agreement governing the status and handling of records generated through the White House Access Control System.

### DEFINITIONS

2.      The White House Access Control System ("WHACS") includes two interrelated systems used by the Secret Service for controlling and monitoring access to the White House Complex:

      a.      The Worker and Visitor Entrance System ("WAVES");

      b.       The Access Control Records System ("ACR").

3.      "WHACS Records" include "WAVES Records" and "ACR Records."

4.      "WAVES Records" consist of records generated when an authorized White House pass holder submits to the Secret Service information about visitors (and workers) whose business requires their presence at the White House Complex.

      a.      WAVES Records include the following information submitted by the pass holder: the visitor's name; the visitor's date of birth; the visitor's Social Security Number; the time and location of the planned visit; the name of the pass holder submitting the request; the date of the request.

      b.      Once a visit takes place, WAVES Records are typically updated electronically with information showing the actual time and place of the visitor's entry into and exit from the White House Complex.

5.      "ACR Records" consist of records generated when a White House pass holder, worker, or visitor swipes his or her permanent or temporary pass over one of the electronic pass readers located at entrances to and exits from the White House Complex.

# Exhibit A

a. ACR Records include the following information: the pass holder's name and badge number; the time and date of the swipe; and the post at which the swipe was recorded.

6. "Federal Records" mean documentary materials subject to the Federal Records Act (44 U.S.C. § 3301 et seq.).

7. "Presidential Records" mean documentary materials subject to the Presidential Records Act (44 U.S.C. § 2201 et seq.).

8. "The White House Complex" means the White House and the Eisenhower Executive Office Building, and the secured grounds encompassing them, and the New Executive Office Building.

9. The "White House Office of Records Management" ("WHORM") means the office in the White House responsible for preserving Presidential Records.

## BACKGROUND

10. WHACS is operated by the Secret Service in order to control and monitor the entry and exit of persons into and out of the White House Complex.

11. The information contained in WHACS Records originates with White House pass holders, visitors, and workers as a result of White House business.

a. Such information reflects the conduct of the President's business by providing details about the comings and goings of staff, workers, and visitors to the White House.

12. The authorized White House pass holders provide information contained in WAVES Records to the Secret Service temporarily for two limited purposes:

a. To allow the Secret Service to perform background checks to determine whether, and under what conditions, to authorize the visitor's temporary admittance to the White House Complex;

b. To allow the Secret Service to verify the visitor's admissibility at the time of the visit.

13. Once the visit ends, the information contained in WAVES Records and ACR Records has no continuing usefulness to the Secret Service.

14. It has been the longstanding practice of the Secret Service to transfer WAVES Records on CD-ROM to WHORM every 30 to 60 days. Except as noted in paragraph 16 below, once the Secret Service transferred the WAVES Records, the Secret Service ensured that those records were erased from its computer system.

a. Under this practice, the Secret Service has retained WAVES Records for completed visits for only a brief period, and solely for the purpose of facilitating an orderly and efficient transfer of those records to WHORM.

15. The Secret Service historically has retained ACR Records in its computer system without transferring those records to WHORM. In 2004, however, the Secret Service and the White House recognized and agreed that ACR Records should be treated in a manner consistent with the treatment of WAVES Records, and concluded that ACR Records should be transferred to WHORM and eliminated from the Secret Service's files. The Secret Service has continued to maintain ACR Records pending a legal determination of their status as Presidential Records.

16. In October 2004, at the request of the National Archives and Records Administration ("NARA"), the Secret Service began retaining its own copy of the WAVES Records that it transferred to the White House.

a. The Secret Service agreed to NARA's request on the understanding that it would be a temporary practice maintained until a legal determination was made confirming the propriety of handling WHACS Records as Presidential Records.

## UNDERSTANDING AND AGREEMENT

17. The purpose of this Memorandum of Understanding is to express and embody The Parties' understanding and agreement that WHACS Records whenever created:

a. are at all times Presidential Records;

b. are not Federal Records; and

c. are not the records of an "agency" subject to the Freedom of Information Act (5 U.S.C. § 552).

18. The Parties understand and agree that all WHACS Records are at all times under the exclusive legal custody and control of the White House.

a. Although the Secret Service may at times have physical possession of WHACS Records, such temporary physical possession does not alter the legal status of those records, and does not operate in any way to divest the White House of complete and exclusive legal control.

19. The Parties understand and agree that any information provided to the Secret Service for the creation, or in the form, of WHACS Records is provided under an express reservation of White House control.

20.     The Parties understand and agree that the White House, but not the Secret Service, has a continuing interest in WHACS Records and that the White House continues to use the information contained in such records for various purposes.  Specifically:

    a.     WAVES Records have historical and other informational value to the White House as evidence of who has been invited and/or granted admission to the White House to meet with the President or members of his staff.

    b.     ACR Records have historical or other informational value to the White House, as evidence of the comings and goings of staff, visitors, and workers at the White House Complex in the conduct of White House business.

21.     The Parties understand and agree that, once a visitor's visit to the White House Complex is complete, the Secret Service has no continuing interest in preserving or retaining WAVES Records.  The Parties also understand and agree that the Secret Service has no interest whatsoever in preserving or retaining ACR Records.

    a.     WHACS Records are therefore not appropriate for preservation by the Secret Service either as evidence of the Secret Service's activities or for their informational value.

22.     The Secret Service understands and agrees that it will regularly transfer all WHACS Records in its possession to WHORM, and that it will not retain its own copies of any WHACS Records except as is necessary to facilitate the transfer of those records to WHORM.

    a.     Any temporary retention of WHACS Records by the Secret Service after the visit, entrance, or exit memorialized by those records is solely for the purpose of facilitating an orderly and efficient transfer of those records, and does not operate in any way to divest the White House of complete and exclusive legal control.

23.     The understandings and agreements expressed herein apply to:

    a.     Any and all WHACS Records currently in the possession or custody of the Secret Service;

    b.     Any and all WHACS Records that may be generated at any time subsequent to the execution of this Memorandum of Understanding.

24.     It is specifically intended by The Parties that the understandings and agreements set forth herein serve as evidence that the White House at all times asserts, and the Secret Service disclaims, all legal control over any and all WHACS Records subject to this Memorandum of Understanding.

a.    The foregoing is not intended, and should not be construed, to suggest that WHACS Records in the possession or custody of the Secret Service before the execution of this Memorandum of Understanding were under the legal control of the Secret Service.

Director, White House Office
of Records Management

Chief Records Officer,
United States Secret Service

Dated: ___S - 17___ , 2006

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CIVIL ACTION NO. 1:06-cv-01912-JGP |
| U.S. DEPARTMENT OF HOMELAND SECURITY, et al., | ) ) ) | |
| Defendants. | ) ) ) | |

## DECLARATION OF CLAIRE M. O'DONNELL, ASSISTANT TO THE VICE PRESIDENT AND DEPUTY CHIEF OF STAFF, OFFICE OF THE VICE PRESIDENT

I, Claire M. O'Donnell, hereby DECLARE:

1.    I am, and have been since January 20, 2001, an employee of the Vice President of the United States appointed by the Vice President pursuant to 3 U.S.C. § 106.  My title is Assistant to the Vice President and Deputy Chief of Staff.  In that capacity, I am responsible for all aspects of the administration and operations of the Office of the Vice President.  Within my area of responsibility is the records management policy and operations of the Office of the Vice President.

2.    This Declaration is based on my personal knowledge and on information available to me in my official capacity.

## THE OFFICE OF THE VICE PRESIDENT

3.     The Vice President performs both executive functions, as recognized by 3 U.S.C. § 106, and legislative functions as President of the Senate under the Constitution. The personnel employed by, or assigned or detailed to, the Vice President consist of employees paid from the Vice President's executive appropriations, employees paid from the Vice President's legislative appropriations, and employees assigned or detailed to the Vice President by executive branch departments and agencies. The aggregation of the Vice President and these employees is called the Office of the Vice President ("OVP"). The personnel in the OVP perform their official duties at the White House, in the Eisenhower Executive Office Building, at the Vice President's official residence (*see* 3 U.S.C. § 111 note), and at other locations (including when the Vice President is traveling).

4.     The number of personnel who work for the Vice President is quite small, especially in comparison to the number of personnel in the White House Office or in executive branch departments and agencies. The personnel employed by, assigned to, or detailed to the Vice President, as described above, number eighty-five (85) in all. All these personnel are under the supervision and control of the Vice President and are not under the supervision or control of any other officer, department, agency or entity of the United States Government.

5.     The Vice President relies in substantial part on OVP personnel for support in the performance of his official functions. These personnel provide support to the Vice President on matters of domestic policy, national security, homeland security, legislative affairs, communications, scheduling, advance, military matters, continuity of government and protective matters, administration, legal matters, and other official matters as appropriate. The range of duties they perform extends from providing policy advice to the Vice President to driving motor

2

pool vehicles. These duties include meeting at the White House Complex or at the Vice President's Residence with individuals from outside OVP to gather information and advice for the purpose of assisting the Vice President in formulating advice for the President and other purposes.

## RECORDS POLICY OF THE OFFICE OF THE VICE PRESIDENT

6.     In the course of conducting activities that relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the Vice President with respect to his executive functions, the personnel employed by or assigned or detailed to the Vice President create or receive records that relate to or have a direct effect upon the carrying out of those functions.

7.     From the inception of the Vice Presidency of Richard B. Cheney on January 20, 2001 and after, it has been the intent and actual practice of the OVP to retain and not relinquish to anyone control over the records created or received by Vice Presidential personnel. The Vice President has resolutely protected Vice Presidential executive records under the law to preserve the effective functioning of the Vice Presidency under the Constitution. Therefore, it is the policy of the OVP to maintain control, consistent with the law, over information, documents and other material relating to the operation of the OVP, so as to preserve the effective functioning of this Office.

8.     This policy of maintaining control over records applies in particular with respect to the movements, appointments and schedule of the Vice President and Vice Presidential personnel. Systematic public release of the information regarding when and with whom the Vice President and Vice Presidential personnel conduct meetings would impinge on the ability of the OVP to gather information in confidence and perform its essential functions, including

3

assisting the Vice President in his critical roles of advising and assisting the President. The ability of the Vice President to conduct these functions in confidence is critical to the effective functioning of the Presidency and Vice Presidency. If the Vice President or the personnel who perform official duties in the Office of the Vice President must expect public dissemination of information regarding persons with whom they meet to gather information and advice, they would, as a matter of human nature, be chilled from meeting with useful sources of information and advice, and individuals outside of the OVP would be equally chilled in sharing information with the OVP. It was this principle of confidentiality to ensure the effective functioning of the Vice Presidency that the Vice President successfully defended in a similar context in *Cheney v. United States District Court for the District of Columbia*, 542 U.S. 367 (2004), and related cases.

9.      Documents and materials that relate to Vice Presidential support of Presidential functions are preserved in accordance with the Presidential Records Act (44 U.S.C. § 2207). This includes the information that OVP inputs into, and receives as the output of, United States Secret Service-operated systems that facilitate clearance of visitors to the OVP in the White House Complex (by which I refer to the 18.07 acre area defined as the White House in Public Law 87-286) and to the Vice President's Residence, and any documents derived from that information, except for documentation, such as the results of background checks, that relates to the Secret Service's continuing protective function.

## SECRET SERVICE PROTECTION OF THE VICE PRESIDENT

10.      By law, the U.S. Secret Service of the Department of Homeland Security ("Secret Service") has a duty to protect the Vice President, members of the Vice President's immediate family, and the Vice President's Residence and other facilities in which the Vice President is from time to time located (see, e.g., 18 U.S.C. § 3056(a), 18 U.S.C. § 3056A). It is vitally

important to the United States that the Secret Service protect the Vice President so that he can perform effectively his official functions.

11.     As part of its statutory protective function, the Secret Service provides protective services for and controls access to (a) the White House Complex, which includes much of the office space used by the Office of the Vice President, and (b) the Vice President's Residence. In order to facilitate the Secret Service's statutorily directed protective services, the Office of the Vice President provides to the Secret Service information regarding persons who have appointments with the Vice President and Vice Presidential personnel at the White House Complex and at the Vice President's Residence. I am generally familiar with the records control systems relating to entry of individuals for appointments at the White House Complex and Vice President's Residence.

## VICE PRESIDENTIAL VISITOR RECORDS FOR THE WHITE HOUSE COMPLEX

12.     When the Vice President or other OVP personnel want to arrange an appointment for a visitor to the White House Complex, OVP personnel will input into a computer terminal connected to the White House Appointment Request Server identifying information relating to the visitor (such as name, date of birth, and social security number) and the time and location of the scheduled meeting. The Secret Service then makes use of the information to determine whether there is any protective concern with giving that visitor access to the White House Complex for the meeting and transmits the information electronically to the Secret Service's White House Access Control System, which includes the Worker and Visitor Entrance System ("WAVES"). Once that individual is cleared into the White House Complex, the visitor is issued an appropriate badge. Upon swiping that badge on a badge reader, the visitor's entry is recorded in an Access Control Record ("ACR") by the Secret Service.

13.    It has been the understanding and practice of the OVP that the information provided by the OVP to the Secret Service in order to facilitate appointments for the OVP within the White House Complex, and any records generated therefrom that do not relate to the Secret Service's continuing protective function, are under the legal control of the OVP, exclusive of the Department of Homeland Security (which includes the Secret Service), and are preserved in accordance with the Presidential Records Act. This OVP understanding and practice applies to documents generated using the information provided by the OVP to the Secret Service.

14.    Accordingly, since at least 2001, it has been the practice of the Secret Service to transfer WAVES records on compact disc to the White House Office of Records Management (the "WHORM") every 30 to 60 days. The WHORM preserves these WAVES records, which reflect information regarding visitors cleared into the White House Complex for both Presidential business and Vice Presidential business, in accordance with the Presidential Records Act. The White House Office and the Vice President, respectively, maintain legal custody and control of the records, exclusive of the Department of Homeland Security (which includes the Secret Service), and, with the assistance of the WHORM, see to their historic preservation under the Presidential Records Act. In accordance with a general understanding with WHORM dating back at least to the beginning of the Vice Presidency of Richard B. Cheney, WHORM routinely holds records relating to Vice Presidential business and preserves those records on behalf of the Vice President.

15.    In a May 2006 Memorandum of Understanding between the Secret Service and WHORM, the Secret Service and WHORM confirmed their understanding and practice. The parties agreed that WAVES and ACRs relating to visitors to the White House Complex were not

subject to the control of the Secret Service and thus were not agency records of the Secret

Service, but rather were Presidential Records Act materials.

## VICE PRESIDENTIAL VISITOR RECORDS RELATING
## TO THE VICE PRESIDENT'S RESIDENCE

16.    Under Public Law 93-346, as amended (3 U.S.C. § 111 note), the Government

furnishes an official residence for use by the Vice President for official functions and as a home.

The law authorizes for the Residence an adequate staff, including both civilian staffing and

military staffing, subject to the supervision and control of the Vice President. The staff for the

residence ensures proper care and maintenance for the facilities, assists with performance of

official functions at the residence, such as hosting visiting foreign dignitaries, and assists in

ensuring that it operates properly as a home. The staff assigned to the residence – who are under

the supervision and control of the Vice President – consists of one Department of the Navy

civilian employee serving as residence manager and social secretary, one employee of the Vice

President serving as deputy social secretary and deputy residence manager, and a number of

naval enlisted aides who staff the day-to-day functioning of the residence.

17.    The process for clearance of visitors to the Vice President's Residence is similar

to the process for visitors at the White House. When an official or personal visitor to the Vice

President's Residence has an appointment, OVP personnel provide identifying information to the

Secret Service (including name, date of birth, social security number, date and time of scheduled

appointment) in order to facilitate the appropriate clearance process. As it does with visitors to

the White House Complex, Secret Service then makes use of the information to determine

whether there is any protective concern with giving that visitor access to the Vice President's

Residence. Once that individual is cleared into the Vice President's Residence, the entry of the

individual into the Residence complex is recorded manually on an entry log kept by the Secret Service at access control points to the Residence.

18.    OVP provides this identifying information to the Secret Service with the understanding that the information and any materials derived from it (except those which relate to Secret Service's ongoing protective function, such as the results of background checks) remain in the exclusive ownership, custody and control of OVP. In accordance with that practice, starting in June 2001, the Secret Service has returned to the OVP on a monthly basis all entry logs (dating back to January 2001) kept by the Secret Service at the Vice President's Residence, showing identity of visitor and time and date of entry. Upon the return of each periodic batch of documents, an OVP employee signs a form acknowledging receipt of the documents.

19.    The OVP preserves all entry and access control records periodically returned by the Secret Service to OVP under the Presidential Records Act (44 U.S.C. § 2207).

20.    The understanding and practice for handling visitor records relating to the Vice President's Residence was confirmed and reiterated in a September 13, 2006, letter from Shannen W. Coffin, Counsel to the Vice President, to Donald Personette, Chief Counsel to the Secret Service (attached as Exhibit A hereto).

21.    The OVP has taken the necessary measures to protect and preserve the confidentiality of information provided to the Secret Service. OVP provides information to the Secret Service for access clearance solely for the limited purpose of facilitating the Secret Service's statutory duty to protect the Vice President. The information is provided on condition of confidentiality, and with the information and records containing it remaining under the ownership, custody and control of the Vice President, exclusive of the Secret Service, all in a manner consistent with the Presidential Records Act. Short of refusing to cooperate with the

Secret Service and exposing the Vice President (and with respect to the White House Complex, the President) to unnecessary risks (which the OVP would not do), the Office of the Vice President has taken all reasonable measures to protect and preserve the confidentiality of the information provided to the Secret Service and documents generated from that information while respecting the Secret Service's need to protect the President and Vice President.

22.    While the Secret Service has no continuing interest in visitor records sufficient to justify preservation or retention by the Secret Service (except with respect to those limited documents which relate to the Secret Service's ongoing protective function), OVP has a continuing interest in the documents.  The documents are preserved by OVP under the Presidential Records Act in recognition of their contemporary and historic value.  Routinely subjecting documents like those at issue in this case to FOIA could disclose sensitive information regarding the inner workings and deliberations and other communications of the Office of the Vice President.  Disclosure of such records could provide a roadmap to the meetings, contacts, and sources of input, information, and advice sought or received by the Vice President and his closest advisors, and could help chronicle the course and timing of substantive policy discussions within the Office.  Also, to the extent such communications and contacts are undertaken in the course of formulating or providing advice to the President or presidential staff, public release could result in the unauthorized disclosure of presidential communications.  In addition, release of the documents could result in the unwarranted disclosure of private information about the Vice President, his staff, and visitors.  Finally, public disclosure of the identities of individuals who have physical access to the Vice President and the areas in which he works or lives, or of patterns of physical access to the Vice President, could reasonably be expected to adversely

affect the safety of the Vice President and his family. Protection of the President and the Vice President from physical harm is a public interest of paramount importance.

23.    If the visitor records of the Office of the Vice President were subject to the Freedom of Information Act (FOIA), it would impose substantial administrative burdens on the Office of the Vice President. The records generated by visits to the White House Complex or the Vice President's Residence since January 2001 number in the tens of thousands, and document the comings and goings of thousands of employees, visitors, and contractors. Searching those records in response to FOIA requests from entities such as the plaintiff, news organizations, and other persons and entities would require a significant expenditure of resources. Moreover, unlike federal agencies, the small OVP staff does not have personnel dedicated to or experienced in processing documents under the FOIA. This burden would be even greater to the extent any requests sought documents regarding visits to specific OVP personnel or for specific purposes. In many if not most cases, the reason for a visit reflected in the records is not apparent from the face of such records, nor is the relationship of the visitor to the Vice President, his family, OVP staff, or any outside organization. In those cases, processing of the documents for FOIA purposes would require the assistance of knowledgeable OVP personnel to determine or estimate the purpose of a visit for which the Secret Service received visitor clearance input from OVP

personnel, thus distracting such personnel from their official duties. Avoiding such burdens and avoiding intrusion into the effective functioning of the Presidency and Vice Presidency are principal reasons the Freedom of Information Act does not apply to the Presidency and Vice Presidency and that Presidential and Vice Presidential executive records are instead covered by Sections 2201-2207 of title 44 of the U.S. Code.

I declare under penalty of perjury, pursuant 28 U.S.C. § 1746 that the foregoing is true and correct. Dated this _23_ day of May 2007.

Claire M. O'Donnell



**THE VICE PRESIDENT**

WASHINGTON

September 13, 2006

Don Personette
Chief Counsel
United States Secret Service
958 H Street, N.W.
Suite 8300
Washington, D.C. 20223

BY FAX: (202) 406-6544

Dear Don:

I write today with respect to pending ("FOIA") requests directed to the United States Secret Service ("USSS") and seeking certain documents relating to visitors to the Vice President's Residence ("VPR"). I want to take this opportunity to confirm and reiterate our consistent practice of exercising exclusive control over any and all documents and information held by the USSS relating to visitors to the VPR, including those originated by the Office of the Vice President ("OVP") staff and those derived from those original OVP records.

At least since January 2001, OVP has made available to the USSS, on a temporary basis and on the condition of confidentiality, documents and information relating to individuals scheduled to visit the VPR – including the name and identifying information of individuals scheduled to visit the VPR and information regarding the date and time of the scheduled visit – for the limited purpose of enabling USSS to perform its protective function with respect to the Vice President, his family and the VPR. All such documents and information, and any documents derived from the information provided by OVP for the purpose of facilitating USSS's protective function are and shall remain subject to the exclusive ownership, custody and control of OVP, and the USSS shall maintain the confidentiality of the documents and information and shall have neither any proprietary or other interest in OVP materials nor custody or control thereof. To the extent required by law, such documents shall be maintained by OVP as Vice Presidential executive records pursuant to the Presidential Records Act, 44 U.S.C. § 2207.

Such materials and information, and any documents derived from them for the purpose of facilitating USSS's protective function, shall be maintained in good order by USSS and shall be returned to OVP on a periodic basis. USSS shall not retain any copy of these documents and information upon return to OVP. As per our pre-existing arrangement, I understand that such

Exhibit A

documents have been returned to OVP on a monthly basis. If any documents remain in your possession, please return them to OVP as soon as possible.

OVP materials subject to this practice and understanding shall include, but not be limited to: a) all communications, including emails, faxes and other writings from OVP staff to USSS providing personal information on visitors scheduled to visit the VPR; (b) cleared visitor lists derived from the visitor information provided by OVP to USSS; (c) visitor logs compiled by USSS from visitor information provided by OVP.

Thank you for your continued cooperation in this matter.

Cordially,

Shannen W. Coffin
Counsel to the Vice President

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, | ) ) ) | |
| Plaintiff, | ) ) | CIVIL ACTION NO. |
| v. | ) ) | 1:06-cv-01912-JGP |
| U.S. DEPARTMENT OF HOMELAND SECURITY, et al., | ) ) ) | |
| Defendants. | ) ) ) | |

**DECLARATION OF KATHY J. LYERLY**
**SPECIAL AGENT IN CHARGE, LIAISON DIVISION AND**
**FREEDOM OF INFORMATION AND PRIVACY ACTS OFFICER,**
**UNITED STATES SECRET SERVICE**

I, Kathy J. Lyerly, hereby declare as follows:

1.     I am the Special Agent in Charge of the Liaison Division and the Freedom of

Information and Privacy Acts (FOI/PA) Officer for the United States Secret Service (hereinafter

"Secret Service"), which is a component of the Department of Homeland Security ("DHS").  I

have been the Secret Service FOI/PA Officer since December 28, 2003, and have been employed

with the Secret Service as a Special Agent (GS-1811) since October 26, 1987.

2.     DHS regulations, Title 6, Code of Federal Regulations, Section 5.4, and Appendix

A, II(I)(3), vest authority in the FOI/PA Officer, Secret Service, to make initial determinations as

to whether to grant Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, requests for Secret

Service records (68 FR 4056, 4058, and 4069).

3.     As the Secret Service's FOI/PA Officer, I am familiar with plaintiff's FOIA request

to the Secret Service.  At my request, the Secret Service conducted a search in its records for

information responsive to plaintiff's request.  That search uncovered 19 pages of agency records

that contain some responsive information.   After review by the FOI/PA Office, all such

information is being withheld pursuant to FOIA exemptions 552(b)(2), (b)(6), (b)(7)(C),

(b)(7)(E), and (b)(7)(F).   A description and explanation of the FOIA processing and search for

records responsive to plaintiff's FOIA request, and the reasons for the exemptions claimed, are

set forth below.

### Plaintiff's FOIA Request

4.    By letter dated October 4, 2006, and received by the Secret Service FOI/PA Office

on October 20, 2006, plaintiff submitted to the Secret Service a FOIA request for:

> all records relating to any visit that any and all of the following individuals made to the
> White House or the residence of the Vice President from January 1, 2001, to the present.
> As used herein, the term 'White House' includes, but is not limited to, any office within
> the Executive Office of the President, the residence of the President, the Old and New
> Executive Office Buildings, and any other office or space on the grounds of the White
> House.  Specifically, we seek any record of visits to the White House or the Vice
> President's residence by the following individuals: James Dobson[,] Gary L. Bauer[,]
> Wendy Wright[,] Louis P. Sheldon[,] Andrea Lafferty[,] Paul Weyrich[,] Tony Perkins[,]
> Donald Wildmon [and] Jerry Falwell.

### Search for Responsive Records

5.    The information provided in this declaration concerning the search for responsive

Secret Service records is based on information known to me in my position as the Secret Service

FOI/PA Officer, and on information provided to me by other Secret Service employees in

connection with my position as the Secret Service FOI/PA Officer.

6.    To begin the search for Secret Service records and information responsive to

plaintiff's FOIA request, that request was forwarded to the Office of the Assistant Director,

Office of Protective Operations ("OPO").

2

7.    Plaintiff's request was forwarded by the FOI/PA Office to the OPO as the OPO is charged with direct oversight for the security of the White House Complex and the Vice President's Residence. Therefore, it was reasonable to ask the OPO to search for records of visitors to these two areas, as this office was the most likely to have such records, and personnel in this office were the most likely to know where such records might be located.

8.    I understand that based on my search requests for information in Secret Service records responsive to plaintiff's FOIA request, the OPO conducted a series of searches of various Secret Service record groups.   It is also my understanding that the individuals who performed the searches are assigned to the OPO, Presidential Protective Division ("PPD"), or the OPO, Vice Presidential Protective Division ("VPPD"), and that these individuals conduct FOIA searches as part of their regular responsibilities.   I am advised that the searches as conducted by the PPD and VPPD were as follows, with the following results.

A.    The PPD searched Secret Service Form ("SSF") 1888s for any and all records responsive to plaintiff's October 4, 2006, request. The search was completed through an electronically searchable database in which SSF 1888 information is electronically stored. The records are searchable by visitor name. The Secret Service searched the database by the names of the individuals listed in plaintiff's FOIA request. This search, which included the period of January 1, 2001, until January 25, 2007, produced no information concerning the named individuals. Therefore, it was unnecessary to search the paper documents related to the 1888s.

B.    The Secret Service also searched additional security-related records for information responsive to plaintiff's October 4, 2006, request. Some of these

3

records were in paper files; others were in a searchable database in which the

information is electronically stored.  Some of these records went back to March

2003 and others went back to October 2006 (with some sporadic records from

September 2006); all of them were searched up to January 25, 2007.  The records

in the electronic database are searchable by visitor name.  In regard to the elec-

tronic records, the Secret Service searched these records electronically by the

names of the individuals as provided in plaintiff's FOIA request.  The search of

the electronic files located three (3) pages that contained some responsive

information.  In regard to the paper records, the Secret Service conducted a page

by page review of the documents for the names of the individuals set forth in

plaintiff's FOIA request.  The search of the paper files located four (4) pages

which contained some responsive information.  The responsive records were

segregated and processed under the FOIA.

C.     The VPPD conducted a search of "hit" reports as maintained by the Secret Service

in connection with the security of the Vice President's Residence.  This search

included a page by page hand search of paper records for the names of the

individuals listed in plaintiff's FOIA request.  This search, which covered the

period of January 1, 2001, until January 25, 2007, produced no information

concerning the individuals named in plaintiff's FOIA request (although not all hit

reports that were created during this period still exist).

D.     The VPPD also searched Watch Commander Journals that are also maintained in

connection with the security of the Vice President's Residence.  This search was

conducted in an electronic database containing this information, which is searchable by the names of the individuals as provided in plaintiff's FOIA request. This search, which covered the period of October 1, 2004, until January 25, 2007, produced no information concerning the individuals named in plaintiff's FOIA request (Watch Commander Journals predating October 1, 2004, no longer exist).

9.     In connection with this search, the OPO advised that, as PPD had located potentially responsive records among a certain type of record, it was possible that the Office of the Assistant Director, Office of Protective Research ("OPR"), Intelligence Division, might also maintain records responsive to plaintiff's FOIA request. Consequently, my office requested that the OPR, Intelligence Division, search a specific named group of records for information responsive to plaintiff's FOIA request. I am advised that this search was conducted by individuals assigned to the Intelligence Division, and that these individuals conduct FOIA searches as part of their regular responsibilities. I am also advised that the Intelligence Division's search was a page by page search of paper records for the name of any individual set forth in plaintiff's FOIA request. This search produced 12 pages of material that contain the name of at least one individual as set forth in plaintiff's FOIA request. These potentially responsive records were then segregated and processed under the FOIA.

10.     For a further description of the documents searched by the OPO and the OPR, Intelligence Division, the Court is respectfully referred to the "Third Declaration of Paul Morrissey" submitted in this case.

5

**FOIA Processing and Exemptions Claimed**

11.    Upon completion of the above described searches, and once potentially responsive records were segregated, these records were reviewed for possible release under the FOIA.

12.    The 19 pages processed under the FOIA include the following information: the name of an internal Secret Service security program; the time and date a report was run, and a number letter sequence associated with an Access Control Officer who requested the report; date and time of the request for the security program's check/report; the name and telephone number of the Access Control Officer making the request; an appointment letter and number sequence assigned to an appointment for access to the White House Complex by a computer system; who the appointment is with; the name, Social Security number, date of birth, current residence location, and country of citizenship for certain individuals seeking access to the White House Complex for whom the security check is being requested; internal information confirming that a National Crime Information Center check was conducted; hand written notations from other federal agencies concerning actions taken by those agencies; typed stamps from other federal agencies concerning actions taken by those agencies; and information from other federal agencies concerning individuals seeking access to the White House Complex, or concerning other individuals who have the same name as certain individuals seeking access to the White House Complex.

13.    It is also noted that it is unclear whether the individual(s) whose name(s) appear on the documents located through the search for information responsive to plaintiff's FOIA request are the individuals about whom plaintiff seeks information.  Plaintiff's FOIA request did not provide Social Security numbers, dates of birth or other identifying information.  Therefore,

the responsive information concerns individuals with the same name as the person listed in

plaintiff's FOIA request.  It is not known, however, if the information in fact concerns the

person(s) about whom plaintiff seeks information.  Further, the responsive information concerns

only certain of the nine names set forth in plaintiff's FOIA request.

14.     A review of these records first indicated that not all of the information on a

document was responsive to plaintiff's FOIA request.  Many of the documents contained names

and information concerning third parties not named in plaintiff's FOIA request, as well as

information from other agencies concerning individuals not named in plaintiff's FOIA request.

This information was considered beyond the scope of plaintiff's request, and the FOIA

processing of that information was considered completed.

15.     The review of these records also indicated that the responsive information as

provided by the OPR, Intelligence Division, contained notations and information that had

originated with other federal agencies.   In compliance with DHS regulations, title 6 of the Code

of Federal Regulations, section 5.22, the Secret Service has consulted with those agencies

regarding the processing of this FOIA request.  Revealing the identity of those federal agencies

would disclose information protected by Exemption 7(E) of FOIA, section 552(b)(7)(E), in that it

would disclose certain "techniques and procedures" used by the Secret Service in conducting

background checks and other security-related activities regarding visitors and proposed visitors

to the White House Complex.  One of those agencies has classified as "Confidential" the four

pages that contain its notations.

16.     It was also determined that all of the responsive information that had been located

in connection with plaintiff's FOIA request had been compiled for law enforcement purposes.

All of the information had been gathered and utilized by the Secret Service in connection with its statutory responsibilities for protection and security, as set forth in Title 18 of the United States Code, sections 3056 and 3056A.   Therefore, all of the responsive information met the threshold requirement for exemption from release under the provisions of the FOIA, section 552(b)(7).

17.    Finally, it was determined that the responsive information located in connection with plaintiff's FOIA request should be withheld from release in its entirety under the FOIA, sections 552(b)(2), (b)(6), (b)(7)(C), (b)(7)(E), and (b)(7)(F).   A detailed discussion of the basis for invoking these exemptions is incorporated into the following paragraphs.

**FOIA Exemptions (b)(2) and (b)(7)(E)**

18.    Information located as responsive to plaintiff's FOIA request is being withheld under Title 5 of the United States Code, section 552(b)(2), and in some cases under 552(b)(2) in conjunction with section 552(b)(7)(E).   Section 552(b)(2) exempts from disclosure information "relating solely to the internal personnel rules and practices of an agency."   Section 552(b)(7)(E) exempts from disclosure "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information. . .would disclose techniques and procedures for law enforcement investigations or prosecutions; or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law."

19.    Responsive information withheld under exemption (b)(2) includes the appointment letter/number sequence assigned to an appointment by the computer; and a letter/number sequence associated with an Access Control Officer.   These pieces of information are strictly internal and provide no information to the public, and are generally meaningless other than to the

computer which generates the number, or to the internal workings of the Secret Service.
Therefore, these numbers are being withheld under a low (b)(2) exemption.

20.    All responsive information contained in the documents located was compiled for
law enforcement purposes, and in connection with the Secret Service's protective responsibilities
as set forth under 18 U.S.C. §§ 3056 and 3056A.  To release the responsive information would
disclose information related to when and if various security checks and security measures are
taken in connection with individuals seeking entrance into the White House Complex.  In regard
to the documents at issue, the name of the program as shown on the documents themselves
reveals security-related information concerning when certain checks are, or are not, conducted.
Further, to reveal the name of and personal identifying information concerning an individual, and
who they were visiting, could suggest when additional security checks are conducted and when
certain security measures are not, or are unlikely, to be taken.   Thus, the name, personal
identifying information, and intended visitee information must also be withheld as such details
may indicate certain security related activity, or the lack thereof.  The information at issue is
internal and release of the information would reveal information not known to the general public.
Further, the release of the information would reveal techniques and criteria used by the Secret
Service to gather additional information in certain circumstances and in regard to certain
individuals.  Disclosing the documents could reasonably be expected to enable individuals to
circumvent the law by revealing information regarding the circumstances that trigger when
certain security steps are taken, and the manner through which those additional security checks
are taken or information is gathered.  For this reason, all such responsive information located in

9

connection with plaintiff's FOIA request through the searches described above is being withheld under a high (b)(2) exemption in conjunction with exemption (b)(7)(E).

**FOIA Exemptions (b)(6) and (b)(7)(C)**

21.    Title 5, United States Code, section 552(b)(6), exempts from disclosure information about individuals in "personnel and medical files" when the disclosure of such information "would constitute a clearly unwarranted invasion of personal privacy." Title 5, United States Code, section 552(b)(7)(C), exempts from disclosure "records or information compiled for law enforcement purposes," the disclosure of which "could reasonably be expected to constitute an unwarranted invasion of personal privacy."

22.    Exemptions (b)(6) and (b)(7)(C) are cited to justify the withholding of names and telephone numbers of Access Control Officers and others making requests under the security program at issue; the name, Social Security numbers, dates of birth, and other personal identifying information for certain individuals seeking access to the White House Complex; and the investigative status of third parties as it appears on the responsive documents located in connection with plaintiff's FOIA request.

23.    In making its determination to withhold this information under exemptions (b)(6) and (b)(7)(C), the Secret Service balanced the public's interest in disclosure against the rights of the individuals named to personal privacy, and determined that the privacy rights of third parties outweighed any public interest in disclosure.

24.    First, in regard to the names of Access Control Officers and others making requests, and their work telephone numbers, there would appear to be little public interest in such information. Yet, the release of such information could invade the individual's privacy by

10

causing him/her public attention or subjecting the individual to unnecessary and unwanted telephone contact. Therefore, such information is being withheld under exemptions (b)(6) and (b)(7)(C).

25.    Second, the individuals about whom plaintiff seeks information are individuals who may have sought entrance into the White House Complex. This fact, however, would not seem to provide to plaintiff or the public a reason to obtain any such person's individual date of birth or Social Security number. That information, combined with an individual's name, could lead to various forms of criminal activity against these named individuals, such as identity theft or fraud. This would seem to be a substantial reason for withholding the dates of birth and Social Security numbers under exemption (b)(6) and (b)(7)(C), as an invasion of privacy. In addition, there seems to be no reason why information such as an individual's Social Security number should flow into the public domain, or why the public would have a valid interest in such a combination of these individuals' identifying information. Considering these factors, the dates of birth and Social Security numbers of those who appear in the responsive records are being withheld under exemptions (b)(6) and (b)(7)(C).

26.    Finally, one of the responsive pages at issue here includes information possibly concerning the personal history of one of the persons whose name appears in the records. The notation of this information indicated that the information may relate to the person about whom the Secret Service sought information or to a different person with the same or a similar name. Release of such information in association with an individual's name would directly invade the personal privacy of the individual. Should such information enter the public domain, it would almost certainly result in personal embarrassment and discomfort. Although the public may

11

arguably have some interest in knowing the personal history of those who seek entrance to the White House Complex, the Secret Service has concluded that the balance of interests favors the individual and forecloses disclosure as a clearly unwarranted invasion of personal privacy. Any public interest is further attenuated by the fact that, as noted above, the record is unclear on its face as to the identity of the person to whom the information pertains.

**FOIA Exemption (b)(7)(F)**

27.     Title 5, United States Code, section 552(b)(7)(F), exempts from disclosure "records or information compiled for law enforcement purposes," the disclosure of which "could reasonably be expected to endanger the life or physical safety of any individual." As shown above, disclosure of the responsive documents at issue would disclose information related to when and if various security checks and security measures are taken in connection with individuals seeking entrance into the White House Complex. One purpose of those security checks and security measures is to protect the life and physical safety of one or more protectees of the Secret Service. Disclosing the Secret Service's techniques and procedures in that regard would permit an individual or organization to attempt to avoid certain security checks, potentially impeding the Secret Service's efforts to identify persons who may be a threat to its protectees, and thus potentially endangering the life and physical safety of one or more Secret Service protectees.

**Segrebility of Information**

28.     In processing this request, the Secret Service FOI/PA Office also considered whether any responsive information could be segregated and thus released to plaintiff. It was, however, determined that were the withheld information to be segregated, the remaining

information on a document would be meaningless. The responsive pages located in connection with this request show the name of a program that is being withheld; a list of the names, Social Security numbers, dates of birth, and other identifying information concerning those subject to the security process; and information that indicates when and by whom the process is triggered. With all such information withheld, there is either no information remaining on the page, or the remaining information is a blank form. Therefore, it was determined that there was no information that could be reasonably segregated and released to plaintiff.

## Conclusion

29.    In completing its protective and investigative functions, the Secret Service must protect from disclosure identifying information regarding third parties, and must protect the integrity of its security and protection related processes and information. For these reasons, the responsive information located in connection with plaintiff's FOIA request has been withheld in full.

I declare under penalty of perjury that the foregoing is true and correct.

_5-24-07_____
Date

_Kathy J. Lyerly_____
Kathy J. Lyerly
SAIC, Liaison Division
FOIA Officer

13

### UNITED STATES DISTRICT COURT
#### FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **CITIZENS FOR RESPONSIBILITY** | ) | |
| **AND ETHICS IN WASHINGTON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No. 06-1912 (JGP)** |
| **v.** | ) | |
| | ) | |
| **UNITED STATES DEPARTMENT OF** | ) | |
| **HOMELAND SECURITY, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

### ORDER

This matter comes before the Court on **Defendants' Motion for Summary Judgment** [29]. Upon consideration of Defendants' motion and of all materials submitted in relation thereto, it is hereby

**ORDERED** that Defendants' motion [29] is **GRANTED**; and it is further

**ORDERED** that summary judgment be entered for the Defendants and that this action be, and it hereby is, DISMISSED WITH PREJUDICE.

**SO ORDERED.**

DATE: _____

**JOHN GARRETT PENN**
**United States District Judge**