**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

CITIZENS FOR RESPONSIBILITY AND )
ETHICS IN WASHINGTON, )
    )
        Plaintiff, )
    )
        v. )    Civil No. 1:06cv01912 (JGP)
    )
U.S. DEPARTMENT OF HOMELAND )
SECURITY, et al., )
    )
        Defendants. )
_____)

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## STATEMENT

Invoking the specter of a constitutional crisis unless it prevails in this litigation, the government suggests that nothing short of the effective functioning of the president and vice president is at issue. To the contrary, it is the president and vice president who have disregarded the rule of law and the statutory schemes that Congress put in place by their efforts to co-opt agency records as their own in order to place them beyond the reach of this Court, Congress and -- for the foreseeable future -- the public.

This case is really about the failure of the Secret Service to respond adequately to the Freedom of Information Act ("FOIA") request that CREW[1] made for White House visitor records that the Secret Service creates and maintains as part of its statutory responsibilities to protect the president, vice president, and their offices and residences. According to the White

---

[1] "CREW" is the acronym plaintiff Citizens for Responsibility and Ethics in Washington uses and that is used herein to refer to the plaintiff.

House, because some of the information in the Secret Service's White House visitor records could reveal things about the president and vice president that they do not want made public, they have the exclusive right of ownership and control over the records. Rather than rely on the statutory scheme that Congress put in place when it enacted the FOIA and that provides agencies with an opportunity to withhold materials that fall within nine specified categories, however, the president and vice president are attempting to remove the records from the reach of the FOIA altogether by arguing that they should be treated as presidential records.

The White House's unilateral effort to transform agency records into presidential records beyond the reach of the FOIA must fail as a matter of law and fact. To accept the government's claims is to ignore the evidence as well as the command of the Presidential Records Act ("PRA") that no record that qualifies as an agency record under the FOIA is also subject to the PRA. Governing case law makes clear that where, as here, records are created by an agency as part of fulfilling its statutory functions and the agency is in possession of the requested records at the time of the request, the records are agency records subject to the FOIA. That the Secret Service may not have a continuing interest in retaining the records does not change their status as agency records under the FOIA.

The government's arguments also rest on a self-selected factual record that is conspicuously incomplete and that demonstrates a propensity by the White House to enter into secret agreements and manufacture secret directives that come to light only months later, when the government is pressed in litigation. Just as troubling, the government has rebuffed every effort the plaintiff has made to date to obtain all of the evidence relevant to the status of the White House visitor records. Accordingly, while defendants' motion for summary judgment

must be denied as unsupported by the current record, the Court should grant the plaintiff an opportunity to conduct discovery to ensure that all relevant evidence is brought to light.

Finally, for the first time the Secret Service has acknowledged -- many months after the plaintiff filed its FOIA request -- that it has 19 pages of responsive documents that the agency claims are exempt from disclosure. Quite apart from the government's failure to properly disclose to CREW the existence of these documents, CREW has no interest in obtaining the security-related information that the Secret Service asserts is contained in the withheld documents. Had the agency followed proper FOIA procedures there would have been no need to address these documents at all, as CREW does not contest the withholdings.

## FACTUAL BACKGROUND

On October 4, 2006, CREW sent a FOIA request to the Department of Homeland Security ("DHS") seeking Secret Service records, regardless of format and including electronic records and information, relating to any visit that any of the following individuals made to the White House or the residence of the vice president from January 1, 2001, to the present: James Dobson, Gary L. Bauer, Wendy Wright, Louis P. Sheldon, Andrea Lafferty, Paul Weyrich, Tony Perkins, Donald Wildmon and Jerry Falwell. Letter from Anne L. Weismann to U.S. Secret Service, Freedom of Information and Privacy Acts Branch, Oct. 4, 2006 (Exhibit A to Complaint).

CREW also sought a waiver of fees associated with processing its request given that the request concerns the operations of the federal government, the disclosures will likely contribute to a better understanding of relevant government procedures and the request is primarily and fundamentally for non-commercial purposes. Id. Specifically, the requested records are likely to

shed light on the influence that conservative Christian leaders have, or attempt to have, on the president in the exercise of his authority.  Id.

Despite repeated phone calls to the Secret Service FOIA office by CREW's counsel to ascertain the status of CREW's request, including specifically when the Secret Service had received the request, the Secret Service refused to disclose to CREW any information about the request.  See Declaration of Anne L. Weismann, Feb. 15, 2007 (submitted as Exhibit 2 to Plaintiff's Memorandum in Support of Plaintiff's Motion for a Temporary Restraining Order (Document 12)).[2]  In fact, Secret Service FOIA personnel advised CREW's counsel that they had been instructed specifically not to tell CREW anything about its request, including any information about the status of the request.  Id.

Having received no response whatsoever to its FOIA request, CREW filed its complaint in this matter on November 9, 2006, against DHS and Archivist Allen Weinstein.  CREW's complaint challenges the failure of the Secret Service (a component of DHS) to fulfill CREW's FOIA request.  Complaint, ¶ 1.  In addition, CREW challenges as contrary to law the policy of the Secret Service to erase federal records, including Worker and Visitor Entry System ("WAVES") records, once it has transferred the information on those records to the White House.  Id.  CREW also challenges the failure of the Archivist to take enforcement action to prevent DHS from unlawfully destroying agency records, contrary to its statutory mandate under the Federal Records Act ("FRA").  Id., ¶¶ 1, 2.

CREW's challenge to the government's unlawful policy of document destruction was based in large degree on information made available through other litigation.  For example, on

---

[2] References herein to documents filed in this case will refer to their document number.

May 16, 2006, the Secret Service filed a motion to dismiss for lack of subject matter jurisdiction in <u>Judicial Watch v. U.S. Secret Service</u>, No. 06-310 (JGP) (D.D.C.), another FOIA lawsuit challenging the failure of the Secret Service to produce records in response to plaintiff Judicial Watch's request for all records that reflect the White House entries and exits of convicted lobbyist Jack Abramoff.[3]  As part of its motion, the Secret Service submitted the declaration of Kathy J. Lyerly, the Special Agent in Charge of the Liaison Division and the Freedom of Information and Privacy Acts Office for the Secret Service ("Lyerly Decl. I) (Exhibit B to Complaint).

Ms. Lyerly attested to the "longstanding practice of the Secret Service to transfer WAVES records on CD-ROM to the White House every 30 to 60 days."  Lyerly Decl. I at ¶ 10. Ms. Lyerly also stated that "once the Secret Service transferred the WAVES records, the Secret Service ensured that those records were erased from its computer system."  <u>Id.</u>  According to Ms. Lyerly, beginning in October 2004, "at the request of the National Archives and Records Administration, the Secret Service began temporarily retaining its own copy of the WAVES records that it transferred to the White House.  As such, the Secret Service has in its possession WAVES records dating back only to October 2004."  <u>Id.</u> at ¶ 11.[4]

Other information includes a Memorandum of Understanding ("MOU") that the Secret

---

[3] Notably, in that case the Secret Service did not argue that the requested records were presidential records not subject to the FOIA  Instead, the Secret Service entered into a court-ordered stipulation by which it agreed to produce to Judicial Watch the requested visitor logs. The only remaining dispute is whether the Secret Service has produced all responsive records or merely a subset of responsive records.

[4] The government has not explained the significance of the October 2004 date; CREW notes that it is one month before the last presidential election.

Service entered into on May 17, 2006, with the White House Office of Records Management

(Exhibit C to Complaint).  The MOU purports to "govern the status and handling of records

generated through the White House Access Control System," MOU, ¶ 1, and states without

exception that White House Access Control System ("WHACS") records, which include records

generated by WAVES and the Access Control Records ["ACR"] system, "are at all times

Presidential Records," "are not Federal Records, and "are not the records of an 'agency' subject

to the Freedom of Information Act."  Id., ¶¶ 2, 17a-c.  Under the MOU, the Secret Service is to

"regularly transfer all WHACS Records in its possession" to the White House and is not to

"retain its own copies of any WHACS Records except as is necessary to facilitate the transfer of

these records" to the White House.  Id., ¶ 22.

     The government first made public the existence of the MOU on October 25, 2006, as part

of its request for a stay from the district court's grant of a preliminary injunction in The

Washington Post v. U.S. Dep't of Homeland Security, No. 06-1737 (D.D.C.) (appeal dismissed).

Although the status of White House visitor logs created by the Secret Service had already been

litigated, the government withheld the MOU -- which it had entered into months earlier -- from

the district court in The Washington Post until it received an adverse ruling.  Moreover, the

Secret Service and the White House entered into this MOU after CREW and Judicial Watch

separately had filed lawsuits under the FOIA seeking White House visitor records.  See Judicial

Watch v. U.S. Secret Service, (filed Feb. 22, 2006); CREW v. Dep't of Homeland Security, No.

06-883 (JGP) (D.D.C. filed May 10, 2006) ("CREW v. DHS I").

     After promising for months that they were on the verge of filing a motion for summary

judgment motion, defendants here, in response to a Court order, filed their motion on May 25,

2007 (hereinafter "Ds' Mem.").  As part of that motion defendants disclosed for the first time the existence of a letter dated September 13, 2006, from Shannen W. Coffin, counsel to the vice president, to Don Personette, chief counsel of the Secret Service.  See Document 29-2.[5]  Among other things, the letter purported to confirm the practice by the Office of the Vice President ("OVP") of "exercising exclusive control over any and all documents and information held by the USSS relating to visitors to the VPR [vice president residency] . . ."  Id.  In addition, with no acknowledgment of the legal constraints that any pending litigation or FOIA requests would impose, the OVP letter directed that the Secret Service "shall not retain any copy of these documents and information upon return to OVP," and stated "[i]f any documents remain in your possession, please return them to OVP as soon as possible."  Id.

Since the first lawsuit brought by Judicial Watch for White House visitor records on February 22, 2006, to the present, the government has submitted approximately 16 different declarations describing in various ways the Secret Service's creation and maintenance of the records.  These declarations document newly discovered records, the purportedly inadvertent destruction of records and differing practices as to what the Secret Service retained after providing the White House with copies.  For example, on May 16, 2006, Ms. Lyerly claimed that the Secret Service only had in its possession WAVES records dating back to October 2004.

---

[5] At the February 16, 2007 hearing on plaintiff's motion for a temporary restraining order in this matter, CREW's counsel advised the Court of CREW's understanding that, in addition to the MOU, there was another secret agreement between the vice president and the Secret Service. Transcript of Motions Hearing, Feb. 16, 2007, p. 15.  The government did not produce this letter until over three months later, on May 25, 2007.  Just as remarkably, an October 13, 2006 declaration that Claire M. O'Donnell, assistant to the vice president, executed for The Washington Post case (and attached as Exhibit 1) describes the records policy of the OVP, but makes no mention whatsoever of Mr. Coffin's letter, submitted to the Secret Service only one month earlier.

Lyerly I Decl., ¶ 11.  Almost two months later, on July 7, 2006, Ms. Lyerly stated in a

declaration that the Secret Service had discovered on the hard drives of two of its computers

"certain WAVES data pre-dating October 2004." (attached as Exhibit 2).

Other declarations tell a different story.  For example, Mr. Morrissey, Deputy Assistant

Director of the Office of Protective Operations for the Secret Service, submitted multiple

declarations in multiple cases outlining the practices of the Secret Service with respect to White

House visitor records.  Not until CREW moved for a temporary restraining order to ensure the

preservation of all potentially responsive records pending the outcome of this litigation did Mr.

Morrissey explain that up until some point in June 2006, the Secret Service destroyed or

otherwise transferred to the White House all of its records concerning access to the VPR.

Second Morrissey Decl., March 5, 2007, ¶ 18 (Document 21-2).  Perhaps this is why Ms.

Lyerly's earlier declaration of September 21, 2006, filed in <u>CREW v. DHS I</u> (and attached as

Exhibit 3), makes no mention of the dates covered by the agency's records of VPR visits.

## STATUTORY BACKGROUND

### The Freedom of Information Act

The FOIA, 5 U.S.C. §552, requires agencies of the federal government to release

requested records to the public unless one or more specific statutory exemptions apply.  An

agency must respond to a party making a FOIA request within 20 working days, notifying that

party of at least the agency's determination whether or not to fulfill the request and of the

requester's right to appeal the agency's determination to the agency head.  5 U.S.C. §

552(a)(6)(A)(I).  Although in "unusual circumstances" an agency may delay its response to a

FOIA request or appeal, the agency must still provide notice and "the date on which a

determination is expected to be dispatched."  5 U.S.C. § 552(a)(6)(B).

Congress originally defined "agency" for purposes of the FOIA as "each authority of the Government of the United States."  5 U.S.C. § 551(a).  In 1974, Congress amended the definition of "agency" for FOIA purposes to include  any "establishment in the executive branch of the Government (including the Executive Office of the President)."  5 U.S.C. § 552(f).  Excluded from this amended definition was "the President's immediate staff or units in the Executive Office whose sole function is to advise and assist the President."  H.R. Conf. Rep. No. 1380, 93rd Cong., 2d Sess. 14 (1974).

This Court has jurisdiction, upon receipt of a complaint, "to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant."  5 U.S.C. § 552(a)(4)(B).

## The Federal Records Act

The FRA is a collection of statutes that governs the creation, management and disposal of federal records.  See generally 44 U.S.C. §§ 2101 et seq., 2901 et seq., 3010 et seq., and 3301 et seq.  Among other things, the FRA ensures "[a]ccurate and complete documentation of the policies and transactions of the Federal Government," as well as "judicious preservation and disposal of records."  44 U.S.C. § 2902.

To fulfill this purpose, the FRA requires the head of each agency to "make and preserve records containing adequate and proper documentation of the organization, functions, policies, decisions, procedures, and essential transactions of the agency."  Id. at § 3101.  Under the statute, each agency must also "establish and maintain an active, continuing program for the economical and efficient management of the records of the agency," id. at § 3102, and must

"establish safeguards against the removal or loss of records" the agency head determines are

necessary and required by regulations of the archivist.  Id. at § 3105.

The FRA also prescribes the exclusive mechanism for the disposal of federal records,

which it defines to include:

> all books, papers, maps, photographs, machine readable
> materials, regardless of physical form or characteristics,
> made or received by an agency of the United States
> Government under Federal law or in connection with
> the transaction of public business and preserved or
> appropriate for preservation by that agency . . as evidence
> of the organization, functions, policies, decisions, procedures
> operations, or other activities of the Government or because
> of the informational value of data in them.

44 U.S.C. § 3301.  No records may be "alienated or destroyed" except pursuant to the disposal

provisions of the FRA.  Id. at § 3314.

The archivist administers the provisions of the FRA and may authorize an agency to

dispose of records that the agency no longer needs and that do not have "sufficient

administrative, legal, research, or other value to warrant their continued preservation by the

Government."  44 U.S.C. § 3303a(a).  Only if the archivist determines that agency records do not

have administrative, legal, research, or other value can the archivist authorize their disposal.  Id.

at §§ 3303a(a), (d), and (e).

An agency wishing to dispose of records must first submit to the archivist either lists of

records the agency head determines "are not needed by it in the transaction of its current

business," 44 U.S.C. § 3303a(2), or "schedules proposing the disposal after the lapse of specified

periods of time of records of a specified form or character" that the agency head determines will

not have "sufficient administrative, legal, research, or other value to warrant their further

preservation by the Government." Id. at § 3303a(3).  Upon receipt of such a request, the

archivist must issue a notice requesting public comment on the agency's proposal and the

archivist's staff must conduct its own assessment of the value of the records the agency is

proposing to destroy.  Id. at § 3303a(a).  The archivist is free to accept or reject an agency's

proposal.  Id.

If the archivist learns of "any actual, impending, or threatened unlawful removal . . . or

destruction of records in the custody of [an] agency," the archivist is required to notify the head

of the agency and assist the agency head "in initiating action through the Attorney General for

the recovery of records wrongfully removed and for other redress provided by law."  44 U.S.C. §

2905(a).  If the agency head does not initiate such action, the archivist "shall request the

Attorney General to initiate such action, and shall notify the Congress when such a request has

been made."  Id.

### The Presidential Records Act

Congress enacted the PRA in 1978, following a protracted legal battle between President

Nixon and the government about his ability to control the records of his presidency after leaving

office.[6]  The PRA, which first took effect on January 20, 1981, directs the president to "take all

such steps as may be necessary to assure that the activities, deliberations, decisions, and policies

that reflect the performance of his constitutional, statutory, or other official or ceremonial duties

are adequately documents and that such records are maintained as Presidential records . . ."  44

---

[6] Congress first enacted the Presidential Recordings and Materials Act in 1974 to transfer control of President Nixon's presidential records to the Administrator of the General Services Administration (later changed to the archivist) and to address the issue of public access to the materials.  See 44 U.S.C. § 2111 note.

U.S.C. § 2203.

The statute defines "presidential records" as

> documentary materials . . . created or received by the President,
> his immediate staff, or a unit or individual in the Executive
> Office of the President whose function is to advise and assist
> the President, in the course of conducting activities which relate
> to or have an effect upon carrying out of the constitutional,
> statutory, or other official or ceremonial duties of the President.

Id. at § 2201(2).  Records of components of the Executive Office of the President that do not

advise or assist the president are governed by the FRA.  The records of the vice president are

subject to the same provisions as those of the president under the PRA.  44 U.S.C. § 2207.

Significantly for this case, the PRA explicitly exempts from the definition of a

presidential record "any documentary materials that are (I) official records of an agency (as

defined in section 552[f] of title 5 . . ."  44 U.S.C. § 2201.[7]  The intent of the PRA was to address

"records which are neither agency records subject to FOIA nor personal records."  H.R. Rep. 95-

1487, reprinted in 1978 USCCAN 5732, 5734.  As the D.C. Circuit has explained, the PRA

applies only to records that "fall outside the scope of FOIA because they are not 'agency

records.'  Put another way, the PRA provides that the definition of 'agency' records in the FOIA

trumps the definition of 'presidential records' in the PRA."  Armstrong v. Executive Office of

the President, 1 F.3d 1274, 1292 (D.C. Cir. 1993).

The PRA also dictates that an incumbent president may dispose of any of his presidential

records only where they "no longer have administrative, historical, informational, or evidentiary

---

[7] "Agency" is defined in 5 U.S.C. § 552(f)(1) as including "any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government (including the Executive Office of the President), or any independent regulatory agency."

value." Id. at § 2203(c). Although neither the archivist nor Congress can veto a president's decision to destroy records, if the archivist notifies Congress of a president's intent to dispose of records, the president must submit a disposal schedule to the appropriate congressional committees and wait 60 days before destroying the records. Id. at §§ 2203(c), 2203(d).

## ARGUMENT

The records at issue here were created by the Secret Service, a component of DHS that is undeniably an agency, in furtherance of the agency's statutorily mandated protective function, were stored on agency computers and in agency files and were subject to disposition and transfer by the Secret Service. These facts lead to the inescapable conclusion that the requested records are agency records subject to the FOIA.

In arguing to the contrary, the government relies primarily on the fact that the White House visitor records are generated upon a request from the White House and are based in part on information the White House provides to the Secret Service. The notion that these facts alone transform agency records into presidential records borders on the absurd and, if accepted, would set a dangerous precedent that would leave the public's access to the records of any agency at the whim of the White House. This is not the scheme either the FOIA or the PRA envisions.

The government also suggests that unless its approach is adopted, the president and vice president will essentially be stripped of any confidentiality in their meetings and deliberations thereby creating "serious constitutional problems." This argument too is flawed as a matter of fact and law. By the White House's own admissions, a great many of the visitor logs reveal nothing -- they do not disclose who requested that the visitor be cleared, to whom the visitor is cleared to see, or the purpose of his or her visit. Moreover, the availability of the FOIA's nine

exemptions to protect any truly confidential materials, including those falling within the presidential communications privilege, undermines completely any claim of constitutional impairment.

### I. VISITOR RECORDS CREATED BY THE SECRET SERVICE IN FURTHERANCE OF ITS STATUTORY MISSION ARE AGENCY RECORDS SUBJECT TO THE FOIA.

Under a two-part test enunciated by the Supreme Court in Dep't of Justice v. Tax Analysts, materials requested under the FOIA are "agency records" if they are (1) either created or obtained by the agency, and (2) under agency control at the time the FOIA request is made. 492 U.S. 136, 145 (1989). The burden is on the agency to establish that requested documents are not agency records,[8] guided by the "general principles that underlie the Act [FOIA] as a whole," including the FOIA's goal to "'open[] up the workings of government to public scrutiny.'" McGehee v. CIA, 697 F.2d 1095, 1108 (D.C. Cir. 1983). As the D.C. Circuit explained,

> One of the premises of that objective is the belief that 'an informed electorate is vital to the proper operation of a democracy.' A more specific goal implicit in the foregoing principles is to give citizens access to the information on the basis of which government agencies make their decisions, thereby equipping the populace to evaluate and criticize those decisions. Each of these objectives -- and particularly the last -- would be best promoted by a rule that *all records in an agency's possession, whether created by the agency itself or by other bodes covered by the Act, constitute 'agency records.'*

Id. at 1108-09 (citations omitted) (emphasis in original). See also Consumer Federation of America v. Dep't of Agriculture, 455 F.3d 283, 287 (D.C. Cir. 2006) ("term 'agency records'

---

[8] Judicial Watch, Inc. v. Dep't of Energy, 412 F.3d 125, 128 (D.C. Cir. 2005), *citing* Assassination Archives & Research Ctr. v. CIA, 334 F.3d 55, 57 (D.C. Cir. 2003).

must not be manipulated to avoid the basic structure of the Freedom of Information Act.").

The control inquiry for the agency records test refers to the materials "com[ing] into the agency's possession in the legitimate conduct of its official duties," Reporters Comm. for Freedom of the Press v. Kissinger, 445 U.S. 136, 145 (1980), and "focuses on an agency's possession of the requested materials, not on its power to alter the content of the materials it receives . . ." Tax Analysts, 492 U.S. at 147.  As the Supreme Court recognized, limiting "agency records" to only those records that the agency itself generates would be "incompatible with the FOIA's goal of giving the public access to all nonexempt information received by an agency as it carries out its mandate." Id.

The D.C. Circuit has identified four specific factors to consider when determining agency control:

> (1) the intent of the document's creator to retain or relinquish control over the records; (2) the ability of the agency to use and dispose of the records as it sees fit; (3) the extent to which agency personnel have read or relied upon the document; and (4) the degree to which the document was integrated into the agency's record system or files.

United We Stand America, Inc. v. IRS, 359 F.3d 595, 599 (D.C. Cir. 2004) ("United We Stand Am."), quoting Burka v. U.S. Dep't of Health and Human Services, 87 F.3d 508, 515 (D.C. Cir. 1996).  Where, however, the agency created and maintained the requested documents in the course of the agency's official duties, the D.C. Circuit has suggested at least three of these factors do not apply, as their application would conflict with the Supreme Court's definition of agency control in Tax Analysts.  United We Stand Am., 359 F.3d at 603.

**A.  The Requested Records Were Created By An Agency.**

Applying the Tax Analysts inquiry here to the White House and VPR visitor records, it

cannot seriously be disputed that they are created by an agency -- the Secret Service -- in furtherance of its statutorily mandated protective function. The Secret Service, now a component of DHS, is an "agency" for purposes of the FOIA. Under the direction of Secretary Michael Chertoff, the Secret Service is mandated to protect the president and vice president, 18 U.S.C. § 3595(a)(1), and its duties extend to protecting the White House complex and the vice presidential residence. 3 U.S.C. §§ 202(1) and (6). As the government's own declarations make clear, the Secret Service creates the records in question in fulfillment of that mandate. See, e.g., Third Morrissey Decl. at ¶¶ 3, 12, 32 (Document 29-2).

There is at least a suggestion in the government's brief and supporting declarations that because some of the information captured in at least some of the visitor records was provided by presidential and vice presidential staff, the records were actually created by those White House offices. Ds' Mem. at 22 n.20. That some of the information was provided by White House staff is not at all dispositive of the question of whether the records that contain that information are agency records, nor does it transform those records into presidential records. See, e.g., Bureau of Nat'l Affairs v. Dep't of Justice, 742 F.2d 1484 (D.C. Cir. 1983).

To the extent the government is also suggesting that the Secret Service, for these purposes, is not an agency, such an argument must fail. "Once an agency is found to be an agency, this determination will not vary according to its specific function in each individual case." Ryan v. Dep't of Justice, 617 F.2d 781, 788 (D.C. Cir. 1980); see also Pacific Legal Found. v. Council on Environmental Quality, 636 F.2d 1259, 1264 (D.C. Cir. 1980). As the D.C. Circuit recognized in Ryan, agencies such as the CIA sometimes advise the president, but courts still consider them to be "agencies" subject to the FOIA. Id. at 788.

16

**B.  The Secret Service Exercises Control Over The Visitor Records.**

The real dispute centers on whether the Secret Service exercises control sufficient to make the requested records agency records.  The four-factor test this Circuit uses compels the conclusion that the Secret Service exercises sufficient control over the White House visitor records that they must be considered to be agency records under the FOIA.

First, the Secret Service is able to use and dispose of the records in its possession as it sees fit.  As the agency's own declarations demonstrate, the Secret Service is able to transfer and dispose of the records once it no longer needs them.  Ms. Lyerly, for example, described a unilateral "longstanding" practice of erasing WAVES records once it had transferred copies to the White House.  Lyerly Decl. I at ¶ 10.  In a subsequent declaration, submitted in CREW v. DHS I, Ms. Lyerly explained that the Secret Service destroyed the visitor records not at the request or directive of the White House, but based on the agency's own assessment of the limited, long-term utility these records have for the Secret Service:

> Once a visitor's visit to the White House Complex is complete, WAVES and ACR records have no continuing usefulness to the Secret Service, the Secret Service has no continuing interest in preserving or retaining them . . .

Declaration of Kathy J. Lyerly ("Lyerly Decl. II"), ¶ 26 (Exhibit 3).

Similarly, in this case Mr. Morrissey has described the practice of the Secret Service prior to July 2006, to remove data from its records before transferring copies to the White House, again reflecting the Secret Service's ability to use and dispose of the records.  Third Declaration of Paul S. Morrissey (Document 29-2), ¶ 18.

In the face of this evidence the government offers only the agency's present-day intent, incorporated in a document apparently created for litigation purposes, that is actually contrary to

its actual practices.  That the Secret Service intended to erase WAVES records from its

computers, for example (Ds' Mem. at 23), does not alter the fact that it did not do so and, to this

day, retains the computer records at the request of Secret Service personnel.  In fact, the May

2006 MOU on which the government places such reliance does not confirm actual consistent

past practices of the Secret Service, but the practices and understandings that the White House

apparently has now adopted in the face of litigation on the issue of the records' status under the

FOIA.

       The fact that the Secret Service ultimately provides copies of visitor records to the White

House, which maintains them on a more permanent basis, does not change their character as

agency records of the Secret Service because they were created initially by employees of an

agency within the scope of their duties.  Judicial Watch, Inc. v. Dep't of Energy, 412 F.3d at 131.

Although in Judicial Watch documents were not agency records because they had been produced

by a private entity rather than an agency, the court noted "[i]f they [the creators of the

documents] were DOE employees, then the documents would have been created in the legitimate

conduct of their official duties at the DOE, and it would be immaterial that the documents were

and are located at the Office of the Vice President and were never integrated into the DOE's

records system." Id. at 131.

       In addition, while under the auspices of the Department of the Treasury, the Secret

Service submitted multiple requests to NARA for records disposition authority over visitor

records (attached as Exhibit 4), reflecting the Secret Service's ownership of and control over the

records.

       Further evidence of agency control is found in the Secret Service's past responses to

requests for visitor records.  In 1998, in response to a subpoena  in <u>Alexander v. FBI</u>, Civil No.

96-2123 (D.D.C.), the Secret Service produced WAVES logs from 1996.[9]  More recently, in

response to FOIA requests from CREW, the Democratic National Committee and Judicial

Watch, the Secret Service produced WAVES and ACR records, including records discovered in

searches of the agency's computer hard drives.[10]  In none of the agency declarations submitted to

support the adequacy of its searches did the Secret Service suggest that it had less than full

control over its use and disposition of the records, which were currently in its possession.  For

example, in describing its search for records responsive to Judicial Watch's FOIA request, Ms.

Lyerly stated:

> the FOI/PA Office conducted a search for responsive information.
> This search was conducted under the direction of the Secret
> Services Presidential Protective Division by personnel who
> conduct FOIA searches as part of their regular responsibilities.

Lyerly Decl. I at ¶ 9.  And ultimately in the <u>Judicial Watch</u> case the Secret Service agreed to be

bound by a court-ordered stipulation that required the agency to produce White House visitor

logs, an action that is simply incompatible with the agency's newly minted claim that it lacks the

ability to use and dispose of the records as it sees fit.

Moreover, while Mr. Morrissey now attempts to explain away these FOIA disclosures

based on his "understanding" that they were made only after White House authorization, Third

Morrissey Decl. at ¶ 23, he does not explain the basis of his understanding.  Accordingly his post

---

[9] These records were submitted as Exhibit 4 to Plaintiff's Motion to Compel in <u>Judicial Watch v. Secret Service</u>.

hoc explanation is entitled to no weight.[11]  In any event, the agency's current explanation does not change the fact that the Secret Service responded to the FOIA requests in its own name and expressed no limitations on its ability to process and disclose its White House visitor records.

Second, the visitor records have been integrated into the agency's record system or files. As the government declarations explain, the records are created by inputting directly into Secret Service records visitor information that comes from both the White House and White House visitors.  For example, in the case of the White House Complex, ACR records are generated when a visitor swipes his or her pass on an entry and exit station at the White House until the data is transferred to the agency's computer servers.  Third Morrissey Decl. at ¶ 13.  And the Secret Service agents who are posted at the VPR -- and who report to the Secretary of DHS, not the president or vice president -- have exclusive control and maintenance over the entry logs and watch commander journals.  Id. at ¶¶ 32-36.

Moreover, as the Secret Service's own declarations confirm, the requested records are not only integrated into the agency's official files, but they are maintained in those files after the White House visits are concluded.  The Secret Service has admitted that at least as of October 2004, it has retained visitor records on CD-ROMs in a searchable form.  See, e.g., Lyerly Decl. II. at ¶ 13; Third Morrissey Decl. at ¶ 19.  Additional visitor records pre-dating October 2004 remain on the hard drives of at least two Secret Service computers.  Lyerly Decl. II at ¶ 14. Similarly, the Secret Service files include permanent access lists and daily access lists for the

---

[11] See, e.g., Rule 56(e) of the Federal Rules of Civil Procedure which provides that declarations submitted in support of a motion for summary judgment must be based on "personal knowledge" and "shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."

VPR, Third Morrissey Decl. at ¶ 39, which Mr. Morrissey in previous litigation described as being maintained on the agency's computer database where they were updated on an ongoing basis by the agency.  Morrissey Decl. filed in <u>The Washington Post</u>, Oct. 13, 2006 at ¶ 12 (and attached as Exhibit 5).

Notwithstanding this evidence, the government argues that because the Secret Service only has a short-term need for the documents and has expressed its intent to ultimately relinquish control to the White House when the agency is finished with the records, this necessarily defeats any finding that the records are integrated in the agency's files.  Ds' Mem. at 22.  The fact that the Secret Service may not have a long-term need or interest in retaining the records, however, does not alter its practice of integrating the visitor logs in its files and computer hard drives in the short-term while it undeniably uses the information to perform an agency function.

Third, all of the documents are essential to the agency's performance of its statutorily mandated function and in fulfilling that function the Secret Service regularly and continuously reads and relies on the records.  Even White House officials admit that the express reason they provide information to the Secret Service which, in turn, incorporates the information into visitor records, is "(1) to enable the Secret Service to perform background checks to determine the existence of any protective concern . . . and (2) to enable the Secret Service to verify the visitor's admissibility at the time of the visit."  Declaration of Philip C. Droege, ¶ 5 (Document 29-2).  "Documents that are substantially prepared for agency decisionmaking are precisely those that FOIA intends to disclose."  <u>Berry v. Dep't of Justice</u>, 753 F.2d 1343, 1350 (9th Cir. 1984).

In arguing to the contrary, the government characterizes the agency's use of the records as "limited" and claims that, as in <u>BNA v. Dep't of Justice</u>, this limitation defeats their status as

21

agency records.  Ds' Mem. 23-24.  This is a gross distortion of the facts.  The records at issue

here are not simply located physically and by happenstance at  the agency.  To the contrary, the

Secret Service has these records -- which it has created -- to perform its independent protective

function.  The agency's use of the records and their incorporation in the agency's files makes

this case very different from the personal papers at issue in <u>BNA</u>.  Indeed, the <u>BNA</u> court

expressly recognized that use of a record by an agency employee to perform agency business is

"highly relevant for determining whether that document is an 'agency record' within the

meaning of FOIA."  742 F.2d at 1492.  <u>See also</u> <u>The Washington Post v. Dep't of Homeland</u>

<u>Security</u>, 459 F. Supp.2d 61, 70-72 (D.D.C. 2006), *vacated on appeal*, No. 06-5337 (D.C. Cir.

Feb. 27, 2007) (concluding Secret Service visitor records were agency records under the FOIA

because of the agency's use of the records).[12]

     The government's argument also rests on its continuing mischaracterization of the

records as having been provided by the White House to the Secret Service.  <u>See</u> Ds' Mem. at 24.

These records did not exist until their creation by the Secret Service; at most, the White House

provided some information that led to and was incorporated into the records.[13]  Whatever

independent interest the White House may have in certain *information* contained in the records,

however, is not sufficient to transform the records themselves into records of the president and

---

[12] Plaintiff cites to this case, now vacated on appeal, only because the government has
also relied on it to support its argument that three of the four factors of control do not apply.  Ds'
Mem. at 25.  Plaintiff notes, however, that the court reached this conclusion in the context of a
motion for a preliminary injunction on the basis of a very limited factual record that did not have
much of the evidence available to this Court.

[13] <u>See</u>, <u>e.g.</u>, Declaration of Claire M. O'Donnell at  ¶ 17 ("OVP personnel provide
identifying information to the Secret Service . . . in order to facilitate the appropriate clearance
process.") (Document 29-4).

vice president.

Moreover, that the president and vice president consider the protective function of the agency to be "merely ancillary" to their interests, Ds' Mem. at 26, does not alter the fact that for the Secret Service -- the agency in possession of the records and the agency to which plaintiff's FOIA request is directed -- its protective function is central to its mission and the reason why it created the records in the first place. Nor does the fact that some number of these documents would not have been created but for visits connected to the president and vice president alter their status or diminish the existence of Secret Service control. "To hold otherwise would be to exempt from FOIA's purview a broad array of materials otherwise clearly categorizable as agency records, thereby undermining the spirit of broad disclosure that animates the Act." Paisley v. CIA, 712 F.2d 686, 696 (D.C. Cir. 1983).

Indeed, to accept the government's argument would mean that any time an agency incorporates information it gets from an outside source into its own records, that source would have a valid claim of ownership over the information. Not surprisingly, the government cites no legal authority in support of this novel proposition and the case law is to the contrary.[14] See, e.g., Consumer Federation of America v. Dep't of Agriculture, 455 F.3d 283 (D.C. Cir. 2006) (document circulated among multiple employees to carry out agency business an "agency record"); Lykins v. Dep't of Justice, 725 F.2d 1455 (D.C. Cir. 1984) (pre-sentence report that

---

[14] Of course, if the information the White House had provided the Secret Service were a proprietary database or otherwise subject to copyright, the White House might have a legitimate claim of continued control. See, e.g., Tax Analysts v. Dep't of Justice, 913 F.Supp. 599, 607 (D.D.C. 1996). The White House makes no such claim here, nor could it as there is nothing proprietary about the background information that the White House submits to the Secret Service to aid the agency in clearing visitors into the White House and VPR.

court had provided agency found to be agency record based on the function the document served

in the agency); (RCA Global Communications, Inc. v. FCC, 524 F. Supp. 579, 584 (D. Del.

1981) (non-agency submitter seeking administrative action cannot "demand or receive sufficient

restrictions on agency use of its documents to preclude their classification as 'agency record.'").

The government also relies on the MOU and letter from the vice president's counsel as

evidence that it is the White House, not the Secret Service, that controls the White House visitor

records. This purported evidence, however, is highly suspect given that it was created by the

White House in the midst of litigation over the status of Secret Service visitor records and

ignores, if not outright conflicts with, the actual past practices of the Secret Service. As

discussed infra, the Secret Service has not hesitated in the past to comply with requests for White

House visitor records, both under the FOIA and in response to other information requests. This

simply cannot be squared with the government's litigation position that the records are not

agency records subject to the FOIA because the agency lacks sufficient control.

Further, as at least one court has already found, the White House cannot change the legal

status of a document simply by executing an MOU. See American Historical Ass'n v. Peterson,

876 F. Supp. 1300 (D.D.C. 1995) (addressing legality of MOU former President Bush entered in

which he purported to retain exclusive legal control over materials subject to the PRA after he

left office). The White House's similar efforts here to manipulate the legal status of Secret

Service records must also be rejected.[15]

---

[15] Perhaps most disingenuous of all, the government fails to mention that whether or not
these records are "agency records" has been hotly disputed within the government for years.
Information disclosed in another lawsuit, CREW v. NARA, No. 960947 (RBW) (D.D.C.) ,
reflects that until very recently, there was a dispute among the White House, Department of
Justice, Secret Service and NARA about whether the records plaintiff seeks here are agency

With a dearth of factual support for its position that the White House visitor records are not agency records of the Secret Service, the government relies on a policy argument that allowing plaintiff access to the records will not further the purpose of the FOIA to shed light on agency action, given that neither the president nor the vice president is an "agency."  Ds' Mem. at 26-27.  It is well-settled, however, that the requester's need or intended use of the documents is not relevant to a determination of whether the documents are disclosable in the first place. See, e.g., North v. Walsh, 881 F.2d 1088, 1096 (D.C. Cir. 1989).

More fundamentally, the FOIA should not be construed so narrowly given the pivotal role that the president plays as head of the executive branch of government.[16]  Agency heads serve at the pleasure of the president who is empowered to set agency policies.  There is no support for the government's strained interpretation of the FOIA, which asks the Court essentially to accept that what the president and vice president do has no relevance to how the government functions as a whole.  The FOIA was enacted to open up the government to the light of public scrutiny; the efforts of this administration to shield from public view any and all details of how the White House functions are completely at odds with and would actually subvert that

---

records under the FRA or presidential records not subject to the FOIA.  NARA, apparently at the direction of the White House and Department of Justice, has refused to disclose documents reflecting this dispute, including an opinion rendered by the Office of Legal Counsel.  The most the government has admitted is that in October 2004, at the request of NARA, the Secret Service began saving copies of WAVES and ACR records (see, e.g., MOU at ¶ 16), a directive presumably dictated by the status of the documents as agency records.

[16] While the vice president has suggested in another context that he is not part of the executive branch, his claim to a status as some fourth branch of government is completely at odds with the Constitution.

purpose.[17]  See McGehee v. CIA, 697 F.2d at 1109.

## II. SUBJECTING THE WHITE HOUSE VISITOR RECORDS TO THE FOIA RAISES NO LEGITIMATE CONSTITUTIONAL CONCERNS.

Relying on the doctrine of constitutional avoidance, the government argues alternatively that construing the FOIA as covering the Secret Service's White House visitor records would raise separation-of-powers concerns.  This is so, the government argues, because the FOIA would leave the president and vice president no ability to protect the confidentiality of their communications.

As a matter of fact and law, the doctrine of constitutional avoidance has no application here.  First, the doctrine, which requires a court to construe a statute so as to avoid "serious constitutional problems,"[18] applies only to a statute that is "fairly subject to two potential interpretations, one of which raises 'serious constitutional problems' and the other of which does not . . ."  INS v. St Cyr, 533 U.S. 289, 299-30 (2001).  Those who invoke the doctrine, however, "must believe that the alternative is a serious likelihood that the statute will be held unconstitutional."  Almendarez-Torres v. U.S., 523 U.S. 224, 238 (1998).  This is because the doctrine of constitutional avoidance is meant to serve the "basic democratic function of

---

[17] Moreover, separate and apart from what the records reveal about the president and vice president, they do shed light on the Secret Service's performance of its protective duties.  For example, in seeking to determine whether the Secret Service had permitted preferential use of temporary passes, members of Congress requested information from the agency's White House visitor logs.  H.R. Rep. 109-30, 109th Cong. 2d Sess.   Given the time period of the congressional inquiry, the Secret Service was required to examine copies that had already been transferred to the White House Office of Records Management.   This further illustrates an independent and ongoing need that the Secret Service has for the records -- accountability to Congress.

[18] Public Citizen v. U.S. Dep't of Justice, 491 U.S. 440, 466 (1989).

maintaining a set of statutes that reflect, rather than distort, the policy choices that elected representatives have made." Id.   And courts need not apply the doctrine "where a constitutional question, while lacking an obvious answer, does not lead a majority gravely to doubt that the statute is constitutional." Id. at 239.  See also Rust v. Sullivan, 500 U.S. 173, 190-91 (1991) (declining to apply doctrine even where petitioner's constitutional claims were not "without some force.").

Here, for the reasons discussed above, the FOIA is not "genuinely susceptible"[19] to an interpretation that would exclude from its reach the White House visitor records created by the Secret Service in fulfillment of its independent statutory mission.   Nor would the FOIA's application here create any legitimate constitutional concerns.  In arguing to the contrary, the government claims that revelation of the White House visitor records would "strike at the heart of . . . constitutional concerns" because it "could reveal the nature of initiatives under consideration or suggest how the President or Vice President may decide pending issues . . ." Ds' Mem. at 29.  This bloated rhetoric, however, is without substance.

As the government's own declarations make clear, the visitor records do not come close to revealing confidential matters deserving of constitutional protection.  For example, the supplemental declaration of Ms. O'Donnell, executed on October 25, 2006, and filed in The Washington Post case, states unambiguously that for "many, if not most" of the documents generated by visits to the White House Complex or the VPR,

> the purpose of the visits is not apparent from the face of the documents, nor is the relationship of the visitor to the Vice President, his family, OVP staff, or any outside organization.

---

[19] Almendarez-Torres, 523 U.S. at 238.

> In these cases, it would require the assistance of knowledgeable
> OVP personnel to determine or estimate the purpose of a visit
> for which the Secret Service received visitor clearance input
> from OVP personnel.

Supplemental O'Donnell Declaration (attached as Exhibit 6) at ¶ 7. Similarly, Mr. Morrissey

has explained that "ACR records do not include information about who the entrant (pass holder,

worker, or visitor) is visiting on the Complex, or who requested the visitor's entrance." Third

Morrissey Decl. at ¶ 14 (Document 29-2). Moreover, the burden that the government claims

would fall on the White House if forced under the FOIA to protect any interest it has in the

documents is pure speculation at this point and certainly not a sufficient basis on which to find a

constitutional infirmity. Thus, as a factual matter, there is no merit in the government's claims

that disclosure of White House visitor records would strike at the heart of the confidentiality that

the president enjoys under the Constitution.

Moreover, the government's arguments ignore the fact that under the FOIA, information

that is legitimately within the presidential communications or deliberative process privileges is

protected from compelled disclosure under Exemption 5. Given that Exemption 5 of the FOIA

affords sufficient protection for the White House's interest in preserving the confidentiality of

presidential deliberations, subjecting the visitor records to the FOIA presents no constitutional

infirmity. See The Washington Post v. Dep't of Homeland Security, 459 F. Supp.2d at 73

(recognizing that FOIA accommodates potential separation-of-powers issues by its exemptions

that offer protection for the executive branch).

The government also relies on the PRA to bolster its argument that constitutional

concerns compel interpreting the FOIA so as to exclude from its reach the records at issue. Ds'

Mem. at 28. This reliance is also misplaced, as it ignores the express language of the PRA that

no record that qualifies as an agency record under the FOIA is also subject to the PRA.  See 44 U.S.C. § 2201(2)(B)(I) (defining presidential records as explicitly not including official agency records).  The D.C. Circuit has explained that the PRA applies only to records that "fall outside the scope of FOIA . . . Put another way, the PRA provides that the definition of agency records in the FOIA trumps the definition of 'presidential records' in the PRA."  Armstrong v. Executive Office of the President, 1 F.3d at 1292.  See also H.R. Rep. No. 951487, at 8 (1978), reprinted in 1978 USCCAN 5732, 5739 (confirming that purpose of PRA was to encompass "those records which currently fall outside the scope of the Freedom of Information Act.").  The government's effort to invert the two statutes in contravention of their express language and intent cannot prevail, especially as it appears to be part of an improper "presidential carte blanche to shield materials from the reach of the FOIA."  Armstrong v. Exec. Office of the President, 1 F.3d at 1292.  Indeed, as the Armstrong court recognized, while Congress was cognizant of the need to "ensure executive branch control over presidential records during the president's term of office,"

> [a]t the same time, however, Congress sought to provide a clear limitation on just which materials the President could legitimately assert control over and to preserve the pre-existing body of FOIA law governing the disclosure of government agency records.

Id.

None of the cases the government cites provides persuasive authority for the government's novel position that any time an agency possesses documents in which the president has an interest, subjecting those documents to the FOIA is the equivalent of subjecting the president to the FOIA.  For example, the Cheney case[20] on which the government places significant reliance did not involve the FOIA, but rather the question of discovery in a case

---

[20] Cheney v. U.S. Dist. Court, 542 U.S. 367 (2004), cited at pp. 28-29 of Ds' Mem.

brought under the Federal Advisory Committee Act ("FACA"). The burdens of discovery cannot reasonably be equated with an agency's obligations under the FOIA, particularly given the differing burdens of proof for invoking privilege in the discovery context and in the FOIA context. And Armstrong v. Bush, 924 F.2d 282, 290 (D.C. Cir. 1981) (cited at Ds' Mem. at 29), involved presidential records under the PRA, a decidedly different scheme than that at issue here. Likewise, the government's reliance on Ryan v. Dep't of Justice, 617 F.2d 781 (D.C. Cir. 1980) (cited in Ds' Mem. at 29), improperly conflates subjecting the visitor logs to the FOIA with subjecting presidential staff to the FOIA.

In sum, subjecting the Secret Service's visitor records to the FOIA does not raise any serious constitutional concerns that require the Court to interpret the FOIA in a manner completely at odds with its express language and intent. The White House's desire for secrecy cannot trump the statutory scheme that Congress has enacted through the FOIA and the FRA.

### III.  AS AGENCY RECORDS UNDER THE FOIA, THE WHITE HOUSE VISITOR RECORDS ARE ALSO SUBJECT TO THE FRA.

The government's argument that the White House visitor records are not federal records subject to the FRA is essentially derivative of and rests on the same erroneous assumptions as its argument concerning the applicability of the FOIA, and must fail for the same reasons. That the FRA does not apply to presidential records (Ds' Mem. at 32) is irrelevant given that the records at issue are those of the Secret Service created in fulfillment of its agency mission. Moreover, the government's arguments do not even acknowledge, much less explain away, the express language of the PRA that makes it clear that it is the FRA that trumps the PRA, not vice versa. See Armstrong v. Executive Office of the President, 1 F.3d at 1292.

The government also makes the bizarre and completely circular argument that CREW

pg 31 of 33

lacks standing to raise an FRA claim here.  According to the government, because the records

are really subject to the PRA and because under the PRA plaintiff lacks standing to challenge

"the mere <u>classification</u> of records as Presidential or Vice Presidential," Ds' Mem. at 33

(emphasis in original), plaintiff lacks standing here.  In fact, however, plaintiff's FRA claim is

based on the policy of the Secret Service to destroy its White House visitor records after sending

copies to the White House, and plaintiff's standing is based on the fact that it has in the past and

will continue to seek these documents under the FOIA and that the agency's unlawful policy of

document destruction makes those records unavailable to CREW.  <u>See</u> Complaint at ¶¶ 6, 8-9,

46-49. <u>Armstrong</u> makes clear that this is precisely the kind of claim for which a litigant like

CREW has standing under the FRA.  As the <u>Armstrong</u> court noted, the FRA "supports a finding

that Congress intended, expected, and positively desired private researchers and private parties

whose rights may have been affected by government actions to have access to the documentary

history of the federal government."  924 F.2d at 288.  CREW's claims here are just like those at

issue in Armstrong; there, as here, "plaintiff[] do[es] not seek the creation of any new records,

but rather ask[s] only that the records already created be appropriately classified and disposed of

pursuant to disposal schedules approved by the Archivist."  <u>Id.</u>[21]

---

[21] The government suggests that recognizing CREW's standing to sue is unnecessary because no matter how the records are classified (<u>i.e.</u> as subject to either the FRA or PRA) they will be preserved.  Ds' Mem. at 33-34.  The so-called "classification" of these records is, however, no mere formality.  Most significantly, neither the archivist nor Congress has the authority to veto a president's decision to destroy any records covered by the PRA.  <u>Armstrong v. Bush</u>, 924 F.2d at 286.  The attempt by the White House here to bring the visitor records into the orbit of the PRA, even when they are created by and in the possession of the Secret Service, is also an attempt to give the president and vice president the unilateral and unreviewable discretion to destroy these records as they see fit.

## IV.  ADDITIONAL DISCOVERY IS NECESSARY TO ENSURE A FULL AND ACCURATE RECORD.

On the basis of the current record, the Court can conclude with confidence that the Secret Service's White House visitor records are agency records subject to both the FOIA and the FRA. Should there be any question, however, the Court should permit discovery to supplement the record, especially given the government's refusal to date to make all relevant documents available to the plaintiff.

Here the government has resisted plaintiff's efforts to engage in discovery, insisting that it should first be permitted to file a motion for summary judgment.  Now that it has filed such a motion, it is clear that there are large gaps in the evidentiary record proffered by the government. For example, CREW has learned from a lawsuit it has brought against NARA under the FOIA, that there is a wealth of documents addressing the precise issue presented here, including an opinion from the Office of Legal Counsel and NARA's responses to, among other things, Secret Service requests for records disposition authority.  It appears from the record in the NARA case that this issue has been hotly debated for some time and that debate has generated many documents that would be useful to this Court.

Just as useful would be the deposition testimony of Mr. Morrissey and Ms. Lyerly, each of whom has submitted multiple declarations in multiple cases, including this one, with sometimes critically varying facts.  That the Secret Service admittedly has not had a uniform practice alone bolsters CREW's need for discovery.  There are other avenues of worthwhile pursuit in discovery.  For example, it is CREW's understanding that both the WAVES and ACR systems are funded completely by DHS, and not out of any White House appropriations.  Clearly this is a relevant fact on the issue of whether those records are agency or presidential records that

could easily be confirmed through discovery.

In sum, a variety of factors highlight the need for discovery here: the government's unilateral efforts to limit and control what facts are made known, including its failure to timely disclose the MOU it entered into in secret as well as the OVP letter; the gaps and inconsistencies in the government's declarations; and the evidence that is known but inaccessible to CREW without discovery.

## **CONCLUSION**

For all of the foregoing reasons, the Court should deny defendants' motion for summary judgment and grant plaintiff an opportunity to pursue discovery.

Respectfully submitted,

_____/s/_____
Anne L. Weismann
(D.C. Bar No. 298190)
Melanie Sloan
(D.C. Bar No. 434584)
Citizens for Responsibility and Ethics
 In Washington
1400 Eye Street, N.W., Suite 450
Washington, D.C.  20005
Phone: (202) 408-5565
Fax: (202) 588-5020

Attorneys for Plaintiff

Dated:  July 11, 2007

33

**EXHIBIT 1**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| THE WASHINGTON POST, <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF HOMELAND SECURITY, <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> )     Civil Action No. 06-1737 (RMU) |

## DECLARATION OF CLAIRE M. O'DONNELL, ASSISTANT TO THE VICE PRESIDENT AND DEPUTY CHIEF OF STAFF, OFFICE OF THE VICE PRESIDENT

I, Claire M. O'Donnell, hereby DECLARE:

    1.    I am, and have been since January 20, 2001, an employee of the Vice President of the United States appointed by the Vice President pursuant to 3 U.S.C. § 106. My title is Assistant to the Vice President and Deputy Chief of Staff. In that capacity, I am responsible for all aspects of the administration and operations of the Office of the Vice President. Within my area of responsibility is the records management policy and operations of the Office of the Vice President.

    2.    This Declaration is based on my personal knowledge and on information available to me in my official capacity.

## THE OFFICE OF THE VICE PRESIDENT

3.      The Vice President performs both executive functions, as recognized by 3 U.S.C.

§ 106, and legislative functions as President of the Senate under the Constitution.  The personnel

employed by, or assigned or detailed to, the Vice President consist of employees paid from the

Vice President's executive appropriations, employees paid from the Vice President's legislative

appropriations, and employees assigned or detailed to the Vice President by executive branch

departments and agencies.  The aggregation of the Vice President and these employees is called

the Office of the Vice President ("OVP").  The personnel in the OVP perform their official

duties at the White House, in the Eisenhower Executive Office Building, at the Vice President's

official residence (*see* 3 U.S.C. § 111 note), and at other locations (including when the Vice

President is traveling).

4.      In the course of conducting activities which relate to or have an effect upon the

carrying out of the constitutional, statutory, or other official or ceremonial duties of the Vice

President with respect to his executive functions, the personnel employed by or assigned or

detailed to the Vice President create or receive records that relate to or have a direct effect upon

the carrying out of those functions.  As provided by 44 U.S.C. § 2207, such records are Vice

Presidential records and the Vice President handles them in accordance with chapter 22 of Title

44.

## RECORDS POLICY OF THE OFFICE OF THE VICE PRESIDENT

5.      From the inception of the Vice Presidency of Richard B. Cheney on January 20,

2001 and after, it was the intent of the OVP, and it was the actual conduct of the OVP, to retain

and not relinquish to anyone control over the records created or received by Vice Presidential

personnel.  The Vice President has resolutely protected Vice Presidential executive records to

2

preserve the effective functioning of the Vice Presidency under the Constitution. Therefore, it is the policy of the OVP to maintain control, consistent with the law, over information, documents and other material relating to the operation of the OVP, so as to preserve the effective functioning of this Office.

6.      This policy of maintaining control applies in particular with respect to the movements, appointments and schedule of the Vice President and Vice Presidential personnel. Systematic public release of the information regarding when and with whom the Vice President and Vice Presidential personnel conduct meetings would impinge on the ability of the OVP to gather information in confidence and perform its essential functions, including assisting the Vice President in his critical roles of advising and assisting the President. The ability of the Vice President to conduct these functions in confidence is critical to the effective functioning of the Presidency and Vice Presidency. If the Vice President or the personnel who perform official duties in the Office of the Vice President must expect public dissemination of with whom they meet to gather information and advice, they would, as a matter of human nature, be chilled from meeting with useful sources of information and advice, and individuals outside of the OVP would be equally chilled in sharing information with the OVP. It was this principle of confidentiality to ensure the effective functioning of the Vice Presidency that the Vice President successfully defended in a similar context in *Cheney v. United States District Court for the District of Columbia*, 542 U.S. 367 (2004), and related cases.

7.      It is the policy of the OVP that documents and materials that relate to Vice Presidential support of Presidential functions are preserved as Vice Presidential executive records in accordance with the Presidential Records Act (44 U.S.C. § 2207). This includes the information that OVP inputs into, and receives as the output of, United States Secret Service-

3

operated systems that facilitate clearance of visitors to the OVP in the White House Complex (by

which I refer to the 18.07 acre area defined as the White House in Public Law 87-286) and to the

Vice President's Residence, and any documents derived from that information.

### RECORDS RELATING TO ACCESS TO THE OFFICE OF THE VICE PRESIDENT AND VICE PRESIDENT'S RESIDENCE

8.      By law, the U.S. Secret Service of the Department of Homeland Security ("Secret

Service") has a duty to protect the Vice President, members of the Vice President's immediate

family, and the Vice President's Residence and other facilities in which the Vice President is

from time to time located (see, e.g., 18 U.S.C. § 3056(a), 18 U.S.C. § 3056A).  It is vitally

important to the United States that Secret Service protect the Vice President so that he can

perform effectively his official functions.

9.      As part of its protective function, the Secret Service provides protective services

for and controls access to (a) the White House Complex, which includes much of the office

space used by the Office of the Vice President, and (b) the Vice President's Residence.

10.     I am generally familiar with the records control systems for the White House

Complex and Vice President's Residence.  When the Vice President or other OVP personnel

want to arrange an appointment for a visitor to the White House Complex, OVP personnel will

input into the Secret Service-operated Worker and Visitor Entrance System ("WAVES"),

identifying information relating to the visitor (such as name, date of birth, and social security

number) and the time and location of the scheduled meeting.  The Secret Service then makes use

of the information to determine whether there is any protective concern with giving that visitor

access to the White House Complex for the meeting.  Once that individual is cleared into the

White House Complex, the visitor is issued an appropriate badge.  Upon swiping that badge on a

badge reader, the visitor's entry is recorded in an Access Control Record by the Secret Service.

11.    In accordance with the policies described above, it has been the understanding and practice of the OVP that the information provided by the OVP to the Secret Service in order to facilitate appointments for the OVP within the White House Complex, and any records generated therefrom that do not relate to the Secret Service's continuing protective function, are under the exclusive legal control of the OVP and are Vice Presidential records under 44 U.S.C. § 2207. This understanding applies to documents generated using the information provided by the OVP to the Secret Service.

12.    Since at least January 20, 2001, it has been the practice of the Secret Service to transfer WAVES records on CD-ROM to the White House Office of Records Management (the "WHORM") every 30 to 60 days.  The WHORM preserves WAVES records relating to OVP meetings and appointments on behalf of the OVP pursuant to a mutual understanding that WHORM will hold and manage OVP records, with legal possession, custody and control of the records remaining with the OVP.  This understanding and practice, dating back at least to January 20, 2001, is that WAVES records remain at all times under the exclusive legal custody and control of the Office of the Vice President for visitors to the Office of the Vice President and are Vice Presidential records for purposes of the Presidential Records Act (44 U.S.C. § 2207).

13.    This understanding and practice is similar with respect to entry records for the Vice President's Residence.  As with WAVES records, when an official or personal visitor to the Vice President's Residence has an appointment, OVP personnel will provide identifying information to the Secret Service (name, date of birth, social security number, date and time of scheduled appointment) in order to facilitate the appropriate clearance process.  As it does with visitors to the White House Complex, Secret Service then makes use of the information to determine whether there is any protective concern with giving that visitor access to the Vice

5

President's Residence.  Once that individual is cleared into the Vice President's Residence, the

entry of the individual into the Residence complex is recorded manually on an entry log kept by

the Secret Service at access control points to the Residence.

14.     OVP provides this identifying information to the Secret Service with the

understanding that the information and any materials derived from it which do not relate to the

Secret Service's ongoing protective function remain in the exclusive ownership, custody and

control of OVP.  In accordance with that practice, starting in June 2001, the Secret Service has

returned to the OVP on a monthly basis (dating back to January 2001) all entry logs kept by the

Secret Service at the Vice President's Residence, showing identity of visitor and time and date of

entry.

15.     The OVP preserves all entry and access control records periodically returned by

the Secret Service to OVP as Vice Presidential executive records under the Presidential Records

Act (44 U.S.C. § 2207).  In the case of WAVES records, those records are kept physically by

WHORM on behalf of OVP.

16.     As is reflected above, the OVP provides information to the Secret Service for

access clearance solely for the limited purpose of Vice Presidential protection, on condition of

confidentiality, and with the information, and records containing it, remaining in the exclusive

ownership, custody and control of the Vice President, all in a manner consistent with the

Presidential Records Act (44 U.S.C. § 2207).

6

I declare under penalty of perjury, pursuant 28 U.S.C. § 1746 that the foregoing is true and correct.   Dated this __13__ day of October 2006.


_Claire M. O'Donnell_
Claire M. O'Donnell

**EXHIBIT 2**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JUDICIAL WATCH, | ) |
| Plaintiff, | ) |
| v. | ) |
| UNITED STATES SECRET SERVICE, | ) |
| Defendant. | ) |

Civil Action No. 06-310 (JGP)

SECOND DECLARATION OF KATHY J. LYERLY
SPECIAL AGENT IN CHARGE, LIAISON DIVISION AND
FREEDOM OF INFORMATION AND PRIVACY ACTS OFFICER,
UNITED STATES SECRET SERVICE

I, Kathy J. Lyerly, hereby make the following declaration:

1.    I am submitting this declaration to supplement and modify my May 16, 2006, declaration regarding the United States Secret Service (Secret Service)'s Worker and Visitor Entrance System ("WAVES") records, based on additional information that has become available to me since that declaration.

2.    In paragraphs 10 and 11 of my May 16, 2006, declaration, I stated: "It has been the longstanding practice of the Secret Service to transfer WAVES records on CD-ROM to the White House every 30 to 60 days. Except as noted in paragraph 11 below, once the Secret Service transferred the WAVES records, the Secret Service ensured that those records were erased from its computer system. In October 2004, at the request of the National Archives and Records Administration, the Secret Service began temporarily retaining its own copy of the

WAVES records that it transferred to the White House. As such, the Secret Service has in its possession WAVES records dating back only to October 2004." Further, I stated in paragraph 13 of my May 16, 2006, declaration that "the Secret Service only has in its possession WAVES records dating from October 2004."

3.    In the course of conducting a Freedom of Information Act (FOIA) search recently regarding a FOIA request not at issue in this litigation, what appeared to be a WAVES record was discovered on the hard drive of a Secret Service computer located in the Information Technology Section of the Secret Service's Presidential Protective Division (PPD). Upon further examination, it appeared that certain WAVES data pre-dating October 2004 existed on the hard drive of that computer and the hard drive of a second computer in the same office.

4.    The Secret Service then assembled a team of independent Secret Service representatives under the direction of the Secret Service's Office of Inspection, and I have been informed of the team's findings to date.

5.    First, the Inspection team reviewed both the first (older) and second (more recent) PPD computers to determine what, if any, WAVES data pre-dating October 2004 were located on those computers, and the location and time periods of any such data. The review process was accomplished by searching each computer's hard drive for WAVES-related information contained within Microsoft Access database files. The review of these Microsoft Access database files revealed that some WAVES data are in fact stored in these files. The team's review revealed that the only place WAVES data were stored was in Microsoft Access database files. Each Microsoft Access database file was opened manually to determine if it contained

2

WAVES-related data. If it did, the team documented the location of the database file on the hard drives as well as the report periods of this data (report periods are based upon time of arrival).

6.    I have been advised that the Inspection team believes that the hard drive of the first computer contains multiple database files of varying degrees of WAVES data that pre-date October 2004. The team believes that the database files contain non-comprehensive WAVES data, with sizeable gaps in the report periods. The team also believes that the hard drive of the second computer contains multiple database files of varying degrees of WAVES data that pre-date October 2004. The team further believes that the database files on this computer contain non-comprehensive WAVES data, with gaps in the report periods. The team believes that the validity of the pre-October 2004 WAVES data found on the hard drives of both computers cannot be assured, because some of the data appear to have been used for testing and development. The team believes the pre-October 2004 data have certain elements of WAVES information. The Inspection team further believes that the pre-October 2004 WAVES data found on the hard drives of the two computers appear to exist in a separate location from the folder where the WAVES CD-ROMs are made.

7.    In addition, the Inspection team located on the hard drives of both computers what appear to be WAVES data beginning in October 2004. The Inspection team has not examined these data in detail, but did search the data when the search of all Microsoft Access database files on both computers' hard drives was conducted as described in paragraph 8.

8.    Second, under the direction of the Inspection team, an automated search was conducted through all Microsoft Access database files on both computers' hard drives for the name Jack Abramoff. An automatic search function was designed, developed, and deployed for

this purpose. The program's search function searched the hard drives for all Microsoft Access database files, and examined each database file for all records containing the name Jack Abramoff. The program created a report of each database file and any data found. The search function was designed to show results in the format that it is currently stored in the database level (raw); a manual review of the search results was also conducted by the team.

9.    I have been advised that the Inspection team has found what appear to be WAVES data containing appointment information for Jack Abramoff. This information would appear to reflect six appointment dates. The Inspection team further found what appear to be additional repeated data entries of WAVES appointment information for Jack Abramoff for these same dates. The WAVES data for one of these dates appear to correspond with the date of one of the two Access Control Record System (ACR) entries/exits previously produced in this case. The Inspection team also found what appear to be two ACR entries/exits reflecting the same dates and times as the records previously produced in this case. In that regard, please see paragraph 14 of my May 16, 2006, declaration. The Inspection team further found what appear to be additional repeated data entries of ACR information for these same dates. The Inspection team believes that it has located all WAVES and ACR data on the two computers with the name Jack Abramoff.

10.    The Inspection team determined that WAVES data are on a server. According to standard procedure, every 30 to 60 days, data from that server are downloaded, along with entry/exit data from ACR records, to the hard drive on one of the PPD computers. This information is then used to create the CD-ROMs referenced in paragraphs 10, 11, and 13 of my May 16, 2006, declaration.

4

11.    In paragraph 10 of my earlier declaration, I stated that "once the Secret Service transferred the WAVES records [to the White House], the Secret Service ensured that those records were erased from its computer system." The Inspection team has found that the WAVES records on the server, older than 60 days, are purged daily and overwritten on the server. The Inspection team also found, however, that some WAVES data downloaded from the server to the two computers' hard drives remain on the hard drives.

12.    I have been advised that the Inspection team's interviews to date of Secret Service employees who were the primary executors of both the WAVES CD-ROMs data transfer process and FOIA requests associated with these records revealed that these executors appear to have followed written download procedures; however, these procedures did not provide guidance on the maintenance of any data left behind in the computers' hard drives. As such, many of the executors were unaware of their existence. The Inspection team's interviews revealed that the individual who currently runs the Information Technology Section of PPD, and his predecessor who served in an interim capacity, did not know that the office computers contained pre-October 2004 WAVES data. Therefore, neither individual had a knowledge or an intent to retain that data.

13.    Attached as Exhibit 2 are copies of what appear to be WAVES data concerning Mr. Abramoff printed from a hard drive of one of the computers by a PPD employee prior to the involvement of the Inspection team. Attached as Exhibit 3 are copies of the WAVES and ACR data concerning Mr. Abramoff found in the search by the Inspection team. Exhibit 3 contains the same information as in Exhibit 2, plus additional information. Attached as Exhibit 4 are three one-page summaries prepared by the Inspection team of the WAVES and ACR data found in the

5

team's search. On one of these pages, the last listing of appointment data has been scratched out.
I have been advised that a member of the Inspection team indicated that he scratched out this
listing because it appeared to be a duplicate of the first listing of appointment data on that same
page. Lastly, attached as Exhibit 5 is a spreadsheet which presents data contained in Exhibit 3 in
a different format. In the interest of protecting Mr. Abramoff's privacy, the Social Security
number and date of birth have been redacted from the documents in all four exhibits. This is the
only information redacted from the data.

14.    In paragraph 16 of my May 16, 2006, declaration, I explained that there are a
variety of reasons why ACR records are not comprehensive as to entries and exits. In that regard,
it is noted that turnstiles are not the only source of protection for the White House Complex.
Prior to being granted entry, visitors must undergo security checks, provide proper identification,
and go through magnetometers as well as other platforms of security.

15.    The information contained in WAVES records is provided to the Secret Service
temporarily for two limited purposes: (a) to allow the Secret Service to perform background
checks to determine whether, and under what conditions, to authorize the visitor's temporary
admittance to the White House Complex; and (b) to allow the Secret Service to verify the
visitor's admissibility at the time of the visit.

16.    Once a visitor's visit to the White House Complex is complete, WAVES and
ACR records have no continuing usefulness to the Secret Service, the Secret Service has no
continuing interest in preserving or retaining them, and the Secret Service does not control or
direct the ultimate disposition or use of the records. The White House does have such a

continuing interest and therefore the records are turned over to the White House Office of

Records Management.

17.    No other documents responsive to plaintiff's FOIA request were found in the

search.

18.    No document located in response to plaintiff's request has been withheld in part

or in whole, except as noted in paragraph 13.


I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing

statements are true and correct to the best of my knowledge and belief.


_____7/7/06_____
Date

Kathy J. Lyerly
Special Agent in Charge, Liaison Division and
Freedom of Information and Privacy Acts Officer
United States Secret Service

**EXHIBIT 3**

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

|  |  |
|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, )<br><br>Plaintiff, )<br><br>v. )<br><br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY, )<br><br>Defendant. ) | Civil Action No. 06-883 (JGP) |
| DEMOCRATIC NATIONAL COMMITTEE, )<br><br>Plaintiff, )<br><br>v. )<br><br>UNITED STATES SECRET SERVICE, )<br><br>Defendant. ) | Civil Action No. 06-842 (JGP) |

## DECLARATION OF KATHY J. LYERLY
### SPECIAL AGENT IN CHARGE, LIAISON DIVISION AND FREEDOM OF INFORMATION AND PRIVACY ACTS OFFICER, UNITED STATES SECRET SERVICE

I, Kathy J. Lyerly, hereby make the following declaration:

1.     I am the Special Agent in Charge of the Liaison Division and the Freedom of

Information and Privacy Acts (FOI/PA) Officer for the United States Secret Service (hereinafter

"Secret Service"), which is a component of the Department of Homeland Security ("DHS").  I

have been the Secret Service FOI/PA Officer since December 28, 2003, and have been employed

with the Secret Service as a Special Agent (GS-1811) since October 26, 1987.

     2.     DHS regulations, Title 6, Code of Federal Regulations, Section 5.4, and Appendix

A, II(I)(3), vest authority in the FOI/PA Officer, Secret Service, to make initial determinations as

to whether to grant Freedom of Information Act (FOIA), 5 U.S.C. § 552, requests for Secret

Service records (68 FR 4056, 4058, and 4069).

     3.     As the Secret Service's FOI/PA Officer, I am familiar with Citizens for

Responsibility and Ethics in Washington's ("CREW's") FOIA request to the Secret Service. At

my request, the Secret Service conducted a search for documents responsive to CREW's request.

That search uncovered 356 pages of responsive records which were redacted (to protect

individuals' privacy and the security of the White House Complex) and, on September 20, 2006,

released. (The White House Complex refers to the White House, the Eisenhower Executive

Office Building ["EEOB"], the secured grounds encompassing the White House and the EEOB,

and the New Executive Office Building.) A description of the correspondence in this matter and

the processing of CREW's FOIA request is set forth below.

     4.     In a letter dated February 2, 2006, and received February 16, 2006, CREW

submitted to the Secret Service, a component of DHS, a FOIA request for "all records relating to

any visit that any and all of the following individuals made to the White House [including any

office, wherever located, in the Executive Office of the President ("EOP")] or the residence of

the Vice President from January 1, 2001, to the present . . . : Jack Abramoff, Michael Scanlon,

Neil Volz, Tony Rudy, Shawn Vassell, Kevin Ring, Edwin Buckham, [and] Patrick Pizzella."

     5.     In a letter dated March 1, 2006, I acknowledged receipt of CREW's

2

FOIA request and advised CREW that a search for records responsive to the request was being
conducted.

6.      There are two interrelated systems – collectively termed the White House Access
Control System – for controlling and monitoring access to the White House Complex:  the
Worker and Visitor Entrance System ("WAVES") and the Access Control Records System
("ACR").  The Vice President's residence is not a part of the White House Complex, and the
Secret Service does not use WAVES or ACR at that site.

7.      ACR records consist of records generated when a pass holder, worker, or visitor
swipes his or her permanent or temporary pass over one of the electronic pass readers located at
entrances to and exits from the White House Complex.  ACR records include information such
as the pass holder's name and badge number, the time and date of the swipe, and the post at
which the swipe was recorded.

8.      WAVES records consist of records generated when information is submitted by a
White House pass holder to the Secret Service about workers and visitors who need access to the
White House Complex to conduct business or attend social events.  WAVES records include the
following information submitted by the pass holder: the visitor's name, date of birth, and Social
Security number; the time and location of the planned visit; the name of the pass holder
submitting the request; and the date of the request.  They may also include limited information
from background checks performed by the Secret Service and coded instructions to Secret
Service officers.  Once a visit takes place, WAVES records are typically updated electronically
with information showing the actual time and place of the visitor's entry into and exit from the
White House Complex.

9.    The Secret Service controls and monitors access to the Vice President's residence through the use of two access lists – a daily access list for individuals with appointments or work orders, and a permanent access list for those individuals who regularly access the facility. The Secret Service receives requests from the Vice President's staff to allow entry for individuals with appointments or work orders at the facility. The Secret Service conducts background checks on individuals for whom there has been a request for admission, and if there is no information of protective interest, the Secret Service places the name on a daily access list. A permanent access list is also maintained listing those individuals who regularly access the facility. All individuals are logged in by the Uniformed Division officer working at the gate where the individual arrives.

10.    In response to CREW's February 2, 2006 FOIA request, the Secret Service has conducted three searches for records. The first two searches were for records of visits to the White House Complex, and the third search was for records of visits to the Vice President's residence. The first search was conducted by the Secret Service's Presidential Protective Division ("the PPD search"). Secret Service employees under the direction of the Secret Service's Office of Inspection performed the second search ("the Inspection team search"). Secret Service Uniformed Division officers assigned to the Vice President's residence conducted searches of visits to the Vice President's residence.

11.    The individuals who performed the PPD search conduct FOIA searches as part of their regular responsibilities. The PPD searched both the ACR records and the WAVES CD-ROMs for any and all records responsive to CREW's February 2, 2006 FOIA request.

4

12.    The PPD searched for ACR records in a searchable database in which ACR
records are stored.  The records are searchable by visitor name.  In this case, the Secret Service
searched the ACR database by searching for records that would have been generated from
January 1, 2001 to the date of the search that had the name Michael Scanlon, Neil Volz, Tony
Rudy, Shawn Vasell/Vassell, Kevin Ring, Edwin Buckham, or Patrick Pizzella in the visitor
field.

13.    It has been the longstanding practice of the Secret Service to transfer WAVES
records on CD-ROM to the White House Office of Records Management every 30 to 60 days.
The intent of the Secret Service was to ensure that, once transferred, the records were erased
from its computer system.  The Secret Service has temporarily retained, in a searchable form on
CD-ROM, WAVES records generated since October 2004; the records can be searched by visitor
name.  In this case, the PPD explored the WAVES CD-ROMs by searching for records that had
the name Michael Scanlon, Neil Volz, Tony Rudy, Shawn Vasell/Vassell, Kevin Ring, Edwin
Buckham, or Patrick Pizzella in the visitor field.  The Secret Service did not save on CD-ROM
WAVES records for the relevant period (i.e., from January 2001 to the date of the search)
generated before October 2004.

14.    PPD ran its initial search in March 2006.  The search results were reviewed, and
several inconsistencies were noted compared to documents produced to the FOI/PA Office by
PPD in response to search requests for other FOIA requests pertaining to some of the same
individuals.  In running an additional search, what appeared to be a WAVES record was
discovered on the hard drive of a Secret Service computer located in the Information Technology
Section of the PPD.  Upon further examination, it appeared that certain WAVES data pre-dating

October 2004 existed on the hard drive of that computer and the hard drive of a second computer in the same office.

15.    The PPD search yielded ACR and WAVES records for Michael Scanlon, Neil Volz, Shawn Vasell, Kevin Ring, and Patrick Pizzella. The PPD search yielded ACR records for Tony Rudy. The PPD search yielded no records for Shawn Vassell (as spelled in the February 2, 2006 CREW FOIA request) or Edwin Buckham.

16.    The Inspection team searched the hard drives of two computers in the Information Technology Section of the PPD for records regarding visits to the White House Complex. The Inspection team was comprised of the following individuals: an Assistant Inspector in the Inspection Division, whose responsibilities include assessing the effectiveness of operations, quality of management and supervision, and adherence to policies, regulations, and procedures within Secret Service offices and divisions; an Assistant to the Special Agent in Charge in the Criminal Investigative Division (CID), who oversees all Information Technology programs for the Office of Investigations; a Special Agent in the CID and member of the Electronic Crimes Special Agent Program, who is a trained computer specialist and whose duties include forensic examination of computers associated with criminal investigations; and an Information Technology Specialist in the Information Resources Management Division, who is a computer specialist skilled in database design and architecture.

17.    I have been advised that the Inspection team believes that the hard drive of the first computer contains multiple database files of varying degrees of WAVES data that pre-date October 2004. The team believes that the database files contain non-comprehensive WAVES data, with sizeable gaps in the report periods. The team also believes that the hard drive of the

6

second computer contains multiple database files of varying degrees of WAVES data that pre-date October 2004. The team further believes that the database files on this computer contain non-comprehensive WAVES data, with gaps in the report periods. The team believes that the validity of the pre-October 2004 WAVES data found on the hard drives of both computers cannot be assured, because some of the data appear to have been used for testing and development. The Inspection team further believes that the pre-October 2004 WAVES data found on the hard drives of the two computers appear to exist in a separate location from the folder where the WAVES CD-ROMs are made.

18.     In addition, the Inspection team located on the hard drives of both computers WAVES data beginning in October 2004. The Inspection team has not examined these data in detail, but did search the data when the search of all Microsoft Access database files on both computers' hard drives was conducted as described in paragraph 21.

19.     The Inspection team determined that WAVES data are on a server. According to standard procedure, every 30 to 60 days, data from that server are downloaded, along with entry/exit data from ACR records, to the hard drive on one of the PPD computers. This information is then used to create the WAVES CD-ROMs.

20.     The Inspection team has found that the WAVES records on the server, older than 60 days, are purged daily and overwritten on the server. The Inspection team also found, however, that some pre-October 2004 WAVES data downloaded from the server to the two computers' hard drives remain on the hard drives.

21.     The Inspection team searched these computers by conducting an automated

7

search through all Microsoft Access database files on both computers' hard drives for the names
Michael Scanlon, Neil Volz, Tony Rudy, Shawn Vasell/Vassell, Kevin Ring, Edwin Buckham,
and Patrick Pizzella. The program's search function searched the hard drives for all Microsoft
Access database files, and examined each database file for all records containing the names
Michael Scanlon, Neil Volz, Tony Rudy, Shawn Vasell/Vassell, Kevin Ring, Edwin Buckham,
or Patrick Pizzella. The program created a report of each database file and any data found.

22.    The Inspection team search yielded data/records regarding entry/exit to the White
House Complex for the following individuals: Michael Scanlon, Neil Volz, Tony Rudy, Shawn
Vasell, Kevin Ring, and Patrick Pizzella. No data/records of entry/exit to the White House
Complex for Edwin Buckham or Shawn Vassell (as spelled in the February 2, 2006 CREW
FOIA request) were discovered by the Inspection team.

23.    Neither the PPD search nor the Inspection team search uncovered any WAVES
or ACR data/records for Edwin Buckham or Shawn Vassell for the relevant time period. Both
searches did reveal data/records for Shawn Vasell. Also, the Secret Service released to CREW,
on May 10, 2006 and July 7, 2006, its WAVES and ACR data/records concerning Jack
Abramoff. I have signed two declarations filed in <u>Judicial Watch v. United States Secret Service</u>,
Civil Action No. 06-310, describing that search.

24.    CREW's February 2, 2006 FOIA request asks for records of visits of certain
individuals to the Executive Office of the President ("EOP") whether the visits took place at the
White House Complex or elsewhere. There are some EOP offices located outside of the White
House Complex, but the Secret Service does not maintain or operate access systems at these
sites.

25.    The information in WAVES records submitted by a White House pass holder is provided to the Secret Service temporarily for two limited purposes: (1) to allow the Secret Service to perform background checks to determine whether, and under what conditions, to authorize the visitor's temporary admittance to the White House Complex; and (2) to allow the Secret Service to verify the visitor's admissibility at the time of the visit.

26.    Once a visitor's visit to the White House Complex is complete, WAVES and ACR records have no continuing usefulness to the Secret Service, the Secret Service has no continuing interest in preserving or retaining them -- indeed, prior to the temporary WAVES-retention practice begun in October 2004, the Secret Service's intent was to retain WAVES records only long enough to effectuate their orderly transfer to the White House – and the Secret Service does not control or direct the ultimate disposition or use of the records. The White House does have such a continuing interest and therefore the records are turned over to the White House Office of Records Management.

27.    To search for potentially responsive records regarding the Vice President's residence, Secret Service Uniformed Division officers assigned to the Vice President's residence completed three separate computer-based searches and one hand search. First, the file server utilized by the Secret Service command post at the Vice President's residence was searched. This search was done by entering some portion of the requested names at issue and then allowing the system's search feature to run. A portion of the name, rather than the name in its entirety, was used to ensure that spellings close to the spelling provided by the requestor would be captured. Because of the breadth of the records contained on the file server, each name took approximately eight to nine hours to complete. Second, a search was run in Microsoft Outlook

9

on the three computers in the command post for email records potentially responsive to each

request. These searches captured any reference to the requested name in the email subject line

and the body of the email. For any email with an attachment, the attachment was opened and

searched separately. The hard drives of these computers were also searched to determine

whether any emails had been saved as separate documents onto the hard drives. Third, the access

list database system that generates the daily and permanent access lists used at the gates was

searched. This system is housed on the file server, and this third check was done in an effort to

verify the results of the search of the file server. The access database was checked by opening up

the basic tables it contains, sorting alphabetically by last name and then checking the sorted list

against the request. Additionally, the entry logs were searched by hand.

28.    Potentially responsive data then available on the computer system and all entry

logs in the possession of the Secret Service were searched. No responsive records were found.

29.    Prior to producing documents to CREW, the Secret Service redacted information

from WAVES data/records to protect the privacy of individuals visiting the White House

Complex and the security of the Complex. To protect the individuals' privacy, the Secret Service

redacted their dates of birth and Social Security numbers from the WAVES data/records. And to

protect the security of the Complex, the Secret Service redacted, from WAVES data/records,

limited information from background checks performed by the Secret Service and coded

instructions to Secret Service officers who work in the Complex.

30.    Entries for Michael Scanlon were also redacted when information in the

documents demonstrated that the entries did not refer to the Michael Scanlon referred to in

CREW's request.

10

31.    With the exception of the redactions noted in paragraphs 29 and 30, no document

responsive to CREW's February 2, 2006 FOIA request has been withheld in part or in whole.

32.    On September 20, 2006, all documents responsive to CREW's February 2,

2006 FOIA request with the redactions noted were produced to CREW.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing

statements are true and correct to the best of my knowledge and belief.


_9-21-06_
Date

_Kathy J. Lyerly_
Kathy J. Lyerly
Special Agent in Charge, Liaison Division and
Freedom of Information and Privacy Acts Officer
United States Secret Service

11

**EXHIBIT 4**

# REQUEST FOR RECORDS DISPOSITION AUTHORITY
### (See Instructions on reverse)

TO: NATIONAL ARCHIVES and RECORDS ADMINISTRATION (NIR)
WASHINGTON, DC 20408

1. FROM (Agency or establishment)

Department of the Treasury

2. MAJOR SUBDIVISION

United States Secret Service

3. MINOR SUBDIVISION

Management & Organization Division

| 4. NAME OF PERSON WITH WHOM TO CONFER | 5. TELEPHONE |
|---|---|
| Ann Parker | (202) 435-7013 |

LEAVE BLANK (NARA use only)

JOB NUMBER

N1-087-93-03

DATE RECEIVED

MAR 2 8 1996

NOTIFICATION TO AGENCY

In accordance with the provisions of 44 U.S.C. 3303a the disposition request, including amendments, is approved except for items that may be marked "disposition not approved" or "withdrawn" in column 10.

DATE 9-23-02   ARCHIVIST OF THE UNITED STATES   WITHDRAWN

6. AGENCY CERTIFICATION

I hereby certify that I am authorized to act for this agency in matters pertaining to the disposition of its records and that the records proposed for disposal on the attached __2__ page(s) are not now needed for the business of this agency or will not be needed after the retention periods specified; and that written concurrence from the General Accounting Office, under the provisions of Title 8 of the GAO Manual for Guidance of Federal Agencies,

[X] is not required;   [ ] is attached; or   [ ] has been requested.

| DATE 3/26/96 | SIGNATURE OF AGENCY REPRESENTATIVE | TITLE Pars/Branch Chief |
|---|---|---|

| 7. ITEM NO. | 8. DESCRIPTION OF ITEM AND PROPOSED DISPOSITION | 9. GRS OR SUPERSEDED JOB CITATION | 10. ACTION TAKEN (NARA USE ONLY) |
|---|---|---|---|
| | WHITE HOUSE DIVISION'S WHITE HOUSE COMPLEX (WAVES) RECORDS DISPOSITION SCHEDULE | NC1-87-76-3 #18 | |
| | This schedule covers U. S. Secret Service official files generated by the Workers and Visitors Entrance System (WAVES) maintained by the White House Division under the jurisdiction of the Assistant Director, Office of Protective Operations. | | |
| | The Secret Service protects the President and Vice President of the United States and their immediate families, the White House and grounds, and any building in which Presidential offices are located; the Treasury Building and grounds; the temporary official residence of the Vice President and grounds in the District of Columbia; foreign diplomatic missions in the United States, its territories and possessions as specified in Title 3, Section 202, of the United States Code. | | |

10/24/2008 14:56 FAX 2024370293          NARA GENERAL COUNSEL          ☐007

Case 1:06-cv-01912-RCL     Document 35-3     Filed 07/11/2007     Page 3 of 14
Case 1:06-cv-01912-RBW     Document 42     Filed 02/15/2007     Page 35 of 46

1.        Worker and Visitors (Appointments) Entrance System Files (WAVES)

Consists of workers and visitors lists, request for appointments, expired work orders, agency reports, movement logs, WAVES printouts and tapes. Records pertain to appointments for workers, tradesmen, and visitors cleared for official access into the White House Complex by the Secret Service. Documents are used for protective security purposes.

    a.    Paper Records.

        1.    WAVES Monthly Printout.

            PERMANENT.   Break file monthly and transfer to White House Office of Records Management. Maintain in the White House Office of Records Management for the duration of each presidential administration. Transfer to the National Archives at the conclusion of each presidential administration in accordance with 36 CFR 1228.188.

        2.    All other paper records.

            Destroy when no longer needed.

    b.    WAVES Database.

        1.    Data downloaded from other law enforcement databases used for checking entrants to the White House complex.

            Delete prior to copying records to tape.

        2.    All other data elements.

            Copy to tape at the conclusion of each month. Delete on-line version when copying is completed.

        3.    Monthly Tapes.

            a.    Tape copy of BADHIST, HITS, LARGEREQ, NAME and VAREQ tables.

                Permanent. Break file monthly and transfer to White House Office of Records Management. Maintain in the White House Office of Records Management for the duration of each presidential administration. Transfer to the National Archives at the conclusion of each presidential administration in accordance with 1228.188.

10/24/2008 4:46 FAX 2022270283        ARA: GENERAL COUNSEL

Case 1:06-cv-01912-RCL    Document 35-3    Filed 07/11/2007    Page 4 of 14    ⌐008
Case 1:06-cv-01912-RBW    Document 12    Filed 02/15/2007    Page 36 of 46

b. Tape copies of all other tables.

Destroy when no longer needed.

c. Associated system documentation.

Permanent. Transfer to the National Archives with related records.

2.    Workers and Visitors (Appointments) Entrance System Files (WAVES) - Treasury Building

Records pertain to appointments for workers, tradesmen, and visitors cleared for official access into the Treasury Building by the Secret Service.

a.    Paper Records.

(1).        WAVES Monthly Printout

Destroy printout at the end of each month.

b.    WAVES Database.

(1)        Monthly Tapes.

Destroy when no longer needed, not to exceed one year.

Case 1:06-cv-01912-RCL     Document 35-3     Filed 07/11/2007     Page 5 of 14

# REQUEST FOR RECORDS DISPOSITION AUTHORITY

(See Instructions on reverse)

LEAVE BLANK (NARA use only)

TO: NATIONAL ARCHIVES and RECORDS ADMINISTRATION (NIR)
WASHINGTON, DC 20408

**JOB NUMBER**
N1-87-93-3

**DATE RECEIVED**
FEB 9 1993

FROM (Agency or establishment)

Department of the Treasury

**NOTIFICATION TO AGENCY**

2. MAJOR SUBDIVISION

United States Secret Service

In accordance with the provisions of 44 U.S.C. 3303a the disposition request, including amendments, is approved except for items that may be marked "disposition not approved" or "withdrawn" in column 10.

3. MINOR SUBDIVISION

Management & Organization Division

4. NAME OF PERSON WITH WHOM TO CONFER

Ann Parker

5. TELEPHONE

(202) 435-7013

DATE | ARCHIVIST OF THE UNITED STATES

6. AGENCY CERTIFICATION

I hereby certify that I am authorized to act for this agency in matters pertaining to the disposition of its records and that the records proposed for disposal on the attached __2__ page(s) are not now needed for the business of this agency or will not be needed after the retention periods specified; and that written concurrence from the General Accounting Office, under the provisions of Title 8 of the GAO Manual for Guidance of Federal Agencies,

[X] is not required;  [ ] is attached; or  [ ] has been requested.

DATE
2/4/93

SIGNATURE OF AGENCY REPRESENTATIVE

TITLE
Chief - Management & Organization Division

| 7. ITEM NO. | 8. DESCRIPTION OF ITEM AND PROPOSED DISPOSITION | 9. GRS OR SUPERSEDED JOB CITATION | 10. ACTION TAKEN (NARA USE ONLY) |
|---|---|---|---|
| | UNIFORMED DIVISION'S WHITE HOUSE COMPLEX (WAVES) RECORDS DISPOSITION SCHEDULE | NC1-87-76-3 #18 | |

This schedule covers U. S. Secret Service official files generated by the Workers and Visitors Entrance System (WAVES) maintained by the Uniformed Division under the jurisdiction of the Assistant Director, Office of Protective Operations.

The Uniformed Division protects the President and Vice President of the United States and their immediate families, the White House and grounds, and any building in which Presidential offices are located; the Treasury Building and grounds; the temporary official residence of the Vice President and grounds in the District of Columbia; foreign diplomatic missions in the United States, its territories and possessions as specified in Title 3, Section 202, of the United States Code.

Worker and Visitors (Appointments) Entrance System Files (WAVES)

Consists of workers and visitors lists, request for appoints, expired work orders, agency reports, movement logs, WAVES printouts and tapes. Records pertain to appointments for workers, tradesmen, and visitors cleared for official access into the White House Complex by the Secret Service. Documents are used for protective security purposes.

| REQUEST FOR RECORDS DISPOSITION AUTHORITY — CONTINUATION | JOB NUMBER | PAGE 2 OF 2 |
|---|---|---|

| 7. ITEM | 8. DESCRIPTION OF ITEM AND PROPOSED DISPOSITION | 9. GRS OR SUPERSEDED JOB CITATION | 10. ACTION TAKEN (NARA USE ONLY) |
|---|---|---|---|

a.  Paper Records.

    1.  WAVES monthly printout.

    Transfer to the White House Office of Records Management at the end of the month.

b.  WAVES Database.

    1.  Data downloaded from other law enforcement databases used for checking entrants to White House complex.

    Delete prior to copying records to tape.

    2.  All other data elements.

    Copy to tape monthly.  Delete on-line version when copying is completed.

    3.  Monthly Tapes.

    Transfer to White House Office of Records Management.

Two copies, including original, to be submitted to the National Archives and Records Administration.

STANDARD FORM 115-A (REV. 3-91)
Prescribed by NARA

| REQUEST FOR RECORDS DISPOSITION AUTHORITY — CONTINUATION | JOB NUMBER | PAGE 2 OF 2 |
|---|---|---|

| 7. ITEM NO. | 8. DESCRIPTION OF ITEM AND PROPOSED DISPOSITION | 9. GRS OR SUPERSEDED JOB CITATION | 10. ACTION TAKEN (NARA USE ONLY) |
|---|---|---|---|

a. Paper Records.

   1. WAVES Monthly Printout.

   Disposition: Transfer to the White House Office of Records Management at the end of the month.

b. WAVES Database.

   1. Data downloaded from other law enforcement databases used for checking entrants to the White House complex.

   Disposition: Delete prior to copying records to tape.

   2. All other data elements.

   Disposition: Copy to tape monthly. Delete on-line version when copying is completed.

   3. Monthly Tapes.

   Disposition: Transfer to White House Office of Records Management.

2.   Workers and Visitors (Appointments) Entrance System Files (WAVES) - Treasury Building

Records pertain to appointments for workers, tradesmen, and visitors cleared for official access into the Treasury Building by the Secret Service.

a. Paper Records.

   (1). WAVES Monthly Printout.

   Disposition: Destroy printout at the end of each month.

b. WAVES Database.

   (1) Monthly Tapes.

   Disposition: Destroy when 6 months old.

Two copies, including original, to be submitted to the National Archives and Records Administration.

STANDARD FORM 115-A (REV. 3-91)
Prescribed by NARA

SEP 10 1998

| REQUEST FOR RECORDS DISPOSITION AUTHORITY<br>(See Instructions on reverse) | LEAVE BLANK |
|---|---|
| | JOB NO. $NI-87-90-1$ |
| TO: GENERAL SERVICES ADMINISTRATION<br>NATIONAL ARCHIVES AND RECORDS SERVICE, WASHINGTON, DC 20408 | DATE RECEIVED $1/22/90$ |

| 1. FROM (Agency or establishment)<br>Department of the Treasury | NOTIFICATION TO AGENCY |
|---|---|
| 2. MAJOR SUBDIVISION<br>United States Secret Service | In accordance with the provisions of 44 U.S.C. 3303a the disposal request, including amendments, is approved except for items that may be marked "disposition not approved" or "withdrawn" in column 10. If no records are proposed for disposal, the signature of the Archivist is not required. |
| 3. MINOR SUBDIVISION<br>Management & Organization Division | |

| 4. NAME OF PERSON WITH WHOM TO CONFER<br>Darnelle M. Speed<br>Management Analyst | 5. TELEPHONE EXT.<br>535-6046 | DATE<br>6-20-91 | ARCHIVIST OF THE UNITED STATES<br><br>WITHDRAWN |
|---|---|---|---|

6. CERTIFICATE OF AGENCY REPRESENTATIVE

I hereby certify that I am authorized to act for this agency in matters pertaining to the disposal of the agency's records; that the records proposed for disposal in this Request of ____3____ page(s) are not now needed for the business of this agency or will not be needed after the retention periods specified; and that written concurrence from the General Accounting Office, if required under the provisions of Title 8 of the GAO Manual for Guidance of Federal Agencies, is attached.

A. GAO concurrence: ☐ is attached; or ☒ is unnecessary.

| B. DATE | C. SIGNATURE OF AGENCY REPRESENTATIVE<br>W. E. Keefe Jr. | D. TITLE<br>Chief - Management & Organization Division |
|---|---|---|

| 7. ITEM NO. | 8. DESCRIPTION OF ITEM<br>(With Inclusive Dates or Retention Periods) | 9. GRS OR SUPERSEDED JOB CITATION | 10. ACTION TAKEN (NARS USE ONLY) |
|---|---|---|---|
| | WHITE HOUSE COMPLEX RECORDS DISPOSITION SCHEDULE<br>(UNIFORMED DIVISION) (WAVES)<br><br>Records have been given previous disposition authorization under NARA Job No. NC-1-87-76-3, item #18. It has been determined that certain records can be more properly scheduled and, therefore, it is necessary to break out individual series from the general description for a more efficient disposition and essentially treat them as new series.<br><br>This schedule covers U. S. Secret Service official files generated by Uniformed Division and maintained under the jurisdiction of the Assistant Director, Office of Protective Operations. | | WITHDRAWN |

| REQUEST FOR RECORDS DISPOSITION AUTHORITY — CONTINUATION | JOB NO. | PAGE OF |
|---|---|---|
| 7. ITEM NO. | 8. DESCRIPTION OF ITEM (With Inclusive Dates or Retention Periods) | 9. GRS OR SUPERSEDED JOB CITATION | 10. ACTION TAKEN (NARS USE ONLY) |

The Uniformed Division protects the President and Vice President of the United States and their immediate families, the White House and grounds, and any building in which Presidential offices are located; the Treasury Building and grounds; the temporary official residence of the Vice President and grounds in the District of Columbia; foreign diplomatic missions in the United States, its territories and possessions as specified in Title 3, Section 202, of the United States Code.

WHITE HOUSE COMPLEX RECORDS DISPOSITION SCHEDULE (UNIFORMED DIVISION) (WAVES)

DESCRIPTION OF RECORD                    AUTHORIZED DISPOSITION

1.   Workers and visitors
     (Appointments) Entrance System
     Files (WAVES).  Consist of
     workers and visitors lists,
     requests for appointments,
     expired work orders, agency
     reports, movement logs, WAVES
     printouts and tapes.  Records
     pertain to appointments for
     workers, tradesman, and visitors
     cleared for official access into
     the White House Complex by Secret
     Service.  Documents are used for
     protective security purposes.
     (Broken out from NC1-87-76-3,
     #18.  Recommends new description
     and disposition instruction).

     a.   Paper records                  Cut off at the end of each month
                                         and transfer to legal custody of
                                         Presidential Records, the White
                                         House.  These records are
                                         transferred to the Presidential
                                         Libraries (NARA) at the end of
                                         the President's term.

     b.   Waves Computer Tapes.          Cut off at the end of each month
          Consists of workers and        and recycle tape locally.
          visitors data collectively
          entered into the WAVES
          computer system.  A printout
          summary of monthly data is
          provided to the White House
          Records Office at the end of
          each month.

3

## REQUEST FOR RECORDS DISPOSITION AUTHORITY
### (See Instructions on reverse)

LEAVE BLANK

JOB NO. **N1-87-90-2**

TO: GENERAL SERVICES ADMINISTRATION
NATIONAL ARCHIVES AND RECORDS SERVICE, WASHINGTON, DC 20408

DATE RECEIVED **2-22-90**

**1. FROM (Agency or establishment)**

Department of the Treasury

**2. MAJOR SUBDIVISION**

United States Secret Service

**3. MINOR SUBDIVISION**

Management & Organization Division

**4. NAME OF PERSON WITH WHOM TO CONFER**

Darnelle M. Sneed
Management Analyst

**5. TELEPHONE EXT.** 535-6046

**DATE** 6-20-91

NOTIFICATION TO AGENCY

In accordance with the provisions of 44 U.S.C. 3303a the disposal request, including amendments, is approved except for items that may be marked "disposition not approved" or "withdrawn" in column 10. If no records are proposed for disposal, the signature of the Archivist is not required.

ARCHIVIST OF THE UNITED STATES

WITHDRAWN

**6. CERTIFICATE OF AGENCY REPRESENTATIVE**

I hereby certify that I am authorized to act for this agency in matters pertaining to the disposal of the agency's records; that the records proposed for disposal in this Request of ____4____ page(s) are not now needed for the business of this agency or will not be needed after the retention periods specified; and that written concurrence from the General Accounting Office, if required under the provisions of Title 8 of the GAO Manual for Guidance of Federal Agencies, is attached.

A. GAO concurrence: ☐ is attached; or ☐ is unnecessary.

**B. DATE**

**C. SIGNATURE OF AGENCY REPRESENTATIVE**

W. R. Hefe, Jr.

**D. TITLE**

Chief
Management & Organization Division

| 7. ITEM NO. | 8. DESCRIPTION OF ITEM (With Inclusive Dates or Retention Periods) | 9. GRS OR SUPERSEDED JOB CITATION | 10. ACTION TAKEN (NARS USE ONLY) |
|---|---|---|---|
| | **WHITE HOUSE COMPLEX RECORDS DISPOSITION SCHEDULE (UNIFORMED DIVISION) (WAVES)** | | WITHDRAWN |
| | Records have been given previous disposition authorization under NARA Job No. NC-1-87-76-3, item #18 and 19. It has been determined that certain records can be more properly scheduled and, therefore, it is necessary to break out individual series from the general description for a more efficient disposition and essentially treat them as new series. | | |
| | This schedule covers U. S. Secret Service official files generated by Uniformed Division and maintained under the jurisdiction of the Assistant Director, Office of Protective Operations. | | |

115-108

| 7. ITEM NO. | 8. DESCRIPTION OF ITEM *(With Inclusive Dates or Retention Periods)* | 9. GRS OR SUPERSEDED JOB CITATION | 10. ACTION TAKEN *(NARS USE ONLY)* |
|---|---|---|---|

**REQUEST FOR RECORDS DISPOSITION AUTHORITY — CONTINUATION**   JOB NO.   PAGE   OF

The Uniformed Division protects the President and Vice President of the United States and their immediate families, the White House and grounds, and any building in which Presidential offices are located; the Treasury Building and grounds; the temporary official residence of the Vice President and grounds in the District of Columbia; foreign diplomatic missions in the United States, its territories and possessions as specified in Title 3, Section 202, of the United States Code.

)                                    )

1.  Appointment and Security Control Logs.  Control and accountability
    logs pertaining to appointments at the White House Complex, New
    Executive Office Building, Vice President's residence and other
    facilities designated for Secret Service protective security.
    (Broken out from NC-1-87-76-3, #18.  Recommends new description and
    shorter disposition standards).

    a.   Individual Name Check Logs       Cut off at the end of each month
         for Vice President's             and destroy.
         Residence and New Executive
         Offices Building

    b.   After Hours Arrival and          Cut off at the end of each month
         Departure Logs Note: Record      and immediately destroy.
         series closed March 1989.

    c.   Cruiser Activity Reports         Cut off at the end of each month
                                          and immediately destroy.

    d.   Key Logs                         Cut off at the end of each month
                                          and destroy when 6 months old.

    e.   K-5 Delivery Logs                Cut off at the end of each
                                          month.  Destroy when one year
                                          old.

2.  Alarm Logs.  Printouts of alarms      Cut off monthly and forward to
    installed in facilities               Uniformed Division Central
    designated for Secret Service         Files.  Destroy 3 years after
    protective security.  Records         the end of the current
    reflect location, date, time,         administration.
    room, type of alarm, individual
    who accessed area or who secured
    alarm, etc.

3

3. Special Events Logs. Record book of events occurring at the White House Complex, e.g., the President's movements into or out of the White House grounds, helicopter landings, receptions, press conferences, or other special residence or grounds activities. Information reflects date, time and location of event.

Cut off at the end of the calendar year. Destroy when 3 years old.

Note: Record series closed in 1988 since the same information is reported under a newly revised schedule.

4. Picket Report File. Records of picket activity which has been authorized to take place in front of the White House. Record reflects activity and number of individuals authorized, arrival and departure times, permit number and related information. (Broken out from NC-1-87-76-3, #19. Recommends a new description and retention standard).

Cut off at the end of the month. Retire to custody of Uniformed Division Central Files. Destroy when 3 years old.

5. Deputy Chief's Uniformed Division White House Branch File. Contains mixture of duplicate copies as well as originals of internal and external correspondence, memoranda and reports pertaining to Secret Service, Uniformed Division, and White House Branch activities.

Cut off at the end of the calendar year. Retire to custody of Uniformed Division Central Files when 2 years old. Review and destroy when 3 years old.

# EXHIBIT 5

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| THE WASHINGTON POST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action No. 06-1737 (RMU) |
| UNITED STATES DEPARTMENT OF | ) | |
| HOMELAND SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

### DECLARATION OF PAUL S. MORRISSEY
### DEPUTY ASSISTANT DIRECTOR
### UNITED STATES SECRET SERVICE

I, Paul S. Morrissey, hereby make the following declaration:

1.  I am the Deputy Assistant Director of the Office of Protective Operations for the United States Secret Service (hereinafter "Secret Service"), which is a component of the Department of Homeland Security ("DHS"). I have held this position since September, 2006, and have been a special agent with the Secret Service since January, 1983.

2.  The Secret Service is a protective and law enforcement agency operating under the provisions of Title 18 of the United States Code, Sections 3056 and 3056A. Pursuant to Section 3056, the Secret Service is charged with the protection of the President and Vice President of the United States and their immediate families; major candidates for President and Vice President of the United States and their spouses; the President-elect and Vice President-elect and their immediate families; former Presidents of the United States, their spouses and

minor children; visiting foreign heads of state and heads of government; and other individuals as

directed by the President of the United States.  Additionally, the Secret Service is authorized to

provide security for the White House and the Vice President's official residence; foreign

embassies and missions in the Washington, D.C. area, and certain other locations within the

United States; designated events of national significance, including National Special Security

Events; as well as other locations.

3.      The Office of Protective Operations is one of eight directorates that manage

various operational and support functions within the Secret Service.  It is responsible for

establishing policies related to the Secret Service's protective mission and for overseeing the

operational divisions that protect the persons, places and events we are authorized by statute and

Executive Order to protect.

4.      The "White House Complex" as secured by the Secret Service includes the White

House, the Eisenhower Executive Office Building ("EEOB"), and the grounds encompassing the

EEOB and the White House, and the New Executive Office Building.  Housed in the White

House and the EEOB are the offices of various staff of the Executive Office of the President as

well as offices for the staff of the Office of the Vice President, including the Executive Branch

office of the Vice President himself.   The secured area of the White House Complex also

includes all of the office space used by the Office of the Vice President on the White House

Complex.

5.      It is my understanding that there has been a request by the Washington Post for

information concerning visitor access to the Office of the Vice President, including Access

Control Records ("ACR") and Worker and Visitor Entrance System ("WAVES") records.  These

2

same systems are used in connection with the monitoring of access of visitors to the White House

Complex, including the Executive Office of the President and the Office of the Vice President.

6.      ACR records consist of records generated when a pass holder, worker, or visitor

swipes his or her pass over one of the electronic pass readers located at entrances to and exits

from the White House Complex.  ACR records include information such as the pass holder's

name and badge number, the time and date of the swipe, and the post at which the swipe was

recorded.  ACR records do not include information about who the entrant is visiting in the

Complex.

7.      WAVES records consist of records generated when information is submitted by

an authorized White House pass holder to the Secret Service about workers and visitors who

need access to the White House Complex to perform work, conduct business, or attend events.

Authorized White House pass holders include members of both the President's and Vice

President's staff.  WAVES records include the following information submitted by the

authorized pass holder: the visitor's name, date of birth, and Social Security number; the time

and location of the planned visit; the name of the pass holder submitting the request; and the date

of the request.  They may also include limited information from background checks performed by

the Secret Service and coded instructions to Secret Service officers.  Once a visit takes place,

WAVES records are typically updated electronically with information showing the actual time

and place of the visitor's entry into and exit from the White House Complex.

8.      Since at least 2001, it has been the practice of the Secret Service to transfer newly-

generated WAVES records on CD-ROM to the White House Office of Records Management (the

"WHORM") every 30 to 60 days.  It was the intent of the Secret Service that once transferred to

the WHORM, the records were to be erased from its computer system. With regard to the time period at issue in the Washington Post's request (October 2004 to present), in October 2004, at the request of the National Archives and Records Administration, the Secret Service began temporarily retaining a copy of the WAVES records that it transferred to the WHORM.

9.      The information in WAVES records submitted by an authorized White House pass holder is provided to the Secret Service temporarily for two limited purposes: (1) to allow the Secret Service to perform background checks to determine whether, and under what conditions, to provide for the visitor's temporary admittance to the White House Complex; and (2) to allow the Secret Service to verify the visitor's admissibility at the time of the visit.

10.      Once a visitor's visit to the White House Complex is complete, the Secret Service has no continuing interest sufficient to justify preservation or retention of WAVES records, and the Secret Service does not control or direct the ultimate disposition or use of the records. Both the White House and the Office of the Vice President, respectively, do have such a continuing interest and therefore the records are turned over to the WHORM.

11.      The Vice President's residence, located at One Observatory Circle, Washington, D.C., is not part of the White House Complex, and the Secret Service does not use the WAVES or ACR systems at that site. The Secret Service provides security for the Vice President at the Vice President's residence. The Secret Service monitors and controls access to the Vice President's residence through the use of two lists: a daily access roster for individuals with appointments or work orders, and a permanent access list for those individuals who regularly come to the residence such as OVP staff members, contractors, military personnel, and the Vice President's family members. The Secret Service receives requests from the Vice President's staff

4

or from authorized Naval personnel to screen individuals for entry. The Secret Service conducts

background checks on individuals for whom there has been a request for admission (using

personal identifiers provided by the requester, including name, date of birth and Social Security

number), and the name then appears on the daily access roster or the permanent access list. Both

the permanent access list and the daily access roster are provided to Secret Service officers at

entrances to the residence's grounds and reflect that the individual requested for entry has been

screened by the Secret Service. The names of individuals who actually enter on a particular day

are handwritten on an entry log by the officer working at the gate where the individual arrives.

The entry log is the ultimate record created from the initial request for entry.

      12.    It has been the Secret Service's consistent practice to transfer the entry logs to the

OVP on a monthly basis since 2001. Information contained in the daily access list database,

which generates the daily access roster, has been maintained by the Secret Service in electronic

form for thirty (30) calendar days. Historically, on the thirty-first (31st) day, this daily access

information was manually purged from the computer on which it was stored. Similarly, the

Secret Service disposed of the daily access roster on a daily basis. The permanent access list has

been maintained on a computer database on an ongoing basis and updated to reflect changes in

authorized personnel. On June 19, 2006, the Secret Service issued a memorandum directing that

records concerning access to the Vice President's residence be maintained. The records were to

be maintained pending a judicial determination of their status.

      13.    It is the understanding between the Secret Service and the OVP that the OVP

exercises exclusive control over materials generated in the visitor clearance and entry process to

the residence for the OVP, other than materials containing information of protective interest to the Secret Service, such as NCIC criminal history check results. The Secret Service has no continuing interest sufficient to justify preservation or retention of the daily access list data, permanent access lists, daily access rosters, and post entry logs.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing statements are true and correct to the best of my knowledge and belief.

_10/13/06_
Date

Paul S. Morrissey
Deputy Assistant Director
Office of Protective Operations
United States Secret Service

**EXHIBIT 6**

## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

THE WASHINGTON POST,                    )
                                        )
          Plaintiff,                    )          Civil Action No. 06-1737 (RMU)
                                        )
               v.                       )
                                        )
UNITED STATES DEPARTMENT OF             )
HOMELAND SECURITY                       )
                                        )
                                        )
                                        )
                                        )

## SUPPLEMENTAL DECLARATION OF CLAIRE M. O'DONNELL

I, Claire M. O'Donnell, hereby DECLARE:

1.      I am, and have been since January 20, 2001, an employee of the Vice President of the

United States, appointed by the Vice President pursuant to Section 106 of title 3 of the United

States Code. My title is Assistant to the Vice President and Deputy Chief of Staff. In this

capacity, I am responsible for all aspects of the administration and operations of the Office of the

Vice President ("OVP"). I previously submitted a declaration in the above-captioned case dated

October 13, 2006.

2.      This declaration is based on my personal knowledge and on information made

available to me in my official capacity.

3.      The number of personnel who work for the Vice President is quite small, especially in

comparison to the number of personnel in the Executive Office of the President or in executive

branch departments and agencies. The personnel employed by, assigned to, or detailed to the

Vice President consist of employees of the Vice President paid from the Vice President's

executive appropriations, employees of the Vice President paid from the Vice President's

legislative appropriations, and employees assigned or detailed to the Vice President by executive

branch departments and agencies, and number ninety-two (92) in all. All these personnel are

under the supervision and control of the Vice President and are not under the supervision or

control of any other officer, department, agency or entity of the United States Government. The

aggregation of the Vice President and these personnel is called the Office of the Vice President

(OVP).

4.      The Vice President relies in significant part on OVP personnel for support in the

performance of his official functions. These personnel provide support to the Vice President on

matters of domestic policy, national security, homeland security, legislative affairs,

communications, scheduling, advance, military matters, continuity of government and protective

matters, administration, legal matters, and other official matters as appropriate. The range of

duties they perform extends from providing policy advice to the Vice President to driving motor

pool vehicles. These duties include meeting at the White House Complex, or at the Vice

President's Residence, with individuals from outside OVP to gather information and advice for

the purpose of assisting the Vice President in formulating advice for the President and other

purposes.

5.      Under Public Law 93-346, as amended (3 U.S.C. § 111 note), the Government

furnishes an official residence for use by the Vice President for official functions and as a home.

The law authorizes adequate staffing for the residence, including both civilian staffing and

military staffing, subject to the supervision and control of the Vice President. The staff for the

residence ensures proper care and maintenance for the facilities, assists with performance of

official functions at the residence, such as hosting visiting foreign dignitaries, and assists in

2

ensuring that it operates properly as a home.  The staff assigned to the residence – who are under

the supervision and control of the Vice President – consists of one Department of the Navy

civilian employee serving as residence manager and social secretary, one employee of the Vice

President serving as deputy residence manager, and a number of naval enlisted aides who staff

the day-to-day functioning of the residence.  The staff assigned to the residence is included in the

overall number of OVP personnel given in paragraph 3 above.

6.      In paragraphs 10 and 13 of my Declaration of October 13, 2006 filed in this case, I

described the access control systems for the White House Complex and the Vice President's

Residence, and different kinds of records that are generated when OVP personnel make

arrangements with the U.S. Secret Service to provide visitors access to the White House

Complex or the Vice President's Residence.  In paragraphs 11, 12, and 13 of my Declaration of

October 13, 2006 filed in this case, I also explained that, at least since January 20, 2001, such

records have remained at all times under the legal custody and control of the Office of the Vice

President under the Presidential Records Act, section 2207 of title 44 of the United States Code.

Unlike the Secret Service, which merely uses the visitor-identifying information provided by

OVP personnel for the very temporary and limited purpose of determining whether admission of

a particular visitor would pose a risk to the safety of the Vice President or other Secret Service

protectees, the Office of the Vice President has a continuing interest in the documents because

they reflect activities and official functions of the Office of the Vice President.  Accordingly,

under the Presidential Records Act (44 U.S.C. § 2207), the Vice President maintains legal

custody and control of the documents, exclusive of Department of Homeland Security (which

includes the Secret Service), and sees to their historic preservation as Vice Presidential executive

records.

3

7.    The documents generated by visits to the White House Complex or the Vice

President's Residence during the period October 2004 through June 2006 – the period covered

by the Freedom of Information Act ("FOIA") request that resulted in the above-captioned case –

number in the tens of thousands.  Such documents would relate to individuals visiting for a

variety of purposes, including official purposes, ranging from visits by senior officials to address

high matters of state to visits by repair personnel to fix broken office equipment; social purposes,

ranging from hosting visiting heads of foreign governments to hosting small private meals; and

other private purposes.  However, in many if not most cases, the purpose of the visits is not

apparent from the face of the documents, nor is the relationship of the visitor to the Vice

President, his family, OVP staff, or any outside organization.  In these cases, it would require the

assistance of knowledgeable OVP personnel to determine or estimate the purpose of a visit for

which the Secret Service received visitor clearance input from OVP personnel.  Only estimation

may be possible if the knowledgeable OVP personnel no longer work in OVP, as is true of

several of the individuals named in the FOIA request.  If there were a requirement to review such

documents and determine the purposes of the visits to which they relate, that task would require

an enormous amount of the time of OVP personnel, diverting them from their duties supporting

the Vice President.  Moreover, unlike federal agencies, OVP does not have personnel dedicated

to or experienced in processing documents under the FOIA because FOIA does not apply to the

OVP.  Avoiding such burdens and avoiding intrusion into the effective functioning of the

Presidency and Vice Presidency are principal reasons the Freedom of Information Act does not

apply to the Presidency and Vice Presidency and that Presidential and Vice Presidential

executive records are instead covered by Sections 2201-2207 of title 44.

8.      While the Secret Service has no interest in WAVES or ACR records beyond their brief and time-limited role in ensuring that persons who pose a risk to Secret Service protectees do not have access to protectees, the documents are delivered to and held by the White House Office of Records Management, pursuant to the direction of the Executive Office of the President and the Office of the Vice President, in recognition of their contemporary and historic value as Presidential and Vice Presidential records. More particularly, the documents at issue in this case could disclose sensitive information protected from disclosure by law regarding the inner workings and deliberations of the Office of the Vice President. Disclosure of the records could provide a roadmap to the meetings, contacts, and sources of input, information, and advice sought or received by the Vice President and his closest advisors, and could help chronicle the course and timing of substantive policy discussions within the Office. Also, to the extent such communications and contacts are undertaken in the course of formulating or providing advice to the President or presidential staff, public release could result in the unauthorized disclosure of presidential communications protected from disclosure by law. In addition, release of the documents could result in the unwarranted disclosure of private information about the Vice President, his staff, and visitors. Finally, public disclosure of the identities of individuals who have physical access to the Vice President and the areas in which he works or lives, or of patterns of physical access to the Vice President and those areas such as the patterns of service contractors with regular access, could reasonably be expected to adversely affect the safety of the Vice President and his family. Protection of the President and the Vice President from physical harm is a public interest of paramount importance.

* * * * * *

5

I declare this 25 day of October 2006, under penalty of perjury, in accordance with 28

U.S.C. § 1746, that the foregoing is true and correct.

_Claire M. O'Donnell_
Claire M. O'Donnell, Assistant to the Vice President and Deputy Chief of Staff

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

CITIZENS FOR RESPONSIBILITY AND    )
ETHICS IN WASHINGTON,              )
                                   )
            Plaintiff,             )
                                   )
        v.                         )        Civil No. 1:06cv01912 (JGP)
                                   )
U.S. DEPARTMENT OF HOMELAND        )
SECURITY, et al.,                  )
                                   )
            Defendants.            )
_____)

**PLAINTIFF'S STATEMENT AND RESPONSE TO DEFENDANTS' STATEMENT OF**
**MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE**

Pursuant to LCvR 7(h) plaintiff Citizens for Responsibility and Ethics in Washington

("CREW") hereby provides its statement and responds to defendants' statement of material facts

as to which they contend there is no genuine issue:

1. Plaintiff admits that the Secret Service provides security for the White House complex

and monitors and controls access to the complex, except to deny any implication that this is all

that the Secret Service does as part of its statutorily-mandated function to provide security for

the White House Complex.

2. Plaintiff admits that defendants have identified two electronic systems for controlling

and monitoring access to the White House complex, WAVES and ACR.

3. Plaintiff admits the process for entry of a proposed visitor to the White House

Complex includes the process described in paragraph 3, but denies any implication that this is

the only process by which proposed visitors enter the White House complex and avers that,

without discovery, plaintiff cannot ascertain the extent to which this paragraph may be

incomplete or inaccurate.

4. Plaintiff admits that the cited declarations of Paul S. Morrissey, Philip C. Droege and Claire M. O'Donnell contain the information in this paragraph, but denies any implication that this is the only way that information is provided to the Secret Service. See Third Morrissey Decl. at ¶ 11. Plaintiff avers that without discovery, plaintiff cannot ascertain the extent to which this paragraph may be incomplete or inaccurate.

5. Plaintiff admits that the cited declaration of Paul S. Morrissey contains this language, but denies that it is logically supported by the preceding information set forth in paragraph 11 of Mr. Morrissey's Third Declaration and avers that without discovery, plaintiff cannot ascertain the extent to which this paragraph may be incomplete or inaccurate.

6. Plaintiff denies that there is no genuine issue as to whether presidential and vice presidential personnel provide visitor information to the Secret Service on a confidential basis. Plaintiff avers that in the two prior declarations submitted by Claire M. O'Donnell in The Washington Post v. U.S. Dep't of Homeland Security, No. 06-1737 (RMU) and dated October 13, 2006, and October 25, 2006, Ms. O'Donnell did not describe presidential and vice presidential personnel providing visitor information to the Secret Service on a confidential basis and that the inconsistencies between her declarations raise a genuine issue that is in dispute and for which plaintiff needs discovery. Plaintiff lacks knowledge as to what defendants mean by "temporary basis," except to deny that the understanding of presidential and vice presidential personnel in this regard is a material fact and to further deny any implication that their understanding alters the legal status of the White House visitor records that the Secret Service creates in fulfillment of its statutorily-mandated protective function. Plaintiff admits that the

purposes for which the Secret Service uses the information include enabling the Secret Service to

perform background checks and to provide for the visitor's temporary admittance to the White

House complex, but denies any implication that these are the only uses that the Secret Service

makes of the information and avers that without discovery, plaintiff cannot ascertain the extent

to which this paragraph may be incomplete or inaccurate.

7.  Plaintiff denies that the first sentence is a material fact.  Plaintiff admits the second

sentence.

8.  Plaintiff denies that either Ms. O'Donnell or Mr. Droege is competent to testify as to

the understanding of the Secret Service.  Plaintiff denies that the understanding of the White

House and OVP regarding the status of WAVES and ACR records and the visitor information

contained in them is a material fact not in dispute and avers that the record as a whole, outlined

in Plaintiff's Opposition to Defendants' Motion for Summary Judgment, documents that the

White House visitor records that the Secret Service creates in fulfillment of its statutorily-

mandated protective function are agency records subject to both the Freedom of Information Act

and the Federal Records Act.  See, e.g., Exhibits 1-6 of Plaintiff's Opposition to Defendants'

Motion for Summary Judgment.  Plaintiff further avers that without discovery, it cannot ascertain

the extent to which this paragraph may be incomplete or inaccurate.

9.  Plaintiff admits that the Morrissey declaration contains this language, but denies that

it is not in dispute.  Plaintiff further avers that under the Federal Records Act, the archivist is

empowered to determine whether the Secret Service must preserve or retain WAVES or ACR

records and in this regard the archivist may overrule the recommendation of the Secret Service.

44 U.S.C. § 3303a.  Plaintiff denies that the records are under the exclusive legal control of the

president and vice president and avers that this is a legal issue in dispute in this litigation, not a statement of material fact not genuinely in dispute.

10.  Plaintiff admits that the cited declarations contain the statements in the first sentence, but denies that they are material facts given that this case concerns a Freedom of Information Act request plaintiff submitted to the U.S. Department of Homeland Security for records in its possession.  Plaintiff denies that Ms. O'Donnell is a competent witness to testify as to what the White House Office of Records Management ("WHORM") does with the WAVES records and notes that in his declaration Mr. Droege, who is director of the WHORM, does not state that the WHORM preserves these records in accordance with the Presidential Records Act, and that Mr. Droege is not competent to testify to the practice of the Secret Service dating back to 2001. Plaintiff denies the third sentence.  See Declaration of Kathy Lyerly, September 21, 2006 (Exhibit 3 to Plaintiff's Opposition to Defendants' Motion for Summary Judgment), ¶¶ 14-19. Plaintiff avers that without discovery, plaintiff cannot ascertain the extent to which this paragraph may be incomplete or inaccurate.

11.  This paragraph is a selective characterization of an MOU, the contents of which speak for themselves.  Plaintiff denies that the MOU confirms the legal status of WAVES and ACR records and avers further that this is a legal issue in dispute, not a statement of material fact not genuinely in dispute.

12.  Plaintiff denies that Mr. Morrissey is a competent witness to testify about the Secret Service's recognition as early as 2001 that ACR records should be treated in a manner consistent with the treatment of WAVES records and avers that Mr. Morrissey has been in his position only since September 2006, and his declaration does not provide the basis for his purported

4

understanding of Secret Service practices prior to that date.  See Third Morrissey Decl., ¶¶ 1, 22.

Plaintiff denies that Mr. Droege is a competent witness to testify about the White House's and

Secret Service's recognition and agreement, dating back to as early as 2001, regarding the

treatment of ACR records given that Mr. Droege has been in his position only since July 2004,

and his declaration does not provide the basis for his purported understanding of White House

practices prior to that date.  See Droege Decl., ¶¶ 1, 10. Plaintiff denies that the second sentence

is a material fact, given that this case concerns a Freedom of Information Act request that

plaintiff submitted to the U.S. Department of Homeland Security for records in its possession.

Plaintiff further avers that without discovery, it cannot ascertain the extent to which this

paragraph may be incomplete or inaccurate.

     13.  Plaintiff denies that the first two sentences of this paragraph are material facts, given

that this case concerns a Freedom of Information Act request that plaintiff submitted to the U.S.

Department of Homeland Security for records in its possession.  As to the third sentence,

Plaintiff admits that the Morrissey declaration contains this language, but denies that it is not in

dispute.  Plaintiff further avers that under the Federal Records Act, the archivist is empowered to

determine whether the Secret Service must preserve or retain agency records regarding visitors

to the White House Complex and in this regard the archivist may overrule the recommendation

of the Secret Service.  44 U.S.C. § 3303a.  Plaintiff further avers that without discovery, it

cannot ascertain the extent to which this paragraph may be incomplete or inaccurate.

     14.  Plaintiff admits, except to deny any implication that this is all that the Secret Service

does as part of its statutorily-mandated function to provide security for the Vice President's

Residence ("VPR").

15.  Plaintiff admits that the cited declarations contain the statements set forth in this paragraph and avers that without discovery, plaintiff cannot ascertain the extent to which this paragraph may be incomplete or inaccurate.

16.  Plaintiff admits that Ms. O'Donnell's declaration contains the cited language, but denies that whether the information and any materials that the Secret Service creates that are derived in whole or part from the information remain in the exclusive ownership, custody and control of the OVP is a material fact not genuinely in dispute.  Plaintiff also denies any implication that the OVP's understanding is dispositive of the legal issue of the status of the White House visitor records that the Secret Service creates in fulfillment of its statutorily-mandated protective function under the Freedom of Information Act and the Federal Records Act.

17.  Plaintiff admits that the Morrissey declaration contains this language, but denies that it is not in dispute.  Plaintiff further avers that under the Federal Records Act, the archivist is empowered to determine whether the Secret Service must preserve or retain records relating to VPR visits and in this regard the archivist may overrule the recommendation of the Secret Service.  44 U.S.C. § 3303a.  Plaintiff denies that the records are under the exclusive legal control of the vice president and avers that this is a legal issue in dispute in this litigation, not a statement of material fact not genuinely in dispute.

18. Plaintiff denies that Mr. Morrissey is a competent witness to testify about the practice of the Secret Service since 2001 with respect to the transfer to the OVP of handwritten post entry logs given that Mr. Morrissey has been in his position only since September 2006, and his declaration does not provide the basis for his purported understanding of Secret Service

practices prior to that date.  <u>See</u> Third Morrissey Decl., ¶¶ 1, 37.  Plaintiff admits that Ms.

O'Donnell's declaration contains the cited information and avers that without discovery, plaintiff

cannot ascertain the extent to which this paragraph may be incomplete or inaccurate.

19.  Plaintiff admits that Mr. Morrissey's Third Declaration contains the cited language

and avers that without discovery and given the inconsistencies between the multiple declarations

that Mr. Morrissey has submitted in this and other litigation, plaintiff cannot ascertain the extent

to which this paragraph may be incomplete or inaccurate.

20.  Plaintiff admits that Mr. Morrissey's Third Declaration contains the cited language

and avers that without discovery and given the inconsistencies between the multiple declarations

that Mr. Morrissey has submitted in this and other litigation, plaintiff cannot ascertain the extent

to which this paragraph may be incomplete or inaccurate.

21.  Plaintiff admits that Mr. Morrissey's Third Declaration contains the cited language

and avers that without discovery and given the inconsistencies between the multiple declarations

that Mr. Morrissey has submitted in this and other litigation, plaintiff cannot ascertain the extent

to which this paragraph may be incomplete or inaccurate.

22.  Plaintiff admits that Ms. O'Donnell's declaration contains the cited language and

avers that without discovery, and given the more limited statement in the letter from Shannen

Coffin of September 13, 2006, and attached to the Third Declaration of Mr. Morrissey, that the

OVP maintains these records only "[t]o the extent required by law," plaintiff cannot ascertain the

extent to which this paragraph may be incomplete or inaccurate.

23.  This paragraph is a selective characterization of letter, the contents of which speak

for themselves.

24.  Plaintiff admits that Mr. Morrissey's Third Declaration contains the cited language and avers that without discovery and given the inconsistencies between the multiple declarations that Mr. Morrissey has submitted in this and other litigation, plaintiff cannot ascertain the extent to which this paragraph may be incomplete or inaccurate.

25.  Plaintiff admits that the Secret Service has identified 19 pages of records responsive to plaintiff's Freedom of Information Act request, but denies that this is a material fact given that plaintiff does not contest any withholding in this case.

26 - 37.  Plaintiff denies that these paragraphs contain statements of material fact given that plaintiff does not contest any withholding in this case.

Respectfully submitted,

_____/s/_____
Anne L. Weismann
(D.C. Bar No. 298190)
Melanie Sloan
(D.C. Bar No. 434584)
Citizens for Responsibility and Ethics
 In Washington
1400 Eye Street, N.W., Suite 450
Washington, D.C.  20005
Phone: (202) 408-5565
Fax: (202) 588-5020

Attorneys for Plaintiff

Dated:  July 11, 2007

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____

CITIZENS FOR RESPONSIBILITY AND )
ETHICS IN WASHINGTON,           )
                                )
              Plaintiff,        )
                                )
       v.                       )        Civil No. 1:06cv01912 (JGP)
                                )
U.S. DEPARTMENT OF HOMELAND     )
SECURITY, et al.,               )
                                )
              Defendants.       )
_____)

## [PROPOSED] ORDER

The Court having considered defendants' motion for summary judgment, plaintiff's

opposition thereto, and the entire record herein, it is hereby

ORDERED that defendants' motion is DENIED and it is further

ORDERED that discovery shall proceed in this case.


Dated: _____            _____
                                    JOHN GARRETT PENN
                                    United States District Judge