**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| C ITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, | |
| Plaintiff, | CIVIL ACTION NO: 1:06-cv-01912-JGP |
| v. | |
| U.S. DEPARTMENT OF HOMELAND SECURITY, | |
| Defendants. | |

**MOTION OF NATIONAL SECURITY ARCHIVE TO FILE MEMORANDUM OF LAW,**
**AS *AMICUS CURIAE*, IN SUPPORT OF PLAINTIFF**

The National Security Archive ("Archive") respectfully moves this Court for leave to

participate as *amicus curiae* in support of Plaintiff Citizens for Responsibility and Ethics in

Washington ("CREW").  The Archive seeks leave to participate for these reasons:  this is a

matter of first impression, the decision of the court will have implications for a broad swathe of

the public who request records under the Freedom of Information Act, and the Archive has a

depth of knowledge about these issues that can assist the court in reaching the correct resolution

of the matter.

The Archive notes that neither the Federal Rules of Civil Procedure nor a local rule of

this Court establish a deadline for the filing of an *amicus curiae* brief.  Accordingly, the Archive

submits this motion seven days after Plaintiff's due date for filing its Opposition to Defendant's

Motion for Summary Judgment, in accordance with the standard established by the Federal Rules

of Appellate Procedure.[1]  CREW has consented to this motion.  Defendant, U.S. Department of

Homeland Security ("DHS"), has declined to consent.  A proposed Order is submitted with this

motion.

## THE ARCHIVE'S INTEREST

The Archive is an independent non-governmental research institute and library located at

The George Washington University in Washington, D.C.[2]  The Archive collects and publishes

declassified documents acquired through the Freedom of Information Act ("FOIA"), 5 U.S.C. §

552. The Archive also serves as a repository of declassified and released documents on a wide

range of topics pertaining to the national security, foreign intelligence, and economic policies of

the United States.  As part of its mission to broaden access to the historical record, the Archive is

a leading user FOIA.  In its twenty-year history, the Archive has made over 35,000 FOIA

requests to more than forty government agencies.  The Archive has published at least 500,000

pages of documents obtained pursuant to FOIA in print books,[3] microfiche and CD-ROM,[4] and

---

[1] Fed. R. App. P. 29(e) states "[a]n amicus curiae must file its brief, accompanied by a motion for filing when necessary, no later than 7 days after the principal brief of the party being supported is filed."

[2] The National Security Archive discloses that it is a project of the National Security Archive Fund, Inc. The National Security Archive Fund, Inc. is a not-for-profit corporation established under the laws of the District of Columbia. The National Security Archive Fund, Inc. has no parent corporation and no stock, thus no publicly held corporation owns 10 percent or more of its stock. The Archive identifies that its general nature and purpose is to promote research and public education on U.S. governmental and national security decisionmaking and to promote and encourage openness in government and government accountability. The Archive has no members, thus no member has issued shares or debt securities to the public.

[3] Print books published by the Archive include: Safe for Democracy: *The Secret Wars of the CIA, by John Prados* (Chicago: Ivan R. Dee, 2006); *Spying on the Bomb: American Nuclear Intelligence from Nazi Germany to Iran and North Korea by Jeffrey T. Richelson* (W.W. Norton March 13, 2006); *Cardboard Castle: An Inside History of the Warsaw Pact, 1955-1991*, by Malcolm Byrne, et al. (Central European University Press, June 30, 2005); The *Pinochet File: A Declassified Dossier on Atrocity and Accountability*, by Peter Kornbluh (The New Press, September 11, 2003); *The 1956 Hungarian Revolution: A History in Documents*, edited by Malcolm Byrne (Central European University Press, Jan. 1, 2003); *The Kissinger Transcripts: The Top Secret Talks with Beijing and Moscow*, by William Burr (The New Press, 1999); *Bay of Pigs Declassified: The Secret CIA Report*, by Peter Kornbluh (The New Press, 1998); *Atomic Audit: The Costs and Consequences of U.S. Nuclear Weapons Since 1940*, by Stephen I. Schwartz, with Thomas S. Blanton, William Burr, et al. (Brookings Institution Press, 1998).

[4] The Archive's microfiche collections include: *The Archive's microfiche collections include: U.S. Intelligence on Weapons of Mass Destruction: From World War II to Iraq* (2004); *The Cuban Missile Crisis Revisited: An International Collection of Documents from the Bay of Pigs to the Brink of Nuclear War* (2006); *The Kissinger Transcripts: A Verbatim Record of U.S. Diplomacy 1969-1977* (2006); *U.S. Policy in the Vietnam War*,

online,[5] all pursuant to the core purpose of FOIA "to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber*, 437 U.S. 214, 242 (1978).

This case concerns the attempt of DHS and the United States Secret Service (collectively "Secret Service"), in league with the White House, to circumvent Congress' broad disclosure objective for FOIA. Specifically, DHS has refused to disclose records of the Worker and Visitor Entrance System ("WAVES") and Access Control Records System ("ACR") that log White House visitor information, and the access lists, entry logs and event lists recording information about visitors to the Vice President's residence ("VPR"). The Secret Service has based its refusal on the arguments that the records are not "agency records" within the meaning of, and subject to, FOIA, and that the records are cloaked with executive privilege under the Presidential Records Act ("PRA"). Furthermore, the Secret Service and the White House have attempted to alter the character of the records and evade the objectives of FOIA by entering into a Memorandum of Understanding that purports to assign "legal custody" of the visitor records to Executive Offices beyond the reach of FOIA.

Indeed, this case requires the Court to decide how much power the White House and federal agencies may claim to customize the application of FOIA and its companion records statutes to comport with a particular administration's preferred level of secrecy. Although the

---

*Part I, 1954-1968* (2004); *U.S. Policy in the Vietnam War, Part II: 1969-1975* (2004); *Japan and the United States: Diplomatic, Security, and Economic Relation, Part II, 1977-1992* (2004); *and Terrorism and U.S. Policy: 1968-2002* (2002).

[5] The Archive distributes electronic newsletters, at no cost, on an almost weekly basis to over 7,000 subscribers. These newsletters directly link to documents recently released through the Archive's FOIA activities and update the public on issues pertaining to the operations and activities of the U.S. Government. Furthermore, the Archive's website attracts well over one million successful visits per month, with visitors downloading an estimated 300,000 pages per day of declassified documents from some 225 electronic books published on the site. A complete list of the Archive's electronic briefing books is available at http://www.gwu.edu/~nsarchiv/NSAEBB/index.html.

Supreme Court of the United States has warned that a federal agency may attempt to purposefully route agency records out of agency possession to avoid a FOIA request, *Kissinger v. Reporters Committee for Freedom of Press*, 445 U.S. 136, 155 n. 9 (1980), the boundaries of conduct that fall within that admonition have not been brightly set, and are directly implicated by this case. Accordingly, the Court has before it novel issues of first impression, the resolution of which will either underscore or unravel almost to forty years of FOIA jurisprudence. Under such circumstances, the Court should have the benefit of a full briefing on the issues by *amicus curiae*.

The Archive's mission to broaden access to the historical record and to serve as a repository of declassified and released government documents, and its research and publication activities, regularly cause the Archive to confront attempts by the executive branch to evade the requirements of FOIA. Recently, Thomas S. Blanton, Executive Director of the Archive, testified regarding the Presidential Records Act before the House Government Reform Committee.[6] In addition, the Archive has participated in numerous lawsuits in this Court, in the United States Court of Appeals for the D.C. Circuit, and in the United States Supreme Court, both as a party and as an *amicus curiae*, that involved the interpretation of the scope and limits of FOIA and the PRA. Specifically, the Archive participated as a party in *Armstrong v. Executive Office of the President*, 897 F. Supp. 10 (D.D.C. 1995), and the subsequent appeal before the United States Court of Appeals for the D.C. Circuit, the holding of which has significant bearing on this case. The Archive also participated as a plaintiff in *American Historical Assoc. v.*

---

[6] *See* Press Release, Archive Director Testifies Before House Oversight Subcommittee, The National Security Archive (March 1, 2007), *available at* http://www.gwu.edu/~nsarchiv/news/20070301/ (last visited July 18, 2007).

*National Archives and Records Administration*, 310 F. Supp. 2d 216 (D.D.C. 2004).

Accordingly, the Archive has significant knowledge and insight on the issues raised in this litigation and can assist in presenting the Court with a full understanding of the purpose and meaning of FOIA and PRA without duplicating arguments or information submitted by the Parties.

For the above reasons, the Archive respectfully requests that this motion for leave to file the accompanying *amicus curiae* brief be granted.

Respectfully submitted,

*Burt A. Braverman* (EAD)

Burt A. Braverman (D.C. Bar. No. 178376)
Robert Corn-Revere (D.C. Bar. No. 375415)
Elizabeth A. Drogula*
**DAVIS WRIGHT TREMAINE, LLP**
1919 Pennsylvania Avenue, NW
Suite 200
Washington, DC 20006
(202) 973-4200

Meredith Fuchs (D.C. Bar. No. 450325)
National Security Archive
George Washington University
2130 H Street, NW, Suite 701
Washington, DC 20037

*Counsel for the National Security Archive*

Dated: July 18, 2007
* Admitted in Maryland; DC Bar Admission Pending.

## LOCAL RULE 7(M) CERTIFICATE

On July 13, 2007, counsel for the Archive contacted Anne Weisman, counsel for Plaintiff, Citizens For Responsibility and Ethics in Washington ("CREW"), by email to inquire whether she would consent to the Archive seeking leave to file an *amicus curiae* brief. Ms. Weisman consented.

On July 18, 2007, counsel for the Archive contacted Scott Simpson, counsel for Defendant U.S. Department of Homeland Security ("DHS"), by email to inquire whether he would consent to the Archive seeking leave to file an *amicus curiae* brief. He declined to consent.

*Burt A. Braverman* (EAD)

Burt A. Braverman

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

C ITIZENS FOR RESPONSIBILITY AND
ETHICS IN WASHINGTON,

       Plaintiff,

v.

U.S. DEPARTMENT OF HOMELAND
SECURITY,

       Defendants.

CIVIL ACTION NO:
1:06-cv-01912-JGP

## MEMORANDUM OF NATIONAL SECURITY ARCHIVE, AS *AMICUS CURIAE,* IN SUPPORT OF PLAINTIFF

The National Security Archive ("Archive") respectfully submits this memorandum of law, as *amicus curiae,* in support of Plaintiff Citizens for Responsibility and Ethics in Washington ("CREW").

### INTEREST OF *AMICUS CURIAE*

The National Security Archive is an independent, nongovernmental research institute and library located at the George Washington University that collects and publishes declassified documents obtained through the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, concerning United States foreign policy and national security matters. The Archive also serves as a repository of declassified and released documents on a wide range of topics pertaining to the national security, foreign intelligence, and economic policies of the United States. As part of its mission to broaden access to the historical record, the Archive is a leading user of FOIA. In its twenty-year history, the Archive has made over 35,000 FOIA requests to more than forty government agencies. The Archive has published at least 500,000 pages of documents obtained

pursuant to FOIA in print books,[1] microfiche and CD-ROM,[2] and online.[3]  The Archive files this

brief *amicus curiae* to address the implications of the attempt of Defendant Department of

Homeland Security and  the  United  States  Secret  Service  (collectively  "Secret  Service"),  in

league with the White House, to circumvent Congress' broad disclosure objective for FOIA.

## INTRODUCTION

The  current  administration  has  been  described  as  one  that  "thrives  on  secrecy  while

pulling  the  levers  of  power."[4]    A  long  series  of  denials  of  information  about  government

programs characterize this administration's practices, including refusals by the Department of

Justice to furnish oversight committees with the legal opinions provided to the President on the

---

[1] Print books published by the Archive include: *Safe for Democracy: The Secret Wars of the CIA,* by John Prados (Chicago: Ivan R. Dee, 2006); *Spying on the Bomb: American Nuclear Intelligence from Nazi Germany to Iran and North Korea* by Jeffrey T. Richelson (W.W. Norton March 13, 2006); *Cardboard Castle: An Inside History of the Warsaw Pact, 1955-1991*, by Malcolm Byrne, *et al.* (Central European University Press, June 30, 2005); *The Pinochet File: A Declassified Dossier on Atrocity and Accountability*, by Peter Kornbluh (The New Press, September 11, 2003); *The 1956 Hungarian Revolution: A History in Documents*, edited by Malcolm Byrne (Central European University Press, Jan. 1, 2003); *The Kissinger Transcripts: The Top Secret Talks with Beijing and Moscow*, by William Burr (The New Press, 1999); *Bay of Pigs Declassified: The Secret CIA Report*, by Peter Kornbluh (The New Press, 1998); *Atomic Audit: The Costs and Consequences of U.S. Nuclear Weapons Since 1940*, by Stephen I. Schwartz, with Thomas S. Blanton, William Burr, *et al.* (Brookings Institution Press, 1998).

[2] The Archive's microfiche collections include: *U.S. Intelligence on Weapons of Mass Destruction: From World War II to Iraq* (2004); *The Cuban Missile Crisis Revisited: An International Collection of Documents from the Bay of Pigs to the Brink of Nuclear War* (2006); *The Kissinger Transcripts: A Verbatim Record of U.S. Diplomacy 1969-1977* (2006); *U.S. Policy in the Vietnam War, Part I, 1954-1968* (2004); *U.S. Policy in the Vietnam War, Part II: 1969-1975* (2004); *Japan and the United States: Diplomatic, Security, and Economic Relation, Part II, 1977-1992* (2004); and *Terrorism and U.S. Policy: 1968-2002* (2002).

[3] The Archive distributes electronic newsletters, at no cost, on an almost weekly basis to over 7,000 subscribers.  These newsletters directly link to documents recently released through the Archive's FOIA activities and update the public on issues pertaining to the operations and activities of the U.S. Government.  Furthermore, the Archive's website attracts well over one million successful visits per month, with visitors downloading an estimated 300,000 pages per day of declassified documents from some 225 electronic books published on the site.  A complete list of the Archive's electronic briefing books is available at http://www.gwu.edu/~nsarchiv/NSAEBB/index.html.

[4] *See* Tom Raum, *Cheney Fatigue Settles Over Some in GOP*, The Associated Press, July 8, 2007 (describing Vice President Cheney); *see also* Editorial, *The Dangerous Comfort of Secrecy*, The New York Times, July 12, 2005, at A20 ("The Bush Administration['s] . . . [m]ove toward greater secrecy has nearly doubled the number of documents annually hidden from public view . . . leaving the government working behind an ever darker, ever denser screen").

National Security Agency surveillance program[5] the Attorney General's refusal to answer congressional questions regarding the Bush Administration's conception of the program and its implications for the reach of executive power,[6] and President Bush's personal intervention to block an internal probe of the program by DOJ's Office of Professional Responsibility.[7]

This case presents one of several novel theories for secrecy employed by this administration to limit its accountability to the public.  For example, recently, Vice President Cheney refused to comply with Executive Order 12958, which creates a "uniform system for classifying, safeguarding and declassifying national security information."[8]  Its implementing directive requires that "[e]ach agency that creates or handles classified information shall report annually to the Director of [the Information Security Oversight Office ("ISOO") within the National Archives and Records Administration] statistics related to its security classification program."[9]  However, in 2003 the Vice President simply stopped filing the required reports, and he has since prevented the ISOO from investigating his office to ensure compliance with security

---

[5] Eric Lichtblau, *Senate Panel Rebuffed on Documents on U.S. Spying*, The New York Times, Feb. 2, 2006.

[6] *See* Statement of Senator Patrick Leahy, Ranking Member, Senate Judiciary Committee, Hearing on "Wartime Executive Power and the NSA's Surveillance Authority II" (Feb. 28, 2006) (Attorney General Gonzales' "testimony was far from complete and left many important questions unanswered . . . These are questions to which Congress and the American people deserve answers . . . [T]his obsessively secretive administration proceeded with action that it must have known would face strong bipartisan opposition and did so without informing Congress or the American people.")

[7] Siobhan Gorman, *Bush Blocked Probe of NSA Spy Program, Gonzales Says*, The Baltimore Sun, July 19, 2006.  *See also Gonzales: Bush Blocked NSA Probe*, Associated Press, July 18, 2006.

[8] E.O. 12958, 60 Fed. Reg. 19825 (April 17, 1995), *as amended*, E.O 13292, 68 Fed. Reg. 15315 (March 25, 2003); *see also* Peter Baker, *Cheney Defiant on Classified Material; Executive Order Ignored Since 2003*, June 22, 2007, at A01.

[9] 32 C.F.R. § 2001.80.  An "agency" subject to this directive includes "any 'Executive agency' . . . and 'Military department' . . . and any other entity within the executive branch that comes into the possession of classified information."  E.O. 13292, 68 Fed. Reg. 15315 (March 25, 2003).

procedures as required by law.[10]  The rationale initially provided to the ISOO by the Vice

President's Chief of Staff – and since widely ridiculed – was that the Vice President *is not a*

*member of the Executive Branch subject to Executive Order 12958* because, as the President of

the Senate, he has legislative as well as executive responsibilities.[11]  When congressional

members and the media responded to this argument with predictable astonishment,[12] the Vice

President's office backpedaled, and instead argued that the Office of the Vice President is not

subject to Executive Order 12958 because the Order treats the Vice President like the President,

*and neither office is an agency subject to its terms*.[13]  No legal authority was provided for this

stance, and the ISOO explicitly rejected it.[14]

There are many other examples, including the Vice President's refusal to provide the

Governmental Accountability Office with information about the costs incurred by the Office of

---

[10] *See* Letter from J. William Leonard, Director, Information Security Oversight Office to David S. Addington, Assistant to the President and Chief of Staff to the Vice President of the United States (June 8, 2006) ("First ISOO Letter to Cheney").  *See also* Letter from Hon. Henry A. Waxman, Chairman, House Committee on Oversight and Government Reform to Richard Cheney, Vice President of the United States (June 21, 2007).

[11] *See* David Jackson, *Lawmaker Challenges Cheney on Executive Order*, USA Today, July 24, 2007 ("Cheney's office has claimed his constitutional role as president of the Senate also makes him part of the legislative branch and therefore is not covered by a presidential order requiring executive branch workers to report their numbers of classified and declassified government documents.")

[12] *See* Letter from Representative Henry A. Waxman, Chairman, House Committee on Oversight and Government Reform *et al.* to Hon. Alberto Gonzales, Attorney General of the United States (June 27, 2007); Scott Shane, *Agency is Target in Cheney Fight on Secrecy Data*, The New York Times, June 22, 2007 (this "dispute is far from the first to pit Mr. Cheney and Mr. Addington against outsiders seeking information, usually members of Congress or advocacy groups").

[13] *See* Michael Abramowitz, *Cheney Aide Explains Stance on Classified Material*, The Washington Post, June 27, 2007 (reporting on letter sent to Senator John F. Kerry by David S. Addington, Vice President Cheney's Chief of Staff).

[14]*See* Letter from J. William Leonard, Director, ISOO to Hon. Alberto R. Gonzales, U.S. Attorney General (January 9, 2007) (noting that although Executive Order 12958 specifically exempts the Office of the Vice President from one requirement in the order, the rest of the order's requirements apply to it with full force).

the Vice President for its role in developing a national energy policy[15] and the Vice President's refusal to report information about travel expenses paid for by special interests in accordance with Executive Branch ethics laws.[16]

In the instant case, the White House, in concert with the Secret Service, decided to alter the character of federal agency records by crafting agreements outlining how the President and the Vice President want the records to be handled. Those agreements purport to categorically remove records from the reach of FOIA. The result is tantamount to a declaration that the law does not apply when the White House does not want it to apply. Such tactics cannot be reconciled with Congress' mandate in enacting FOIA. If this Court were to accept the idea that the White House can swoop into a federal agency and decide records should be categorically insulated from any disclosure, it would be condoning a severe degradation of FOIA and potentially unravel forty years of established judicial precedent under the law.

## ARGUMENT

## I. SECRET SERVICE RECORDS OF VISITORS TO THE WHITE HOUSE AND THE VICE PRESIDENT'S RESIDENCE ARE AGENCY RECORDS SUBJECT TO FOIA

### A. FOIA Creates a Presumptive and Judicially Enforceable Right of Disclosure

FOIA creates a presumptive right for *any* person to obtain identifiable federal agency records upon request without stating the reason the information is sought or providing a legal justification for disclosure. *See United States Dep't of State v. Ray*, 502 U.S. 164, 173 (1991); *Dep't of Air Force v. Rose*, 425 U.S. 352, 360-61 (1976). FOIA "is broadly conceived. It seeks

---

[15] *See* Governmental Accountability Office, Energy Task Force: Process Used to Develop the National Energy Policy, GAO 03-894 at 22 (August 2003) (reporting that "[t]he documents that the [Office of the Vice President] provided contain little useful information or insight" and that "[i]n response to our requests seeking clarification . . . [the Office of the Vice President] stated that it would not provide us with any additional information").

[16] *See* Christopher Lee, *Vice President's Office Keeps Travel Expenses Under Wraps*, The Washington Post, Nov. 29, 2005, at A19.

to permit access to official information long shielded unnecessarily from public view and attempts to create a judicially enforceable public right to secure such information from possibly unwilling official hands." *EPA v. Mink*, 410 U.S. 73, 80 (1973). A federal agency's obligation to provide public access to its records is mandatory unless the records identified in a request qualify for one of nine limited exemptions from disclosure. *See* 5 U.S.C. § 552(b); *Rose*, 425 U.S. at 361; *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 135 (1975) ( "[V]irtually every document generated by an agency is available to the public in one form or another, unless it falls within one of [FOIA's] nine exemptions."). FOIA places the burden on federal agencies to legally justify the invocation of an exemption. 5 U.S.C. § 552(a)(4)(B); *U.S. Dep't of Justice v. Reporters Committee for Freedom of the Press*, 489 U.S. 749, 754 (1989).

The existence of the nine exemptions does "not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act." *Rose*, 425 U.S. at 361. The exemptions were provided by Congress in recognition of the tension between the public's right to information and the government's need to keep certain information confidential to execute its functions. *See* S. Rep. No. 813, 89th Cong., 1st Sess. (1965). In essence, by creating the exemptions, Congress relieved the judiciary of having to balance the two interests in disclosure decisions by building the balance into the statutory scheme. *Schell v. Dep't of Health and Human Services*, 843 F.2d 933, 937 (6th Cir. 1988); *Washington Post*, 459 F. Supp. 2d at 73. Indeed, the judiciary may not allow a federal agency to withhold records for reasons beyond the nine exemptions, as the exemptions are "explicitly made exclusive" and "must be narrowly construed." *Rose*, 425 U.S. at 361 (quotations omitted).

FOIA reflects Congress' recognition that "government by secrecy benefits no one. It injures the people it seeks to serve; it injures its own integrity and operation. It breeds mistrust,

dampens the fervor of its citizens, and mocks their loyalty." S. Rep. No. 813, 89[th] Cong., 1[st]
Sess. 10 (1965). FOIA embodies the principles of open government and the democratic ideal
that, to have self-governance, the nation's citizens must be an informed electorate with access to
the information needed to hold the government accountable for its actions. *See NLRB v. Robbins
Tire & Rubber Co.*, 437 U.S. 214, 242 (1978); *Renegotiation Bd. v. Bannercraft Clothing Co.*
415 U.S. 1, 17 (1974); *see also* Letter from Former President James Madison to W.T. Barry
(August 4, 1822) ("A people who mean to be their own governors must arm themselves with the
power which knowledge gives."). In short, FOIA ensures that United States citizens know "what
the government is up to." *See Reporters Comm.*, 489 U.S. at 773.

### B. The Visitor Logs Are Agency Records Under Applicable Judicial Precedent

To constitute an "agency record," materials sought by a FOIA request must satisfy two
criteria. *See U.S. Department of Justice v. Tax Analysts*, 492 U.S. 136, 144-45 (1989). First, the
federal agency must create or obtain the requested material. Second, the federal agency must be
in control of the requested materials at the time the FOIA request is made. *Id.* "Control" in this
context means "that the materials have come into the agency's possession in the legitimate
conduct of its official duties." *Id.* at 145. The United States Court of Appeals for the District of
Columbia has instructed lower courts to consider the "totality of the circumstances" when
applying this two-part test, and to weigh "a variety of factors surrounding the creation,
possession, control, and use of the document by the agency." *See Consumer Federation of
America v. Dep't of Agriculture*, 455 F.3d 283, 287 (D.C. Cir. 2006) (quotations omitted).

Consistent with the requirement that federal agencies observe "a general philosophy of
full agency disclosure," *Dep't of Air Force v. Rose*, 425 U.S. 352, 372 (1976) (quoting S. Rep.
No. 813, 89th Cong. 1st Sess. 3 (1965)), FOIA places the burden of proof on federal agencies to

prove that requested materials are *not* agency records subject to FOIA. *See* 5 U.S.C. §
552(a)(4)(B); S. Rep. No. 813, 89th Cong., 1 Sess. 8 (1965).  Accordingly, when deciding
whether materials are agency records, a court should construe all ambiguities in favor of the
requesting party. *See Ray v. Turner*, 587 F.2d 1187, 1215 (D.C. Cir. 1978) (holding that when
"ambiguity is present courts should be guided by FOIA's emphasis in increasing disclosure and
Congress' decision to place the burden on the party withholding information.").

Under the totality of the circumstances, the records of the Worker and Visitor Entrance
System ("WAVES") and Access Control Records System ("ACR") that log White House visitor
information, and the access lists, entry logs and event lists recording information about visitors to
the Vice President's residence ("VPR"), are agency records within the meaning of, and subject
to, FOIA.[17]  Indeed, this Court already has applied the *Tax Analyst* test to the class of visitor
records at issue in this case and concluded that they are agency records under FOIA.
*Washington Post v. Dep't of Homeland Security*, 459 F. Supp. 2d 61, 72, 74 (D.D.C. 2006),
*vacated as moot*, 2007 U.S. App. LEXIS 6682 (D.C. Cir. Feb. 27, 2007).[18]  The Secret Service's
course of dealing anchors this Court's decision in *Washington Post*,[19] as it has produced such
records in response to FOIA requests on at least three occasions – to *The Washington Post* during

---

[17] In this brief, the Archive refers to the WAVES, ACR and the VPR visitor access records collectively as
"visitor records."

[18] The Archive understands that the Court's opinion in *Washington Post* is not binding precedent as a
vacated decision.  *Natural Resources Defense Council, Inc. v. Hodel*, 865 F.2d 288, 317 n. 31 (D.C. Cir. 1988).
However, the decision was vacated because *The Washington Post* voluntarily dismissed its complaint, not because
of a successful challenge by the government to the Court's holdings on appeal.  *See Washington Post v. Dep't of
Homeland Security*, Pl. Notice of Voluntary Dismiss., Civ. No. 06-1737 (RMU) (filed Jan. 8, 2007).  For the reasons
stated below, the Archive asserts that the Court's reasoning and decision in *Washington Post* were correct in
substance and that the Court's opinion stands as persuasive authority in this case.

[19] The Secret Service is an agency obligated to disclose government records under FOIA.  *See Allen v.
United States Secret Service*, 335 F. Supp. 2d 95 (D.D.C. 2004); *Kuffle v. United States Bureau of Prisons*, 882 F.
Supp. 1116 (1995) (noting Secret Service response to FOIA request); *Lair v. Dep't of Treasury*, No. 03-827, 2005
U.S. Dist. LEXIS 4645 (D.D.C. March 21, 2005); *U.S. News & World Report v. Dep't of the Treasury*, No. 84-2303,
1986 U.S. Dist. LEXIS 27634 (D.D.C. March 26, 1986).  The Secret Service does not dispute this.

the pendency of its litigation,[20] to CREW in response to FOIA requests seeking visitor records relating to lobbyist Jack Abramoff, among others,[21] and to Judicial Watch in a substantially similar pending case.[22] Notwithstanding this Court's well-reasoned decision in *Washington Post* and the agency's own practices,[23] the Secret Service argues that it cannot disclose the visitor records sought in *this* case because it does not control the records, and any claim that it created them is a "dubious assumption." As demonstrated herein, the Secret Service's arguments are not plausible and cannot be reconciled with Congress' FOIA mandate.

### 1.    The Secret Service Creates the White House and VPR Visitor Records

The Secret Service asserts that its status as the creator of visitor records is "a dubious assumption since the *information* they contain is provided *primarily* by Presidential and Vice Presidential personnel." (Def. Mot. Summ. J. at 22 (emphasis added).) In *Washington Post*, this Court observed that the Secret Service phrased its arguments using words that *encouraged* ambiguity with regard to the identity of the creator of the visitor logs. *Washington Post*, 459 F. Supp. 2d at 69 (noting that the Secret Service did not clearly deny that it could be the creator of

---

[20] *See* note 28, *infra*. The Archive notes that this disclosure was voluntary, leading to *The Washington Post*'s dismissal of the case.

[21] *Citizens for Responsibility and Ethics in Washington v. U.S. Dep't of Homeland Security*, Lyerly Decl. ¶¶ 31, 32, 06-CV-883 (D.D.C. filed Sept. 21, 2006). That case is currently pending before this Court.

[22] *See, e.g., Judicial Watch v. United States Secret Service*, Lyerly Decl. ¶ 19, 06-CV-310 (D.D.C. filed May 16, 2006).

[23] Paul S. Morrissey, Deputy Assistant Director of the United States Secret Service, states in his Third Declaration that "I understand that these releases were made only after the Office of the President and the Office of the Vice President, the exercise of discretion [sic], expressly authorized these releases." Third Declaration of Paul S. Morrissey ¶ 23, Civ. No. 1:06-cv-01912-JGP (D.D.C. May 17, 2006) ("Third Morrissey Decl."). As the Archive explains below, it is not within the discretion of the Office of the President or the Office of the Vice President to determine whether the visitor records should be withheld or released because the "understandings" between the Secret Service and the two Executive Offices provide no authority for them to determine whether the records are agency records and under what terms they may be disclosed pursuant to FOIA. Mr. Morrissey's Declaration is further evidence that the White House and the Secret Service believe that they have boundless discretion to observe or ignore FOIA as they see fit. To the contrary, FOIA is a *mandatory* disclosure scheme, not one that is optional at the discretion of the Executive Branch.

the records and fell short of flatly stating that the President or the Vice President are the creators). The Secret Service repeats the same tactic in this case, using words like "primarily" and "typically" to qualify statements it offers to prove absolutes. By creating such ambiguities, the Secret Service compels this Court to rule for CREW, because when reviewing whether disclosure is required pursuant to a FOIA request, ambiguities are to be resolved in favor of the requesting party. *See Ray v. Turner*, 587 F.2d 1187, 1215 (D.C. Cir. 1978).

Moreover, agency records do not lose their status as such merely because they were created with, and include, information obtained from external sources. Congress intended the term "agency records" to include records and information acquired by an agency, because any other construction "would frustrate Congress' desire to put within public reach the information available to the agency in its decision-making processes." *Tax Analysts*, 492 U.S. at 144 (agency records may include "studies, trade journal reports, and other materials produced outside the agencies both by private and governmental organizations"); *see also Forsham v. Harris*, 445 U.S. 169, 184-85 (1980). Indeed, an immeasurable number of agency records that are created as the result of external prompts and currently are subject to disclosure under FOIA suddenly would become inaccessible if the Secret Service's argument were upheld. For instance, the public could be cut off from the briefings and records compiled by the U.S. Department of State relating to presidential meetings with foreign leaders. Presidential briefings by the Nation's intelligence agencies could be buried. Agency records generated in response to citizen complaints, Congressional requests and directions, and as a consequence of state investigations would be indiscoverable. Obstructing public and media access to such information would deal a catastrophic blow to FOIA, the democratic principles it exists to protect, and Congress' intent to guarantee an open government for its citizens.

With regard to Presidential visitors, the Secret Service concedes that the information it receives is transmitted to *its* WAVES system, which results in WAVES files that are annotated by Secret Service personnel with background information or instructions, and "*coded instructions to Secret Service officers.*" (Def. Mot. Summ. J. at 6 (emphasis added).) The Secret Service maintains complete control over both the WAVES and the ACR files until it transfers the files to the White House Office of Records Management ("WHORM"). (*See id.* at 7-8.) No other entity annotates, edits, generates or accesses the files, which are coded with information specific to the Secret Service. With regard to Vice Presidential visitors, the Secret Service concedes that after it performs a background check, "the information supplied by OVP enters a [Secret Service] computer database that is used to *generate* [access lists, and] . . . entry and exit of visitor to the VPR is noted by the [Secret Service] gatehouse officer in a *handwritten post entry log*." (*Id.* at 10.) The only reasonable conclusion to be drawn from these facts is that the Secret Service is the *only* entity that could be the creator of the visitor records.[24]

## 2.     The Secret Service Controls the White House and VPR Visitor Records

The Secret Service asserts that it does not control the records because its use and reliance on the visitor records is "limited." (Def. Mot. Summ. J. at 23.) Indeed, to the extent that its use of the records is limited, it is only because the records have limited purposes – to clear proposed visitors for entry to see the President and the Vice President and to control the entry and exist of visitors. (*Id.* at 5.) In using the records fully for these purposes, the Secret Service is fulfilling its statutorily mandated protective function. (*Id.* at 4-5, 30.) The fact that it *may* not have a continuing use for the records (*id.* at 23-24) does not alter the fact that the visitor records are an

---

[24] At a minimum, the records "are 'obtained' by the Secret Service in the performance of its duties," *Washington Post*, 459 F. Supp. 2d at 69. Accordingly, the first prong of the *Tax Analysts* test would be satisfied even if the Secret Service were not the creator of the visitor records.

indispensable part of the Secret Service's core function to protect the President and Vice President. Moreover, the Secret Service in fact ***does*** identify a continuing interest that it has in the visitor records – to retain information of protective interest to the Secret Service, such as information resulting from background checks. (Def. Mot. Summ. J. at 23.) Given that the Secret Service's "protective interest" is its primary interest as the agency charged with protecting the President of the United States, it is difficult to conceive of a more paramount interest the Secret Service could have in the records.

What the Secret Service conspicuously ignores is the continuing interest that others may have in the visitor records, specifically Congress and the public. For instance, if there were a security incident at the White House, or if Congress felt it necessary examine the Secret Service's execution of its statutory functions, the visitor records would be unquestionably relevant to the inquiries. Correspondingly, the records have a useful purpose for the public insofar as it may wish to examine the Secret Service's performance of its duties. Thus, while the Secret Service asks the Court to believe that the public's interest in the documents is limited to invading confidential deliberations of constitutional officers (Def. Mot. Summ. J. at 2-3), that plainly is not the case.

In addition, the Secret Service's argument that making the visitor records, which it creates in furtherance of its statutorily mandated duty to protect the President, subject to FOIA would constitute an end run around FOIA's recognition of the executive privilege is unpersuasive. (Def. Mot. Summ. J. at 30). It is the Secret Service's theory that constitutes an end run around the FOIA. By recharacterizing agency records as presidential records, the Secret Service avoids its FOIA obligations completely. Instead, it should justify its withholdings on the basis of the exemptions that Congress enacted into law. Otherwise, any government agency that

has any dealings with the White House involving the exchange of information could make the same argument, which if accepted, would foreclose public access to millions of documents currently obtainable under FOIA. As the Secret Service states, Congress provided an exemption for executive privilege in FOIA, and the Service is free to invoke that and any other assertedly appropriate FOIA exemption to withhold records from disclosure. But Congress did *not* exempt the Secret Service itself from FOIA's reach, as it could have, so the Secret Service may withhold *only* those of its records, or those portions of its records, that fall within a particular FOIA exemption.

Further, the Secret Service argues that it does "not have the 'exclusive control' over the visitor records necessary to make them 'agency records'" (*id.* at 1), because it does not have exclusive control over the information that goes into them (*id.* at 21). This lack of exclusive control could relate to myriad agency records throughout the federal government that rely on citizen, commercial, or other third party input. Further, under the totality of the circumstances test, it need only have sufficient control of the records, which we have shown to be the case. Moreover, if the Secret Service's assertion were accepted as true, then the President and Vice President could not be found to have any more control over the records than the Secret Service. For instance, the Secret Service admits that the visitor records are created using information received from "authorized personnel (including [*i.e., but not limited to*] Presidential and Vice Presidential staff . . .") (*id.* at 5), and that WAVES files consist "*primarily* [*i.e., not exclusively*] of information supplied—usually electronically – by White House pass holders, including [*i.e., but not limited to*] Presidential and Vice Presidential personnel, and ACR records are created *automatically* by the entry or exist of a visitor or other entrant." (*Id.* at 21-22 (emphasis added)) Thus, the Secret Service acknowledges that the President and Vice President do not even control

all of the information from which the visitor records were created, and therefore this basis for Secret Service's argument that it does not control the visitor records themselves must fail.

Having been created by, and within the control of, the Secret Service, the White House and VPR visitor records are agency records subject to FOIA.  Because the Secret Service cannot rebut that conclusion under a reasonable application of the *Tax Analysts* test, it attempts to manipulate the analysis by injecting factors that Congress never intended to be dispositive on the question of FOIA disclosure, *i.e.*, impermissible expansions of executive privileges and attempts to circumvent FOIA through secret agreements.  As described below, these tactics are legally unsupportable and, if tolerated, would undermine the democratic principles on which FOIA is premised.

II.    **THE SECRET SERVICE CANNOT AVOID DISCLOSURE OF THE VISITOR RECORDS UNDER FOIA BY IMPERMISSIBLY EXPANDING EXECUTIVE PRIVILEGES OR REDEFINING FOIA's APPLICABILITY BY SECRET AGREEMENT**

    A.  **The Secret Service Cannot Interpose the Presidential Records Act as a Bar to FOIA Access to White House and VPR Visitor Records**

The Secret Service argues that the visitor records are "preserved by the President and Vice President under the Presidential Records Act ("PRA")." (Def. Mot. Summ. J. at 2.)  It contends that such status insulates them from disclosure under FOIA,  and that such insulation is necessary to preserve the confidentiality of executive communications and "avoid chilling 'the frankness of advice' that the President and the Vice President must expect." (*Id.*)  Further, the Secret Service asserts that disclosure of the visitor records would in actuality frustrate the FOIA. (*Id.*)  The Secret Service is wrong on all points.

The visitor records are not Presidential records, which are defined in the PRA as follows:

The term "Presidential records" means documentary materials, or any reasonably segregable portion thereof, created or received by the President, his immediate

staff, *or a unit or individual of the Executive Office of the* President whose function is to advise and assist the President in the course of conducting activities which relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President. Such term –

(A) includes any documentary materials relating to the political activities of the President or members of his staff, but only if such activities relate to or have a direct effect upon the carrying out of constitutional, statutory, or other official or ceremonial duties of the President; but

(B) *does not include any documentary materials that are . . . official records of any agency* (as defined in [5 U.S.C. § 552(f)] . . .

44 U.S.C. § 2201(2) (emphasis added).

The Secret Service is a division of the Department of Homeland Security, not a unit of the Executive Office with the function of advising and assisting the President in the course of his duties. Moreover, the Secret Service's primary function is to *protect* the President, not to advise him. It is impossible for records that the Secret Service generates or receives to qualify as "Presidential records."

Moreover, the Secret Service's PRA argument puts the cart before the horse. The U.S. Court of Appeals for the District of Columbia has held that the status of a document under the Presidential Records Act is not dispositive of its status under FOIA. *See Bureau of National Affairs v. United States Dep't of Justice*, 742 F.2d 1484, 1493 (D.C. Cir. 1984) (holding "we reject the government's invitation to hold that the treatment of documents for disposal and retention purposes under the various federal records management statutes determines their status under FOIA"). Indeed, it is the law of this Circuit that:

the definition of 'agency' records in the FOIA trumps the definition of 'presidential records' in the [Presidential Records Act] . . . Congress sought to provide a clear limitation on just which materials the President could legitimately assert control over and to preserve the pre-existing body of FOIA law governing the disclosure of government agency records.

*Armstrong v. Executive Office of the President*, 1 F.3d 1274, 1292 (D.C. Cir. 1993). Congress intended the disclosure of agency records under FOIA to take **precedence** over claims of withholding documents under the PRA. In doing so, Congress showed no disrespect to the Office of the President, as it provided enumerated exemptions to protect the interests that must be protected to allow effective operation of the government. *See* S. Rep. No. 813, 89th Cong., 1st Sess. (1965); *Rose*, 425 U.S. at 361 (Congress "explicitly made [the FOIA exemptions] exclusive" (quoting *EPA v. Mink*, 410 U.S. 73, 79 (1980)); 5 U.S.C. § 552(d).

Further, the D.C. Circuit also has held that an agency cannot unilaterally decide that FOIA does not apply to agency records generated while serving the President. *See Ryan v. Dep't of Justice*, 617 F.2d 781, 788 (D.C. Cir. 1980). As the Court in *Ryan* held, "[t]he logical conclusion from the FOIA language and from *Soucie*[25] is that . . . a particular unit is either an agency or it is not. Once a unit is found to be an agency, this determination will not vary according to its specific function in each individual case." *Id.* at 788. Importantly, the Court realized that if a federal agency makes determinations about what is and is not an agency record based on an agency's particular functions related to the President, records could be "somehow transformed" into records not subject to FOIA, and that "this does not appear as either a realistic or intended distinction under the Freedom of Information Act." *Id.* at 787.

However, that is *exactly* what the Secret Service is trying to accomplish here, and the liberties it is taking in doing so are offensive not only Congress' authority to delineate the reach of FOIA and the PRA, but the judiciary's authority to construe those statutes and decide issues

---

[25] 448 F.2d 1067 (D.C. Cir. 1971).

having constitutional implications. Indeed, the Secret Service argues that this Court should

abdicate such authority and responsibility, and

> [d]efer to the Executive's designation of the records as Presidential or Vice
> Presidential, given that those officers and their designees necessarily know
> whether a record was 'created or received . . . in the course of conducting
> activities which relate to or have an effect upon the carrying out of the
> constitutional, statutory, or other official or ceremonial duties of the President [or
> Vice President.

(Def. Mot. Summ. J. at 33 n. 22.)   The federal courts have never shirked their duty to construe

the bounds of FOIA and the companion federal records statutes, and this Court should decline

the Secret Service's invitation for it to do so here.

### B. Allowing Federal Agencies to Abrogate FOIA By Entering Into Secret Agreements With the Executive Would Enable the Government to Shield Significant Activities of Substantial Public Interest from Public Scrutiny

Memoranda of Understanding ("MOU") are widespread in the Federal government.

Federal agencies use them for numerous legitimate purposes, including launching joint

initiatives, assignment management and jurisdictional duties in shared enforcement areas, and

even to coordinate matters relating to national security.[26] They may not, however, be used to

abrogate Congress' statutory commands, confer new powers on a federal agency, or supersede

the authority of a branch of government. *See American Historical Assoc. v. Peterson*, 876 F.

Supp. 1300, 1320 (D.D.C. 1995) ("[N]othing [in the PRA] authorizes the Archivist to enter into

agreements to create special rules for disposition of the records of a particular Presidential

administration, particularly where such agreements conflict with the provisions of the PRA").

However, those are the powers claimed under the Memorandum of Understanding between the

---

[26] *See, e.g.,* Memorandum of Understanding Between the Federal Communications Commission and the National Telecommunications and Information Administration (Jan. 31, 2003) (increasing coordination between radio spectrum management agencies); Memorandum of Understanding Between the Secretary of State, the U.S. Attorney General, the Secretary of Homeland Security, and the Director of Central Intelligence on the Integration and Use of Screening Information to Protect Against Terrorism (Sept. 16, 2003).

Secret Service and the White House, and the similar "understanding" between the Secret Service

and the Office of the Vice President. (Def. Mot. Summ. J. at 9, 11, 21.)  In these agreements, the

parties have determined to undercut FOIA, to circumscribe the judiciary's province and authority

to construe FOIA, and to eviscerate the specific mandatory and judicially enforceable right

created by FOIA for the public to access federal agency records.  They do so by purportedly

assigning "legal custody" of the visitor records to Executive Offices beyond FOIA's reach, and

expressing an intent that those offices "control" the records to avoid their classification as

"agency records."  Not coincidentally, the White House/Secret Service Memorandum was

executed on May 17, 2006, approximately four months after CREW and Judicial Watch

submitted FOIA requests to the Secret Service seeking visitor records,[27] and the OVP/Secret

Service "understanding" was reached on September 13, 2006, while *The Washington Post* was

pursuing a FOIA request submitted to the Secret Service seeking visitor records.[28]

---

[27] *Citizens for Responsibility and Ethics in Washington v. U.S. Dep't of Homeland Security*, Lyerly Decl. ¶ 4, 06-cv-833 (D.D.C. filed Sept. 21, 2006); *Judicial Watch v. U.S. Secret Service*, Lyerly Decl. ¶ 4, 06-cv-310 (D.D.C. filed May 16, 2006).

[28] Although the Secret Service refers to the arrangement with the OVP as an "understanding," the letter from Vice President Cheney's attorney instructing the Secret Service to transfer, and the subsequent destruction of, information regarding visitors to the VPR was more of a directive.  *See* Pete Yost, *White House Officials Had Lengthy Debate Before Deciding To Call Visitor Records Confidential*, Associated Press, June 1, 2007.  The letter from Vice President Cheney's attorney to the Secret Service, which was dated September 13, 2006 (*id.*) followed The Washington Post's June 12, 2006 FOIA request to the Secret Service for WAVES, ACR and VPR visitor logs. *See Washington Post v. Dep't of Homeland Security*, Complaint, Civ. No. 06-1737 (RMU) (filed Oct. 10, 2007). The Washington Post's June 12, 2006 letter to the Secret Service sought expedited processing of its request, citing the immediate and time-sensitive issues surrounding the relationship between The White House and lobbyists in the wake of the Jack Abramoff scandal and concerns about the role of the Office of the Vice President with regard to the CIA leak of Valerie Plame's identity.  *Id.*  The Washington Post's request for expedited processing was at first denied, but on August 31, 2006 was *granted* after an appeal. *Id.*  Counsel for The Washington Post contacted the Secret Service on September 5, 2006 to inquire about the status of its request.  *Id.*  The next day, the Secret Service responded that it was still working on the request and would require more time due to its scope.  *Id.*  However, on September 20, 2006 – seven days after Vice President Cheney's lawyer instructed the Secret Service to turn over and destroy VPR visitor logs – the Secret Service backpedaled on expediting The Washington Post's request, and notified The Post that its FOIA request was denied because the materials sought were not agency records.  *Id.*  It is difficult to imagine that the timing of Vice President Cheney's letter to the Secret Service, in relation to denial of The Washington Post's FOIA request, is mere coincidence.

The use of a Memorandum of Understanding in this fashion is an example of the purposeful routing of an agency record out of agency possession about which the U.S. Supreme Court warned in *Kissinger v. Reporters Committee for Freedom of Press*, 445 U.S. 136, 155 n. 9 (1980) (warning that federal agencies may engage in such transfers to avoid an impending FOIA request). It is also directly contrary to this Court's holding in *Allen v. Dep't of Defense*, 580 F. Supp. 74 (D.D.C. 1983). There, the CIA attempted to avoid disclosing agency records pursuant to a FOIA request seeking records relating to the assassination of President Kennedy. The CIA argued that its MOU with a congressional committee (a government body that is not subject to FOIA, like the Executive Office) investigating the assassination insulated the records from disclosure under FOIA because the MOU provided that the CIA's materials produced during the investigation would be secured from public view for at least 30 years. The CIA's argument was that MOU expressed Congress' intent to control the CIA records and withhold them from public disclosure. *Id.* at 81-82.

This Court rejected that argument, holding that "memoranda, reports and other correspondence specifically created by an agency in response to Congressional requests ***remain subject to FOIA notwithstanding Congress' intent to control the documents***." *Id.* (emphasis added). The Court deemed the ruling necessary in order to be "consistent with the policy underlying FOIA to open the workings of government to public scrutiny." *Id.* The Court also rejected the CIA's argument that the MOU prevented the documents from being "improperly withheld" within the meaning of FOIA.[29]

> The defendant . . . argues that the Memorandum divests the CIA of discretion to grant plaintiff's request . . . However, the court has already determined that the Memorandum does not insulate the vast majority of the records at issue here from

---

[29] The CIA based its argument on *GTE Sylvania, Inc. v. Consumer's Union of the United States*, 445 U.S. 375, 384 (1980), which held that agency records were not improperly withheld from disclosure under FOIA if a court order prohibited their disclosure.

> FOIA. If this court were to endorse the defendants' argument, it would destroy the carefully constructed and strictly applied Goland[] test, *and replace it with a test that would require a mere agreement between the agency and Congress.* The court finds that the records are "improperly withheld" if the agency fails to disclose them, unless they are covered by an exemption found within FOIA, or are exempt under the *Goland*[] formula.

*Allen*, 580 F. Supp. at 82 (emphasis added).

The Court's concern in *Allen* is exactly what the Court should be concerned about in this case – the assumption by a federal agency and the Executive Office that they can replace FOIA and the public's right to disclosure by "mere agreement." The Court should unequivocally reject the use of an MOU to circumvent Congress and the courts in this fashion as an abuse of power that has no legal effect. The consequences of any other holding would be devastating. Federal agencies would be empowered to negotiate the public's access to their records, effectively clothing the government's operations in secrecy. Congress' mission of promoting open government, an informed electorate and government accountability through public scrutiny would be thwarted as innumerable documents slip from public consciousness. In this attempt to hide its operations from the public and the media, the current administration has gone too far. The Court should deny the Secret Service's Motion for Summary Judgment, and in the trial to follow, reaffirm its principled ruling in *Washington Post v. Department of Homeland Security*.

## CONCLUSION

For the foregoing reasons and the reasons set forth in Plaintiff's Opposition to

Defendant's Motion for Summary Judgment, the National Security Archive respectfully requests

that the Court deny Defendant's Motion for Summary Judgment.


Respectfully submitted,


*Burt A. Braverman* (EAD)

Burt A. Braverman (D.C. Bar. No. 178376)
Robert Corn-Revere (D.C. Bar. No. 375415)
Elizabeth A. Drogula*
**DAVIS WRIGHT TREMAINE, LLP**
1919 Pennsylvania Avenue, NW
Suite 200
Washington, DC 20006
(202) 973-4200


Meredith Fuchs (D.C. Bar. No. 450325)
National Security Archive
George Washington University
2130 H Street, NW, Suite 701
Washington, DC 20037


*Counsel for the National Security Archive*


Dated: July 18, 2007

* Admitted in Maryland; DC Bar Admission Pending.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON,<br><br>     Plaintiff,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY,<br><br>     Defendants. | CIVIL ACTION NO:<br><br>1:06-cv-01912-JGP |

**[PROPOSED] ORDER**

Upon consideration of the National Security Archive's Motion for Leave to File a Memorandum of Law as *Amicus Curiae* in Support of Plaintiff, any opposition thereto, and the entire record herein, it is hereby

ORDERED that:

1. The motion is granted.

2. The National Security Archive's *amicus curiae* memorandum is hereby filed.

SO ORDERED.


DATE:                                         _____

                                                     The Honorable John Garrett Penn
                                                     U.S. District Judge