# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, )
)
)
Plaintiff, )
)
v. )
)
U.S. DEPARTMENT OF HOMELAND SECURITY, et al., )
)
)
Defendants. )
)

CIVIL ACTION NO.
1:06-cv-01912-JGP

## REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

PETER D. KEISLER
Assistant Attorney General

CARL J. NICHOLS
Deputy Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

ELIZABETH J. SHAPIRO, D.C. Bar 418925
Assistant Director

JOHN R. TYLER, D.C. Bar 297713
Senior Trial Counsel

W. SCOTT SIMPSON, Va. Bar 27487
Senior Trial Counsel

COUNSEL FOR DEFENDANTS

TABLE OF CONTENTS

INTRODUCTION .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1


ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3


I.      White House and VPR Visitor Records Are Not "Agency Records"
        Subject to the Freedom of Information Act. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        A.      All Relevant Factors Establish that These Are Not
                "Agency Records" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

                1.      The President and Vice President Have a Major
                        Role in Creating the Subject Records. . . . . . . . . . . . . . . . . . . . . . . 4

                2.      The Secret Service Intends to (and Does) Disclaim
                        Any "Control" Over the Subject Visitor Records . . . . . . . . . . . . . 6

                3.      The Secret Service Lacks Disposal Authority
                        Over the Subject Records . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

                4.      The "Extent to Which" the Secret Service Relies
                        on These Records Is Limited Both Temporally
                        and Functionally.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

                5.      The Subject Visitor Records Are Not Integrated into
                        Secret Service Record Systems. . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        B.      Alternatively, the FOIA Must Be Construed as Not Reaching
                the Subject Records in Order to Avoid Serious Questions as
                to Its Constitutionality. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15


II.     Because the Subject Records Are Presidential Records
        Under the PRA, They Are Also Not Federal Records
        Under the Federal Records Act. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20


III.    No Discovery Is Needed or Appropriate Here. . . . . . . . . . . . . . . . . . . . . . . . . . . 21


CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23

<u>INTRODUCTION</u>

Under all of the governing law and circumstances, the types of records of visitors to the White House Complex and the Vice President's Residence ("VPR") at issue here are not "agency records" under the Freedom of Information Act ("FOIA").  Presidential and Vice Presidential staff have a very significant role in the creation of these records, which are under the "control" of the White House and the Office of the Vice President ("OVP") rather than the Secret Service.  All three entities recognize that the White House and OVP control the records, and they exercise that control by directing their handling and disposition and by taking permanent possession of the records.

Plaintiff's own arguments illustrate another reason why these are Presidential and Vice Presidential records.  It contends, on the one hand, that the records should be disclosed because of the President's "pivotal role" as the head of the Executive Branch; the records, plaintiff argues, are "likely to shed light" on the influence of certain third parties on the President.  <u>See</u> Plaintiff's Opposition to Defendants' Motion for Summary Judgment 3-4, 25 (docket #35) [hereinafter Pl's Opp.].  But plaintiff also contends, on the other hand, that a FOIA requester's purpose in seeking records is "not relevant" to their disclosability under that statute.  <u>Id</u>. at 25.  Plaintiff cannot have it both ways:  If the records are valuable because of what they show about the Presidency or Vice Presidency rather than an agency, that fact (with which defendants agree) would tend to show that they are Presidential and Vice Presidential records rather than agency records.  Although FOIA was "enacted to open up [federal agencies] to the light of public scrutiny," <u>id</u>., it was emphatically not enacted to open the Presidency and Vice Presidency to such scrutiny; that task is left to the Presidential Records Act ("PRA").

Notwithstanding the contrary rhetoric of plaintiff and proposed amici, the foregoing does not mean that the subject visitor records are in danger of destruction or will be "shield[ed] from public view." Id. Rather, the question here is essentially one of timing: that is, whether these records will immediately be subject to disclosure under the FOIA, or will be made available for disclosure, pursuant to the PRA, no sooner than five years after the President and Vice President leave office. 44 U.S.C. § 2204(b)(2), (c)(1). Similarly, defendants' arguments are based on the circumstances regarding the records at issue here; defendants do not argue — and their arguments cannot reasonably be understood as meaning — that "any record that in any way involves the President or Vice President . . . is a presidential record." See Amicus Curiae Brief of Judicial Watch, Inc. in Support of Plaintiff at 11 (docket #36) [hereinafter Judicial Watch Amicus Brief]; see also Memorandum of National Security Archive, as Amicus Curiae, in Support of Plaintiff at 10 (docket #37) [hereinafter National Sec. Archive Amicus Brief].[1]

Based on "all of the circumstances" regarding the records in question, plaintiff's challenge under the FOIA should be dismissed. See United We Stand America, Inc. v. IRS, 359 F.3d 595, 600 (D.C. Cir. 2004). Moreover, as plaintiff is admittedly able to oppose defendant's motion for summary judgment on the record now before the Court, the unusual recourse to discovery sought by the plaintiff would be inappropriate.[2]

---

[1] Besides addressing plaintiff's opposition memorandum, this reply responds, as necessary, to the briefs submitted by proposed amici curiae Judicial Watch and National Security Archive.

[2] In addition to arguing the issues addressed herein, defendants' motion for summary judgment explains why nineteen pages of responsive Secret Service records are covered by certain FOIA exemptions. Plaintiff expressly concedes the propriety of these withholdings, which will not, therefore, be discussed in this reply. See Pl's Opp. at 3.

ARGUMENT

I.    White House and VPR Visitor Records Are Not "Agency Records"
      Subject to the Freedom of Information Act

      A.    All Relevant Factors Establish that These Are Not
            "Agency Records"

The Supreme Court has held that documents constitute "agency records" subject to FOIA

if they are (1) created or obtained by an agency, and (2) in the agency's control.  See U.S. Dep't of

Justice v. Tax Analysts, 492 U.S. 136, 144-46 (1989).  The D.C. Circuit uses a four-factor

analysis to determine whether an agency exercises "sufficient control" over a record to render it

an "agency record" under FOIA:

> [1] the intent of the document's creator to retain or relinquish control over the
> records; [2] the ability of the agency to use and dispose of the record as it sees fit;
> [3] the extent to which agency personnel have read or relied upon the document;
> and [4] the degree to which the document was integrated into the agency's record
> system or files.

Tax Analysts v. U.S. Dep't of Justice, 845 F.2d 1060, 1069 (D.C. Cir. 1988) (quoting Lindsey v.

U.S. Bureau of Prisons, 736 F.2d 1462, 1465 (11th Cir. 1984)), aff'd on other grounds, 492 U.S.

136 (1989).[3]

---

[3] While acknowledging that the D.C. Circuit "uses" these four factors in "determining
agency control," plaintiff argues that U.S. Department of Justice v. Tax Analysts, 492 U.S. 136
(1989), and United We Stand America, Inc. v. IRS, 359 F.3d 595 (D.C. Cir. 2004), somehow call
into question the applicability of some of these factors, at least where the materials at issue
"[came] into the agency's possession in the legitimate conduct of its official duties."  See Pl's
Opp. at 15, 17.  Both the D.C. Circuit and this Court, however, continue to rely on all four factors
of this test.  See Burka v. U.S. Dep't of Health & Human Servs., 87 F.3d 508, 515 (D.C. Cir.
1996) (fact that agency would be "tak[ing] physical possession of the [records] at the conclusion
of the project" was only one of several factors considered); Summers v. U.S. Dep't of Justice,
Civil Action No. 97-1715 (EGS), 2007 WL 1541402, at *9 (D.D.C. May 24, 2007) ("To deter-
mine control, the Court must undertake a fact-based inquiry to discern, based upon the totality of
the circumstances, who intended to control the records in question."); Washington Post v.
Department of Homeland Sec., 459 F. Supp. 2d 61, 70 (D.D.C. 2006) ("court must balance four
factors under a totality of the circumstances test").  Plaintiff's singular reliance on an agency's
(continued...)

Under these principles, the White House and VPR visitor records involved here are not "agency records" subject to the FOIA.  Presidential and Vice Presidential personnel have a major role in creating the records, and all four of the D.C. Circuit's factors in analyzing "control" require a finding that the Secret Service lacks sufficient control to classify them as "agency records."

1.     The President and Vice President Have a Major Role
in Creating the Subject Records

Resolution of the first overall requirement — that the records be "created or obtained by an agency" — is not nearly as straightforward in this case as the plaintiff pretends.  Plaintiff vastly understates the role of Presidential and Vice Presidential personnel in creating records of visitors to the White House Complex and VPR — asserting, for example, that the White House, "at most . . . provided some information that led to and was incorporated into the records."  See Pl's Opp. at 22 (emphasis added); see also id. at 13, 16.  In truth, these records would not exist at all if Presidential or Vice Presidential personnel (or other authorized White House passholders) did not prompt their creation, and essentially all of the information in the records that would "shed light" on the President's or Vice President's business is provided by such personnel.  See id. at 3-4.  Indeed, the Presidential and Vice Presidential role in the creation of these records is a necessary product of those officers' statutory direction to accept protection from the Secret Service, extending to the places where they live and work.  18 U.S.C. §§ 3056(a), 3056A(a).

---

[3](...continued)
"possession" of a record "in the legitimate conduct of its official duties" is also refuted by United We Stand itself.  The IRS had received, in the conduct of its official duties, the congressional request that prompted the letter at issue there, but that did not make the request an agency record; indeed, the court held that although the IRS letter was an agency record, those portions of the letter "that would reveal the congressional request" were not.  359 F.3d at 596.

Thus, in scheduling a visit at the White House Complex, an authorized pass holder gives the Secret Service, among other information, the name, date of birth, and Social Security number of the visitor; the name of the person to be visited; the time and location of the visit; and the name of the official or employee submitting the request. See Third Declaration of Paul S. Morrissey, Deputy Assistant Director, United States Secret Service ¶ 10 (May 23, 2007) (Attachment 1 to docket #29) [hereinafter Third Morrissey Decl.]. In fact, Presidential and Vice Presidential personnel usually provide this information electronically, by entering it themselves into a computer terminal, which automatically transmits it to the Secret Service. Id. ¶ 11. That information then becomes the bulk of a Worker and Visitor Entrance System ("WAVES") record, which is typically updated electronically later to reflect the times of the visitor's entry and exit. Id. ¶¶ 11, 15.

The way in which these visitor records are created differs significantly from the creation of records involved in other "agency records" cases. For example, Presidential and Vice Presidential personnel have a much greater role in creating WAVES records than the congressional committee had in creating the IRS letter involved in United We Stand America, Inc. v. IRS, on which plaintiff relies. 359 F.3d 595 (D.C. Cir. 2004) [hereinafter United We Stand].[4] Indeed,

---

[4] Plaintiff's reliance on Paisley v. CIA in this regard is also misplaced. See Pl's Opp. at 23. Paisley involved records of the CIA and FBI reflecting their investigations into the death of a former CIA officer. 712 F.2d 686, 689 (D.C. Cir. 1983). Defendants contended that the records were congressional because a congressional committee had asked the FBI to undertake the investigation; the defendants argued, therefore, that the records were "intimately related to a congressional investigation and may well have not been created but for Congress' investigation of the Paisley death." Id. at 695-96. The court rejected that contention, noting that most of the records were, in fact, "internal agency memoranda about the Paisley investigation and notations of meetings or phone calls between CIA and [congressional] personnel or among CIA personnel alone." Id. at 695. It was in that context that the court said the records were "clearly categorizable as agency records." Id. at 696. This case, in contrast, presents much more than a mere possibility that a body of records "may well have not been created but for" the action of a

(continued...)

the D.C. Circuit's conclusion in United We Stand that "those portions of the [IRS letter] that would reveal the [congressional] request are congressional documents not subject to FOIA," id. 602-03, suggests that FOIA does not apply to any material in a record that reveals information provided by a non-FOIA entity under a reservation of control — which, in relation to this case, would include the name of the visitor, the date of the visit, and who was visited. At the very least, given that the D.C. Circuit analyzes "agency records" issues based on "all of the circumstances," id. at 600, any uncertainties regarding whether a given set of records was "created" by an agency should simply be weighed with other factors in resolving the issue.[5]

       2.       The Secret Service Intends to (and Does) Disclaim
                    Any "Control" Over the Subject Visitor Records

Plaintiff does not address at all the first factor in the appellate court's analysis: the Secret Service's intent to "retain or relinquish" whatever "control" it may ever have over visitor records. See Tax Analysts, 845 F.2d at 1069. The primacy of this factor is reflected in United We Stand, where the D.C. Circuit explained that the non-FOIA entity's "intent to control" and "the agency's ability to control 'fit together in standing for the general proposition that the agency to whom the

_____

[4](...continued)
non-FOIA entity. Rather, the creation of each record involved here was occasioned by the transmission of visitor information by a White House pass holder or Vice Presidential personnel at the VPR. Unlike the records in Paisley, moreover, these records reflect primarily Presidential and Vice Presidential business, not agency business.

[5] The alarmist warnings of both of the proposed amici, regarding the purported ramifications of a judgment for the defendants, are somewhat puzzling in light of their own emphasis on the D.C. Circuit's "totality of the circumstances" approach to agency records issues. See National Sec. Archive Amicus Brief at 7, 8, 13; Judicial Watch Amicus Brief at 5. That Presidential and Vice Presidential personnel have a major role in creating the subject records is only one of many circumstances leading to the conclusion that they are not agency records. Thus, defendants' argument does not compel or suggest a conclusion that all records "created as the result of external prompts" or reflecting an "exchange of information" with the White House are beyond the reach of FOIA. See National Sec. Archive Amicus Brief at 10, 12-13.

6

FOIA request is directed must have **exclusive control** of the disputed documents . . .'" in order

for the records to be considered agency records subject to FOIA.  359 F.3d at 600 (emphasis

added) (quoting Paisley v. CIA, 712 F.2d 686, 693 (D.C. Cir. 1983)).[6]

Plaintiff's omission of the "intent to control" factor is not surprising, for this factor

requires finding that these records are Presidential and Vice Presidential.  The Secret Service

disclaims any interest in the key records involved here, after a visitor's visit is complete, suffi-

cient to justify preserving or retaining them (other than materials of protective interest, such as

records resulting from background checks).  See Third Morrissey Decl. ¶¶ 18, 21-22, 24, 37, 39-

42 & Ex. B.  In contrast, the agency recognizes that such records are under the exclusive legal

control of the President and Vice President; that recognition has been acknowledged both by the

Deputy Assistant Director of the Secret Service's Office of Protective Operations, in his

declaration for this case, and by the Secret Service's Chief Records Officer, in the Memorandum

of Understanding ("MOU") between the agency and the White House Office of Records

Management ("WHORM").  Id. ¶¶ 18, 21-22, 37, 42 & Exs. B & D.[7]

---

[6] The court's observation that the "control" factor "reflects the considerations that underlie" the "use" factor, see Judicial Watch Amicus Brief at 6 n.6 (quoting 359 F.2d at 600), does not undercut the court's statements regarding the importance of the "control" factor.

[7] The MOU between the Secret Service and the WHORM is entirely unlike the agreement between the Archivist and former President Bush in American Historical Association v. Peterson. See National Sec. Archive Amicus Brief at 17; Judicial Watch Amicus Brief at 8.  The court held that the agreement in that case directly contradicted the PRA in several significant respects, such as by stating that the former President would retain "exclusive legal control of all Presidential Information" in certain electronic records.  See 876 F. Supp. 1300, 1318-20 (D.D.C. 1995). Compare 44 U.S.C. § 2202 ("The United States shall reserve and retain complete ownership, possession, and control of Presidential records . . . .").  The MOU involved here, by contrast, simply reflects the "understanding" and intent of the Secret Service and the WHORM regarding the handling of visitor records.  Similarly, the memorandum of understanding addressed in Allen v. Department of Defense purported to prevent disclosure of certain agency records for up to thirty years, 580 F. Supp. 74, 77 (D.D.C. 1983); see National Sec. Archive Amicus Brief at 19,

(continued...)

Moreover, the Secret Service's conduct also reflects its "intent [to] relinquish" whatever "control" it might have over visitor records.  See Tax Analysts, 845 F.2d at 1069.  Since at least 2001, the Secret Service's practice has been to transfer newly-generated WAVES records to the White House Office of Records Management every 30 to 60 days.  See Third Morrissey Decl. ¶ 18; Declaration of Philip C. Droege ¶ 9 (May 23, 2007) (Attachment 2 to docket #29) [hereinafter Droege Decl.]; Declaration of Claire M. O'Donnell, Assistant to the Vice President and Deputy Chief of Staff, Office of the Vice President ¶ 14 (May 23, 2007) (Attachment 3 to docket #29) [hereinafter O'Donnell Decl.].  Access Control Records System ("ACR") records, reflecting actual entry into and exit from the White House Complex, are also transferred to the WHORM. See Third Morrissey Decl. ¶ 22; see id. ¶ 24 (transfer of paper records).  With respect to the VPR, the Secret Service has, since 2001, periodically transferred entry logs — the final record generated due to a request to admit a visitor — to the Office of the Vice President.[8]  Id. ¶¶ 33, 37;

---

[7](...continued)
whereas handling the visitor records involved here as Presidential and Vice Presidential records would make them available to FOIA requesters within the time periods provided by the PRA.

[8] These facts amply refute the assertion by plaintiff and proposed amici curiae that the MOU and the September 13, 2006, letter from the Vice President's Counsel to the Secret Service Chief Counsel were created for purposes of litigation in an attempt to "change the legal status" of the subject records.  See Pl's Opp. at 24; see also National Sec. Archive Amicus Brief at 5, 17-20 & n.28; Judicial Watch Amicus Brief at 7-8.  The records involved here are Presidential and Vice Presidential records, not simply because of the MOU and the OVP letter, but because of "all of the circumstances."  United We Stand, 359 F.3d at 600.  Also, both the MOU and the OVP letter actually pre-dated the commencement of this litigation, and even the submission of plaintiff's FOIA request.  In any event, plaintiff cannot seriously contend that the existence of litigation related to the control of records freezes the government's ability to address those issues internally.  Such a rule would handcuff the government's ability to address any policy or administrative matter once a lawsuit had been filed.  See National Ass'n of Home Builders v. Defenders of Wildlife, 127 S. Ct. 2518, 2537-38 (2007) (deferring to agency letters issued after commencement of litigation); see also Auer v. Robbins, 519 U.S. 452, 462-63 (1997) (deferring to federal agency interpretation of regulation first stated in amicus brief in Supreme Court).  Furthermore, the erstwhile continuation of discussions about the legal issues within the Executive Branch, see
(continued...)

O'Donnell Decl. ¶ 18.  More recently, the same procedure is followed with respect to other records of visitors to the VPR.  See Third Morrissey Decl. ¶¶ 39-41.

While acknowledging that the Secret Service "may not have a continuing interest in retaining the records" in question, see Pl's Opp. at 2, plaintiff asserts that that fact is irrelevant to their legal status.  But this contention directly contradicts controlling precedent.  See Tax Analysts, 845 F.2d at 1069.  It is precisely because the Secret Service has no continuing interest in the records sufficient to justify their retention that the agency intends to "relinquish" possession of them to the President and Vice President.

3.     The Secret Service Lacks Disposal Authority
       Over the Subject Records

The undisputed record in this case also establishes that the Secret Service lacks authority to "dispose of [White House and VPR visitor] record[s] as it sees fit."  See Tax Analysts, 845 F.2d at 1069.  Since WAVES records, ACR records, and VPR visitor records are under the exclusive legal control of the President and Vice President, see Third Morrissey Decl. ¶¶ 18, 21-22, 37, 42 & Exs. B & D; Droege Decl. ¶¶ 8-13; O'Donnell Decl. ¶¶ 7-9, 13-15, the Secret Service necessarily lacks unilateral disposal authority over them.  Moreover, as noted above, the Secret Service does not dispose of these records after use — notwithstanding its lack of continuing interest in them sufficient to justify their preservation — but rather transfers them to the White House Office of Records Management and to the OVP.  See Third Morrissey Decl. ¶¶ 18, 22, 37, 39-41; Droege Decl. ¶ 9; O'Donnell Decl. ¶¶ 14, 18.

_____

[8](...continued)
Pl's Opp. at 24 n.15, does not change or override the facts as to the treatment of visitor records, as described in the declarations submitted with defendants' motion for summary judgment.

Plaintiff's arguments on this factor do not suggest any independent disposal authority on the part of the Secret Service.  First, plaintiff cannot rely on the fact that the agency's intent is to dispose of its copy of visitor records after transferring them to the WHORM or the OVP.  <u>See</u> Pl's Opp. at 17; <u>see also</u> Judicial Watch Amicus Brief at 7.  In this day of rapid document photo-copying and nearly ubiquitous electronic records, there will almost always be additional copies of a record, presenting an issue as to the disposition of such copies after the "original" reaches its final destination.  Presidential and Vice Presidential personnel are aware of the Secret Service's intent to dispose of its copies of visitor records after transfer, which does not, therefore, suggest any independent authority on the part of the Secret Service.  <u>See</u> Third Morrissey Decl. ¶ 21 & Ex. B; Droege Decl. ¶¶ 9, 11 & Ex. A; O'Donnell Decl. ¶ 20 & Ex. A.[9]

Nor can plaintiff rely on the fact that the Secret Service currently retains its copies of visitor records, in deference to the courts in light of pending litigation and FOIA requests.  <u>See</u> Third Morrissey Decl. ¶¶ 19, 20, 22, 24, 39-41.  Plaintiff ignores the fact that this temporary retention of records is occurring with the approval of the White House Office and the Office of the Vice President.  <u>Id</u>. ¶¶ 26, 44. Moreover, the Secret Service is currently following this temporary practice only to accommodate pending litigation and FOIA requests and to permit this Court (and other courts) to resolve the issues before it; this practice does not reflect the long-term intent of the Secret Service and the President and Vice President with respect to the records.  <u>Id</u>. ¶¶ 18-20, 22, 24, 39-41.  Further, plaintiff's reliance on the temporary retention of copies of such records is strikingly inappropriate given that the plaintiff has sought, in this very action, to

---

[9] Contrary to plaintiff's argument, no Secret Service declaration has "explained" that the agency's destruction of its copies of visitor records has "not [occurred] at the request or directive of the White House."  <u>See</u> Pl's Opp. at 17.  The declaration cited by the plaintiff is simply silent as to any White House direction.

compel the Secret Service to refrain from transferring any potentially responsive records to the White House without retaining a copy.  See Plaintiff's Motion for a Temporary Restraining Order, Feb. 15, 2007 (docket #12).

Next, plaintiff recites the fact that the Secret Service has previously submitted proposed disposition schedules covering visitor records to the National Archives and Records Administration.  See Pl's Opp. at 18.  Nothing in those proposed schedules, however, contradicts anything in the declarations submitted on defendants' behalf in this case, or otherwise suggests that the Secret Service actually had disposal authority.  The proposed schedules were submitted in 1990, 1993, and 1996.  Id., Ex. 4.  In contrast, the Secret Service's declaration regarding the status of visitor records states that the agency's practice of transferring WAVES records to the WHORM has existed "[s]ince at least 2001," and that the practice of transferring VPR post entry logs to the OVP has existed "[s]ince 2001."  See Third Morrissey Decl. ¶¶ 18, 37.

In any event, plaintiff's argument ignores the fact that the Archivist, not the record-holding agency, promulgates a final schedule.  44 U.S.C. §§ 3303, 3303a; 36 C.F.R. §§ 1228.20, 1228.22, 1228.24.  Only at that point is an agency authorized to dispose of records.  44 U.S.C. § 3314; 36 C.F.R. §§ 1228.20, 1228.26.  Specifically in relation to this case, the proposed Secret Service schedules filed with plaintiff's opposition are marked as "WITHDRAWN."  See Pl's Opp., Ex. 4.

Finally, plaintiff and proposed amicus Judicial Watch rely on the fact that the Secret Service has, at times, disclosed certain visitor records in other cases.  See id. at 18-19; see also id. at 5 n.3; Judicial Watch Amicus Brief at 3–4, 7, 8, 12-13.  Prior disclosures of visitor records in recent litigation have occurred, however, with the express authorization of the Office of the

President and the Office of the Vice President.  <u>See</u> Third Morrissey Decl. ¶ 23.[10]  Additionally, in disclosing visitor records in <u>Judicial Watch v. U.S. Secret Service</u>, on which plaintiff and proposed <u>amicus</u> place special reliance, <u>see</u> Pl's Opp. at 5 n.3, 19, the Secret Service stated, through counsel, that the production was not a concession as to the status of the records.  <u>See</u> Pl's Mo. to Compel, <u>Judicial Watch v. U.S. Secret Service</u>, Case No. 1:06-CV-00310 (JGP) (D.D.C.), Ex. 3 (Attachment 1 hereto).  In any event, the discretionary release of certain documents in response to a FOIA request does not waive arguments for non-disclosure except as to the very records that are released.  <u>See</u> <u>Mobil Oil Corp. v. EPA</u>, 879 F.2d 698, 700 (9th Cir. 1989); <u>see also</u> <u>Armstrong v. Executive Office of the President</u>, 90 F.3d 553, 566 (D.C. Cir. 1996) ("That the NSC . . . voluntarily subjected certain of its records to the FOIA . . . does not reflect any intention to concede, and should not be taken to establish as a matter of law, that the NSC is subject to [the FOIA]."); <u>Mehl v. EPA</u>, 797 F. Supp. 43, 47-49 (D.D.C. 1992) (one asserting waiver of FOIA exemption must show that "the withheld information has already been specifically revealed").

> 4.    The "Extent to Which" the Secret Service Relies on These
>        Records Is Limited Both Temporally and Functionally

The next factor in the D.C. Circuit's analysis is "the extent to which agency personnel have read or relied upon the document."  <u>Tax Analysts</u>, 845 F.2d at 1069.  Plaintiff seeks to add a substantive gloss to this factor, arguing that the visitor records constitute agency records because

---

[10] Plaintiff attempts to dismiss the declarant's statement to this effect on grounds that the declarant lacks personal knowledge.  <u>See</u> Pl's Opp. at 19-20 & n.11.  In the context of FOIA, however, the declaration of "the most appropriate person to provide a comprehensive affidavit" is acceptable.  <u>See</u>, <u>e.g.</u>, <u>Brophy v. U.S. Dep't of Defense</u>, No. Civ.A. 05-360 (RMC), 2006 WL 571901, at *4 (D.D.C. Mar. 8, 2006).  Where many persons are involved in the agency's "efforts in response to [a] FOIA request," a person coordinating those efforts is an appropriate declarant.  <u>Id</u>.

they are "essential to the agency's performance of its statutorily mandated function."  See Pl's

Opp. at 21.  But plaintiff cites no authority for this formulation, and, as far as defendants are

aware, there is none.  Moreover, plaintiff's assertion contradicts the D.C. Circuit's instruction that

an agency's use of a record "alone . . . is not dispositive" of its status.  See Bureau of National

Affairs, Inc. v. U.S. Dep't of Justice, 742 F.2d 1484, 1492 (D.C. Cir. 1984).[11]

    As properly formulated, this factor also demonstrates that visitor records are Presidential

and Vice Presidential records rather than agency records.[12]  As soon as a visitor leaves the White

House Complex or the VPR, the Secret Service has no continuing interest in the corresponding

WAVES records, ACR records, paper access requests, or VPR visitor records  — other than any

information of protective interest, such as records resulting from background checks — sufficient

to justify preserving or retaining them.  See Third Morrissey Decl. ¶¶ 18, 24, 37, 39-41.  In

contrast, the President and Vice President have a continuing interest, both operationally and

historically, in records reflecting who has visited the White House and the VPR — which is why

possession of the records is transferred to the WHORM after the visits to which they relate.  Id.

¶¶ 18, 21, 22, 24, 37, 39-42 & Exs. B, D; Droege Decl. ¶¶ 9, 12, 14; O'Donnell Decl. ¶¶ 14, 18,

22.

_____

    [11] The argument of proposed amicus Judicial Watch that "use is the decisive factor" is
based on a misquotation from the D.C. Circuit's decision in Consumer Federation of America v.
Department of Agriculture.  See Judicial Watch Amicus Brief at 5 n.5.  The court did not say that
use is always the "decisive factor," but that it was considering four factors — "creation, location/
possession, control, and use" — and that it found "use" to be "the decisive factor here."  455 F.3d
283, 288 (D.C. Cir. 2006) (emphasis added).

    [12] The D.C. Circuit's decision in Ryan v. Department of Justice, 617 F.2d 781 (D.C. Cir.
1980), is not to the contrary.  See National Sec. Archive Amicus Brief at 16.  The court there
held, not that a record in the possession of an "agency" is necessarily an "agency record" — the
proposition for which proposed amicus cites it — but rather that all components of an entity
determined to be an "agency" for FOIA purposes will also themselves be "agencies."  617 F.2d at
787-88.

Plaintiff largely ignores the limited degree and duration of the Secret Service's use of visitor records, asserting that the agency "regularly and continuously reads and relies" on this type of record.  See Pl's Opp. at 21.  Apparently plaintiff believes that because the Secret Service "regularly" uses records of the kind sought here, every record of that kind becomes an agency record, notwithstanding the brief and limited nature of the agency's use of it.  But there is no authority for such a concept; moreover, what plaintiff argues is contrary to the scope of FOIA, which permits a requester to seek individual records rather than to control what happens to all records of a particular type.

> 5.    The Subject Visitor Records Are Not Integrated into
>        Secret Service Record Systems

Finally, the D.C. Circuit considers "the degree to which the document was integrated into the agency's record system or files."  Tax Analysts, 845 F.2d at 1069.  While recognizing that the Secret Service holds visitor records only "in the short term," plaintiff argues that this factor militates in favor of an "agency records" finding because the records are "transferred to the agency's computer servers" and remain there "after the White House visits are concluded."  See Pl's Opp. at 20, 21.  That the records reside temporarily on the Secret Service's servers does not mean, however, that they have been "integrated" into the agency's other files.  Since most records today exist in electronic format — and many exist in no other format — an agency's possession of a record in electronic format is no more meaningful than possession in any other format.

Nor is a visitor record transformed into an agency record by the Secret Service's brief possession of it after the visit concludes.  Transferring the records of each visit immediately after the visit would be unnecessarily burdensome; that the transfers are effected in batches should not convert these Presidential and Vice Presidential records into agency records.  Indeed, the

Memorandum of Understanding regarding visitor records expressly acknowledges that "[a]ny temporary retention of WHACS Records by the Secret Service after the visit, entrance, or exit memorialized by those records is solely for the purpose of facilitating an orderly and efficient transfer of those records, and does not operate in any way to divest the White House of complete and exclusive legal control."  See Third Morrissey Decl. ¶ 21 & Ex. B.

Finally, the fact that the Secret Service is now retaining copies of visitor records as an accommodation to the courts — and as the plaintiff itself has sought — should not affect the "agency records" analysis.  See Pl's Opp. at 20-21.  As noted above, both the White House Office and the Office of the Vice President have specifically approved this temporary retention of Presidential and Vice Presidential records.  See Third Morrissey Decl. ¶¶ 26, 44; see also Droege Decl. ¶ 9.  Further, plaintiff's theory that retention of electronic records on an "agency's computer servers" makes them agency records cannot apply to WAVES records, see Pl's Opp. at 20, which are purged from the Secret Service's servers after 60 days.  See Third Morrissey Decl. ¶ 18.

B.    Alternatively, the FOIA Must Be Construed as Not Reaching
the Subject Records in Order to Avoid Serious Questions as
to Its Constitutionality

If one potential interpretation of a statute would raise "serious constitutional problems" whereas another interpretation without constitutional problems is "fairly possible," the courts are "obligated to construe the statute to avoid such problems."  INS v. St. Cyr, 533 U.S. 289, 299-300 (2001) (emphasis added).  Given the constitutionally based and congressionally recognized need for confidentiality in Presidential and Vice Presidential communications and activities, FOIA must be construed as not reaching the subject records — assuming that were not already clear as a statutory matter.  Plaintiff's opposition is most notable for what it does not say on this subject.  Plaintiff does not, for example, dispute that a statute susceptible to two interpretations,

15

one of which would raise "serious constitutional problems" and the other of which would not, must be construed so as to avoid those problems.  See id.  Nor could the plaintiff dispute this principle, which is well-settled and irrefutable here.  Plaintiff simply disagrees that the FOIA can fairly be construed as not reaching the subject records.  See Pl's Opp. at 27.  That, of course, is the ultimate issue discussed above.

Plaintiff also does not dispute the constitutional need for confidentiality in Presidential and Vice Presidential communications and activities.  This principle, also, is well-settled and irrefutable here.  As the Supreme Court has recognized, "a President's communications and activities encompass a vastly wider range of sensitive material than would be true of any 'ordinary individual.'"  United States v. Nixon, 418 U.S. 683, 715 (1974).  Thus, for example, as the D.C. Circuit has said, en banc, "separation-of-powers concerns" mandate permitting the President and Vice President, "in making decisions on personnel and policy, and in formulating legislative proposals . . . to seek confidential information from many sources, both inside the government and outside."  In re Cheney, 406 F.3d 723, 728 (D.C. Cir. 2005); see Cheney v. U.S. Dist. Ct., 542 U.S. 367, 383, 385 (2004) (recognizing "the Executive Branch's interests in maintaining the autonomy of its office and safeguarding the confidentiality of its communications are implicated"); Nixon v. Adm'r of Gen. Servs., 433 U.S. 425, 448-49 (1977) ("Unless he can give his advisers some assurance of confidentiality, a President could not expect to receive the full and frank submissions of facts and opinions upon which effective discharge of his duties depends.").  In short, "the public interest requires that a coequal branch of Government 'afford Presidential confidentiality the greatest protection consistent with the fair administration of

justice.'" <u>Cheney v. U.S. Dist. Ct.</u>, 542 U.S. at 382 (quoting <u>United States v. Nixon</u>, 418 U.S. at 715).[13]

These very concerns have led Congress to treat Presidential and Vice Presidential records differently from agency records. In enacting the Presidential Records Act, Congress recognized that "premature disclosure" of the former would chill "the frankness of advice [that Presidents and Vice Presidents] could expect from their staffs." <u>See</u> H.R. Rep. No. 95-1487, at 8 (1978), <u>reprinted in</u> 1978 U.S.C.C.A.N. 5732, 5739. The courts have recognized, in fact, that any other approach to the disclosure of Presidential and Vice Presidential records would "raise a constitutional issue of separation of powers." <u>Ryan v. Department of Justice</u>, 617 F.2d 781, 788 n.19 (D.C. Cir. 1980); <u>see</u> <u>Armstrong v. Bush</u>, 924 F.2d 282, 290 (D.C. Cir. 1991) (noting that Congress "sought assiduously to minimize outside interference with the day-to-day operations of the President and his closest advisors and to ensure executive branch control over presidential records during the President's term of office").

While tacitly (and necessarily) acknowledging these principles, plaintiff nevertheless disagrees that disclosure of the visitor records at issue would "reveal[ ] confidential matters deserving of constitutional protection." <u>See</u> Pl's Opp. at 27. Specifically, plaintiff argues that the records do not contain information whose disclosure would violate Presidential or Vice

---

[13] Notwithstanding that the <u>Cheney</u> case dealt with discovery rather than a FOIA request, <u>see</u> Judicial Watch Amicus Brief at 13, the courts' acknowledgment of the need for confidentiality in Presidential communications applies in both contexts. Indeed, the discovery sought in <u>Cheney</u> was virtually identical to the information sought through the FOIA request here: documents identifying persons with whom government officials had met in formulating policy. <u>See</u> 542 U.S. at 387.

Presidential confidentiality, because they do not reflect the "purpose of the visits" or the relationship of a visitor to any outside organization. <u>Id</u>. at 27-28.[14]

Plaintiff understates, however, the harm to Presidential and Vice Presidential decision-making that would be caused by the disclosure of visitors' names. The President and Vice President and their staffs necessarily carry out much of their constitutional responsibility by meeting and consulting with visitors. The names of many visitors would reveal — merely because of the visitor's well-known or easily ascertainable occupation and views — the likely subject matter and tenor of the visit, if not its precise "purpose." Thus, immediate disclosure of the identity of the President's and Vice President's visitors could reveal the nature of initiatives under consideration or suggest how the President or Vice President may decide pending issues, before the decisions are made. <u>See</u> O'Donnell Decl. ¶¶ 8, 22 (describing harm to Vice Presidential deliberations).

Disclosure of the names of economists who visit the White House, for example, could reveal economic initiatives under consideration, thus potentially affecting economic markets regardless of whether any such initiative were ultimately adopted. Likewise, disclosure of the names of judges who visit the White House during a vacancy on the Supreme Court could reveal whom the President is considering for the vacancy, and who was seriously considered but not chosen. And, on the most sensitive national security issues, disclosure of the names of security experts who visit the White House might reveal the kinds of anti-terrorism measures under consideration, by virtue, for example, of the visitor's known area or areas of expertise.

---

[14] Plaintiff also argues that ACR records do not identify the person being visited within the Complex or who scheduled the visit. <u>See</u> Pl's Opp. at 28. WAVES records do contain that information, however, and plaintiff's FOIA request is not limited to ACR records.

In these and a myriad of other ways, "premature disclosure" of the identity of visitors to the White House Complex and the VPR would impede the ability of the President and Vice President to receive "full and frank submissions of facts and opinions" and to "seek confidential information from many sources, both inside the government and outside." See H.R. Rep. No. 95-1487, at 8, reprinted in 1978 U.S.C.C.A.N. at 5739; Nixon v. Adm'r of Gen. Servs., 433 U.S. at 448-49; In re Cheney, 406 F.3d at 728. Accordingly, assuming the status of the subject records were not so clear as a statutory matter, the FOIA would have to be construed as not reaching them to avoid "serious . . . problems" as to its constitutionality. See St. Cyr, 533 U.S. at 299-300. By the same token, even if these records could be seen as having any characteristics of agency records, they should be construed as non-agency records to avoid the same separation of powers concerns that caused Congress to exclude Presidential and Vice Presidential records from the reach of FOIA.

Indeed, plaintiff's own allegations and arguments — in both its complaint and its opposition to summary judgment — illustrate that subjecting White House and VPR visitor records to FOIA, without the delay contemplated by the PRA, would violate the necessary confidentiality of Presidential and Vice Presidential communications. The complaint acknowledges, for example, that visitor records constitute "important historical evidence" and that their disclosure would reveal "the influences to which the Bush administration has been subject." See Complaint ¶¶ 9, 48. Likewise, plaintiff's opposition argues that disclosure of these records would "open up" the Presidency and Vice Presidency "to the light of public scrutiny." See Pl's Opp. at

25.  It is precisely that "public scrutiny" that Congress wished to delay by excepting Presidential and Vice Presidential records from the reach of FOIA.[15]

II.     Because the Subject Records Are Presidential Records
        Under the PRA, They Are Also Not Federal Records
        Under the Federal Records Act

        Plaintiff seems to acknowledge, as it must, that the viability of its claims under the Federal Records Act is coextensive with the viability (or lack thereof) of its claims under the FOIA.  See Pl's Opp. at 30.  Since the visitor records at issue here are "Presidential records" under the PRA, they are not "agency records" under FOIA, and are necessarily also not "federal" records under the FRA.  See Armstrong v. Executive Office of the President, 90 F.3d 553, 556 (D.C. Cir. 1996).[16]

        In arguing that it has standing to challenge the transfer of visitor records to the WHORM notwithstanding their preservation under the PRA, plaintiff asserts that it is challenging the Secret Service's destruction of its own copies of the records after transfer to the White House,

_____

        [15] That the PRA expressly applies only to those materials that do not constitute "agency records" under the FOIA, see Pl's Opp. at 29, does not obviate the facts that certain records are, indeed, Presidential and Vice Presidential records rather than agency records, and that Congress intended to delay disclosure of the former until after the incumbents leave office.  That provision in the PRA — excluding from the term "Presidential records" any materials that constitute "official records of an agency" under the FOIA — simply prevents the two statutes from overlapping.  44 U.S.C. § 2201(2)(B); see Armstrong v. Executive Office of the President, 1 F.3d 1274, 1292 (D.C. Cir. 1993) (noting that provision was intended to prevent "the potential definitional overlap between agency records under the FOIA and Presidential records under the PRA").

        [16] Plaintiff ignores (and thereby apparently concedes) defendants' assertion that the courts should defer to the Executive's designation of the subject records as Presidential or Vice Presidential — assuming their status were not so clear as a statutory matter — since those officers are in a position to know whether the records were "created or received . . . in the course of conducting activities which relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President [or Vice President]."  See 44 U.S.C. § 2201(2).

and that it is harmed by the potential for the President to "dispose of those of his Presidential records that no longer have administrative, historical, informational, or evidentiary value," which neither Congress nor the Archivist can "veto."  See Pl's Opp. at 31 & n.21.  The destruction of a copy of a set of records, when the originals continue to exist, does not, however, constitute a cognizable injury under Armstrong v. Bush, 924 F.2d 282 (D.C. Cir. 1991).  The D.C. Circuit found standing there because "one of the reasons that Congress mandated the creation and preser-vation of federal and presidential records was to ensure that private researchers and historians would have access to the documentary history of the federal government."  Id. at 287.  The Archivist's preservation of Presidential and Vice Presidential records under the PRA makes them available to "private researchers and historians."  Further, the potential for the President to dispose of records having no "administrative, historical, informational, or evidentiary value," is far too speculative as a basis for standing.

III.    No Discovery Is Needed or Appropriate Here

Plaintiff's own actions in this case defeat its argument that discovery is needed.  Rather than invoking Rule 56(f) of the Federal Rules of Civil Procedure by stating in an affidavit why it cannot present "facts essential to justify [its] opposition" to defendants' motion for summary judgment — as a party must do to secure discovery in the face of such a motion — plaintiff has opposed defendants' motion on its merits.  See Strang v. United States Arms Control & Disarma-ment Agency, 864 F.2d 859, 861 (D.C. Cir. 1989) (affirming denial of discovery where plaintiff had failed to "state[ ] concretely" why discovery was needed).  Indeed, plaintiff affirmatively argues that "defendants' motion for summary judgment must be denied as unsupported by the current record," thus conceding that discovery is unnecessary to oppose it.  See Pl's Opp. at 2-3.

Even without that concession, discovery would be inappropriate here.  In the FOIA

context, any request for discovery "must" be denied where the government's declarations are

"sufficiently detailed and submitted in good faith."  Allen v. U.S. Secret Service, 335 F. Supp. 2d

95, 100 (D.D.C. 2004); see Goland v. CIA, 607 F.2d 339, 352 (D.C. Cir. 1978) (court may forgo

discovery in FOIA case if affidavits are "relatively detailed and nonconclusory" and "submitted

in good faith"), vacated in part on other grounds, 607 F.2d 367 (D.C. Cir. 1979) (per curiam).

Even where the supporting declarations are inadequate, "the courts generally will request that the

agency supplement" its declarations rather than ordering discovery.  Judicial Watch, Inc. v. U.S.

Dep't of Justice, 185 F. Supp. 2d 54, 65 (D.D.C. 2002); accord Flowers v. IRS, 307 F. Supp. 2d

60, 68 (D.D.C. 2004) ("Even if an agency's affidavits regarding its search are deficient, courts

generally do not grant discovery but instead direct the agency to supplement its affidavits."); see

also Nation Magazine v. U.S. Customs Service, 71 F.3d 885, 892 (D.C. Cir. 1995) (directing

district court to order agency "to submit further affidavits").

Plaintiff has shown no basis for discovery under these standards.  In relation to the

completeness of defendants' declarations, plaintiff asserts that the record lacks evidence regard-

ing an internal Executive Branch "debate" regarding the status of White House and VPR visitor

records.  See Pl's Opp. at 32.  But the status of these records under the law depends on the facts

surrounding their creation, use, and handling, not on any internal government discussions regard-

ing those facts or regarding the government's position.  Plaintiff's only hope can be to find some-

thing in the internal discussions that might contradict defendants' declarations, but the plaintiff in

a FOIA case may not obtain discovery on "a bare hope of falling upon something that might

impugn the [agency's] affidavits."  Flowers, 307 F. Supp. 2d at 68 (quoting Military Audit Project

v. Casey, 656 F.2d 724, 751-52 (D.C. Cir. 1981)).  Plaintiff also asserts that the declarants have

submitted declarations in other, similar cases, "with sometimes critically varying facts," <u>see</u> Pl's Opp. at 32; but plaintiff's opposition does not point specifically to any such conflict.[17]  Nor does plaintiff allege that defendants' declarations have been submitted in bad faith, and there would be no basis for any such allegation.

Finally, plaintiff makes much of the fact — both in relation to discovery and elsewhere in its opposition — that the Memorandum of Understanding between the White House and the Secret Service and the letter from the Vice President's counsel to the Secret Service were not filed earlier in FOIA litigation.  <u>See</u> Pl's Opp. at 33; <u>see also</u> <u>id</u>. at 6.  An agency has no obligation, however, to reveal the existence of an internal government document that <u>supports</u> its position.  Additionally, in relation to <u>The Washington Post v. U.S. Department of Homeland Security</u>, <u>see</u> <u>id</u>. at 6, the government can hardly be faulted for failing to file the MOU with its opposition to the motion for preliminary injunction, on October 14, 2006, when the complaint and motion had been filed only four days earlier, on October 10, 2006.  The MOU was submitted with the government's next district court filing in <u>The Washington Post</u>, on October 25, 2006.

CONCLUSION

For the foregoing reasons and for those stated in defendants' opening memorandum, defendants' motion for summary judgment should be granted, and this action dismissed with prejudice.

Dated:  August 1, 2007

---

[17] Plaintiff's response to defendants' statement of material facts not in dispute refers to one alleged "inconsistency":  that earlier declarations by the Office of the Vice President did not say that that Office provided visitor information to the Secret Service "on a confidential basis."  <u>See</u> Plaintiff's Statement and Response to Defendants' Statement of Material Facts as to Which There Is No Genuine Issue ¶ 6 (docket #35).  That is not, however, an "inconsistency," but merely an additional fact that was not included in earlier declarations.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

CARL J. NICHOLS
Deputy Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

ELIZABETH J. SHAPIRO, D.C. Bar 418925
Assistant Director

JOHN R. TYLER, D.C. Bar 297713
Senior Trial Counsel

_____
W. SCOTT SIMPSON, Va. Bar 27487
Senior Trial Counsel

Attorneys, Department of Justice
Civil Division, Room 7210
Post Office Box 883
Washington, D.C. 20044
Telephone:  (202) 514-3495
Facsimile:  (202) 616-8470
E-mail: scott.simpson@usdoj.gov

COUNSEL FOR DEFENDANTS

# <u>Attachment 1</u>

Exhibit 3 to Plaintiff's Motion to Compel,

<u>Judicial Watch v. U.S. Secret Service</u>,

Case No. 1:06-CV-00310 (JGP) (D.D.C.)



**U.S. Department of Justice**

Civil Division, Federal Programs Branch

| | |
|---|---|
| **Via First-Class Mail** | **Via Overnight Delivery** |
| P.O. Box 883 | 20 Massachusetts Ave., N.W. |
| Ben Franklin Station | Rm. 7224 |
| Washington, D.C. 20044 | Washington, D.C. 20001 |

Justin M. Sandberg
Trial Attorney

Tel: (202) 514-3489
Fax: (202) 616-8202
email: *justin.sandberg@usdoj.gov*

May 10, 2006

BY HAND DELIVERY

Judicial Watch, Inc.
Christopher J. Farrell
501 School St., S.W.
Suite 500
Washington, D.C. 20024

Dear Judicial Watch:

On January 20, 2006, you submitted to the United States Secret Service a Freedom of Information Act (FOIA) request for records "concerning, relating to, or reflecting . . . [a]ll White House visitor logs from January 1, 2001 to present that reflect the entries and exits of lobbyist Jack Abramoff from the White House."

Pursuant to the stipulation to which we voluntarily agreed, and without conceding that the documents constitute "agency records" under FOIA, we are providing you with the enclosed documents that are responsive to your FOIA request. No exemptions have been claimed, and no responsive documents or portions thereof have been withheld. In addition, please be advised that the enclosed documents were found as the result of a computer-generated query of electronic entry and exit logs for the White House Complex, and that the system does not differentiate between individuals with the same name.

Sincerely,

Justin M. Sandberg
Trial Attorney
U.S. Department of Justice, Civil Division

Enclosures