### UNITED STATES DISTRICT COURT
#### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON,** ) ) ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 06-1912 (RCL)** |
| ) | |
| **UNITED STATES DEPARTMENT OF HOMELAND SECURITY, et al.,** ) ) ) | |
| **Defendant.** ) | |

## MEMORANDUM OPINION

### INTRODUCTION

Plaintiff Citizens for Responsibility and Ethics in Washington (CREW), a non-profit organization and self-described government watchdog, filed a Freedom of Information Act request with the United States Secret Service, a component of the United States Department of Homeland Security, for documents relating to nine individuals. CREW sought all records in the Secret Service's possession showing that any of these nine individuals, described as prominent "conservative Christian leaders," had recently visited the White House or the Vice President's Residence. When the Secret Service failed to respond to this request in a timely fashion, CREW filed the present action under the Freedom of Information Act, the Federal Records Act, and the Administrative Procedure Act, challenging not only the Secret Service's failure to respond to its request, but the Secret Service's policy of deleting certain White House visitor logs.

-1-

# BACKGROUND

## I.

Charged by federal statute with protecting the President and Vice-President of the United States and their immediate families, *see* 18 U.S.C. §§ 3056, 3056A (2007 Suppl.), the Secret Service monitors visitors to the White House Complex[1] and the Vice-President's Residence.[2]  Neither the President nor the Vice-President may refuse this protection.  As part of this mandatory duty, the Secret Service performs background investigations of individuals before they enter either area and supervises the entry and exit of each visitor as they make their scheduled visit.  An assortment of records are created as the Secret Service performs these twin tasks.  What follows is a description of the different types of records that are created at the White House Complex and the Vice-President's Residence, as well as a summary of the Secret Service's record retention practices.

### A.    The White House Complex

#### 1.  Document Creation

The Secret Service monitors visitors to the White House Complex using two interrelated electronic systems known as the Worker and Visitor Entrance System (WAVES) and the Access

---

[1]  The White House Complex includes the White House, the Eisenhower Executive Office Building (EEOB), the grounds encompassing both the White House and the EEOB, and the New Executive Office Building (NEOB).  The EEOB and NEOB house various staff members of the Executive Office of the President and the Office of the Vice-President, including the Vice-President himself.  *See* Third Declaration of Paul S. Morrissey at ¶ 5.

[2]  The Vice-President's Residence is located at One Observatory Circle in Washington, D.C., on the grounds of the United States Naval Observatory.  *See* 3d Morrissey Decl. at ¶ 6.

The Secret Service is also authorized to protect the President-elect and Vice-President-elect, former Presidents and their spouses and children, visiting heads of foreign states, and major Presidential and Vice-Presidential candidates.  *See* 18 U.S.C. § 3056(a)(1)-(7).

Control Records System (ACR). These two electronic systems are collectively known as the White House Access Control System (WHACS). 3d Morrissey Decl. at ¶ 8. Both WAVES and ACR records are central to CREW's document request.

The process by which a visitor enters the White House Complex typically begins when an authorized White House pass holder – who may be (but is not always) a member of the President's or Vice-President's staff[3] – notifies the Secret Service that an individual is scheduled to visit the Complex. 3d Morrissey Decl. at ¶ 9. The White House pass holder, in notifying the Secret Service of the visit, provides the proposed visitor's identifying information, including his name, date of birth and social security number. In addition to this personal information, the White House pass holder will provide the time and location of the scheduled appointment, the name of the person submitting the request, the name of the recipient of the visitor, the date the request was made, and the type of visitor expected, *e.g.*, member of the press or temporary worker. *Id*. at ¶ 10.

This information is usually transmitted to the Secret Service electronically via the White House Appointment Request Server. *Id*. at ¶ 11. The White House pass holder will enter the relevant information into the White House Appointment Request Server, which then automatically transmits the information to the WAVES Center. Upon receiving the visitor request, a member of the Secret Service verifies that the person who submitted the request is authorized to the make the requested appointment. *Id*. The Secret Service officer will then use the identifying information "to determine whether there is any protective concern with giving [the proposed] visitor access to the

---

[3] It is not readily apparent from the Secret Service's motion and accompanying affidavits which individuals, designated as "authorized White House pass holders," are able to submit visitor requests. It may be that persons not considered to be Presidential or Vice-Presidential staff, like a Secret Service agent for example, are able to submit visitor requests.

White House Complex for the meeting." Declaration of Claire M. O'Donnell at ¶ 12.[4] Once the Secret Service officer has made "use of the information," the officer will "transmit[] the information electronically to the Secret Service's White House Access Control System." *Id*. Before transmitting the information, however, the Secret Service officer may add "additional information" to the visitor's file, such as the results of the background check. 3d Morrissey Decl. at ¶ 11. In short, the Secret Service reviews and supplements the information it receives from the pass holder before transmitting it to the White House Access Control System.

Not all visitor requests are transmitted electronically via the White House Appointment Request Server. In some circumstances a White House pass holder may provide the information to the Secret Service by telephone, facsimile, e-mail, or by dropping off a list in-person, in which case a member of the Secret Service will manually enter the information into the Secret Service's system. *Id*. at ¶ 11. As with requests submitted electronically, the Secret Service uses the visitor's identifying information to perform a background check on the individual to determine whether he should be allowed to enter the White House Complex. This information is also used to verify the visitor's admission to the Complex at the time of the visit. *Id*. at ¶ 12.

A WAVES record consists of the information provided by the White House pass holder and any additional information, such as the results of the a background check, added by the Secret Service. 3d Morrissey Decl. at ¶¶ 11, 13. Two fields, known as the "note field" and "comment field," may contain notations created solely by the Secret Service. For example, the Secret Service might indicate in these fields the results of its background check or coded instructions for its officers.

---

[4] Claire M. O'Donnell, the Assistant to the Vice President and Deputy Chief of Staff, is responsible for all aspects of the administration and operation of the Office of the Vice President and oversees the office's records management policy. *See* O'Donnell Decl. at ¶ 1.

These fields might also contain security information or indicate whether there are specific conditions on a visitor's admission to the Complex. *Id*. at ¶ 13. Each WAVES record is electronically stored on the Secret Service's computer servers.

When a visitor arrives at the White House Complex he is generally issued an entrance pass, which the visitor will "swipe" over the electronic pass readers that are located at the entrances and exits of the Complex. 3d Morrissey Decl. at ¶ 14. An ACR record is automatically generated each time a pass holder swipes his pass. Each ACR record contains the entrant's name and badge number, the time and date of the entrance or exit, and the specific post at which the swipe was recorded. An ACR record does not indicate who the pass holder was visiting or who requested the visitor's entrance. *Id*. at ¶ 14. Once the visit has taken place, the WAVES record for the individual is updated electronically with the time and place of the visitor's entry and exit from the White House Complex. *Id*. at ¶ 15. This information is drawn from the ACR system.

In addition to the WAVES and ACR records, the Secret Service also uses a record known as Secret Service Form 1888 (SSF 1888). 3d Morrissey Decl. at ¶ 16. An SSF 1888 is created as part of the Secret Service's background investigation process for several categories of White House visitors, including temporary workers and individuals who have a criminal background or are thought to pose a potential security risk.[5] Finally, there is a collection of documents which the Secret Service simply refers to as "Additional Security-Related Records." 3d Morrissey Decl. at ¶ 17. These are records that are created by the Secret Service as it conducts "additional background checks and other security-related activities regarding certain visitors, who are chosen by the Secret Service

---

[5] The Secret Service does not transfer SSF 1888's, or any related paper files or work orders associated with the form, to the White House. *Id*. at ¶ 16.

based on certain details in their backgrounds [or] the circumstances of their visits." *Id.* at ¶ 17.[6]

## 2. Record Retention Practices

The Secret Service's past retention practices for WAVES and ACR records have proven to be pliant and evolving. Paul Morrissey, the Deputy Assistant Director of the Office of Protective Operations, declares that every 30 to 60 days the Secret Service will copy the WAVES records stored on the Secret Service's "servers" to a compact disc (CD-ROM). 3d Morrissey Decl. at ¶ 18. After making a copy of the records, the Secret Service transfers the CD-ROM containing the WAVES records to the White House Office of Records Management (WHORM). *Id.* at ¶ 18. A WHORM employee "typically signs a form acknowledging receipt of the records." *Id.* After delivering the CD-ROM to the WHORM, the Secret Service erases the WAVES records "from its computer system." *Id.* The Secret Service's practice of purging and overwriting WAVES records that are "older than 60 days" occurred from "at least 2001" until "November 2004." *Id.* at ¶¶ 18-19.[7] This

---

[6] Like the SSF 1888, the Secret Service does not transfer these additional records to the White House.

[7] The declarant does not explain with precision when, exactly, the Secret Service began deleting all WAVES records from its computer system. While he states that this policy has been in effect "[s]ince at least 2001," it is not clear to the Court whether the Secret Service has always deleted WAVES records from its computer system or whether this policy was implemented at the start of 2001. It is also unclear when the Secret Service began transferring these records to the WHORM. The other declarations provided by the Secret Service contain nearly identical language and are just as unhelpful. *Compare* 3d Morrissey Decl. at ¶ 18 ("Since at least 2001, it has been the practice of the Secret Service to transfer newly-generated WAVES records on CD-ROM to the [WHORM] every 30 to 60 days.") *with* Declaration of Philip C. Drodge at ¶ 9 ("Since at least 2001, it has been the practice of the Secret Service to transfer newly-created WAVES records to the [WHORM] on CD-ROM every 30 to 60 days.") *and* O'Donnell Decl. at ¶ 14 ("Accordingly, since at least 2001, it has been the practice of the Secret Service to transfer WAVES records on compact disc to the [WHORM] every 30 to 60 days."). Adding to the uncertainty on this point, the Secret Service has previously taken the position, in a similar case before the Court, that it has a "longstanding practice" of erasing WAVES records once they have been transferred to the WHORM. *See Judicial Watch v. United States Secret Service*, No. 06-

practice ended abruptly in November 2004, at the "request" of the National Archives and Records Administration.[8]  *Id*. at ¶ 19.  From this point until the present, the Secret Service has begun "temporarily retaining a copy"[9] of the WAVES records that its transfers to the WHORM.  *Id*.

Although it has been the practice of the Secret Service to transfer WAVES records to the WHORM, the Secret Service has not always transferred the entire WAVES record.  Prior to July 2006, "the Secret Service was removing the note and comment fields from the WAVES records before transferring the records to the WHORM."  3d Morrissey Decl. at ¶ 18.  The note and comment fields, as explained above, contain notions created by the Secret Service, such as the results of the Secret Service's background investigation.  In July 2006, however, "the Secret Service ceased the practice of removing the note and comment fields when transferring WAVES records."  *Id*. at ¶ 19.  Not only that, the Secret Service "retroactively" furnished the "WAVES records to the WHORM that contained these fields for the period from October 12, 2004, to July 10, 2006."  *Id*. at ¶ 19.  Although unstated, it appears the note and comment fields that were removed before November 2004, when the National Archives and Records Administration directed the Secret Service to stop deleting the WAVES records, have been permanently deleted.  The Secret Service has continued to provide these

---

310, First Declaration of Kathy J. Lyerly at ¶ 10. The Secret Service seems to have since abandoned referring to this as a "longstanding practice."

[8]  Despite the Secret Service's practice of erasing WAVES records from its computer system prior to National Archives and Records Administration's directive, "the Secret Service discovered . . . in June 2006[] that some WAVES data predating October 2004 remained on the hard drives of two Secret Service computers."  3d Morrissey Decl. at ¶ 20.

[9]  The declarant provides no explanation for why, exactly, the National Archives and Records Administration requested that the Secret Service refrain from deleting the WAVES records from its computer system.  The declarant is likewise silent as to how long it will continue to retain these WAVES records, and future WAVES records, saying instead that its present retention policy is only temporary.

fields to the WHORM since July 2006.  *Id*.

The Secret Service's policy for retaining ACR records is equally muddled.  Mr. Morrissey declares that "the Secret Service and the White House [have] recognized and agreed that ACR records should be treated in a manner generally consistent with the treatment of WAVES records." 3d Morrissey Decl. at ¶ 22.  Mr. Morrissey states that the Secret Service and the White House have had this understanding since "[a]t least as early as 2001." *Id*.  Despite this understanding, however, the Secret Service did not begin transferring ACR records to WHORM until May 2006, even though it was routinely transferring WAVES records since at least 2001.  Nor was the Secret Service regularly deleting ACR records similar to its routine practice for WAVES records.  Instead, in May 2006, the Secret Service transferred to the WHORM all the ACR records accumulated during the presidency of George W. Bush, beginning at 12:00 p.m. on January 20, 2001, to April 30, 2006, *en masse*.  The Secret Service also, for reasons that are not evident from the declaration, "transferred, to the National Archives and Records Administration, the ACR records covering the period from 12:00 p.m. on January 20, 1993, to 12:00 p.m. on January 20, 2001." *Id*.

In addition to WAVES and ACR records, the Secret Service also transfers to the WHORM certain paper records every 30 to 60 days.  These paper records generally consist of requests for access to the White House Complex that have been manually entered into WAVES by the Secret Service, such as large event lists, facsimiles, and e-mails.  The Secret Service also transfers some lists and checklists relating to large group appointments.  The Secret Service began retaining these materials in the fall of 2006.  3d Morrissey Decl. at ¶ 26.

### 3. The Memorandum of Understanding

On May 17, 2006, the Secret Service entered into a Memorandum of Understanding (MOU)

with the WHORM.[10]  *See*  3d Morrissey Decl., Exhibit B.  The "purpose" of the MOU was to

memorialize the parties' "agreement that WHACS Records" were "not the records of any 'agency'

subject to the Freedom of Information Act." *Id*., Exhibit B at ¶ 17.  Rather, the MOU provided that

WHACS records "are at all time Presidential Records," which were "under the exclusive legal

custody and control of the White House." *Id*. at ¶ 18.  Although, admittedly, "the Secret Service may

at times have physical possession of WHACS Records," the MOU reasoned that "temporary physical

possession does not alter the legal status of those records, and does not . . . divest the White House

of complete and exclusive legal control."[11]  *Id*. at ¶ 18(a).  The MOU explained that the Secret

Service "has no interest whatsoever in preserving or retaining" WHACS records "once a visitor's

visit to the White House Complex is complete." *Id*. at ¶ 21.

In regards to document retention, the MOU provided that "[i]t has been the longstanding

practice of the Secret Service to transfer WAVES Records on [a] CD-ROM to [the White House]

every 30 to 60 days," and to permanently delete all "records from its computer system" once the

transferal is completed. *Id*. at ¶ 14.  "Under this practice," the MOU explains, "the Secret Service

[retains] WAVES Records for completed visits for only a brief period, and solely for the purpose of

facilitating an orderly . . . transfer of those records to WHORM." *Id*. at ¶ 14(a).  While the MOU

acknowledges that "historically" the Secret Service "has retained ACR Records in its computer

---

[10]  CREW first learned of the MOU after it was filed in *The Washington Post v. United States Dep't of Homeland Security*, 459 F. Supp. 2d 61 (D.D.C. 2006) (voluntarily dismissed), on October 25, 2006.

[11]  The MOU noted that both WAVES records and ACR records "have historical and other informational value to the White House."  WAVES records are "evidence of who has been invited and/or granted admission to the White House to meet with the President"; ACR records "evidence the comings and goings of staff, visitors, and workers at the White House Complex in the conduct of White House business." *Id*. at ¶ 20(a).

system without transferring those records" to the White House, this practice changed in 2004 when "the Secret Service and the White House recognized and agreed that ACR Records should be treated in a manner consistent with the treatment of WAVES Records." *Id*. at ¶ 15. The Secret Service "concluded that ACR Records should be transferred to WHORM and eliminated from [its] files." *Id*.

## B.     The Vice-President's Residence

### 1. Document Creation

The Secret Service monitors visitors to the Vice-President's Residence in much the same way it monitors the White House Complex. The process typically begins when a member of the Office of the Vice President (OVP) alerts the Secret Service to a scheduled visit. *See* O'Donnell Decl. at ¶ 17. The OVP staff member will provide the Secret Service with the visitor's identifying information, such as the visitor's name, date of birth, and social security number, and the date and time of the scheduled appointment. As it does at the White House Complex, the Secret Service uses this identifying information to conduct a background investigation on the proposed visitor, "to determine whether there is any protective concern with giving that visitor access to the Vice President's Residence." *Id*.

While the Secret Service's role at the Vice-President's Residence may be similar to its role at the White House Complex, it relies on a separate record system. *See* 3d Morrissey Decl. at ¶¶ 31-36. There are no WAVES or ACR records at the Vice-President's Residence. *Id*. at ¶ 31. Instead, the Secret Service maintains two entry access lists: (1) a daily access list and (2) a permanent access list. A visitor is placed on one of the access lists once the Secret Service determines that the person does not pose a risk to anyone in the Residence and may enter the area. The Secret Service uses the

daily access list for individuals who have particular appointments or work orders at the Residence. The Secret Service uses the permanent access list, by contrast, for "individuals who regularly enter the facility, including staff members . . . military personnel, contractors, service workers, and members of the Vice President's family." *Id*. at ¶ 32.

Both the daily and permanent access lists are given to the individual Secret Service officers stationed at the entrances to the Vice-President's Residence. *Id*. at ¶ 33. When a visitor enters the Residence, the Secret Service officer working at the entrance will record the visitor's arrival. This information is recorded in what the Secret Service refers to as the "post entry logs." The Secret Service officer will record the name of visitor and the date and time the visitor entered the Residence. This information is all handwritten in the post entry logs. As a result, this information exists only on paper; it is not stored electronically. *Id*.

Somewhat akin to the post entry logs, the Secret Service officer who is commanding each shift creates a Watch Commander Journal. *Id*. at ¶ 36. The commanding officer will use the Watch Commander Journal to record the arrival and departure of the Vice-President and his wife, as well as any other security related incidents that occurred during that shift. The "Watch Commander Journals are created to provide situational awareness for watch commanders between shifts and to provide a means for them to apprise themselves of what went on at the residence in their absence." *Id*. at ¶ 36.[12] These journals "are created and used in electronic format," and the Secret Service supervisors "occasionally refer back to them to . . . make staffing level assessment." *Id*.

In addition to the daily and permanent access lists, post entry logs, and Watch Commander

---

[12] Mr. Morrissey notes, without elaboration, that the commanding officer may also record the entrance of "other visitors to the residence" in the Watch Commander Journal. 3d Morrissey Decl. at ¶ 36. It is not clear from the declaration what visitors would be added to the journal.

Journals, the Secret Service also relies on several other categories of records, including: (1) an electronic database that contains information on individuals who are seeking access to the Residence; (2) requests for access, received by e-mail or facsimile, that are submitted by OVP staff, military and Secret Service personnel; and (3) lists of guests and workers, prepared by the OVP, who have been invited to the Residence. *See* 3d Morrissey Decl. at ¶ 34. Finally, the Secret Service generates a document known as a "hit" report for some visitors. A "hit" report is created when the Secret Service discovers something important, like a criminal conviction, while performing a background check on a potential visitor. After completing the background check, the Secret Service will draft a memorandum describing the results of the investigation and providing a determination as to whether (and under what conditions) the individual may enter the Residence. *Id*.

### 2. Document Retention

The Secret Service's document retention policies for the Vice-President's Residence are somewhat similar to that of the White House Complex. *See* 3d Morrissey Decl. at ¶¶ 37-44. In general, the Secret Service does not actively preserve a document unless it contains "information of protective interest . . . such as . . . background checks and the Watch Commander Journals." *Id*. at ¶ 37. Documents that do not contain "information of protective interest" are either transferred to the OVP or purged. The record retention practice for each record type is as follows:

1. **Requests For Access**: The Secret Service's policy "with respect to e-mails requesting access to the VPR has been to print out the requests and then to destroy them after 15-30 days." 3d Morrissey Decl. at ¶ 40. Access requests that are submitted by other methods, like facsimile, are also destroyed. The Secret Service began retaining these documents in June 2006, due to pending

litigation, and possesses e-mails in electronic format dating back to April 2006. The Secret Services notes, however, that it possesses some "paper requests, [dating] back to June 2002, that had not been discarded." *Id*. These documents were retained on a "sporadic" basis. *Id*. at ¶ 39 n.2.

2.     **Daily Access Lists**: Until June 2006, the Secret Service's practice was "to dispose of printed daily access lists on a daily basis." 3d Morrissey Decl. at ¶ 39. Despite this practice, the Secret Service has retained "some" daily access lists "from sporadic dates" that were generated before June 2006. *Id*. at ¶ 39 n.2. It presently retains access lists due to pending litigation.

3.     **Permanent Access Lists**: Until June 2006, the Secret Service's practice was "to dispose of printed permanent access lists as changes [were] made in persons authorized for permanent access." 3d Morrissey Decl. at ¶ 39. It presently retains access lists due to pending litigation.

4.     **Post Entry Logs**: According to Mr. Morrissey, the Secret Service's "consistent practice" since 2001 "has been to transfer to the OVP, generally on a monthly basis (dating back to January 2001), all handwritten post entry logs."[13]  *Id*. at ¶ 37. The Secret Service did not retain a copy of these handwritten logs until June 2006, when it began doing so due to pending

---

[13]  While it might be easy to infer from Mr. Morrissey's declaration that the Secret Service has consistently transferred post entry logs to the OVP since January 2001, this is not accurate. Ms. O'Donnell explains that this practice actually began in June 2001, at which point the Secret Service <u>retroactively</u> transferred to the OVP the post entry logs for January, February, March, April and May of that year. *See* O'Donnell Decl. at ¶ 18. This suggests, although unstated by either declarant, that the Secret Service used to retain post entry logs without transferring them to the OVP, at least until June 2001.

litigation.  *Id*. at ¶ 38.

5.    **Watch Commander Journals**: The Secret Service's current practice is to retain Watch Commander Journals without transferring a copy to the OVP or the WHORM.  3d Morrissey Decl. at ¶ 43.  The Secret Service acknowledges that it presently retains Watch Commander Journals dating back until October 1, 2004.  *Id*. at ¶ 45.

6.    **Electronic Database**: Prior to June 2006, the Secret Service's regular practice was "to purge the access list database each day of information reflecting persons from the daily access list who [had] not been authorized to enter the VPR for over thirty days."  3d Morrissey Decl. at ¶ 39.  The Secret Service has ceased purging the access list database due to pending litigation.

7.    **Event Lists**: Mr. Morrissey explains that until June 2006 the Secret Service was retaining some event lists, just "not consistently."  3d Morrissey Decl. at ¶ 41.  The Secret Service's present practice is to transfer event lists to the OVP on a monthly basis.

8.    **Hit Reports**: Documents like hit reports, created by the Secret Service in connection with its background investigations, are not transferred to the OVP. 3d Morrissey Decl. at ¶ 43.  The Secret Service has retained hit reports dating back to January 1, 2001.  *Id*. at ¶ 45.

In addition to these retention practices, Mr. Morrissey explains that the proper "handling of entry records relating to the Vice President's Residence was addressed in a September 13, 2006[] letter from Shannen W. Coffin, Counsel to the Vice President, to Donald Personette, Chief Counsel

to the Secret Service." 3d Morrissey Decl. at ¶ 42. Mr. Coffin's letter, which was written in response "to pending [FOIA] requests directed to" the Secret Service, was meant to "confirm and reiterate [the OVP's] consistent practice of exercising exclusive control over any and all documents and information held by the [Secret Service] relating to visitors to the [VPR]." He notes that from "[a]t least . . . January 2001, OVP has made available to the [Secret Service], on a temporary basis . . . documents and information relating to individuals scheduled to visit the VPR . . . for the limited purpose of enabling the [Secret Service] to perform its protective function." Mr. Coffin directs the Secret Service "not [to] retain any copy of these documents and information" once they have been returned to the OVP. *See* 3d Morrissey Decl., Exhibit D.

## II.

By letter dated October 4, 2006, CREW filed a FOIA request with the Secret Service seeking "all records" concerning any visits "to the White House or the residence of the Vice President" that were made by nine named individuals. The nine individuals were James Dobson, Gary L. Bauer, Wendy Wright, Louis P. Sheldon, Andrea Lafferty, Paul Weyrich, Tony Perkins, Donald Wildmon and Jerry Falwell. CREW sought "records of any and all kind, including electronic records, audiotapes, videotapes, photographs, and computer printouts," "regardless of the format, medium, or physical characteristics" of the record. CREW also sought "a waiver of fees associated with processing [its] request for records." As a basis for this fee waiver, CREW asserted that its request was "likely to contribute to the public's understanding of the influence that conservative Christian leaders have, or attempt to have, on the President [of the United States]."

When the Secret Service failed to timely respond to CREW's request, or discuss its status with CREW's representatives, *see* Feb. 22, 2007 Declaration of Anne L. Weismann ¶¶ 3-4, CREW

filed the present action.  *See* Complaint for Declaratory Judgment and Injunctive Relief ("Compl.").

Relying on the Freedom of Information Act, the Administrative Procedure Act, and the Federal

Records Act, CREW challenged "the failure of the United States Secret Service . . . to fulfill [its

FOIA] request," as well as "the policy of the Secret Service to erase federal records . . . once it has

transferred the information on those records to the White House."  Compl. at ¶ 1.  CREW also

"challeng[ed] the failure of the Archivist [of the United States] to take enforcement action to prevent

the [Department of Homeland Security] from unlawfully destroying agency records."  *Id*. at ¶ 1.  In

addition to requiring the Secret Service to respond to its FOIA request, CREW sought declaratory

relief that "the [Secret Service's] record-keeping guidelines and directives are arbitrary . . . and

contrary to the [Federal Records Act]," and "injunctive relief requiring the Archivist to fulfill his

mandatory statutory duty . . . to ensure . . . [compliance with] the FRA."  *Id*. at ¶ 2.  The Secret

Service moved for summary judgment on May 25, 2007.

## DISCUSSION

The Secret Service's motion for summary judgment is premised on the argument that visitor

records[14] are not subject to the Freedom of Information Act.  This argument rests on two overlapping

assertions.  First, and primarily, the Secret Service asserts that these records do not qualify as

"agency records" under the Freedom of Information Act under our circuit's case law.  Second, and

alternatively, the Secret Service asserts that the doctrine of "constitutional avoidance" requires the

Court to construe the Freedom of Information Act so that it does not encompass these visitor records.

The Court  examines each assertion in turn, after summarizing the summary judgment standard.

---

[14] The Secret Service identifies "the key records at issue here" as WAVES records, ACR
records, requests for access, daily and permanent access lists, and event lists.  See Def.'s Mot.
S.J. at 1.  For convenience, the Court refers to these records collectively as "visitor records."

**I.**

Summary judgment should be granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56. The Court must enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2553 (1986). In considering whether there is a triable issue of fact, the Court must draw all reasonable inferences in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 2513 (1986). "[S]ummary judgment may be granted on the basis of agency affidavits if they contain reasonable specificity of detail rather than merely conclusory statements, and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith." *Halperin v. Central Intelligence Agency*, 203 U.S. App. D.C. 110, 629 F.2d 144, 148 (D.C. Cir. 1980) (footnote and citations omitted). *See also Schwarz v. United States Dep't of Treasury*, 131 F. Supp. 2d 142, 146-47 (D.D.C. 2000) ("In a FOIA case, the Court may grant summary judgment solely on the basis of information provided in a declaration, when the declaration describes 'the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate[s] that the information withheld logically falls within the claimed exemption, and [is] not controverted by either contrary evidence in the record nor by evidence of agency bad faith.'") (quoting *Military Audit Project v. Casey*, 211 U.S. App. D.C. 135, 656 F.2d 724, 738 (D.C. Cir. 1981)). In a FOIA case, an agency is entitled to summary judgment where it demonstrates that each document sought is not subject to FOIA's disclosure requirements. *See Exxon Corp. v. Federal Trade Com.*, 213 U.S. App. D.C. 356, 663 F.2d 120, 126 (D.C. Cir.

1980) ("To prevail, the defending agency must prove that each document that falls within the class requested either has been produced, is unidentifiable, or is wholly exempt from the Act's inspection requirements." (quoting *Nat'l Cable Television Ass'n v. Fed. Commc'ns Comm'n*, 156 U.S. App. D.C. 91, 479 F.2d 183, 186 (D.C. Cir. 1973))).

## II.

The Secret Service's primary assertion is that the majority of visitor records sought by CREW, particularly WAVES records, ACR records, access lists and post entry logs, are not "agency records" under our circuit's case law, which is a condition of federal jurisdiction. *See Kissinger v. Reporters Comm. for Freedom of Press*, 445 U.S. 136, 150, 100 S. Ct. 960, 968 (1980) ("Under 5 U. S. C. § 552 (a)(4)(B) federal jurisdiction is dependent upon a showing that an agency has (1) 'improperly; (2) 'withheld'; (3) 'agency records.'"). The Court is not convinced. For the following reasons, it concludes that visitor records are "agency records" under the FOIA.

In *United States Department of Justice v. Tax Analysts*, 492 U.S. 136, 144, 109 S. Ct. 2841, 2848 (1989), the Supreme Court articulated a two-part test to determine what constitutes an "agency record" under the FOIA: agency records are documents that are (1) either created or obtained by the agency, and (2) under agency control at the time the FOIA request was made. *Tax Analysts*, 492 U.S. at 144-45, 109 S. Ct. at 2848.[15] The burden of demonstrating that the documents are not agency records falls on the agency. 492 U.S. at 142 n.3, 109 S. Ct. at 2847 ("The burden is on the agency to demonstrate, not the requestor to disprove, that the materials sought are not 'agency records' . . . ") (citing S. Rep. No. 813, 89th Cong., 1st Sess., 8 (1965)); *Gallant v. NLRB*, 307 U.S. App. D.C. 27,

---

[15]  The Court of Appeals "has adopted a totality of the circumstances test to distinguish 'agency records' from personal records." *Consumer Fed'n of Am. v. United States Dep't of Agric.*, 372 U.S. App. D.C. 198, 455 F.3d 283, 287 (D.C. Cir. 2006).

26 F.3d 168, 171 (D.C. Cir. 1994) (noting that "[i]n the FOIA context . . . the agency has . . . [the] burden of demonstrating that the documents requested are not 'agency records'") (citing 5 U.S.C. § 552(a)(4)(B); *Tax Analysts*, *supra*).[16]

### A.     The Records Were "Created or Obtained" by the Secret Service

The Secret Service's affidavits show that the visitor records were "created or obtained" by the Secret Service. *Tax Analysts*, 492 U.S. at144, 109 S. Ct. at 2848.  A brief summary of how – and, importantly, when –  the records come into existence demonstrates this point.

WAVES records are derived, it is fair to say based on Mr. Morrissey's detailed declaration, from three distinct sources of information: the White House, the Secret Service and the visitor.  The first source is an authorized White House pass holder, who may or may not be a member of the President's or Vice-President's staff.[17]  The pass holder will transfer to the Secret Service, usually electronically, but sometimes by telephone, facsimile, e-mail or paper, information on an upcoming visit.  This information includes, among other things, the name, date of birth, and social security number of the proposed visitor, as well as the date, time and location of the scheduled visit.  Upon receiving this information, the Secret Service's job is twofold.  First, it checks to see that pass holder

---

[16]  *See Schwarz*, 131 F. Supp. 2d at 147-48 ("Offices within the White House whose functions are limited to advising and assisting the President do not come within the definition of an 'agency' within the meaning of FOIA or the Privacy Act.  This includes the Office of the President (and by analogy the Office of the Vice President) and undoubtedly the President and Vice President themselves." (citing *Kissinger*, 445 U.S. at 150-55, 100 S. Ct. at 968-70.) (other citation omitted)).

[17]  As explained above, *see supra* note 3, Mr. Morrissey's declaration falls short of saying that every authorized White House pass holder is a member of the President's or Vice-President's staff.  The inference, rather, is that some pass holders are not.  This undercuts the Secret Service's argument that all WAVES records are not "agency records" because they originate from a member of the White House or the OVP.

making the request is actually authorized to do so.  Second, it uses the information to perform a background check on the proposed visitor, ensuring that the individual does not pose a "protective concern" to anyone in the White House Complex.

The Secret Service agent who performed the background check will then, depending on the results of the check, add a security-related note for the other agents.  Such a note might include the results of the background check or security instructions for the individual's visit.  Once the Secret Service has processed the visitor request, adding security related information where necessary, it transmits the information electronically to the Secret Service's server.  3d Morrissey Decl. at ¶ 11.  A WAVES record is born.  The final version of the WAVES record is ultimately "updated," with the time and place of the visitor's entry and exit, once the visit has taken place.  3d Morrissey Decl. at ¶ 15.  This information is automatically drawn from the ACR system, which records when and where the visitor swipes his pass at one of the several card-readers located throughout the Complex.  The information saved by the ACR system is the pass holder's name and badge number, the time and date of the entry and/or exit, and the specific post at which the pass was swiped.  The ACR record is, in essence, a time-line of the pass holder's entry and exit, showing the location of each.

Although WAVES and ACR records are generated in a slightly different manner and at a slightly different time, they are similar in an important respect: they are each generated by the Secret Service, and not by Presidential or Vice-Presidential staff.  The same can be said of the records generated for the Vice-President's Residence.  Much like the process that occurs at the White House Complex, a member of the OVP will notify the Secret Service of a proposed visit to the Vice-President's Residence.  The OVP will provide the Secret Service with the proposed visitor's identifying information, as well as the scheduled date and time of the visit, which the Secret Service

uses to perform a background check. Presuming the visitor does not pose a risk to anyone at the Residence, the Secret Service will add the individual to either the daily or permanent access list. This list, which is maintained by the Secret Service, is given to the Secret Service agents stationed at the entrances and exits of the Vice-President's Residence, who use it to regulate access to the Residence. When a visitor does enter the Residence, the Secret Service agent guarding the point of entry will handwrite the date and time of the visitor's arrival in the post entry log. For each of these records, it is the Secret Service that creates the document, and not a member of the White House or the OVP.[18]

The Secret Service does not directly contradict the notion that it, rather than a member of the President's or Vice-President's staff, is creating these documents. Nowhere, for example, does the Secret Service claim that these records are generated strictly by Presidential staff. Its argument is more nuanced. The Secret Service suggests that it does not create these documents, at least not by itself, because "Presidential and Vice-Presidential staff have a very significant role in the creation of these records."[19] Def.'s Reply Br. at 1. The Secret Service's argument is, at least implicitly, that it alone is not the creator of these records because the records are really the joint creation between itself, an agency, and the White House and the OVP, each non-agencies. It emphasizes that "the bulk" of the "information" contained in the records, like the visitor's name and who the visitor is scheduled to see, comes from the staff of the White House or the OVP, and not from the Secret

---

[18] While much focus has been directed toward records "created" by the Secret Service, such as WAVES and ACR records, access lists and post entry logs, several records, like paper requests for access and event lists, are more appropriately categorized as being "obtained" by the Secret Service. *Tax Analysts*, *supra*. These records come into the Secret Service's possession as it fulfills its protective mission.

[19] *But see supra* note 17.

-21-

Service. *Id*. at 5. It also notes that "these records would not exist at all if Presidential or Vice-Presidential personnel . . . did not prompt their creation."[20] *Id*. at 4. It is the extent to which Presidential and Vice-Presidential staff are involved in the creation of these visitor records, according to the Secret Service, that makes them different from what our case law considers to be an "agency record." *Id*. at 5-6.

While the Secret Service may be correct that Presidential and Vice-Presidential staff do at times provide much of the "information" contained in these records, this fact does not, by itself, prove the Secret Service does not create these documents. The FOIA deals with documents, not information. *See Forsham v. Harris*, 445 U.S. 169, 185, 100 S. Ct. 977, 987 (1980) (noting that the "Freedom of Information Act deals with 'agency records,' not information in the abstract"). By focusing on the contents of the records, the Secret Service overlooks the process by which the records are generated. *See Wash. Post v. Dep't of Homeland Sec.*, 459 F. Supp. 2d 61, 69 (D.D.C. 2006) (noting the Secret Service's argument that it did not create visitor records "rests on [its] confusion between the agency that created a record [and] the source of the information contained in that record"). Consider WAVES records, for example, which are comprised of information from three sources: the authorized pass holder, the Secret Service, and the ACR system. The Secret Service emphasizes the role the pass holder plays in the formation of a WAVES record, noting that an email from the pass holder to the Secret Service is typically the triggering event that leads to the

---

[20] The notion that visitor records would not exist 'but for' the actions of White House and OVP staff does not change their status as agency records. *See United We Stand Am.*, 360 U.S. App. D.C. at 251, 359 F.3d at 603 (rejecting argument that agency-generated records turn into congressional records simply because "they would not have been created <u>but for</u> the congressional request") (emphasis added).

creation of the record. Maybe so. But a WAVES record does not exist until the Secret Service uses the supplied information to perform a background check on the individual, adds security-related notations as necessary, and sends the completed file to the WHACS server, where it is stored. The record is updated via the ACR system after the visitor's arrival. That the White House pass holder may supply some, or even most, of the record's contents does not change the fact that the record is created by the Secret Service.

By arguing it does not create a WAVES record because "the bulk" of "information" comes from an authorized pass holder, the Secret Service invites the Court to elevate the contents of the record ahead of its creation. Doing so, however, would place the Court in the awkward position of having to review the actual contents of each record (or more precisely, the origin of the record's contents) to identify its creator, which would effectively place the information source above the record's creator. This would insulate records that contain information supplied, perhaps even gleaned, from an external, non-agency source, even if the information represents only a part of the record, as it does here. It might also require the Court to classify a single record as part-agency record and part-presidential record. *See United We Stand Am., Inc.*, 360 U.S. App. D.C. at 255, 359 F.3d at 607 (Henderson, J., dissenting) (noting courts traditionally do "not subdivide any document into part-congressional record and part-agency record.").

Although the Court of Appeals may have implicitly sanctioned a similar approach in *United We Stand Am.*, 360 U.S. App. D.C. at 252, 359 F.3d at 604, that case is not applicable here. In *United We Stand Am.*, the Court of Appeals examined "a FOIA request for a document that the Internal Revenue Service prepared at the direction of a congressional committee." 360 U.S. App. D.C. at 245, 359 F.3d at 597. Finding "sufficient indicia of congressional intent to control" the

-23-

congressional committee's "request[,] and those portions of the IRS response that would reveal the request," the court concluded that "neither Congress nor the agency ha[d] exclusive control over the document." *Id.* at 600, 604. The court held, as a result, "that only those portions of the IRS response that would reveal the congressional request are not subject to FOIA." *Id.* at 597. Central to the court's reasoning, however, was the "confidentiality directive" that appeared on the committee's request.[21] This directive made plain Congress' intent to retain control over the agency-generated document. No such confidentiality directive exists in this case. Indeed, the visitor information is transferred to the Secret Service, haphazardly at times, in many forms, including electronically and over the telephone, by many different individuals. Nowhere, however, has a member of the President's or Vice-President's staff manifested – contemporaneously with the request, as in *United We Stand America* – an intent to control the record. The information transmitted to the Secret Service therefore lacks the explicit and unambiguous confidentiality limitation that was so decisive in *United We Stand America*. Moreover, unlike in *United We Stand America*, where the records were created for the congressional committee, the visitor records are created primarily for the agency's use.

**B.     The Records Are Under the "Control" of the Secret Service**

Under the second prong of *Tax Analysts*, the Court must determine whether the visitor records were under the Secret Service's "control" at the time of the FOIA request. By "control," the Supreme Court "mean[t] that the materials have come into the agency's possession in the legitimate

---

[21] The confidentiality directive provided: "This document is a Congressional record and is entrusted to the Internal Revenue Service for your use only. This document may not be disclosed without the prior approval of the Joint Committee." *United We Stand Am.*, 359 F.3d at 597.

conduct of its official duties." *Tax Analysts*, 492 U.S. at 145, 109 S. Ct. at 2848. Mindful "that 'control' for FOIA purposes has no precise definition and may well change as relevant factors assume varying importance from case to case," *Crooker v. United States Parole Comm'n*, 730 F.2d 1, 5 (1st Cir. 1984), our Court of Appeals "has identified four factors relevant to a determination of whether an agency exercises sufficient control over a document to render it an 'agency record': '(1) the intent of the document's creator to retain or relinquish control over the records; (2) the ability of the agency to use and dispose of the record as it sees fit; (3) the extent to which agency personnel have read or relied upon the document; and (4) the degree to which the document was integrated into the agency's record system or files.'" *Burka v. United States Dep't of Health & Human Serv.*, 318 U.S. App. D.C. 274, 87 F.3d 508, 515 (D.C. Cir. 1996) (quoting *Tax Analysts v. United States Dep't of Justice*, 269 U.S. App. D.C. 315, 845 F.2d 1060, 1069 (D.C. Cir. 1988), *aff'd on other grounds*, 492 U.S. 136, 109 S. Ct. 2841 (1989)). Based on these principles, the Court agrees with CREW and the *amici* that the visitor records were under the control of the Secret Service at the time the request was made.

### 1.    The Intent of the Document's Creator to Retain or Relinquish Control.

The first factor, the intent of the document's creator (here, the Secret Service) to retain or relinquish control over the records, weighs in favor of the Secret Service. Gleaning the Secret Service's intent from both its words and its actions, the Court finds that the Secret Service intends to relinquish control over certain visitor records, *i.e.*, WAVES records, ACR records, access lists, and post entry logs, once a visit is complete.

First, its words. The declarations submitted by the Secret Service show that the agency does not intend to retain control over the records once a visitor's visit is complete. *See, e.g.*, Morrissey

Decl. at ¶ 18 ("Once a visitor's visit to the White House Complex is complete, the Secret Service has no continuing interest sufficient to justify preservation or retention of WAVES or ACR records, and the Secret Service recognizes that such records are under the exclusive legal control of the President and Vice-President."); ¶ 37 ("Once a visitor's visit to the Vice President's Residence is complete, the Secret Service has no continuing interest sufficient to justify preservation or retention of records of such visitors . . ."). In short, whatever control the Secret Service may exercise over these records before and during the visit, it certainly intends to relinquish this control once the visit is complete.[22]

Second, its actions. The Secret Service's actions at the White House Complex are less conclusive than its words, but are not wholly inconsistent with its stated intent to relinquish control. From 2001 to 2004 the Secret Service deleted WAVES records after it had transferred a copy – excluding the note and comment fields, which it retained – to the WHORM. This practice was suspended, temporarily according to the Secret Service, in 2004 at the direction of the National Archives. It has since retained these files. Despite the fact that the Secret Service was routinely transferring WAVES records to the WHORM from 2001 to 2004, it was not transferring ACR records to the WHORM during this same period. It was not until May 2006 – after the Secret Service had been sued for these records – that it began transferring ACR records in a similar fashion. The Secret Service's past practices do not, in short, demonstrate a clear intent to relinquish control over all the records, notably the ACR records. Its retention practices have been too

---

[22] The Secret Service points to the Memorandum of Understanding as additional evidence that it does not intend to retain control over the visitor records. The Court regards this self-serving agreement with skepticism. The MOU was executed <u>after</u> the Secret Service created many of the records and <u>after</u> the Secret Service was sued for the records.

impermanent for that.[23]  Nonetheless, the Secret Service's stated intent is clear: it does not intend to retain control over these records once the visitor has left the White House Complex or the Vice-President's Residence.  Because the Secret Service's actions are not inconsistent with its stated intent, the first factor weighs in its favor.

2.    The Ability of the Agency to Use and Dispose of the Record as it Sees Fit.

The second factor, the ability of the Secret Service to "use and dispose" of the record as it sees fit, weighs against the Secret Service.  The Court finds, first, that the Secret Service is able to use the visitor records as it sees fit, and second, that in most instances the Secret Service is able to freely dispose of the records as well.

First, the Secret Service's declarations demonstrate that the agency is able to use the visitor records as it sees fit.  The Secret Service collects personal information for prospective visitors for two purposes: first, to perform a background investigation on the individual, and second, to enable the Secret Service to verify that the visitor may enter the Complex or Residence at the time of the visit.  *See* Droege Decl. at ¶ 5.  The agency then uses the records it creates for these twin purposes. Consider the daily access list used at the Vice-President's Residence, for example.  Once the Secret Service has performed a background check on the visitor, it adds the individual's name to the daily access list.  The list is then given to the Secret Service agents stationed at the entrances to the Residence, who use the list to let guests in and out of the area.  The process is nearly identical for

---

[23]  The Secret Service's retention practices across town at the Vice-President's Residence are similar to those at the White House Complex.  While it has historically deleted requests for access and daily access lists, this practice was not uniformly applied throughout the relevant time period.  The Secret Service acknowledges that it has retained some records "from sporadic dates."  3d Morrissey Decl. at ¶ 39 n.2.  Permanent access lists were deleted as changes were made to the list, until June 2006 when it began retaining them.  Post entry logs, meanwhile, were transferred on a monthly basis to the OVP, again until June 2006.

the permanent access list. The same notion, that the Secret Service freely uses these records to assist it in protecting the Residence, applies to the post entry logs: when a visitor enters the Residence, a Secret Service officer will handwrite the date and time of visitor's arrival in the post entry log, giving the Secret Service a clear record of who has entered the area. In each instance, the Secret Service is using the record to assist it in protecting the Vice-President. The Secret Service has failed, in other words, to offer any explanation as to how its ability to use these documents is limited, and the Court can see none. Rather, the Secret Service uses these documents exactly as would be expected: to fulfill its statutorily mandated responsibility to protect the President and Vice-President. *See* 18 U.S.C. §§ 3056, 3056A.

Second, despite what the Secret Service may claim, it is not clear whether there are any legitimate limitations on its ability to dispose of the visitor records. The Secret Service argues that it lacks disposal authority over "WAVES records, ACR records and VPR visitor records" because they "are under the exclusive legal control of the President and Vice-President." Def.'s Reply Br. at 9. This is why, the Secret Service reasons, it "necessarily lacks unilateral disposal authority over [the records]," and instead "transfers them to the [WHORM]." *Id*. In the Secret Service's opinion, its practice of transferring the records to the WHORM corroborates this truism. This argument, however, suffers from a number of weaknesses. The most glaring weakness is that it is circular: The Secret Service argues that it does not control these documents because it is not free to dispose of them because they are under the control of the President and Vice-President. Of course, the assumption which this argument rests on – that these documents are under the "exclusive legal control of the President and Vice-President" – is the focal point of this suit. The Secret Service is assuming the very point it is trying to prove.

The most that can be said is the Secret Service <u>acts</u> as if the White House has legal control over these records. Upon closer inspection, however, even this proposition seems suspect. Notice that the Secret Service was routinely preserving all ACR records from 2001 until 2006, and that it was not transferring these records to the White House or the OVP, at least not until 2006, when it did so for the entire time period *en masse*. Notice also that until June 2006 the Secret Service was routinely disposing of all permanent access lists and daily access lists – without first providing a copy (or the original) to the OVP. It was similarly purging its access list database on a daily basis. *See* Morrissey Decl. at ¶ 39. Requests for access were likewise destroyed – again, without first providing a copy to the OVP. *Id* at ¶ 40. These are not the actions of an agency that "lacks [the] unilateral . . . authority" to dispose of visitor records. Def.'s Reply Br. at 9. Rather, these actions suggest that the Secret Service is <u>choosing</u> to delete or transfer visitor records because it concludes that it no longer has a need for them. *See, e.g.*, 3d Morrissey Decl. at ¶ 18 (noting "the Secret Service has no continuing interest sufficient to justify preservation or retention of WAVES or ACR records" "[o]nce a visitor's visit to the White House Complex is complete"). The notion that the Secret Service is able to make this choice, and act on it, suggests it is able to dispose of visitor records as it sees fit.

Another weakness in the Secret Service's argument is that it places too much emphasis on its own record disposal policies. The Secret Service argues that its disposal practices "reflect[] . . . its inability to dispose of the record[s] as it sees fit." See Def.'s Mot. S.J. at 22-23 (internal quotation marks and citation omitted). In *Bureau of National Affairs v. United States Department of Justice*, the Court of Appeals cautioned that courts should not "rely solely," with "[r]igid adherence," "on the agenc[y's] treatment of the documents under [its] records disposal regulations

and policies to determine the status of those documents under FOIA." 239 U.S. App. D.C. 331, 742 F.2d 1484, 1493 (D.C. Cir. 1984). "Although an agency's treatment of documents for preservation purposes may provide some guidance," the court explained, "an agency should not be able to alter its disposal regulations to avoid the requirements of FOIA." *Id*. The Court of Appeals echoed this principle in *Consumer Federation of America v. United States Department of Agriculture*, where it noted the treatment of documents for disposal and retention purposes is not a "'divining rod'" for determining whether a document is an agency record. 372 U.S. App. D.C. 198, 455 F.3d 283, 289 (D.C. Cir. 2006) (quoting *Bureau of Nat'l Affairs*, *supra*, 742 F.2d at 1493.). This cautionary instruction seems especially apt here, given the changing nature of the agency's retention practices. For these reasons, the Court concludes the Secret Service is able to use and dispose of the visitor records as it sees fit.

        3.     The Extent to Which Agency Personnel Have Read or Relied upon the Document.

The third factor, the extent to which Secret Service personnel have read or relied upon the document, weighs heavily against the Secret Service. It is undisputed that the Secret Service uses each one of the visitor records in its efforts to protect the President and Vice-President; indeed, that is why the records are created. The Secret Service uses WAVES and ACR records to perform background investigations of prospective visitors and to verify that the visitor may enter the Complex (and under what conditions) at the time of the visit. *See* Droege Decl. at ¶ 5. The permanent and daily access lists serve the same purpose at the Vice-President's Residence. The post entry logs allow the Secret Service to track what visitors have entered the Vice-President's Residence during a given day. Each of these records therefore has one important trait in common:

they are integral to the Secret Service's protective mission.  Indeed, these records are the *sine qua non* of the Secret Service's supervision of visitors to the Complex and Residence.

The Secret Service does not dispute that it reads and relies on these records.  It stresses, instead, the "brief and limited nature" in which it uses these records, noting that it relies on these records for only a short period of time and only for a specific purpose.  Def.'s Reply. Br. at 12-14.  This same argument was properly rejected in *The Washington Post v. Department of Homeland Security*, *supra*, where Judge Urbina explained: "While the defendant is correct that the Secret Service's use of the WAVES records is limited, the defendant fails to recognize that the very purpose of the WAVES records is limited. . . . [T]he inquiry as to the agency's use of a document is tethered to the purpose behind the records' creation in the first instance."  459 F. Supp. 2d at 71 (citing *Bureau of Nat'l Affairs*, 742 F.2d at 1490).  The limited use of the records is, in other words, inherent in the limited purpose for which they are created, but this does not mean the Secret Service does not read or rely on them.  If that were the case, any convenience store patron who has ever bought a losing scratch ticket could claim that they did not gamble simply because they held the ticket for only a few minutes.

      4.    The Degree to Which the Document Was Integrated into the Agency's Record System or Files.

The final factor, the degree to which the records were integrated into the Secret Service's record system, cuts both ways.  The records created at the White House Complex are integrated into the Secret Services record system, while the records created at the Vice-President's Residence are not.

The key records at the White House Complex are WAVES and ACR records, both of which,

based on the Secret Service's declarations, are integrated into its record systems.  The Secret Service

acknowledges that it stores WAVES records on "its computer system" and its "servers."  3d

Morrissey Decl. at ¶ 18.  The Secret Service also notes "that some WAVES data" is stored "on the

hard drives of two Secret Service computers."  *Id*. at ¶ 20.  ACR records are inputted directly into

"the Secret Service's computers," where they are also stored.  *Id*. at ¶ 22.  WAVES records are later

"updated" using information from the ACR system.  And both WAVES and ACR records remain

in the Secret Service's system after the visitor leaves the Complex, until they are actively purged

from the system.  This all suggests that WAVES and ACR records are integrated into the Secret

Service's record system.  *See Consumer Fed'n of Am.*, 372 U.S. App. D.C. at 205, 455 F.3d at 290

(concluding electronic appointment calendars  "kept . . . on the [agency] computer system" were

subject "to the control of that system's administrators").  Moreover, there is no evidence that these

particular files are segregated from the Secret Service's general files.  *C.f.  Kissinger*, 445 U.S. at

157, 100 S. Ct. 972 (holding Henry Kissinger's notes not agency files because, *inter alia*, they were

"never entered the State Department's files"); *United We Stand Am.*, 359 F.3d at 607 (Henderson,

J., dissenting) (noting "IRS keeps its copy [of the record] in a segregated file devoted solely to IRS

correspondence with the [congressional committee]").

　　　　Despite its acknowledgment that the WAVES and ACR records are stored on its computer

system, the Secret Service claims the records are not truly integrated into its file system.  Its claim

is twofold.  First, it argues that the records are not integrated into its system because they only

"reside temporarily on the Secret Service's servers."  Def.'s Reply Br. at 14.  Second, the Secret

Service argues that "[s]ince most records today exist in electronic format – and many exist in no

other format – an agency's possession of a record in electronic format is no more meaningful than

possession in any other format." *Id*. Neither point is convincing.

As to the first point, the notion that an electronic record is not integrated into the Secret Service's computer system simply because the agency deletes the record 30 or 60 days later misses the point. The length of time a record is saved skirts the salient issue of whether it was integrated into the agency's record system in the first place. The Secret Service does not, for example, attempt to explain where the record is stored on its computer system for this 30-60 day period. On this salient issue, Mr. Morrissey's declaration is silent. As to the second point, the Secret Service is partially correct: location of a record is not determinative. *See Kissinger*, *supra*. An agency's possession of an electronic document does not, in other words, necessarily mean the file is integrated into the agency's file system. But this does not help the Court determine whether WAVES and ACR records, which are stored on the Secret Service's server, are integrated. The problem, as the Court sees it, is that the Secret Service offers no explanation for why some electronic documents are integrated and others are not. Or how the Court should differentiate the two. Taken to its logical extreme, the Secret Service seems to be saying that no electronic document is ever fully integrated in an agency's system, at least not as long as the agency deletes the file within 60 days. This again, however, fails to provide the Court with a clear understanding of how to differentiate an integrated file from a non-integrated electronic file.

Whether the records at the Vice-President's Residence are integrated into the Secret Service's filing system is a nebulous question. While requests for access are typically destroyed after 15-30 days, this practice has not been uniformly applied throughout the relevant time period. The Secret Service acknowledges that it has retained some requests for access, just not consistently. 3d Morrissey Decl. at ¶ 39 n.2. The Secret Service does not, however, explain where these records were

stored, except to say that the records were "discovered . . . in places where such documents are not normally stored." *Id*. Nor does it explain where these types of records are "normally stored." The same uncertainty exists with daily access lists. While the Secret Service states that it disposes of these records on a daily basis, it notes that it "discovered" some daily access lists in a location other than where they are "normally stored." *Id*. Again, the Court is left to wonder where these records are "normally stored," which is central to understanding whether the records are integrated into the agency's filing system. As for the permanent access list, this is deleted as changes are made to it. As for the remaining records at the Residence, the post entry logs and event lists, it appears that these items are transferred to the OVP on a monthly basis and that the Secret Service does not retain copies for its file system. *Id*. at ¶¶ 37, 41. There is a touch of uncertainty here, however, as the Secret Service does not explain where and how the records are stored before transfer.

> 5.    Balancing the Four Factors.

Upon balancing the four factors listed in *Burka*, the Court has no difficulty concluding the visitor records are under the Secret Service's control. Weighing in favor of the Secret Service, that the visitor records are not under its control, is the Secret Service's intent. It is evident from Mr. Morrissey's declarations the Secret Service does not now intend to retain control over visitor records once a visit is complete. Directly contradicting the agency's stated intent, however, are its actions. As explained above, the Secret Service is able to use visitor records – records that it generates for agency business – as it sees fit. It uses WAVES records to perform background checks on prospective visitors and to admit each visitor once they arrive at the Complex. The daily and permanent access lists are used much the same way at the Residence. ACR records are used to track the visitor's entry and exit at the Complex; the post entry logs do the same at the Residence. For

each record, the Secret Service is using the record to help it protect the President and Vice-President, which is the agency's core mission. The Secret Service also appears to be able to dispose of many, if not all, of the records at will.

This case boils down to two competing sides: intent versus use. On one hand, the Secret Service claims that it does not intend to control the visitor records. On the other hand, the Secret Service's historical use of the visitor records suggest that it does in fact control the records. In the face of these contradictory sides, and based on the circumstances of this case, the Court concludes that use trumps intent. Both the Supreme Court and the Court of Appeals have explained that an agency's actual use of a document is often more probative than the agency's subjective intent. *See Tax Analysts*, 492 U.S. at 147, 109 S. Ct. at 2849 (rejecting a "*mens rea* requirement" that would "make[] the determination of 'agency records' turn on the intent of the creator of a document relied upon by an agency."); *Consumer Fed'n of Am.*, 372 U.S. App. D.C. 198, 455 F.3d at 291 n.11 ("We focus on the manner in which the documents were used, rather than on the subjective 'intent of the creator of [the] document,' because the Supreme Court has rejected reliance upon the latter.") (quoting *Tax Analysts*, *supra*) (alterations in original); *Bureau of Nat'l Affairs*, 742 F.2d at 1490, 239 U.S. App. D.C. at 337 ("[W]here documents are created by an agency employee and located within the agency, use of the document becomes more important in determining the status of the document under FOIA."). Because the Secret Service creates, uses and relies on, and stores the visitor records, "in the legitimate conduct of its official duties," *Tax Analysts*, 492 U.S. at 145, 109 S. Ct. at 2848, they are under its control. The Secret Service's intent is just one factor among four, and in this case it is substantially outweighed by the other factors.

### C.     Conclusion: Visitor Records Are "Agency Records" Under the FOIA

The Secret Service has failed to meet its burden of demonstrating that "the key records at issue here," *see supra* note 14,  WAVES records, ACR records, requests for access, access lists, post entry logs, and event lists, are not "agency records" under the FOIA.  *Gallant*, 307 U.S. App. D.C. at 30, 26 F.3d at 171.  To the contrary, the Court concludes that these visitor records at the White House Complex and Vice-President's Residence are created (or obtained) and controlled by the Secret Service and are therefore "agency records" under our circuit's case law.  *Accord The Washington Post*, 459 F. Supp. 2d at 71-72 (holding White House Complex and Vice-President's Residence visitor records constitute agency records under the FOIA).

**III.**

The Secret Service asserts that the doctrine of "constitutional avoidance" requires the Court to construe the Freedom of Information Act so that it does not encompass visitor records. "[D]isclosure of the identity of the President's and Vice President's visitors could," according to the Secret Service, "reveal the nature of initiatives under consideration or suggest how the President or Vice President may decide pending issues, before the decisions are made." Def. Mot. S.J. at 29-30. This poses a serious separation-of-powers concern, it reasons, because it "would impede the ability of the President and Vice President to receive full and frank submissions of facts and opinions and to seek confidential information from many sources, both inside the government and outside." *Id*. at 30 (citation and internal quotation marks omitted).

This same argument was properly rejected in *The Washington Post*.  The doctrine of constitutional avoidance – which provides that "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress," *Edward J.*

*DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575, 108 S. Ct.

1392, 1397 (1988) (citing *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 499-501, 99 S. Ct.

1313, 1318-19 (1979)) – rests on the principle that a congressional act should not be construed to

violate the Constitution if any other possible construction is available. *Murray v. The Charming*

*Betsy*, 2 Cranch 64, 118 (1804). *See also Crowell v. Benson*, 285 U.S. 22, 62, 52 S. Ct. 285, 296

(1932) ("When the validity of an act of the Congress is drawn in question, and even if a serious

doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether

a construction of the statute is fairly possible by which the question may be avoided.") (footnote

omitted). Because the doctrine applies only where the statute is open to more than one interpretation,

however, it "has no application in the absence of statutory ambiguity." *United States v. Oakland*

*Cannabis Buyers' Coop.*, 532 U.S. 483, 494, 121 S. Ct. 1711, 1719 (2001). The purpose of the

doctrine, after all, "is to avoid deciding the constitutional question," *Taucher v. Brown-Hruska*, 364

U.S. App. D.C. 432, 396 F.3d 1168, 1176 (D.C. Cir. 2005)), "not to deliberately create constitutional

questions." *In re Grand Jury Subpoena (Miller)*, 365 U.S. App. D.C. 13, 397 F.3d 964, 977 n.2

(D.C. Cir. 2005) (citations and internal quotation marks omitted).

The doctrine of constitutional avoidance is not applicable in this situation for a number of

reasons. To begin with, as the court noted in *Washington Post*, *supra*, the Secret Service "has

identified no ambiguity in the FOIA statute" which would open the door to an application of the

avoidance doctrine. 459 F. Supp. 2d at 72. To the contrary, as this Court explained above and Judge

Urbina explained in *Washington Post*, the term "agency record" unambiguously encompasses the

visitor records sought here. The Secret Service's concerns, like its apprehension that release of

visitor records may reveal the policy considerations pending before the President, does "not serve

as a license for the court to transmute the meaning of an unambiguous statute." *Id*. The doctrine of constitutional avoidance applies only where the statute is open to more than one possible interpretation, which is not this case. *Crowell*, *supra*.

In addition, the Court rejects the presumption, underlying the Secret Service's argument, that interpreting "agency records" to include visitor records from the White House Complex and the Vice-President's Residence will raise a serious constitutional problem. The Secret Service lists a number of possible negative effects that may follow the public release of these records. Each one of these negative effects is tied to the Secret Service's apprehension that release of the "names of many visitors would reveal . . . the likely subject matter . . . if not the precise 'purpose'" of the person's visit. Def.'s Reply Br. at 18. This, in turn, would reveal the particular policies the President was deliberating, maybe even suggesting the likely policy choice the President would make. The Court views the Secret Service's apprehension, however, as misguided.

In *Washington Post*, *supra*, the Secret Service submitted the declaration of Ms. O'Donnell. Ms. O'Donnell explained that "in many if not most cases, the purpose of the visits [to the White House Complex and Vice-President's Residence] is not apparent from the face of the documents, nor is the relationship of the visitor to the Vice-President, his family, OVP staff, or any outside organization." Supplemental Declaration of Claire M. O'Donnell at ¶ 7. Indeed, she noted that many visitors to the Complex and Residence, people like "repair personnel [entering] to fix broken office equipment" or "visiting heads of foreign governments," would not relate to policy considerations at all. Knowledge of these visitors would not disclose presidential communications or shine a light on the President's or Vice-President's policy deliberations. *Id*. Thus, as a factual matter, it seems unlikely that visitor records will often pose a bona fide risk of improper disclosure.

To the extent that a visitor record might, if publicly released, disclose confidential presidential communications, the Secret Service has a ready recourse in Exemption 5. *See Washington Post*, 459 F. Supp. 2d at 73 (citing *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 148, 95 S. Ct. 1504, 1515 (1975)); *see also Baker & Hostetler LLP v. United States Dept's of Commerce*, 374 U.S. App. D.C. 172, 181, 473 F.3d 312, 321 (D.C. Cir. 2006) ("Exemption 5 incorporates the traditional privileges that the Government could assert in civil litigation against a private litigant. Those include, for example, the government attorney-client privilege, the government attorney work product protection, the presidential communications privilege, the state secrets privilege, and the deliberative process privilege.") (citing *Judicial Watch, Inc. v. Dep't. of Justice*, 361 U.S. App. D.C. 183, 365 F.3d 1108, 1109, 1113-14 (D.C. Cir. 2004); *Burka*, *supra*).   There is therefore no justification for removing these records from the reach of the FOIA based on confidentiality concerns.

**IV.**

Finally, there are three ancillary issues for the Court to address.

### A.     Standing Under the Federal Records Act

The Secret Service claims "the plaintiff . . . [lacks] standing to raise these claims under the [Federal Records Act] in the present circumstances" because "plaintiff [is] challeng[ing] the mere classification of records as Presidential or Vice Presidential" as opposed to "the proposed destruction of records." Def.'s Mot. S.J. at 33.  The Secret Service's claim, however, rests the assumption that "the records will be preserved" regardless of whether they fall under the FRA or the Presidential Records Act. *Id*. at 34. This assumption is counterfactual. The Secret Service has acknowledged its practice of deleting many visitor records. It has only suspended this practice temporarily due to

pending litigation. That the Secret Service may, in some instances, transfer a copy of the record to the President or Vice-President first before deleting it does not mean it is not deleting agency records.

### B.    Nineteen Pages of Security-Related Records

The Secret Service withheld nineteen pages of security-related records created as part of its background investigation of certain visitors.  It has withheld these records – records that it did not transfer to the WHORM – under several different FOIA exemptions, claiming generally that "disclosure would reveal law enforcement techniques and procedures and could, therefore, 'endanger the life or physical safety' of one or more Secret Service protectees."  Def.'s Mot. S.J. at 34. Because Plaintiff does not contest the withholding, *see* Plt.'s Opp'n at 3 (noting "CREW does not contest the withholding" of the "19 pages of responsive documents that the agency claims are exempt from disclosure"), the Court will treat the matter as conceded.

### C.    Plaintiff's Request for Limited Discovery

Lastly, Plaintiff requested limited discovery to supplement the record, if necessary, on the issue of whether visitor records are agency records.  Discovery is not necessary at this juncture because the Court has decided this issue on the current record.

### CONCLUSION

Based on the foregoing, the Secret Service's motion for summary judgment is granted in part and denied in part.  An order consistent with this memorandum opinion will be issued on this same date.

Signed by Royce C. Lamberth, United States District Judge, December 17, 2007.