# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil No. 06-1912 (RCL) |
| U.S. DEPARTMENT OF HOMELAND SECURITY, et al. | ) ) ) | |
| Defendants. | ) ) | |

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON CLAIMS THREE AND FOUR

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, plaintiff moves for summary judgment on Claims Three and Four of its Complaint. As grounds for this motion the Court is respectfully referred to the accompanying memorandum of points and authorities and statement of material facts as to which there is no genuine issue.

Respectfully submitted,

___/s/ Anne L. Weismann___
Anne L. Weismann
(D.C. Bar No. 298190)
Melanie Sloan
(D.C. Bar No. 434584)
Citizens for Responsibility and Ethics
   in Washington
1400 Eye Street, N.W., Suite 450
Washington, D.C.  20005
Telephone:  (202) 408-5565
Fax:  (202) 588-5020
Attorneys for Plaintiff

January 28, 2008

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| CITIZENS FOR RESPONSIBILITY AND )<br>ETHICS IN WASHINGTON, )<br> )<br>         Plaintiff, )<br> )<br>        v. )<br> )<br>U.S. DEPARTMENT OF HOMELAND )<br>SECURITY, et al. )<br> )<br>        Defendants. )<br>_____ ) | Civil No. 06-1912 (RCL) |

### MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
### PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON
### CLAIMS THREE AND FOUR

### STATEMENT

Through this lawsuit CREW[1] seeks to compel defendants U.S. Department of Homeland

Security ("DHS") and Archivist Allen Weinstein to comply with their mandatory duties and

obligations under the Federal Records Act ("FRA"). There can be no question that after this

Court's recent memorandum opinion concluding that White House visitor records[2] are agency

records subject to public disclosure under the Freedom of Information Act ("FOIA"), those same

records are subject to the FRA. As a necessary consequence, White House visitor records must

be preserved, managed and disposed of in accordance with the FRA.

---

[1] CREW is the acronym for plaintiff Citizens for Responsibility and Ethics in Washington.

[2] As used herein "White House visitor records" includes records of visits to the White House Complex, which includes the Eisenhower Executive Office Building ("EEOB"), the grounds encompassing the White House and the EEOB, the New Executive Office Building and the residence of the vice president.

Here, however, DHS has adopted a policy of destroying White House visitor records once it transfers copies to the White House. This policy appears to stem, in large part, from White House directives and the decision of DHS, made with no public input, that the records do not have permanent long-term value to the agency. DHS is destroying its records despite the absence of approved disposition schedules from the archivist. Just as troubling, the archivist has full knowledge of this practice but has failed to initiate action to preserve or recover those records as the FRA mandates.

Under these circumstances, CREW is entitled to summary judgment on its FRA claims, specifically (1) that DHS's policy of destroying White House visitor records without authorization from the archivist and without a disposition schedule that has been subject to notice and public comment is arbitrary, capricious and contrary to law[3] and (2) that the archivist's refusal to initiate enforcement action violates his mandatory obligations under the FRA.[4] These are precisely the kind of claims this Court recently determined it has jurisdiction to hear. Moreover, the salient facts underlying CREW's FRA claims are not genuinely in dispute, in fact have been adopted by this Court in its recent memorandum opinion on CREW's FOIA claims, and lead inescapably to the conclusion that defendants' actions are contrary to law. Finally, CREW has standing to bring these claims, as made clear by the allegations in its complaint and the supplemental declaration of its executive director filed with this memorandum.

---

[3] See Complaint at ¶¶ 46-49.

[4] Id. at ¶¶ 51-53.

2

## FACTUAL BACKGROUND

On October 4, 2006, CREW sent a FOIA request to DHS seeking Secret Service records, regardless of format and including electronic records and information, relating to any visit that any of the following individuals made to the White House or the residence of the vice president from January 1, 2001, to the present:  James Dobson, Gary L. Bauer, Wendy Wright, Louis P. Sheldon, Andrea Lafferty, Paul Weyrich, Tony Perkins, Donald Wildmon and Jerry Falwell. Letter from Anne L. Weismann to U.S. Secret Service, Freedom of Information and Privacy Acts Branch, Oct. 4, 2006 (Exhibit A to Complaint).

CREW also sought a waiver of fees associated with processing its request given that the request concerns the operations of the federal government, the disclosures will likely contribute to a better understanding of relevant government procedures and the request is primarily and fundamentally for non-commercial purposes.  Id.  Specifically, the requested records are likely to shed light on the influence that conservative Christian leaders have, or attempt to have, on the president in the exercise of his authority.  Id.

After receiving no response to its FOIA request, CREW filed its complaint in this matter on November 9, 2006, naming as defendants DHS and Archivist Allen Weinstein.  CREW's complaint challenges the failure of the Secret Service (a component of DHS) to fulfill CREW's FOIA request.  Complaint, ¶ 1.  In addition, CREW challenges as contrary to law the policy of the Secret Service to erase federal records, including Worker and Visitor Entry System ("WAVES") records, once it has transferred the information on those records to the White House.  Id.  CREW also challenges the failure of the archivist to take enforcement action to prevent DHS from unlawfully destroying agency records, contrary to his statutory mandate under

the FRA.  <u>Id.</u>, ¶¶ 1, 2.

CREW's challenge to the government's unlawful policy of document destruction is based in large degree on information made available through other litigation.  For example, on May 16, 2006, the Secret Service filed a motion to dismiss for lack of subject matter jurisdiction in <u>Judicial Watch v. U.S. Secret Service</u>, No. 06-310 (RCL) (D.D.C.), another FOIA lawsuit challenging the failure of the Secret Service to produce records in response to plaintiff Judicial Watch's request for all records that reflect the White House entries and exits of convicted lobbyist Jack Abramoff.  As part of its motion, the Secret Service submitted the declaration of Kathy J. Lyerly, the Special Agent in Charge of the Liaison Division and the Freedom of Information and Privacy Acts Office for the Secret Service ("Lyerly Decl. I) (Exhibit B to Complaint).

Ms. Lyerly attested to the "longstanding practice of the Secret Service to transfer WAVES records on CD-ROM to the White House every 30 to 60 days."  Lyerly Decl. I at ¶ 10. Ms. Lyerly also stated that "once the Secret Service transferred the WAVES records, the Secret Service ensured that those records were erased from its computer system."  <u>Id.</u>  <u>See</u> <u>also</u> Memorandum Opinion of December 17, 2007 at 6 ("Mem. Op.").[5]  As this Court has found, "[t]he Secret Service's practice of purging and overwriting WAVES records that are 'older than 60 days' occurred from 'at least 2001' until 'November 2004.'"  <u>Id.</u>, <i>quoting</i> Third Declaration of Paul Morrissey ("3d Morrissey Decl.") at ¶¶ 18-19.

Beginning in October 2004, "at the request of the National Archives and Records

---

[5] Despite this practice, in June 2006 the Secret Service discovered on the hard drives of two of its computers "some WAVES data predating October 2004."  3d Morrissey Decl. at ¶ 20, <i>cited in</i> Mem. Op. at 7 n.8.

Administration, the Secret Service began temporarily retaining its own copy of the WAVES records that it transferred to the White House." Lyerly Decl. I at ¶ 11, Mem. Op. at 7.[6]  As a result, the Secret Service has WAVES records dating back only to October 2004.  Id.  According to a Memorandum of Understanding ("MOU") that the Secret Service entered into on May 17, 2006, with the White House Office of Records Management (Exhibit C to Complaint),

> [t]he Secret Service agreed to NARA's request on the under-
> standing that it would be a temporary practice maintained
> until a legal determination was made confirming the
> propriety of handling WHACS [White House Access Control
> System] Records as Presidential Records.

MOU at ¶ 16a.  As this Court has noted, the Secret Service has explained neither why NARA requested that the agency stop deleting WAVES records nor "how long it [the Secret Service] will continue to retain these WAVES records, and future WAVES records, saying instead that its present retention policy is only temporary."  Mem. Op. at 7 n.9.

The MOU also provides that the Secret Service is to "regularly transfer all WHACS Records in its possession" to the White House and is not to "retain its own copies of any WHACS Records except as is necessary to facilitate the transfer of these records" to the White House.  Id., ¶ 22.

Since the first lawsuit brought by Judicial Watch for White House visitor records on February 22, 2006, to the present, the government has submitted at least 17 different declarations describing in various ways the Secret Service's creation and maintenance of White House visitor records.  These declarations document newly discovered records, the purportedly inadvertent

---

[6] The government has not explained the significance of the October 2004 date; CREW notes that it is one month before the last presidential election.

destruction of records and differing practices as to what the Secret Service retained after providing the White House with copies.  For example, on May 16, 2006, Ms. Lyerly claimed that the Secret Service only had in its possession WAVES records dating back to October 2004. Lyerly I Decl., ¶ 11.  Almost two months later, on July 7, 2006, Ms. Lyerly stated in a declaration that the Secret Service had discovered on the hard drives of two of its computers "certain WAVES data pre-dating October 2004."

According to Gary Stern, General Counsel of the National Archives and Records Administration ("NARA"), in 1990 and 1993 the Secret Service "formally submitted to NARA's records appraisal division proposed Federal Records Act schedules for WAVES records in its custody  . . ."  Declaration of Gary M. Stern, May 7, 2007, ¶ 14, submitted in CREW v. NARA, Civil No. 07-048 (RBW) (attached as Exhibit 1).  The Secret Service submitted a revised schedule in 1996, which was published in the Federal Register.  Id.   All of these proposed schedules were subsequently withdrawn.   Id.

The Secret Service's practices with respect to the records of visits to the vice president's residence ("VPR") are similar.  As a general matter, "the Secret Service does not actively preserve a document unless it contains 'information of protective interest . . . such as . . . background checks and the Watch Commander Journals' . . . Documents that do not contain 'information of protective interest' are either transferred to the OVP [office of the vice president] or purged."  Mem. Op. at 12, *quoting* 3d Morrissey Decl. at ¶ 37.  More specifically, e-mail requests for access to the VPR are destroyed after 15-30 days, id., although the Secret Service still has some paper requests dating back to June 2000.  Id. at 13.  Similarly, while the Secret Service has a practice of disposing of daily access list on a daily basis, it has retained some of

6

these lists generated prior to June 2006.  Id.  And as to its electronic database, the Secret

Service's practice prior to June 2006 was to purge it daily of the access list database of

individuals not authorized to enter the VPR.  Id.  Of note, not until CREW moved for a

temporary restraining order to ensure the preservation of all potentially responsive records

pending the outcome of this litigation did the Secret Service acknowledge that up until some

point in June 2006, the Secret Service destroyed or otherwise transferred to the White House all

of its records concerning access to the VPR.  Second Morrissey Decl., March 5, 2007, ¶ 18

(Document 21-2).

        In addition, by letter dated September 13, 2006, Shannen W. Coffin, then counsel to the

vice president, dictated to Don Personette, chief counsel of the Secret Service, that the Secret

Service  "shall not retain any copy of these documents and information upon return to OVP," and

stated "[i]f any documents remain in your possession, please return them to OVP as soon as

possible."  See Document 29-2.

## STATUTORY BACKGROUND

### The Federal Records Act

        The FRA is a collection of statutes that governs the creation, management and disposal of

federal records.  See generally 44 U.S.C. §§ 2101 et seq., 2901 et seq., 3010 et seq., and 3301 et

seq.  Among other things, the FRA ensures "[a]ccurate and complete documentation of the

policies and transactions of the Federal Government," as well as "judicious preservation and

disposal of records."  44 U.S.C. § 2902.

        To fulfill this purpose, the FRA imposes a series of mandatory and non-discretionary

obligations on the agencies and the archivist of the United States to make and preserve federal

records.  As this Court has explained, "[t]he Archivist of the United States and the head of each

federal agency play crucial and somewhat symbiotic roles under the FRA's record retention

scheme."  CREW v. U.S. Dep't of Homeland Security, 2007 U.S. Dist. LEXIS 91901, *20

(December 17, 2007) ("DHS I Mem. Op.").

    Toward this end, the FRA mandates that "[t]he head of each agency *shall make and*

*preserve* records containing adequate and proper documentation of the organization, functions,

policies, decisions, procedures, and essential transactions of the agency."  44 U.S.C. § 3101

(emphasis added).  Under the statute, each agency must also "establish and maintain an active,

continuing program for the economical and efficient management of the records of the agency,"

id. at § 3102, and must "establish safeguards against the removal or loss of records" the agency

head determines are necessary and required by regulations of the archivist.  Id. at § 3105.

    The FRA also prescribes the exclusive mechanism for the disposal of federal records,

which it defines to include:

> all books, papers, maps, photographs, machine readable
> materials, regardless of physical form or characteristics,
> made or received by an agency of the United States
> Government under Federal law or in connection with
> the transaction of public business and preserved or
> appropriate for preservation by that agency . . as evidence
> of the organization, functions, policies, decisions, procedures
> operations, or other activities of the Government or because
> of the informational value of data in them.

44 U.S.C. § 3301.  No records may be "alienated or destroyed" except pursuant to the exclusive

disposal provisions of the FRA.  Id. at § 3314.  See also Armstrong v. Bush, 924 F.2d 282, 285

(D.C. Cir. 1991) ("Armstrong I").

    The archivist administers the provisions of the FRA and only the archivist may authorize

an agency to dispose of records that the agency no longer needs and that do not have "sufficient administrative, legal, research, or other value to warrant their continued preservation by the Government." 44 U.S.C. § 3303a(a).  Only if the archivist determines that agency records do not have administrative, legal, research, or other value can the archivist authorize their disposal.  Id. at §§ 3303a(a), (d) and (e).

The FRA sets forth a series of mandatory steps that any agency must complete before it is authorized to dispose of federal records.  "A document that qualifies as a federal record may not . . . be discarded by agency fiat."  DHS I Mem. Op., 2007 U.S. Dist. Lexis 91901, *22.  Instead, an agency wishing to dispose of records must first submit to the archivist either lists of records the agency head determines "are not needed by it in the transaction of its current business," 44 U.S.C. § 3303a(2), or "schedules proposing the disposal after the lapse of specified periods of time of records of a specified form or character" that the agency head determines will not have "sufficient administrative, legal, research, or other value to warrant their further preservation by the Government."  Id. at § 3303a(3).  Upon receipt of such a request, the archivist must issue a notice requesting public comment on the agency's proposal and the archivist's staff must conduct its own assessment of the value of the records the agency is proposing to destroy.  Id. at § 3303a(a).  The archivist is free to accept or reject an agency's proposal.  Id.  In addition, the archivist may request advice and counsel from Congress regarding the disposal of any federal records the archivist believes may be of special interest to Congress or where the disposal of those particular federal records is in the public interest.  44 U.S.C. § 3301a(c).

The FRA also sets forth a number of mechanisms to restore lost or destroyed agency records.  If the archivist learns of "any actual, impending, or threatened unlawful removal . . . or

destruction of records in the custody of [an] agency," the archivist is required to notify the head

of the agency and assist the agency head "in initiating action through the Attorney General for

the recovery of records wrongfully removed and for other redress provided by law."  44 U.S.C. §

2905(a).  If the agency head does not initiate such action, the archivist "*shall* request the

Attorney General to initiate such action, and *shall* notify the Congress when such a request has

been made."  Id. (emphasis added).

      The FRA places a similar and independent duty on the head of each federal agency to

"initiate action through the Attorney General for the recovery of records he knows or has reason

to believe have been transferred to his legal custody."  44 U.S.C. § 3106.  If the agency head

refuses to pursue legal remedies, the archivist – as discussed above -- must request that the

attorney general take action and must inform Congress that he has made this request.  Id.[7]

      The archivist also has an affirmative duty to guide and assist federal agencies to ensure

the adequate and proper documentation of the policies and transactions of each agency.  44

U.S.C. § 2904(a).  In furtherance of these duties, the archivist must promulgate standards and

guidelines for federal agency records management, must establish standards for selective

retention of records and must assist the agencies in applying the standards to records in the

agencies' custody.  44 U.S.C. §§ 2904(b), (c)(1), 2905(a).  In addition, the FRA mandates that

the archivist "'conduct inspections or surveys of the records and the records management

programs and practices within and between Federal agencies.'"  DHS I Mem. Op. at *21,

*quoting* 44 U.S.C. § 2904(c)(1).

---

     [7] This Court has described these provisions as imposing "symmetrical notification
requirements on both the Archivist and agency head.  In the event that either one learns of the
improper destruction of records they must notify the other."  DHS I Mem. Op. at *23-24 n.12.

At the same time, heads of federal agencies are under an affirmative duty to implement the standards and guidelines for the retention of federal records. Specifically, each agency head must maintain an active records management program that provides for effective controls over the creation and use of federal records and that ensures the application of the archivist's standards and procedures for the preservation of federal records. 44 U.S.C. § 3102. In addition, agency heads are required to establish safeguards against the removal or loss of records determined by the agency to be necessary and required by regulations of the archivist. 44 U.S.C. § 3105.

## ARGUMENT

### I. THIS COURT HAS JURISDICTION TO REVIEW CREW'S FRA CLAIMS.

### A. The APA Provides For Judicial Review Of Plaintiff's FRA Claims.

As this Court has already recognized, "a district court is authorized to review the adequacy of an agency's recordkeeping guidelines and directives under the APA." DHS I Mem. Op. at *24. This conclusion flows directly from the D.C. Circuit's ruling in Armstrong I that "'the district court was authorized to hear plaintiffs' APA claim that the [National Security Council's] recordkeeping guidelines and directives do not adequately describe the material that must be retained as 'records' under the FRA.'" Id., quoting Armstrong I, 924 F.2d at 293. In addition, under the authority of Armstrong I, "a district court is authorized to review whether the Archivist or the head of an agency have properly performed their FRA enforcement duties." DHS I Mem. Op. at *25-26.[8]

─────────────

[8] In Armstrong I, the D.C. Circuit rejected the government's claim that judicial review was precluded of a claim that then-President George H. W. Bush and the National Security Council were destroying electronic records in contravention of the FRA. Relying on the

Here, CREW is seeking judicial review of precisely the kinds of claims that the D.C. Circuit has authorized.[9]  Claim Three, brought against defendant DHS, challenges as arbitrary, capricious and contrary to law "[t]he policy of the Secret Service and the DHS to erase from its computers all WAVES records once the information in those records has been transferred to the White House . . ."  Complaint at ¶ 47.  As relief CREW seeks a declaration "that DHS's policy of destroying WAVES and other visitor records is arbitrary, capricious, and contrary to law."  Id. at Prayer for Relief, ¶ 3.

Claim Four, brought against defendant archivist, challenges Dr. Weinstein's "failure to seek the initiation of an enforcement action through the Attorney General," id. at ¶ 53, to prevent the Secret Service from "destroying WAVES and other visitor records after transferring copies to the White House in violation of the FRA, 44 U.S.C. § 2905(a)."  Id. at ¶ 52.  As relief CREW seeks (1) a declaration "that the Archivist has breached his statutory duty to take enforcement action to prevent DHS from destroying records in contravention of the FRA and to recover records that DHS transferred to the White House"[10] and (2) an injunction ordering "the Archivist

---

statutory scheme and congressional intent to "establish a more effective administrative enforcement process to prevent the unlawful destruction or removal of records by agency officials," 924 F.2d at 292, the court concluded that there was judicial review "of the agency head's or Archivist's refusal to seek the initiation of an enforcement action by the Attorney General," to "ensure[] that the administrative enforcement and congressional oversight provisions will operate as Congress intended."  Id. at 295.

[9] As such, this case presents the "properly pleaded" claims that this Court found lacking in DHS I.  See DHS I Mem. Op. at *29.

[10] In DHS I this Court concluded that it did not have jurisdiction to entertain CREW's request for an order "requir[ing] the DHS to retrieve records that have already been transferred to the White House . . ."  DHS I Mem. Op. at *29.  Here, by contrast, CREW does not seek such an injunctive order, but rather seeks a declaratory judgment that recognizes the archivist's failure to fulfill his mandatory duty to either assist the agency head or initiate an action through the attorney general "'for the recovery of wrongfully removed records or for other legal redress.'"

to fulfill his mandatory statutory duty to ask the Attorney General to initiate legal action to ensure that DHS complies fully with its obligations under the FRA with corresponding notice to Congress."  Complaint, Prayer for Relief, ¶¶ 4-5.

In short, under Circuit precedent as followed in this Court's recent decision in <u>DHS I</u>, the APA plainly authorizes judicial review of CREW's claims challenging DHS's record-keeping policies as arbitrary, capricious and contrary to the FRA.  Likewise, judicial review of CREW's claim that the archivist has breached his statutory obligation to take enforcement action to prevent DHS from improperly destroying White House visitor records and to recover any records unlawfully removed from the agency is also authorized.

**B.  CREW Has Standing Under Article III Of The Constitution.**

To invoke the Court's jurisdiction under Article III of the Constitution, a plaintiff must demonstrate, "as an irreducible constitutional minimum,"[11] an injury-in-fact that is "fairly traceable" to the challenged act and "likely to be redressed by the requested relief."  <u>Allen v. Wright</u>, 468 U.S. 737, 751 (1984).  This same test applies to an organization, which "has standing on its own behalf if it meets the same standing test that applies to individuals."  <u>Spann v. Colonial Village, Inc.</u>, 899 F.2d 24, 27 (D.C. Cir. 1990).

CREW's injury, an inability to obtain through the FOIA information necessary to accomplish CREW's mission, is directly traceable to DHS's unlawful document retention policies and procedures and the failure of the archivist to initiate an action to preserve or recover

---

<u>DHS I</u> Mem. Op. at *23, *quoting* <u>Armstrong v. Executive Office of the President</u>, 1 F.3d 1274, 1279 (D.C. Cir. 1993) ("Armstrong II") (*citing* 44 U.S.C. § 2905(a)).  Accordingly, this relief is well within that sanctioned by <u>Armstrong I</u> and <u>Armstrong II</u>.

[11] <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560 (1992).

13

those records as the FRA mandates.[12]  As the complaint and declaration of CREW's Executive

Director Melanie Sloan ("Sloan Decl.") (attached as Exhibit 2) establish,[13] CREW has "such a

personal stake in the outcome of the controversy as to assure that concrete adverseness which

sharpens the presentation of issues upon which the court so largely depends for illumination of

difficult . . . questions . . . ." Baker v. Carr, 369 U.S. 186, 204 (1962).

First, CREW is a frequent FOIA requester, having filed hundreds of FOIA requests since

its inception in 2003.    Sloan Decl. at ¶ 4.  CREW averages at least several new FOIA requests

every month.  Id.

Second, CREW has filed FOIA requests with a wide variety of government agencies,

including at least 15 FOIA requests with DHS alone.  Id.  At present, CREW has FOIA requests

pending with over 25 different agencies.  Id.  Included within those pending requests are the

request at issue in CREW v. DHS I for White House visitor records of now-convicted lobbyist

Jack Abramoff and seven of his associates, a request for visitor records of visits by four other

conservative Christian leaders in addition to those named in the request at issue here, and a

request for White House visitor records of individuals associated with the Reading First Program

administered by the U.S. Department of Education.  Sloan Decl. at ¶ 9.  With the exception of

the request at issue in CREW v. DHS I, the Secret Service has yet to provide CREW with any of

---

[12] This Court has already rejected defendants' claim that CREW lacks standing under the
FRA based on defendants' mischaracterization of CREW's claims as challenging "'the mere
classification of records as Presidential or Vice Presidential' as opposed to 'the proposed
destruction of records.'"  Mem. Op. at 39, quoting Def.'s Mot. S.J. at 33 (emphasis in original).

[13] The Court may properly consider matters outside the complaint in assessing a
plaintiff's standing.  CARE, Inc. v. FAA, 355 F.3d 678, 685 (D.C. Cir. 2004); Friends of Earth v.
Dep't of Interior, 478 F.Supp.2d 11, 16 (D.D.C. 2007).

the requested documents.  Id.

Third, CREW intends to file future FOIA requests, including requests with DHS for White House visitor records.  Sloan Decl. at ¶¶ 10-11 .  These records offer valuable insight into the influences on the administration in the formulation of its policies and priorities.  Id. at ¶ 10.  Moreover, CREW is committed to transparency in government and, through its FOIA requests of the Secret Service, is attempting to combat the actions of this administration to undermine that transparency.  Id.

CREW has been deterred from filing any additional FOIA requests with DHS for White House visitor records by the agency's position that these records are not agency records subject to the FOIA, the pendency of the government's appeal from this Court's ruling that White House visitor records are agency records subject to the FOIA and the accompanying stay of this Court's order.  Sloan Decl. at ¶ 11.  Since taking that position, the agency has refused to respond to CREW's outstanding FOIA requests for White House visitor records.  Id.  Once the stay of this Court's recent ruling that the Secret Service's White House visitor records are agency records subject to the FOIA is lifted, CREW will resume filing additional FOIA requests for additional White House visitor records with DHS.  Id.  For example, CREW contemplates filing a FOIA request shortly for White House visitor records of top telecommunications executives during the past year to determine the extent to which they lobbied the president and his staff directly for retroactive immunity from liability for violating their customers' privacy rights.  Id.

Fourth, CREW has been affected by the agency policies challenged in this litigation in two direct ways.  The policy of the Secret Service to delete all White House visitor records once it has transmitted copies to the White House has prevented CREW from gaining access to all the

White House visitor records it has sought under the FOIA.  Sloan Decl. at ¶ 12.  As CREW's

executive director attests, "[i]f CREW cannot obtain the records it is seeking through its FOIA

request it cannot fulfill a central tenet of its mission," id., specifically the dissemination of

information about the conduct of public officials.  Id. at ¶ 2.  Moreover, DHS's failure to follow

the requirements of the FRA deprived CREW of an opportunity to comment on the proposed

destruction of White House visitor records and to offer its views on the continuing value those

records have to organizations like CREW, historians and the public generally.  Id. at ¶ 13.  In

this way DHS, by failing to provide CREW notice and an opportunity to comment, has caused

CREW harm.

     This case stands on very different footing than CREW v. DHS I, where this Court, on a

very different factual record, concluded that CREW lacked constitutional standing to seek

prospective declaratory and injunctive relief on its FRA count because it had not suffered an

injury-in-fact.  See 2007 U.S. Dist. LEXIS 91901, *8.  Although the Court found that CREW

had properly alleged a past injury-in-fact based on its allegation that it was denied access to

records responsive to its FOIA request, id. at *9-10 -- facts also present here -- the Court

concluded that the record before it did not sufficiently establish a future injury.  Id. at *13.

     This conclusion, however, was based explicitly on the record before the Court.[14]  Indeed,

----

[14] In addition, the Court's opinion in DHS I relies in part on a decision in American
Historical Ass'n v. Nat'l Archives and Records Admin., 310 F.Supp.2d 216 (D.D.C. 2004)
("AHA"), holding that plaintiffs did not have standing to challenge the lawfulness of an
executive order governing access to presidential records because they had not established a
future injury that was "'sufficiently imminent, and not conjectural and hypothetical . . .'"  DHS I
Mem. Op. at *15, quoting AHA, 310 F.Supp.2d at 228.  A key factor in the AHA decision,
however, was the fact that any denial of access to presidential records in the future would flow
from presidential decisions that could not be predicted and were scheduled to take place a year or
more into the future.  Here, by contrast, the agency's policy of document destruction is ongoing

the Court recognized that CREW's alleged future injuries were "certainly plausible." Id. Here, CREW has gone further and established not only that it has sustained a past injury, but also that it will suffer an imminent, non-speculative injury in the future as a result of the defendants' failure to comply with their obligations under the FRA, a showing that goes beyond the merely plausible.

Taken as a whole, these facts establish that CREW has suffered an injury-in-fact. The "concrete and demonstrable injury to [its] activities," Spann, 899 F.2d at 27 (quotation omitted), and the "real risk that records will not be available to [it]" in the future, Public Citizen v. Carlin, 2 F.Supp.2d 1, 6 (D.D.C. 1997), are sufficient to satisfy Article III requirements for standing.

Finally, CREW's future injuries will likely be redressed by a favorable decision. Redressability requires that it be "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Lujan, 504 U.S. at 560 (quotation omitted). The redressability prong of standing is satisfied by a showing that "the practical consequence [of the court's order] . . . would amount to a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered." Utah v. Evans, 536 U.S. 452, 464 (2002).

Here, there is a substantial likelihood that the relief CREW is seeking will remedy its alleged injury. An order declaring the policy of the Secret Service to destroy agency records contrary to law will, of necessity, lead to the records' preservation. In addition, an order compelling the archivist to initiate the process mandated by the FRA for the protection and

---

and accordingly plaintiff's standing is not dependent on future decisions that may or may not be made. Moreover, the AHA standing decision cited in DHS I was subsequently vacated based on changed factual circumstances. See 402 F.Supp.2d 171 (D.D.C. 2005).

recovery of federal records will also ensure their preservation; that is why the statute established this scheme in the first place. As other courts have readily concluded under similar facts, the availability of this relief makes plaintiff's claims redressable.[15]

## II. DHS'S POLICY OF DESTROYING WHITE HOUSE VISITOR RECORDS WITHOUT APPROVAL FROM THE ARCHIVIST OR PUBLIC NOTICE IS ARBITRARY, CAPRICIOUS AND CONTRARY TO THE FRA.

That the records at issue here are agency records subject to the FRA cannot legitimately be challenged in light of this Court's recent ruling that White House visitor records are agency records subject to public disclosure under the FOIA. See Armstrong v. Executive Office of the President, 90 F.3d 553, 556 (D.C. Cir. 1996) ("Armstrong III") ("coverage of the FRA is coextensive with the definition of 'agency' in the FOIA."). Accordingly, DHS can only dispose of these records pursuant to the express terms of the FRA.

It is undisputed that here the Secret Service has a policy of destroying White House visitor records once it has transferred copies to the White House. See, e.g., Lyerly Decl. I at ¶ 10 ("once the Secret Service transferred the WAVES records, the Secret Service ensured that those records were erased from its computer system."); Mem. Op. at 6. As this Court has already found, "[t]he Secret Service's practice of purging and overwriting WAVES records that are 'older than 60 days' occurred from 'at least 2001' until 'November 2004.'" Id., quoting 3d Morrissey Decl. at ¶¶ 18-19. Nor can it be disputed that the Secret Service has not submitted to

---

[15] See, e.g., Public Citizen v. Carlin, 2 F.Supp.2d at 7 (historians seeking to preserve federal records from improper destruction can redress their injury by obtaining judicial review of agency record-keeping guidelines); Am. Friends Serv. Comm. v. Webster, 485 F.Supp. 222, 227 (D.D.C. 1980) (plaintiffs seeking to prevent FBI from destroying records can redress their injury by obtaining court order compelling archivist to review agency disposal guidelines).

the archivist any requests for authority to dispose of these records.  The last proposed FRA

schedules that the agency submitted, in 1990 and 1993, were subsequently withdrawn.

Declaration of Gary M. Stern, May 7, 2007, ¶ 14, submitted in <u>CREW v. NARA</u>, Civil No. 07-

048 (RBW).

      The FRA, however, is unmistakably clear:  no records may be "alienated or destroyed"

except pursuant to the exclusive disposal provisions of the FRA.  44 U.S.C. at § 3314.  <u>See</u> <u>also</u>

<u>Armstrong I</u>, 924 F.2d at 285; <u>DHS I</u> Mem. Op. at *21-22.  Those disposal provisions establish a

"two-part process" that the Court in <u>DHS I</u> described as follows:

> First, the agency will submit a list of records to the Archivist that
> it proposes should be discarded . . . If the Archivist agrees that the
> records do not 'have sufficient administrative, legal, research, or
> other value to warrant their continued preservation,' the Archivist
> may, after providing an opportunity for notice and comment,
> 'empower the agency to dispose of [the] records.

<u>Id.</u> at *22.

      Accordingly, under the express language of the FRA, DHS cannot destroy its copies of

White House visitor records without first submitting a list of the records to the archivist for

disposition authority and an opportunity for public notice and comment on the proposed

destruction of the agency records.  DHS's failure to follow the disposition process that the FRA

mandates is arbitrary, capricious and contrary to law.

### III. THE ARCHIVIST'S FAILURE TO INITIATE ACTION TO PREVENT DHS FROM DESTROYING OR TRANSFERRING WHITE HOUSE VISITOR RECORDS IS CONTRARY TO THE FRA.

The FRA imposes on the archivist a non-discretionary, mandatory obligation to take certain actions "[o]nce the archivist becomes aware of 'any actual, impending, or threatened unlawful removal . . . or destruction of records . . .'" Armstrong I, 924 F.2d at 296, *quoting* 44 U.S.C. § 2905(a). Those actions include notifying the agency head and assisting the agency head "'in initiating action through the Attorney General for the recovery of records unlawfully removed and for other redress provided by law.'" Id. In addition, if the agency head fails to act on his or her independent obligation under the FRA to initiate enforcement action through the attorney general, the archivist "'*shall* request the Attorney General to initiate such an action, and *shall* notify the Congress when such a request has been made.'" 924 F.2d at 296 (emphasis in original).

As the D.C. Circuit has explained, "the mandatory statutory language . . . indicates that the agency head and Archivist are required to take action to prevent the unlawful destruction or removal of records . . ." Armstrong I, 924 F.2d at 296 n.12. Given the mandatory obligation the archivist is under to prevent the unlawful destruction of agency records, the only question here is whether the factual predicate -- the destruction or threatened destruction of federal records -- has occurred.

The Secret Service has acknowledged in multiple sworn declarations that it has a policy of destroying White House visitor records once it transfers copies to the White House. See, e.g., Mem. Op. at 6. In addition, the Secret Service entered an MOU that memorialized this practice. When coupled with this Court's recent finding that these records are agency records subject to

the FRA there can be no question that the Secret Service has been destroying agency records contrary to the dictates of the FRA.

It is also beyond question that the Secret Service has been following this practice of record destruction with the full knowledge of the archivist. See, e.g., MOU at ¶ 16a; Mem. Op. at pp.6-7 (noting fact that Secret Service temporarily stopped its policy of deletion in November 2004 at the "request" of NARA).  Although NARA "requested" that the agency at least "temporarily" retain copies of the White House visitor records, there is "no explanation for why, exactly, the National Archives and Records Administration requested that the Secret Service refrain from deleting the WAVES records from its computer system."  Mem. Op. at 7 n.9. Moreover, the Secret Service has described its present retention policy as "only temporary," id., it does not appear to believe it is under any legal obligation to retain these records and is doing so only as a matter of agreement.  See MOU at ¶ 16a.

While the archivist may argue that his "request" of the Secret Service to temporarily retain the agency's White House visitor records demonstrates full compliance with the FRA, the record does not support such an argument.  First, as noted above and as this Court has already recognized, there is no explanation in the record for why NARA made this request.  Further, the agency clearly views this request as precatory only and not binding, given the language of the MOU and Mr. Coffin's subsequent letter, both of which purport to confirm a longstanding and ongoing practice of transferring all of the records to the White House together with a directive that the agency not retain any copies.

In addition, in CREW v. NARA, Civil No. 07-048 (RBW), CREW has sought from NARA the records relating to this request.  NARA has refused to release the records and has

21

described the process surrounding their creation as relating not to the archivist's exercise of his mandatory obligation under the FRA to prevent the unlawful destruction of agency records, but rather "issues surrounding the legal status of WAVES records . . ."  Stern Decl. at ¶ 15.  As Mr. Stern's declaration makes clear, NARA viewed the process as involving inter-agency discussions and deliberations to which NARA was just one of several participants.  See, e.g., id. at ¶¶ 18-22. This is a far cry from the archivist's exercise of his mandatory obligation to prevent the destruction of agency records.

In sum, the archivist has failed to initiate action through the attorney general to prevent the Secret Service from destroying or transferring White House visitor records as the FRA commands.  In addition, the archivist has failed to notify Congress of the agency's policy of record destruction, contrary to the dictates of the FRA.  See 44 U.S.C. § 2905(a).  Accordingly, CREW is entitled to the declaratory and injunctive relief it has requested.  See Armstrong I, 924 F.2d at 295 (recognizing right of private litigants like CREW to "bring suit to require the . . . Archivist to fulfill [his] statutory duty to notify Congress and ask the Attorney General to initiate legal action.").

## CONCLUSION

For the foregoing reasons, this Court should grant plaintiff's request for summary judgment on Claims Three and Four of its complaint.

Respectfully submitted,


   /s/ Anne L. Weismann
Anne L. Weismann
(D.C. Bar No. 298190)
Melanie Sloan

22

(D.C. Bar No. 434584)
Citizens for Responsibility and Ethics
  in Washington
1400 Eye Street, N.W., Suite 450
Washington, D.C.  20005
Telephone:  (202) 408-5565
Fax:  (202) 588-5020
Attorneys for Plaintiff

January 28, 2008

EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civ. Action No. 07-0048 (RBW) |
| NATIONAL ARCHIVES AND RECORDS ADMINISTRATION, | ) ) ) | |
| Defendant. | ) ) | |
| ———————————————— | ) | |

**DECLARATION OF GARY M. STERN**

I, Gary M. Stern, hereby declare:

1. I am the General Counsel of the National Archives and Records Administration ("NARA"), a career appointment in the Senior Executive Service that I have held continuously since September 1998. In 2006, Archivist of the United States Allen Weinstein appointed me as the Chief Freedom of Information Act (FOIA) Officer for NARA, pursuant to our Agency's implementation of Executive Order 13392. Both in my capacity as General Counsel and Chief FOIA Officer, I provide oversight and guidance on matters related to the FOIA, including to NARA's designated FOIA staff. In my position as General Counsel, I am called upon on a daily basis to provide legal guidance to NARA and to the government at large on recordkeeping issues, including under the Federal Records Act and the Presidential Records Act.

2.  Prior to my appointment as General Counsel, between 1995 and 1998 I served at the Department of Energy in various capacities, including as Special Assistant to the General Counsel, Assistant General Counsel for contractor litigation, and Deputy Assistant General Counsel for information law.  Between 1994 and 1995, I served as a senior policy and research analyst for the U.S. Federal Advisory Committee on Human Radiation Experiments, where I provided legal advice on secrecy and classification issues.  In 1994, I served as legal consultant to the National Academy of Science's Committee on Declassification of Information for the Environmental Remediation and Related Programs of the Department of Energy.  Prior to my time with the federal government, I served as staff attorney for seven years at the Center of National Security Studies of the American Civil Liberties Union, where, among other matters, I worked on drafting the John F. Kennedy Assassination Records Collection Act and the Electronic Freedom of Information Act.  I graduated from Yale Law School in 1987, where I was editor-in-chief of the *Yale Journal of International Law.*  I am a member of the Bars of New York and the District of Columbia.

3.  I am familiar with the allegations in the present lawsuit, and make this declaration on the basis of personal knowledge and on information I have received in the performance of my official duties.  If called upon to do so I could testify competently as to the contents of this declaration.

*NARA's Processing of CREW's FOIA Request*

4. On September 27, 2006, NARA received a FOIA request from counsel for plaintiff requesting documents and records in six categories of records:

(1) Any and all documents related to the request made by NARA to the United States Secret Service (USSS), that the Secret Service retain its own copies of the Worker and Visitor Entrance System (WAVES) records that it transferred to the White House;

(2) Any and all communications both internally and between NARA and any other government agency or government entity, referencing the practice of the USSS to erase copies of WAVES records that it transferred to the White House;

(3) Any and all documents referring or relating to a practice by the Secret Service of deleting records from its computer system;

(4) Any and all documents and records referring or relating to *Judicial Watch v. United States Secret Service,* Civ. Action No. 06-310 (D.D.C.);

(5) Any and all documents and records referring or relating to *Democratic National Committee v. United States Secret Service*, Civ. Action No. 06-842 (D.D.C.); and

(6) Any and all documents and records referring to *CREW v. United States Dep't of Homeland Security*, Civ. Action No. 06-883 (D.D.C.).

The request asked for expedited processing and a waiver of fees associated with the request. A copy of plaintiff's request is attached at Tab A.

5. In response to plaintiff's FOIA request, NARA's FOIA Officer carried out a search for responsive documents by contacting key staff in offices that would have worked on issues

3

relating to Secret Service WAVES records, including of myself and staff in the Office of General

Counsel, in components of the Office of Records Services—Washington, D.C., located at NARA

headquarters in College Park, Maryland, and in the Office of Presidential Libraries, in

Washington, D.C. Individual NARA staff members were tasked with reviewing both their paper

files as well as any potentially relevant records in electronic form (including electronic mail and

word processing documents) that may have been stored in any account on desktop PCs or other

media. The staff forwarded to NARA's FOIA Officer any and all documents identified.

     6. NARA granted plaintiff's request for expedition, as well as plaintiff's separate request

for fee waiver, in correspondence from Ramona Oliver, NARA's FOIA Officer in the Office of

General Counsel, dated October 20, 2006. (A copy of this document is attached at Tab B.) Four

days later, NARA substantively responded to plaintiff's FOIA request, in correspondence from

Ms. Oliver dated October 24, 2006, stating that a search of NARA's operational records located

336 pages of records responsive to plaintiff's request, excluding publicly available court filings.

(A copy of this document is attached at Tab C.) NARA determined to release 31 pages in full

and 11 in part. The 11 pages withheld in part and the remaining 294 pages withheld in full were

determined to be appropriate for withholding under FOIA Exemption 5, 5 U.S.C. 552(b)(5),

which allows for the withholding of information covered by privileges available in civil

litigation, including the deliberative process privilege and attorney work product privilege.

     7. By letter dated October 25, 2006, plaintiff appealed NARA's FOIA determinations

"insofar as CREW's request was denied." The appeal was sent to the Deputy Archivist of the

United States, consistent with NARA regulations at 36 C.F.R. 1250.72. A copy of plaintiff's

appeal letter is attached at Tab D.  Plaintiff also asked for expedition of NARA's response to the

FOIA appeal, which NARA separately granted in correspondence dated October 30, 2006, from

Matthew Olsen, FOIA Specialist.  (A copy of this document is attached at Tab E.)

    8.  In correspondence dated November 28, 2006, Deputy Archivist Lewis Bellardo

responded to plaintiff's appeal on behalf of NARA, further granting the request in part and

denying it in part.  NARA informed plaintiff that an additional 50 pages of responsive records

had been located, of which 28 pages were being released in part.  With respect to the original set

of withholdings, NARA released an additional 11 pages in whole and 57 pages in part under

FOIA Exemption 5.  A copy of the Deputy Archivist's response to plaintiff's appeal is attached

at Tab F.

    9.  Each document that NARA continues to withhold, of which there are 77 in total, is listed

in summary form in the *Vaughn* Index attached hereto at Tab G.  The documents will be referred

to in this Declaration by their corresponding number, appearing in the left-most column of the

*Vaughn* Index.  The 77 documents represent a total of 294 pages that continue to be withheld in

whole or in part.  All of these documents (and pages) were located as part of the searches

conducted initially and later, as set out above (¶¶ 5-8).[1]

---

[1]  The original count of 386 pages found to be responsive (336 found initially with an additional 50 found later),
actually represented 422 pages due to counting errors.  With the additional releases NARA is making with this
filing, the number of pages currently being withheld in whole or in part, as represented in the Vaughn index, totals
294

### *NARA's Justification for Continued Withholding of Documents Under FOIA Exemption 5*

10.  FOIA exemption 5, 5 U.S.C. 552(b)(5), protects against the disclosure of privileged documents that are not ordinarily available to a party in litigation. Principally, there are three types of privileged documents or communications protected by this exemption: attorney work product, attorney-client, and the deliberative process privilege applicable to the government. The exemption 5 privilege is intended to protect the decision-making processes of government agencies from public scrutiny in order to enhance the quality of agency decisions. In the present case, the overwhelming majority of withheld documents are exempt from disclosure on two grounds: first, because they represent pre-decisional evaluations, opinions, and recommendations on one or more matters related to the legal status of WAVES records under the records laws and procedures for the retention and disposition of such records; and second, because they represent communications either among government attorneys, or are the work product of attorneys and those in-house staff from whom attorneys were seeking information, either in connection with the current CREW litigation, or in anticipation of litigation about WAVES records. In all such instances, the documents comprise an exchange of ideas and suggestions, recommendations and opinions, which have accompanied various decisions made about WAVES records, including preliminary assessments by government attorneys and other staff both inside and out of NARA.

11.  A large number of the documents at issue consist of e-mail, an especially candid medium used by attorneys and others to communicate. Disclosure of the contents of these e-mail

6

conversations would severely impede the efficient day to day workings of NARA attorneys and others on current issues, as staff would no longer feel free to discuss their ideas and render opinions, recommendations, or advice using this powerful communication tool. The chilling effect that public disclosure of such information at this time would have on the operations of government is significant: lack of candor will certainly have a negative impact on the ability of civil servants to have honest internal conversations essential to best practices in decision-making. Disclosure of memorialized preliminary evaluations and views would constrict NARA staff in expressing their views and recommendations regarding proposed responses. In my view, the quality of government decision-making is maintained at its highest if NARA and other agency staff are able to completely focus on expressing their views openly and honestly, without simultaneously being distracted out of a concern that those very same views might become publicly available in the near future.

12.  *Segregability.* Each document that has been withheld was evaluated to determine if any information could be reasonably segregated and released. In a number of instances, NARA took additional actions to release segregable information, including, for example, the header information contained in otherwise withheld e-mail communications. The remaining documents determined to be withheld in whole or in part contained no further meaningful portions that could not be released without destroying the integrity of the document, or if release of certain facts would reveal the author's analysis and deliberations. Documents representing attorney work product are not, however, subject to the same strict segregability requirement.

13.   In the remainder of this declaration, I explain NARA's and the government's deliberative and attorney processes with respect to the status, maintenance, and disposition of WAVES records, by grouping the documents into four logically distinct categories. Where applicable, I will also at greater length provide a separate justification regarding why most of the material is additionally covered by the attorney work product privilege.

**Category A:  The Government's Deliberations on the Disposition of WAVES Records**

14.   NARA has always understood WAVES records to be those records generated by the "Worker and Visitor Entrance System" created for the purpose of controlling and monitoring access to the White House Complex. The U.S. Secret Service formally submitted to NARA's records appraisal division proposed Federal Records Act schedules for WAVES records in its custody in 1990 and 1993. A revised schedule was resubmitted in 1996 and published in the *Federal Register*. Under the Federal Records Act, 44 U.S.C. § 3303a, agencies routinely submit to NARA proposed agency records schedules in draft form, which are in turn reviewed by one or more NARA archivists who make the important appraisal recommendations regarding the temporary or permanent nature of the records contained therein (i.e., how long records shall be retained, in what format, etc.). In the ordinary course of business, NARA expects that there will be many back and forth, deliberative, and pre-decisional communications among NARA archivists and an agency records officer and others at the submitting agency, and in some instances attorneys at NARA and the agency, before a schedule is in sufficiently final form to warrant a notice for public comment in the *Federal Register*, pursuant to 44 U.S.C. 3303a(a). In this case, the proposed schedules submitted in the 1990s were withdrawn.

15.  With respect to the proposed WAVES records schedules, in the intervening years, and

especially after 1995, from time to time NARA staff (including myself) were involved in

discussions and meetings with representatives of the U.S. Secret Service, and counsel in one or

more components of the Executive Office of the President and the Department of Justice,

regarding the pending issues surrounding the legal status of WAVES records, including how

USSS proposed to transfer possession of the records to the White House, and how USSS would

proceed to manage and dispose of the records (or specific portions thereof) remaining in the

custody of USSS.  Documents 1 - 11 on the Vaughn index, responsive to either of plaintiff's

requests (2) or (3) (*see* ¶ 4, *supra*), were all generated in connection with an ongoing, inter-

agency deliberative process connected with reaching a final decision on what was a formerly

pending WAVES records schedule at NARA.

16.  In the case of document 2, I am informed that it consists of the handwriting of NARA

archivist Richard Marcus.  This document contains the contemporaneous notes of its author

taken in connection with meetings held to work through issues concerning the legal status of

WAVES records, and thus is both deliberative and pre-decisional in nature.

17.  NARA is making a discretionary release of a segregable factual portion of Document 3,

which consists of a one page, undated cover memorandum entitled "U.S. Secret Service White

House Division Workers and Visitors Entrance System (WAVES), Job No. N1-87-93-03," as

well as an attached records schedule previously released to plaintiff.  Although undated, the

document appears to have been drafted sometime shortly after receipt of the underlying revised

draft records schedule in 1996.  In the still-withheld portion of the cover memorandum, it goes

on to discuss various legal and recordkeeping issues concerning WAVES records.  In light of the

subsequent history of NARA deliberations on the issue of the status and disposition of WAVES

records, the document is clearly deliberative and pre-decisional in nature.

18.    Documents 12 - 14 are responsive to plaintiff's categories (2) and/or (3) (*see* ¶ 4, *supra*),

but may be withheld because they are privileged as deliberative communications on matters of

law and policy under the records laws.  At the end of the Clinton Administration, an Associate

Counsel to the President and counsel at the Secret Service together penned a Memorandum,

dated January 17, 2001, to myself, as NARA General Counsel, in which recommendations were

made regarding the disposition of what were termed "certain Presidential Records created by the

USSS," including, WAVES records.  *See Vaughn* Index, Document 13.  The memorandum

analyzes the status of the Clinton Administration WAVES and related records, including a

discussion of how USSS was currently treating and proposed to treat specific fields of data

contained within such records in terms of transfer to the White House and ultimate disposition of

the records.  Document 12 consists of handwritten notes that I set down in connection with a

phone conversation held with Tom Dougherty of the U.S. Secret Service on December 8, 2000,

which was held prior to my receipt of Document 13 (dated Jan. 17, 2001), jointly authored by

Mr. Dougherty.  As such, I consider my notes to have been both deliberative and pre-decisional

in connection with obtaining further background on the status of WAVES records.  I also

consider my notes to be attorney work product, for the reasons stated *infra*, ¶ 23.  Document 14

is my response, dated January 19, 2001, to the January 17 memo (Document 13), and reflected

my then understanding of how these records would be treated and how NARA intended to

10

proceed in working further with USSS. I consider my response to have been deliberative and pre-decisional on the issues discussed, in light of all the surrounding developments.

19. Documents 15, 15a, and 16 on the *Vaughn* Index, responsive to either of plaintiff's requests (2) or (3) (*see* ¶ 4, *supra*), date from March and April 2001, and reflect deliberations on legal and recordkeeping issues concerning the transfer and disposition of WAVES records. Document 15a constitutes written notes of a NARA archivist, created in response to the sequence of documents 13, 14 and 15, in which he expresses his questions, comments, and opinions, and thus is deliberative. Document 17 is a facsimile that I transmitted to another NARA employee forwarding copies of the deliberative communications contained in Documents 13 and 16, and in which I recounted a deliberative communication between myself and an Associate Counsel to the President.

20. On or about September 30, 2004, NARA received an e-mail from an Associate Counsel to the President, attaching a draft document providing informal views on one way to address the disposition of WAVES records, jointly authored by an Associate Counsel to the President and a Special Assistant to the Director of the U.S. Secret Service, dated July 29, 2004, with the title "Disposition of Certain Presidential Records Created by the USSS." *See Vaughn* Index, Documents 18 & 18a. Receipt of the July 29, 2004 memorandum in turn document led to an internal discussion among NARA staff regarding the proposal contained in the document, as well as a more technical discussion of how the U.S. Secret Service was purporting to manage the various fields contained in WAVES records. Documents 19 - 30 primarily consist of a series of e-mail exchanges, mostly internal to NARA counsel and staff, but also involving DOJ and the

Office of Counsel to the President, on various matters related to the retention of WAVES

records, that are also responsive to paragraphs (2) or (3) of plaintiff's FOIA request (*see* ¶ 4,

*supra*). Document 26, from an unknown NARA author, contains a date contemporaneous with

these e-mail exchanges, and similarly analyzes issues surrounding the transfer and disposition of

WAVES records maintained by USSS. Document 29 is also separately responsive to plaintiff's

request (1), to the extent I described in this e-mail my conversation with USSS staff regarding

issues related to the retention of WAVES records by USSS, as well as the legal advice I gave at

the time with respect to then-current USSS practices. All of the above-referenced documents in

this paragraph are covered by the deliberative process privilege for the reasons noted above.

21. Document 31 consists of six pages representing excerpts from a powerpoint presentation

dated July 2005, with the first page including the wording, "USSS Presidential Protective

Division" and "Presentation to the U.S. National Archives and Records Administration." The

document discusses in bullet point presentation format various issues concerning WAVES

records and other access control records (ACR), including with respect to transfer and

disposition. The document also contains my handwritten annotations. This document originated

as part of a presentation given by the USSS to attorneys from NARA, the Department of Justice,

and the Office of Counsel to the President, as well as an employee of the White House Office of

Records Management, in connection with ongoing legal and policy deliberations regarding

WAVES and ACR records. The presentation itself contains an "Objectives" page that

summarizes and makes recommendations regarding various policy options. The document is

responsive to plaintiff's requests (2) and (3) (*see* ¶ 4, *supra*). In context, and especially given its

fragmentary nature, the document is both deliberative and pre-decisional, and otherwise

constitutes attorney work product.

22.   Documents 32 and 33 consist of handwritten notes of two NARA archivists, both of

which reference the disposition and transfer of WAVES records.  I am informed by staff that

document 32 represents the contemporaneous notes of NARA archivist Maggie Hawkins taken

during the powerpoint presentation represented by document 31, and that document 33

represents notes of NARA archivist Stephen Cooper from an undetermined date.  These

documents are responsive to plaintiff's request (3) (*see* ¶ 4, *supra*).  In context, these notes are

also deliberative and pre-decisional on the subject of the transfer and disposition of WAVES

records.

23.   *Attorney Work Product Doctrine.*  Documents 5 - 25 and document 27 - 31 are

separately covered by the attorney work product doctrine, which protects materials prepared by

an attorney, or by a non-attorney at an attorney's direction, in reasonable anticipation of

litigation or in connection with litigation counseling.  Documents 5 - 30, with only the exception

of Document 21, all were either authored by me or sent to me in my capacity as NARA General

Counsel.  (Although I was not cc'd on Document 21, the e-mail comprising the document was

penned in direct response to my request – embodied in Document 19 – for views of NARA staff

on the initial joint memorandum submitted by the White House and USSS on WAVES records.)

At all times since the original submission of the WAVES records schedule for clearance, I

believe NARA staff have fairly considered the likelihood of litigation over the record status of

WAVES records to be high.  This substantial likelihood of litigation over WAVES records arose

13

from the fact that many parties might wish to file FOIA requests seeking to obtain records

containing information on individuals who visited the White House. Because such FOIA

requests would involve the question of whether these records were "federal" or "presidential,"

and therefore possibly not subject to FOIA during the incumbent Administration, NARA

employees believed that the determination that WAVES records are presidential records would

likely become the subject of litigation. The reasonableness of the belief was confirmed by the

subsequent litigation filed by CREW and other parties, including in connection with the present

lawsuit. Finally, the attorney work product doctrine separately applies to the powerpoint

presentation described *supra*, ¶ 21, for the reasons there described.

### Category B: Comments Made on Pending *Judicial Watch* Litigation

24. On or about February 28, 2006, the public interest group Judicial Watch filed a FOIA

lawsuit against the U.S. Secret Service for access to, *inter alia*, WAVES records. As part of its

separate FOIA lawsuit here, plaintiff CREW has requested all records relating to the lawsuit

captioned *Judicial Watch v. U.S. Secret Service,* No. 06-310 (D.D.C.) (*see* category (4), *supra*

¶ 4). Documents 34 - 44, and 53, on the *Vaughn* Index were found to be responsive to plaintiff's

request, but have been withheld in part. The withheld portions of each of these documents

consist of candid discussions between myself and Justice Department attorneys regarding the

effect, if any, of the *Judicial Watch* lawsuit on the legal status of WAVES records for purposes

of the recordkeeping laws, as well as discussions among NARA staff regarding same. These

types of communications are of the type that would normally occur within an agency and

14

between agencies on subjects that relate to issues filed in litigation, and are deliberative in context.

25.    With the exception of documents 38 and 39, the remaining documents in Category B (documents 34-37, 40-44, and 53) also consist of attorney work product, either as direct communications between DOJ and NARA on a matter in litigation, or as communications responding to questions I directed to NARA staff again on matters related to the litigation.

### Category C:  Deliberations On WAVES Records Contemporaneous With Ongoing Litigation

26.    On May 9, 2006, Associate Counsel to the President Jennifer Brosnahan sent an e-mail addressed to me and others, requesting NARA's review of a draft nonpublic legal advice memorandum from the Department of Justice's Office of Legal Counsel ("OLC") on WAVES records, along with a draft Memorandum of Understanding ("MOU") between the White House Office of Records Management and the U.S. Secret Service on the status and handling of WAVES and ACR records. *See Vaughn* Index, Document 45.  Given the sensitivity of the draft documents in question and at least one pending FOIA lawsuit for WAVES records, it was important that the documents be fully vetted by NARA as well as other agencies.  Documents 46 - 52 consist of the e-mail communications that transpired, comprising a series of candid comments by lawyers and other staff representing NARA, the Secret Service, the Office of Counsel to the President, and the Department of Justice on specific matters raised in the draft documents, many of which were shared on an inter-agency basis.  The kinds of deliberations involved in these documents on matters of both substance and particular wording are typical of

15

what takes place every day at the highest levels of the government. They constitute pre-decisional opinions of attorneys and others. They also consist of exchanges of views on legal issues within the scope of the attorney work product privilege, especially given that the *Judicial Watch* lawsuit already was a matter of public record. All of the documents described in this paragraph are responsive to either of plaintiff's requests (2) and/or (3) (*see* ¶ 4, *supra*),

27. Document 54 is an e-mail that I sent to NARA staff forwarding a FOIA request for WAVES schedules that NARA received from the Washington Post while litigation relating to WAVES records was ongoing. The document is responsive to plaintiff's category (2) and/or (3) (*see* ¶ 4, *supra*). The portions withheld discuss NARA's proposed response to the FOIA request, and also include an e-mail thread between myself and NARA staff commenting on recordkeeping issues surrounding USSS WAVES records as they related to the draft legal opinion and MOU. The FOIA request portion of the document has been disclosed.

28. Document 55 is a copy of a nonpublic legal advice memorandum from the Department of Justice's Office of Legal Counsel, dated May 11, 2006, containing legal discussion regarding WAVES records. That document was issued in connection with OLC's advisory function of providing legal advice to the Executive Branch. Neither this document nor the advice and analysis contained therein have been circulated or revealed outside the Executive Branch. To the contrary, it has been shared only with government officials and staff working on these issues and closely held by them in strict confidence. In order to ensure that legal arguments and theories may be explored candidly, effectively and in writing, it is essential that legal advice of this sort

not be inhibited by concerns about public disclosure. Because this document and its drafts (*see Vaughn* Index, documents 45, 50), contain legal analysis authored by Department of Justice attorneys in their capacity as advisers to the Executive Branch, these documents are protected under the deliberative process and attorney-client privileges, as well as by the work product doctrine. Moreover, documents 51 and 52, because they constitute communications between a DOJ attorney and myself concerning this legal advice, are also shielded by the attorney-client privilege.

29. Document 56 consists of a further request for agency recommendations and opinions from an Associate Counsel to the President, in an e-mail dated June 13, 2006, regarding matters related to the logistics of transferring WAVES records from USSS to the White House Complex and to NARA. Document 56 and responses to it embodied in documents 57 - 60 consist of a set of policy options, set out with opinions and recommendations of NARA and USSS staff. These documents, responsive to plaintiff's categories (2) and/or (3) (*see* ¶ 4, *supra*), all consist of pre-decisional deliberations on the logistics of handling WAVES records, especially in light of pending litigation regarding access issues to such records. The authors of the documents were also very much aware of their obligations to preserve records that are subject to pending litigation, and to that extent the documents represent attorney work product in that they purport to discuss the government's evidentiary obligations to one or more courts.

17

**Category D:  Communications between DOJ Federal Programs Branch and NARA counsel on the substance of Court filings in related CREW litigation**

30.    Documents 61 - 75 are litigation-related documents responsive to category 6 of plaintiff's FOIA request (*see* ¶ 4, *supra*).  With the exception of document 63, this category of documents solely consists of e-mail communications authored either by Justice Department counsel representing the Department of Homeland Security in a related lawsuit filed by plaintiff CREW, or by NARA counsel responding to Justice Department requests.  Many of these e-mails also attach draft briefs for NARA to review and comment upon.  Document 63 is a related e-mail drafted by a NARA archivist responding to NARA counsel's request for comments on one or more positions taken by the Justice Department in litigation.  This category of material represents core attorney work product, containing the opinions and recommendations of counsel at the Justice Department and at NARA on the drafting of filings with the Court in a related lawsuit involving issues related to WAVES records.  The matters discussed in these documents are also covered by the deliberative process privilege, which protects candid exchanges of opinion – here, regarding what legal arguments the government should make before the Court – in a context that is clearly pre-decisional.  Release of documents of this type would severely harm the ability of NARA counsel to work with the Justice Department in being able to provide their candid views on matters in litigation involving records issues generally.

*Summary*

31.    NARA has been consulted throughout the process that resulted in the determination that WAVES records are covered under the Presidential Records Act.  It should be stated, however,

that, while NARA has authority to determine how federal records are disposed of through the

records schedule and disposition process set out in Chapter 33 of Title 44, and while NARA has

considerable expertise in administering to presidential records pursuant to Chapter 22 of Title 44

once presidential records come into the legal custody of this agency, NARA has no formal

records management authority under the Presidential Records Act over the presidential records

of the incumbent President, and is therefore not the final decision-maker regarding whether any

particular set of records is covered within the scope of the Presidential Records Act. *See* 44

U.S.C. 2203(a); *Armstrong v. Bush*, 924 F.2d 282, 290 (D.C. Cir.1991). This legal determination

is a matter for the incumbent President to make, in consultation with the Department of Justice

and NARA, as deemed appropriate, just as the process played out in this instance. It is my belief

that whatever candid discussions took place within and by NARA concerning related issues of

management and disposition of WAVES records are properly considered deliberative and pre-

decisional. I also believe that institutional harm to NARA and the government would ensue if

the staff of this agency acted on the belief that every such conversation memorialized in an e-

mail communication or written memorandum would presumptively and contemporaneously be

open and available for public scrutiny. This is especially true with respect to complicated

matters, such as is the case of the presidential record status of WAVES records.

    I declare under penalty of perjury that the foregoing is true and correct.

GARY M. STERN

Date: May 7, 2007

**EXHIBIT 2**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| CITIZENS FOR RESPONSIBILITY AND )<br>ETHICS IN WASHINGTON, )<br>                      )<br>      Plaintiff, )<br>                      )<br>      v. )<br>                      )<br>U.S. DEPARTMENT OF HOMELAND )<br>SECURITY, et al. )<br>                      )<br>      Defendants. )<br>_____ ) | Civil No. 06-1912 (RCL) |

## DECLARATION OF MELANIE SLOAN

I, Melanie Sloan, hereby declare as follows:

1. I am the executive director of Citizens for Responsibility and Ethics in Washington ("CREW"), plaintiff in the above-captioned case. I have held this position since February 5, 2003. As executive director I am responsible for all aspects of CREW's management and activities, including overseeing legal actions that the organization decides to initiate, writing and reviewing court and administrative filings and reports and disseminating information publicly regarding the conduct of government officials.

2. CREW is a non-profit, non-partisan ethics watchdog group organized under section 501(c)(3) of the Internal Revenue code. CREW was formed in October 2002, and seeks to deter the unethical and illegal conduct of public officials by publicly disseminating information regarding their conduct. CREW believes that by its dissemination of information abut public officials, citizens are empowered to have an influential voice in government decisions and the governmental decision-making process.

3.  To advance its mission, CREW uses a combination of research, litigation, advocacy and public education.  In addition to its legal staff, CREW has a research staff of five full-time analysts and one part-time analyst whose responsibilities include in-depth research on the activities of public officials.  The most effective tool CREW has to advance its mission is the dissemination of information CREW gains from these processes, including the Freedom of Information Act ("FOIA").

4.  Since 2003, CREW has filed hundreds of FOIA requests with a wide variety of government agencies and averages at least several new FOIA requests every month.  CREW has filed at least 15 FOIA requests with the U.S. Department of Homeland Security ("DHS") alone and at present has pending FOIA requests with over 25 different agencies.

5.  CREW has also used the FOIA to gain information about the activities of the White House and administration policies.  Toward that end, CREW has filed FOIA requests with the Secret Service, including the request that is the subject of this lawsuit, the Office of Management and Budget, the Council on Environmental Quality and the Office of Administration.

6.  CREW uses documents it obtains from the FOIA for, among other things, reports that it issues.  For example, in July 2006, CREW issued a report, Best Laid Plans, that details the Federal Emergency Management Agency's plan to respond to a hurricane of Katrina's magnitude and its subsequent failure to implement that plan.  This report was based in large part on documents obtained through a lawsuit CREW filed against DHS after the agency failed to provide documents in response to CREW's FOIA request.  In addition, CREW publishes a yearly report, Beyond DeLay, that details the misconduct of the most unethical members of Congress.  Other reports CREW has issued in the past year include, *inter alia*, the recently issued report

2

<u>Homeland Security for Sale</u>, documenting the misconduct, mismanagement and waste, fraud and abuse at the U.S. Department of Homeland Security; <u>Family Affair</u>, detailing the misuse of power by the chairs and ranking members of House of Representative committees and subcommittees to financially benefit family members; and <u>Without a Trace:  The Story Behind the Missing White House E-Mails and the Violations of the Presidential Records Act</u>, which details the multiple ways in which the White House is not complying with its record-keeping obligations and is the first public disclosure of the serious and systemic problems with the way the House manages electronic records.

7.  In addition, CREW has created an interactive website, <u>www.governmentdocs.org</u>, on which CREW and a growing number of other organizations post for public review documents obtained through the FOIA.  At present this site contains over 37,600 pages of documents obtained from 88 FOIA and document requests submitted by CREW, the Electronic Frontier Foundation, Project on Government Oversight, Public Citizen and the Sunlight Foundation.

8.  CREW also posts on its own website, <u>www.citizensforethics.org</u>, documents it obtains from its FOIA requests as well as pleadings and complaints it has filed in a variety of forums, including federal district courts, administrative agencies and congressional ethics committees. CREW's website attracts approximately 60,000 unique visitors per month or an average of 2,000 per day, although on some days it has attracted over 10,000 unique visitors per day.

9.  In addition to the FOIA request that is the subject of this litigation, CREW has three other FOIA requests pending with DHS seeking White House visitor records and records of visits to the residence of the vice president ("White House visitor records") for specified individuals. In one request, also the subject of litigation (<u>CREW v. U.S. Dep't of Homeland Security</u>, Civil

No. 06-883 (RCL), CREW is seeking all White House visitor records for now-convicted lobbyist Jack Abramoff and seven of his associates.  In addition to the FOIA request at issue here, CREW has also sought White House visitor records of visits by four other conservative Christian leaders in a FOIA request filed with the Secret Service on November 8, 2006.  Finally, CREW has a pending FOIA request with DHS for White House visitor records of individuals associated with the Reading First Program administered by the U.S. Department of Education that was submitted to the agency on October 6, 2006.  With the exception of the FOIA request for records of visits by Jack Abramoff and his associates, the Secret Service has yet to provide CREW with any of the documents it has requested in these FOIA requests.

10.  CREW is seeking White House visitor records because they offer valuable insight into the influence on this administration in the formulation of its policies and priorities.  In addition, CREW is committed to transparency in government and is attempting through its FOIA requests to combat the actions of this administration to undermine that transparency.  Given the value of these records to CREW's mission, CREW will continue to file FOIA requests with DHS for White House visitor records in the future.

11  CREW has been deterred from filing any additional FOIA requests with DHS for White House visitor records by the agency's position that these records are not agency records subject to the FOIA, the government's pending appeal from this Court's ruling that the visitor records are subject to the FOIA and the stay of that order.  Since taking the position that White House visitor records are not agency records, DHS has refused to respond to any of CREW's outstanding FOIA requests for these records.  Once the stay of this Court's recent ruling that the Secret Service's White House visitor records are agency records subject to the FOIA is lifted,

4

CREW will resume filing additional FOIA requests for additional White House visitor records

with DHS.  Id.  For example, CREW intends to file a FOIA request with DHS seeking White

House visitor records from top telecommunications executives during the past year to help in

determining the extent to which these executives have lobbied the president and his staff directly

for retroactive immunity from liability for violating privacy rights.

  12.  The FOIA requests CREW has filed for White House visitor records in the past, has

pending with DHS now and will file in the future demonstrate that CREW has a direct interest in

ensuring that White House visitor records are maintained, preserved and made accessible to the

public as federal law requires.  In addition, CREW is committed to educating the public about

how President Bush and his administration perform their duties and responsibilities.  The policy

of the Secret Service to delete all White House visitor records once it has transmitted copies to

the White House prevents CREW from gaining access to the records it has sought and will

continue to seek through the FOIA.  If CREW cannot obtain the records it is seeking through its

FOIA requests, it cannot fulfill a central tenet of its mission.

  13.  Had DHS followed the requirements of the Federal Records Act ("FRA") and sought

approval of the archivist to destroy the White House visitor records, CREW would have been

afforded an opportunity to comment on the proposed destruction and to articulate its views on the

continuing value White House visitor records have to organizations like CREW as well as

historians and the public generally.  DHS, by not following the mandates of the FRA, has harmed

CREW by failing to provide it notice and an opportunity to comment.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: __1 / 28 / 2008__                   _____
                                                  MELANIE SLOAN
                                                  Executive Director
                                                  Citizens for Responsibility and
                                                   Ethics in Washington
                                                  1400 Eye Street, N.W., Suite 450
                                                  Washington, D.C.  20005
                                                  (202) 408-5565

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| _____ ) | |
| CITIZENS FOR RESPONSIBILITY AND    ) | |
| ETHICS IN WASHINGTON,              ) | |
|                                    ) | |
|                   Plaintiff,       ) | |
|                                    ) | |
|               v.                   )   Civil No. 06-1912 (RCL) | |
|                                    ) | |
| U.S. DEPARTMENT OF HOMELAND        ) | |
| SECURITY, et al.                   ) | |
|                                    ) | |
|                  Defendants.       ) | |
| _____ ) | |

**PLAINTIFF'S STATEMENT OF MATERIAL FACTS AS TO WHICH**
**THERE IS NO GENUINE ISSUE**

Pursuant to LCvR 7(h), plaintiff submits the following statement of material facts as to which there is no genuine issue with respect to plaintiff's motion for summary judgment on Claims Three and Four.

1. By letter dated October 4, 2006, Citizens for Responsibility and Ethics in Washington ("CREW") submitted a Freedom of Information Act ("FOIA") request to the U.S. Department of Homeland Security ("DHS") seeking all records, regardless of format and including electronic records and information, relating to any visit that any of the following individuals made to the White House or the residence of the vice president from January 1, 2001, to the present:  James Dobson, Gary L. Bauer, Wendy Wright, Louis P. Sheldon, Andrea Lafferty, Paul Weyrich, Tony Perkins, Donald Wildmon and Jerry Falwell.  Letter from Anne L. Weismann to U.S. Secret Service, Freedom of Information and Privacy Acts Branch, Oct. 4, 2006, p. 1 ("FOIA Request") (Exhibit A to Complaint).

2. CREW's FOIA request of October 4, 2006, also sought a waiver of fees associated

with processing its request given that the request concerns the operations of the federal

government, the disclosures will likely contribute to a better understanding of relevant

government procedures and the request is primarily and fundamentally for non-commercial

purposes.  FOIA Request at p. 2.  Specifically, the requested records are likely to shed light on

the influence that conservative Christian leaders have, or attempt to have, on the president in the

exercise of his authority.  Id.

   3.  After receiving no response to its FOIA request, CREW filed its complaint in this

matter on November 9, 2006.  Complaint at ¶ 30.

   4.  The Secret Service, a component of DHS, has had a longstanding practice of

destroying its copies of White House visitor records once it has transferred the records to the

White House.  Declaration of Kathy J. Lyerly ("Lyerly Decl. I") (Exhibit B to Complaint) at ¶

10; Memorandum Opinion of December 17, 2007 ("Mem. Op.") at 6; Third Declaration of Paul

Morrissey at ¶¶ 18-19.  The Secret Service has the same policy and practice with respect to

records of visits to the vice president's residence.  Mem. Op. at 12, 13; Third Declaration of Paul

Morrissey at ¶ 37; Second Morrissey Declaration, March 5, 2007 at ¶ 18.

   5.  In October 2004, the Secret Service began temporarily retaining its own copies of the

WAVES records that it transferred to the White House.  Lyerly Decl. I at ¶ 11; Mem. Op. at 7.

The Secret Service has represented that this policy is only temporary, Mem. Op. at 7 n.9, and

that the Secret Service agreed to this policy at the request of the National Archives and Records

Administration ("NARA").  Memorandum of Understanding, May 17, 2006 at ¶ 16a ("MOU")

(Exhibit C to Complaint).

   6.  Under the terms of the MOU, the Secret Service is not to retain its own copies of any

White House Access Control System records "except as is necessary to facilitate the transfer of these records" to the White House.  MOU at ¶ 22.

7.  In 1990 and 1993, the Secret Service submitted to NARA's records appraisal division proposed Federal Records Act schedules for WAVES records in its custody.  Declaration of Gary M. Stern, May 7, 2007, ¶ 14 ("Stern Decl.").  In 1996, the Secret Service submitted a revised schedule which was published in the Federal Register.  Id.

8.  All of these proposed schedules were subsequently withdrawn.  Stern Decl. at ¶ 14.

9.  By letter dated September 13, 2006, Shannen W. Coffin, then counsel to the vice president, dictated to Don Personette, chief counsel of the Secret Service, that the Secret Service "shall not retain any copy" of records of visits to the vice president's residence and further dictated that "[i]f any documents remain in your possession, please return them to OVP as soon as possible."  (Document 29-2).

10.  CREW is a frequent FOIA requester, have filed hundreds of FOIA requests since its inception in 2003.  Declaration of Melanie Sloan ("Sloan Decl.") at ¶ 4.  CREW averages at least several new FOIA requests every month.  Id.

11.  CREW has filed FOIA requests with a wide variety of government agencies, including at least 15 FOIA requests with DHS alone.  Sloan Decl. at ¶ 4.  At present, CREW has FOIA requests pending with over 25 different agencies.  Id.

12.  CREW's pending FOIA requests include a request for White House visitor records of now-convicted lobbyist Jack Abramoff and seven of his associates, a request for visitor records of visits by four other conservative Christian leaders in addition to those named in the request at issue here, and a request for White House visitor records of individuals associated with the

Reading First Program administered by the U.S. Department of Education.  Sloan Decl. at ¶ 9.

With the exception of the FOIA request concerning Jack Abramoff and his associates, the Secret

Service has yet to provide CREW with any of the requested documents.  Id.

     13.  CREW intends to file future FOIA requests, including requests with DHS for White

House visitor records.  Sloan Decl. at ¶¶ 10-11.  These records offer valuable insight into the

influences on the administration in the formulation of its policies and priorities.  Id. at ¶ 10.  In

addition, CREW is committed to transparency in government and, through its FOIA requests of

the Secret Service, is attempting to combat the actions of this administration to undermine that

transparency.  Id.

     14.  CREW intends to file a FOIA request with DHS for White House visitor records of

top telecommunications executives during the past year to determine the extent to which they

lobbied the president and his staff directly for retroactive immunity from liability for violating

their customers' privacy rights.  Sloan Decl. at ¶ 11.

     15.  CREW has been deterred in filing any additional FOIA requests with the Secret

Service for White House visitor records given DHS's position that such records are not subject

to the FOIA, the pendency of its appeal from this Court's ruling that the records are agency

records subject to the FOIA and the accompanying stay of the Court's Order requiring DHS to

process CREW's request.  Sloan Decl. at ¶ 11.

     16.  The policy of the Secret Service to delete all White House visitor records once it has

transmitted copies to the White House has prevented CREW from gaining access to all the White

House visitor records it has sought under the FOIA.  Sloan Decl. at ¶ 12.  If CREW cannot

obtain the records it is seeking through its FOIA requests it cannot fulfill a central tenet of its

mission, the dissemination of information about the conduct of public officials.  <u>Id.</u> at ¶¶ 2, 12.

17.  DHS's failure to follow the requirements of the Federal Records Act deprived CREW of an opportunity to comment on the proposed destruction of White House visitor records and to offer its views on the continuing value those records have to organizations like CREW and the public generally.  Sloan Decl. at ¶ 13.

<div style="margin-left: 40%;">

Respectfully submitted,

_/s/ Anne L. Weismann___
Anne L. Weismann
(D.C. Bar No. 298190)
Melanie Sloan
(D.C. Bar No. 434584)
Citizens for Responsibility and Ethics
  in Washington
1400 Eye Street, N.W., Suite 450
Washington, D.C.  20005
Telephone:  (202) 408-5565
Fax:  (202) 588-5020
Attorneys for Plaintiff

</div>

January 28, 2008

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

—————————————————————
CITIZENS FOR RESPONSIBILITY AND    )
ETHICS IN WASHINGTON,              )
                                   )
              Plaintiff,           )
                                   )
       v.                          )        Civil No. 06-1912 (RCL)
                                   )
U.S. DEPARTMENT OF HOMELAND        )
SECURITY, et al.                   )
                                   )
              Defendants.          )
—————————————————————)

### [PROPOSED] ORDER

For the reasons contained in the accompanying memorandum opinion, it is hereby

ORDERED that Plaintiff's Motion for Summary Judgment on Claims Three and Four is

GRANTED, and this Court further

DECLARES that defendant U.S. Department of Homeland Security's (DHS's) policy of

destroying White House visitor records is arbitrary, capricious and contrary to law, and the Court

further

DECLARES that the archivist has breached his statutory duty to take enforcement action

to prevent DHS from destroying records in contravention of the Federal Records Act and to

recover recovers that DHS transferred to the White House, and it is further

ORDERED that defendant archivist shall immediately fulfill his mandatory statutory

duty to ask the attorney general to initiate legal action to ensure that DHS complies fully with its

obligations under the Federal Records Act, including the preservation of White House visitor

records, with corresponding notice to Congress.

SO ORDERED.

Dated: _____                    _____
                                              ROYCE C. LAMBERTH
                                              United States District Judge