## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 06-1912 (RCL)** |
| | ) | |
| **U.S. DEPARTMENT OF HOMELAND SECURITY, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

This matter comes before the Court on two sets of filings: the parties' cross Motions ([64] and [68]) for Summary Judgment on Claims One and Two; and plaintiff's Motion [51] for Summary Judgment on Claims Three and Four.  Plaintiff Citizens for Responsibility and Ethics in Washington ("CREW") is suing the U.S. Department of Homeland Security ("DHS") and Adrienne Thomas, Acting Archivist of the United States ("Archivist").[1]  Plaintiff articulates FOIA claims against DHS (Claims One and Two) and Federal Records Act ("FRA") claims against both DHS and the Archivist (Claims Three and Four).

On Claims One and Two, the Court will deny defendants' motion [64] and grant plaintiff's motion [68].  As for Claims Three and Four, the Court will grant in part and deny in

---

[1]On December 19, 2008, then-Archivist Allen Weinstein resigned from the office.  In accordance with Federal Rule of Civil Procedure 25(d), his successor, Acting Archivist Adrienne Thomas, is automatically substituted as a party.

1

part plaintiff's motion [51] for summary judgment.  Because the facts relevant to the FOIA

claims are different than those relevant to the FRA claims, this opinion contains a separate

factual background for each set of claims.


## I.  CLAIMS ONE AND TWO (FOIA CLAIMS)

**A.**     **Factual and Procedural Background**

In October 2006, plaintiff made a FOIA request of DHS seeking records of visits by nine

named individuals to either the White House or the Vice President's residence ("VPR").

(Compl. Ex. A.)  The Secret Service, a component of defendant, creates various types of records

associated with visitors to either the White House complex or the VPR.  The main records of

visitors to the White House are Access Control Records System ("ACR") records and Worker

and Visitor Entrance System ("WAVES") records.  Other security-related records are also

maintained.  VPR visit records include post entry logs (handwritten entry records), permanent

and daily access lists (clearance lists for regular visitors and specific visitors, respectively), event

lists (clearance lists for particular events), and e-mails requesting access to VPR.[2]  The sought

records contained information such as the visitor's name, date of visit, and in some cases the

person visited.[3]  After DHS failed to fulfill plaintiff's request within the time allowed by FOIA,

plaintiff filed suit.  (Compl.)

---

[2]The nine individuals were James Dobson, Gary L. Bauer, Wendy Wright, Louis P. Sheldon, Andrea Lafferty, Paul Weyrich, Tony Perkins, Donald Wildmon, and Jerry Falwell.

[3]Further details of the records—not directly relevant to the motions on FOIA claims—are discussed below in part II and in an earlier decision in this case, *CREW v. DHS, et al.*, 527 F. Supp. 2d 76 (D.D.C. 2007).

In December 2007, this Court denied defendants' Motion [29] for Summary Judgment. *CREW v. DHS, et al.*, 527 F. Supp. 2d 76 (D.D.C. 2007).  That opinion established that the records sought by plaintiff, including certain records that had been transferred out of the agency, were in fact subject to FOIA.  *Id.* at 98.  Defendants appealed that decision, and the D.C. Circuit dismissed the appeal for lack of jurisdiction in July 2008.  532 F.3d 860 (D.C. Cir. July 11, 2008).  In September, defendants filed with the Court a letter sent by DHS to plaintiff.  (Defs.' Notice of Filing (Amended) [57] (Sept. 25, 2008).)  The notice and letter indicated that DHS did not plan to release any records responsive to plaintiff's FOIA request because, among other reasons, any such records would fall under the "presidential communications privilege" and were therefore protected from disclosure by FOIA Exemption 5.  (*Id.*)  In connection with that position, DHS indicated that it would neither confirm nor deny the existence of any responsive records, as withholding some records but not others would reveal the identities of persons engaged in confidential communications with the President or his advisors.  (*Id.*; *see also* Defs.' Mot. at 2–3, 11–12.)

Defendants filed their motion thereafter, which makes the same claim as to the extent of the presidential communications privilege.  Plaintiff responded with its own cross-motion for summary judgment, contesting defendants' claim and arguing that DHS has not yet performed an adequate search as required by FOIA.

**B.**     **Legal Framework**

    1.      FOIA Exemption 5, the Presidential Communications Privilege, and the "Glomar Response"

Exemption 5 protects from FOIA's disclosure requirements "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). This language has been construed as covering materials "normally privileged in the civil discovery context." *N.L.R.B. v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975).

One such civil discovery privilege is the presidential communications privilege. "[T]here is 'a presumptive privilege for Presidential communications,' which is 'fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution.'" *Judicial Watch, Inc. v. Dep't of Justice*, 365 F.3d 1108, 1113 (D.C. Cir. 2004) (quoting *U.S. v. Nixon*, 418 U.S. 683, 708 (1974)). The privilege protects "documents or other materials that reflect presidential decisionmaking and deliberations and that the President believes should remain confidential." *In re Sealed Case*, 121 F.3d 729, 744 (D.C. Cir. 1997). The privilege extends not only to direct communications with the President, but also "to communications authored or solicited and received by those members of an immediate White House advisor's staff who have broad and significant responsibility for investigating and formulating the advice to be given to the President on a particular matter." *Id.* at 757.

Courts have recognized that in some cases an agency claiming a FOIA exemption can also refuse to either confirm or deny the existence of responsive records—a so-called "Glomar response." *See Phillippi v. CIA*, 546 F.2d 1009 (D.C. Cir. 1976) (approving such a response by

the CIA regarding the secret "Glomar Explorer" vessel).  Such a response is appropriate "where

to answer the FOIA inquiry [as to the existence or nonexistence of responsive records] would

cause harm cognizable under an FOIA exception."  *Gardels v. CIA*, 689 F.2d 1100, 1003 (D.C.

Cir. 1982).


2.      Legal Standard for Summary Judgment

Summary judgment should be granted when "the pleadings, the discovery and disclosure

materials on file, and any affidavits show that there is no genuine issue as to any material fact and

that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party

seeking summary judgment bears the initial burden of production as to the absence of genuine

issues of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  A genuine issue of

material fact exists if the evidence, viewed in the light most favorable to the nonmoving party,

"is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v.

Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  But a genuine issue requires more than "a

scintilla of evidence" supporting the nonmoving party; "there must be evidence on which the jury

could reasonably find" for the nonmoving party.  *Id.* at 252.

The operative question for summary judgment motions in FOIA cases is whether the

agency has executed a search "reasonably calculated to uncover all relevant documents."

*Weisberg v. U.S. Dep't of Justice*, 705 F.2d 1344, 1351 (D.C. Cir. 1983).  Summary judgment

can be awarded based on information provided by the agency in affidavits or declarations.

*Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981).  Agency affidavits or

declarations establishing the adequacy of a search must be "relatively detailed and non-

conclusory." *SafeCard Servs. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991).  Such affidavits or

declarations "are accorded a presumption of good faith."  *Id.*  "An agency must demonstrate that

'each document that falls within the class requested either has been produced, is unidentifiable,

or is wholly exempt from the Act's inspection requirements.'" *Long v. Dep't of Justice*, 450 F.

Supp. 2d 42, 54 (citing *Goland v. CIA*, 607 F.2d 339, 352 (D.C. Cir. 1978) (internal citation and

quotation omitted)).  If the agency claims that a document is exempt from disclosure, the agency

bears the burden of showing that the claimed exemption applies.  *See* 5 U.S.C. § 552(a)(4)(B);

*U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 142 n.3 (1989).


**C.**     **Analysis**

        In order to prevail on its motion, defendant must show that it has conducted an adequate

search and that any responsive records it has withheld are covered by an applicable FOIA

exemption.  If defendant cannot make that showing, plaintiff will prevail on its cross-motion for

summary judgment.


        1.      Adequacy of DHS's Search

        As a preliminary matter, unless defendant's privilege claim prevails, defendant has not

conducted an adequate search for responsive records.  As plaintiff notes, DHS's September 2008

letter indicated that DHS had searched "records currently retained by the Secret Service," the

Secret Service being a component of DHS.  (Defs.' Notice of Filing (Amended) [57] Ex. (Sept.

25, 2008).)  The letter did not indicate that records not currently retained by the Secret Service

6

had been searched.[4]  But this Court has already held that visit records remain under the legal

"control" of DHS—and are thus subject to FOIA—even if they are transferred to the White

House or the Office of the Vice President and deleted from DHS's internal files.  *CREW v. DHS*,

527 F. Supp. 2d at 98.  Until DHS executes a search of *all* agency records, including those

records which may not be "currently retained" by the agency, it has not fulfilled its obligation

under FOIA to execute a adequate search.


    2.    <u>Applicability of the Presidential Communications Privilege to Records at Issue</u>

The more substantial issue presented by these motions is whether the presidential

communications privilege extends far enough to cover the identities of visitors to the White

House and the Vice President's residence.  If it does, then all of the records sought by plaintiff

are exempt from FOIA, and DHS has no disclosure obligations related to plaintiff's FOIA

request.  If it does not, then DHS remains obligated under FOIA to produce the requested

records.  The Court concludes here that the presidential communications privilege does not

extend as far as defendants claim and, accordingly, will deny defendants' motion and grant

plaintiff's motion.[5]

Defendants contend that the D.C. Circuit in *In re Sealed Case* suggested that the

---

[4]Even if the letter had reflected as much, that would not be enough to prevail on a motion for summary judgment; as already noted, agency declarations or affidavits are required to establish the adequacy of an agency search.  *See SafeCard Servs.*, 926 F.2d at 1200.

[5]Because the records sought by plaintiff are not covered by the presidential communications privilege, the Court need not address plaintiff's contention that the privilege was improperly invoked.  (*See* Pl.'s Mot. at 15–17 (claiming that the President did not delegate to Justice Department counsel the ability to invoke the privilege).)

presidential communications privilege should extend to the identities of all sources of

information used by the President or presidential advisors.  Defendants point to language in the

opinion that, when read out of context, might lead to that conclusion.  (*See* Defs.' Mot. at 6

("'[W]ithout protection for her *sources of information*, an advisor may be tempted to forego

obtaining comprehensive briefings or initiating deep and intense probing . . . .'" (quoting *In re*

*Sealed Case*, 121 F.3d at 750) (emphasis added by defendants)).)  However, defendants' position

is unconvincing for two reasons.  First, read as a whole, *In re Sealed Case* does not advocate

such a broad interpretation of the presidential communications privilege.  Second, such an

interpretation in the context of plaintiff's FOIA action would undermine the purpose of FOIA

while providing little or no additional confidentiality to the President's deliberations or

decisionmaking.

Defendant's interpretation of *In re Sealed Case* rings hollow when the opinion is read as

a whole.  Although the opinion was deliberate in recognizing the wide range of communications

used in presidential decisionmaking and thus appropriately protected by the privilege, it in the

same breath cautioned against an overbroad interpretation of the privilege:

> [T]he presidential communications privilege should be construed as narrowly as is
> consistent with ensuring that the confidentiality of the President's decisionmaking
> process is adequately protected. Not every person who plays a role in the
> development of presidential advice, no matter how remote and removed from the
> President, can qualify for the privilege. . . . [T]he privilege should apply only to
> communications authored or solicited and received by those members of an
> immediate White House adviser's staff who have broad and significant
> responsibility for investigating and formulating the advice to be given the
> President on the particular matter to which the communications relate. Only
> communications at that level are close enough to the President to be revelatory of
> his deliberations or to pose a risk to the candor of his advisers.

*In re Sealed Case*, 121 F.3d at 752.  Defendants' interpretation of the privilege—which would

extend the privilege to the identities of visitors to the White House or the Vice President's residence—is clearly at odds with the Circuit's admonition.  The presidential communications privilege, as its name and the Circuit's opinions suggest, extends only to *communications*.  The visit records sought by plaintiff need only consist of the visitor's name, date and time of visit, and in some cases the name of the person requesting access for the visitor and in some cases the name of the person visited.[6]  Such information sheds no light on the content of communications between the visitor and the President or his advisors, whether the communications related to presidential deliberation or decisionmaking, or whether any substantive communications even occurred.  "The presidential communications privilege should never serve as a means of shielding information regarding governmental operations that do not call ultimately for direct decisionmaking by the President."  *Id.*

Moreover, to make such an extension would be particularly inappropriate in this case. Shielding such general information as the identities of visitors would "considerably undermine the purposes of FOIA to foster openness and accountability in government."  *Judicial Watch*, 365 F.3d at 1118.  That damage would be incurred in exchange for a negligible increase in White

---

[6]WAVES records, created in connection with White House visits, include the requestor name and the visitee name.  *See* Pl.'s Mot. Ex. B (Letter from Justin Sandberg, Oct. 20, 2008). The records may contain other information as well, some of which may well be covered by other FOIA exemptions.  (*See* Defs.' Notice of Filing (Amended) [57] Ex. A at 2 (claiming that visitor Social Security numbers and birthdates, along with coded instructions to Secret Service officers and other security-related information, would be covered by FOIA Exemptions (b)(2), (b)(6), (b)(7)(C), and (b)(7)(E)).)  If that information—which is not at the core of the information sought by plaintiff—is indeed subject to the claimed privileges, DHS has a duty under FOIA to redact the privileged information and release the rest of the sought records.  *See* 5 U.S.C. § 552(b) (following list of exemptions) ("Any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection.").

House confidentiality (of a type which, as discussed above, has not heretofore been considered within the bounds of the presidential communications privilege).  Defendants describe circumstances in which White House visitors' identities might somehow shed some degree of light on the deliberations of the President (for example, a visit of a particular candidate during a Supreme Court vacancy, or the visit of an economist with well-known views or expertise).  (*See* Defs.' Mot. at 7–8.)  While the Court does not rule out the possibility that there may exist some hypothetical situation wherein the factual circumstances surrounding such a visit might reveal the substance of presidential deliberations, such a scenario is certainly not presented by the facts in this action.  In the Court's view, it would take near-omniscience for an observer to tease any accurate meaning out of the visits for which plaintiff seeks records.  Accordingly, the likelihood that public release of these records would "'impede the President's ability to perform his constitutional duty,'" *In re Sealed Case*, 121 F.3d at 751 (quoting *Morrison v. Olson*, 487 U.S. 654, 691 (1988))—the "ultimate question" when interpreting the limits of the presidential communications privilege, *id.*—is not great enough to justify curtailing the public disclosure aims of FOIA.

The Court concludes, therefore, that the agency records sought by plaintiff do not fall within the presidential communications privilege and thus are not shielded from disclosure by FOIA Exemption 5.  Because the records are not covered by the claimed FOIA exemption, the existence or nonexistence of responsive records cannot be covered—meaning that DHS's Glomar response is inappropriate.

**D.      Conclusion as to Claims One and Two (FOIA Claims)**

Defendants' motion asks for an extension of the presidential communications privilege

that is, as a matter of law, inconsistent both with the precedent of this Circuit and with the

purposes of FOIA.  Accordingly, the Court will deny defendants' motion and grant summary

judgment in favor of plaintiff on Claims One and Two.  Defendant DHS shall process plaintiff's

FOIA request—including a search of *all* relevant agency records—and release all nonexempt

responsive records.

## II.   CLAIMS THREE AND FOUR (FRA CLAIMS)

**A.      Factual and Procedural Background**

As discussed in part I, plaintiff requested records of visits to the White House and the

Vice President's residence ("VPR") by certain named individuals in October 2006.  To review,

visits to the White House are reflected by two main types of records, ACR records and WAVES

records.  Other security-related records are also created.  Visits to the VPR are reflected by

several types of records, including "post entry logs," "permanent access lists," "daily access

lists," "event lists," and e-mails requesting access to VPR (hereinafter referred to collectively as

"VPR visit records").[7]

Through the course of other FOIA requests and subsequent litigation, plaintiff learned

that DHS had, prior to October 2004, maintained a "longstanding practice" of periodically

---

[7]Again, s*ee CREW v. DHS*, 527 F. Supp. 2d 76, 79–82, 83–85 (D.D.C. 2007), for more
details on the various types of records.  Those details are not relevant to this motion.  What is
relevant, as discussed in part I and later in this part, is that this Court has already held all of these
records to be "agency records" under FOIA, *see id.* at 98, and that these records were deleted
internally or otherwise not retained by DHS.

transferring large numbers WAVES records to the White House and then deleting DHS's internal

copies.  (Compl. Ex. B (Decl. of Kathy Lyerly, U.S. Secret Service, May 16, 2006) ¶¶10–11

[hereinafter "Lyerly Decl"].)[8]  Plaintiff also obtained a "Memorandum of Understanding"

between the White House and the Secret Service indicating that the Archivist instructed the

Secret Service to stop deleting WAVES records in October 2004; the Secret Service complied.

(Compl. Ex. C (Memorandum of Understanding Between U.S. Secret Service and White House

Office of Records Management, May 17, 2006) ¶¶14, 16 [hereinafter "MOU"]; *see also* Lyerly

Decl. ¶11.)

Plaintiff's first FRA claim, Claim Three, alleges that DHS's recordkeeping policies are

"arbitrary, capricious, and contrary to law" because they fail to comply with the FRA.  (Compl.

¶¶45–49.)  The second FRA claim, Claim Four, alleges that the Archivist violated a mandatory

duty under the FRA by failing to seek legal action through the Attorney General after becoming

aware of the deletion of WAVES records.  (Compl. ¶¶50–53.)  (The Archivist became aware of

the deletion no later than 2004, according to the Memorandum of Understanding.)  In relation to

its FRA claims, plaintiff's Complaint asked the Court (a) to declare DHS's recordkeeping policy

arbitrary, capricious, and contrary to law; and (b) to declare the Archivist in breach of her

statutory duty and order her to seek legal action by the Attorney General with corresponding

---

[8]Plaintiffs asserted their belief that the internal deletion of WAVES records began
sometime in 2001, after President George W. Bush's inauguration.  (Compl. ¶34.)  Although
DHS originally answered that it "lack[ed] knowledge or information sufficient to form a belief"
as to when exactly the practice began (Answer ¶34), it later submitted a declaration indicating
that the practice had been in place "[s]ince at least 2001" (Defs.' Mot. [29] for Summary
Judgment Ex. A (Third Decl. of Paul S. Morrissey, U.S. Secret Service, May 23, 2007) ¶18).  For
purposes of this motion, however, it matters not when exactly the deletion of records began.  The
facts that records were deleted is sufficient.

notice to Congress as required by statute.  (Compl. at 14.)

Defendants, as part of an earlier Motion [29] for Summary Judgment, submitted a declaration stating that, in addition to the aforementioned deletion of WAVES records, DHS had regularly transferred VPR visit records to the Office of the Vice President ("OVP") without retaining agency copies.  (Defs.' Mot. [29] for Summary Judgment Ex. A (Third Decl. of Paul S. Morrissey, U.S. Secret Service, May 23, 2007) ¶¶37, 39–41 [hereinafter "Third Morrissey Decl."].).  DHS decided internally to stop purging its copies of these records in June 2006.  (*Id.* ¶¶38–41.)

B.      **Legal Framework**

1.      The Federal Records Act (FRA)

The statutes that make up the Federal Records Act govern the creation, maintenance, and destruction of federal records.  Of relevance to this litigation, the FRA requires certain actions be taken by both the agency and the Archivist when "alienat[ion] or destr[uction]" of records is contemplated.  44 U.S.C. § 3314.  Before alienation or destruction of federal records, an agency must submit to the Archivist a list of such records "that do not appear to have sufficient administrative, legal, research, or other value to warrant their further preservation by the Government."  *Id.* § 3303(2).   Alternatively, an agency can submit schedules allowing for disposal of a certain type of records after a specified period of time.  *Id.* § 3303(3).  Aside from only a few exceptions not relevant here, records cannot be destroyed or alienated until those lists or schedules are submitted to and approved by the Archivist.  *Id.* §§ 3303a, 3314.

The FRA also includes administrative mechanisms for preventing or remedying the

improper destruction or alienation of records.  Of particular relevance to this litigation is the

specified role of the Archivist:

> [The Archivist] shall notify the head of a Federal agency of any actual, impending,
> or threatened unlawful removal, defacing, alteration, or destruction of records in
> the custody of the agency that shall come to his attention, and assist the head of
> the agency in initiating action through the Attorney General for the recovery of
> records unlawfully removed and for other redress provided by law. In any case in
> which the head of the agency does not initiate an action for such recovery or other
> redress within a reasonable period of time after being notified of any such
> unlawful action, the Archivist shall request the Attorney General to initiate such
> an action, and shall notify the Congress when such a request has been made.

44 U.S.C. § 2905(a).

There is no express or implied provision in the FRA allowing for a private party to sue an

agency for an FRA violation.  *Kissinger v. Reporters Comm. for Freedom of the Press*, 445 U.S.

136, 148 (1980).  However, courts have endorsed certain types of FRA-related suits under the

Administrative Procedures Act ("APA").  *See Armstrong v. Bush*, 924 F.2d 282, 297 (D.C. Cir.

1991) [hereinafter *Armstrong I*].  Accordingly, plaintiff brings this FRA-related action under the

APA.

### 2.       Standard for Summary Judgment

Again, summary judgment can be granted only when there is no genuine issue of material

fact and the moving party is entitled to judgment as a matter of law.  The moving party—here the

plaintiff—bears the burden of establishing the absence of a genuine issue of material fact.

### C.       Analysis

### 1.       Defendants' Arguments Against Summary Judgment

14

i.    *Private Right of Action Against the Archivist*

The Court turns first to defendants' contention that, under the FRA, plaintiff cannot

maintain a private right of action against the Archivist.  The Court draws the opposite conclusion

from the D.C. Circuit's words in *Armstrong I*, which, like this suit, involved an FRA-related

action under the APA: "[I]f the agency head or Archivist does nothing while an agency official

destroys or removes records in contravention of agency guidelines and directives, private litigants

may bring suit to require the agency head and Archivist to fulfill their statutory duty to notify

Congress and ask the Attorney General to initiate legal action."[9]  Defendants dismiss this as

dictum.  But dictum though it may be, this part of the opinion is indispensable to the opinion's

overall conception of rights of action related to the FRA.  After holding that a private individual

could not sue an agency under the FRA to stop destruction of records—as the *Armstrong I*

plaintiff had done—the court continued:

> We do conclude, however, that it would not be inconsistent with *Kissinger*[, 445
> U.S. at 136,] or the FRA to permit judicial review of the agency head's or
> Archivist's refusal to seek the initiation of an enforcement action by the Attorney
> General.  Nothing in the legislative history suggests that Congress intended to
> preclude judicial review of either the agency head's or the Archivist's failure to
> take enforcement action.  Indeed, judicial review of the agency head's and
> Archivist's failure to take enforcement action reinforces the FRA scheme by
> ensuring that the administrative enforcement and congressional oversight
> provisions will operate as Congress intended.  Unless the Archivist notifies the
> agency head (and, if necessary, Congress) and requests the Attorney General to
> initiate legal action, the administrative enforcement and congressional oversight
> provisions will not be triggered, and there will be no effective way to prevent the
> destruction or removal of records.  Thus, *if the agency head or Archivist does
> nothing while an agency official destroys or removes records in contravention of
> agency guidelines and directives, private litigants may bring suit to require the*

---

[9]In this case, plaintiff alleges that the agency violated not agency guidelines and
directives, but the FRA itself.  This difference does not affect the conclusion that plaintiff's
private action is consistent with the FRA.

> *agency head and Archivist to fulfill their statutory duty to notify Congress and ask
> the Attorney General to initiate legal action.*

*Armstrong I*, 924 F.2d at 295 (footnote omitted and emphasis added).  The court even restated its

position in the opinion's conclusion: "[T]he APA authorizes the district court to entertain a

properly pleaded claim that the Archivist or an agency head has breached the statutory duty to

take enforcement action to prevent an agency official from destroying records in contravention of

the agency's recordkeeping guidelines or to recover records unlawfully removed from an

agency."  *Id.* at 297.  Reading this "dictum" in context makes it abundantly clear that suing the

Archivist (or the agency head) under the APA to compel him or her to ask the Attorney General

to initiate legal action is *the* proper course for a private party to go about enforcing the FRA.

Thus, under the law of this Circuit, plaintiff's action against the Archivist is consistent with the

FRA.

   *ii.*  *Standing*

   Alternatively, defendants argue that if there is a private right of action available, plaintiff

does not have Article III standing to bring such an action.  The Court, guided by binding

precedent, disagrees.  Before a plaintiff has standing to bring an action in federal court, he must

demonstrate a three-part "irreducible constitutional minimum."  *Lujon v. Def. of Wildlife*, 504

U.S. 555, 560 (1992).  First, the plaintiff must show a "concrete and particularized" injury that is

"actual or imminent, not conjectural or hypothetical."  *Id*. (quotation marks omitted).  Second,

that injury must be "fairly . . . traceable to the challenged action of the defendant."  *Id*. (quotation

marks omitted).  Finally, it must be "'likely,' as opposed to merely 'speculative,' that the injury

will be redressed by a favorable decision."  *Id*. at 561 (citation and quotation marks omitted).

a.      *Injury and Traceability*

Defendants claim that plaintiff has no standing to bring its suit under the FRA because plaintiff lacks an injury in fact.  Defendants contend that because the records in question will be preserved under the Presidential Records Act ("PRA"), plaintiff has not been harmed by defendants' actions.  Defendants argue that under the PRA any visitor records that have been transferred to the White House or OVP will be available to the public between five and twelve years after the current administration leaves office, "subject to any constitutionally based privileges available to the President or the Vice President."  (Opp'n at 6.)  The Court, however, agrees with plaintiff that, the PRA notwithstanding, defendants' alleged FRA violations contributed to plaintiff's inability to obtain the requested records, which is injury sufficient to support standing.[10]

As plaintiff notes, it is interested not only in preservation of the records, but in *access* to them (through FOIA).  DHS failed to respond fully to plaintiff's FOIA request.  This is sufficient injury for standing under our case law.  *See CREW v. DHS*, 527 F. Supp. 2d 101, 105 (D.D.C. 2007) (Lamberth, J.) (citing *Zivotofsky v. Sec'y of State*, 444 F.3d 614, 617 (D.C. Cir. 2006) ("Anyone whose [FOIA] request for specific information has been denied has standing to bring an action; the requester's circumstances—why he wants the information, what he plans to do with

_____

[10]In the alternative, plaintiff argues that it suffered injury when it was not allowed to comment on the deletion of the records. (Mot. at 16.)  (Under the FRA, had DHS submitted a list or schedule proposing deletion to the Archivist, the Archivist would have published a notice in the Federal Register and allowed for public comment.  44 U.S.C. § 3303a(a).)  Plaintiff cites no legal authority for this position.  The Court is skeptical of this position; were plaintiff correct, then *any* potential litigant could challenge an FRA violation by asserting that it *would have* commented on the deletion.  This would essentially remove the injury requirement from the standing analysis in private actions to enforce the FRA.  Fortunately for plaintiff, however, its pending FOIA action provides a more convincing basis for the requisite finding of injury.

it, what harm he suffered from the failure to disclose—are irrelevant to his standing.")).  The fact

that plaintiff may, at some time years in the future, be able to access these records through some

other source does not nullify the injury plaintiff suffers today.

Moreover, plaintiff faces the type of ongoing or future injury required to maintain

standing for the prospective (declaratory and injunctive) relief sought.  "When a party seeks

prospective relief, such as a declaratory order invalidating an agency policy, it

must show that it is likely to suffer a future injury." *Id.* at 105.  Here, plaintiff's pending FOIA

request has not yet been satisfied.  Plaintiff still seeks from defendant visitor records that have

been transferred to the White House or OVP and internally deleted.  Plaintiff's pending

unfulfilled FOIA request provides the ongoing injury needed for standing.

b.    *Redressability*

In a footnote, defendants argue that plaintiff lacks standing for one of the elements of

prayed-for relief—an order for the Archivist to ask the Attorney General to initiate legal action

against DHS.  (Opp'n at 7 n.5).  Defendants note that even if the Archivist asks the Attorney

General to initiate legal action, the Attorney General may very well decline to do so, leaving

plaintiff's injury unredressed. *Id.*  In this Court's view, defendants' redressability argument is

foreclosed by binding precedent.  The D.C. Circuit decided in *Armstrong I* that it was appropriate

for a plaintiff whose only injury is denial of records to seek the relief exact relief sought here.

*Armstrong I*, 924 F.2d at 295.  Although *Armstrong I* did not directly discuss the redressability

element of standing, one cannot read *Armstrong I* and conclude that court did not believe that a

private litigant who otherwise had standing would be unable to pursue such relief for lack of

redressability.

### iii.      Visitor Records Are "Federal Records" Under the FRA

Defendants' final argument, made in several different forms, claims that the sought

records are presidential records, not agency records, and therefore are covered by the PRA

(which allows no private right of action against the Archivist), not the FRA.   This Court has

already reached the opposite conclusion in this case in relation to plaintiff's FOIA claims.

*CREW v. DHS*, 527 F. Supp. 2d 76, 98 (D.D.C. 2007) (holding that the visitor records at issue

here continue to be "agency records" for purposes of FOIA even after they are transferred to the

White House or OVP and internally destroyed).   "For purposes of the PRA, presidential records

do not include 'any documentary materials that are . . . official records of an agency,' as the term

'agency' is defined in the FOIA."   *Armstrong v. Executive Office of the President*, 90 F.3d 553,

556 (D.C. Cir. 1996) [hereinafter *Armstong III*] (citations omitted).   It follows, then, that the

records at issue here—having been found by this Court to be subject to FOIA—are "federal

records" subject to the FRA.   Defendant's arguments to the contrary are without merit.


### 2.      Plaintiff's Motion for Summary Judgment

Having disposed of defendants' arguments against summary judgment, the Court now

turns to whether plaintiff has carried its burden.   Again, Claim Three asks the Court to declare

that DHS's internal deletion of visitor records is arbitrary, capricious, and contrary to law, and

Claim Four asks the Court to direct the Archivist to ask the Attorney General to initiate legal

action to remedy DHS's allegedly illegal recordkeeping practices and to notify Congress

accordingly.   Plaintiff has established its entitlement to summary judgment on DHS's WAVES

retention practices prior to October 2004 and the insufficiency of the Archivist's response to those practices.  Plaintiff has also demonstrated the illegality of DHS's VPR record retention practices prior to June 2006.  However, plaintiff has not made a similar showing with regard to DHS's recordkeeping practices after those dates, which, based on the record, appear to be consistent with the FRA.

   i. *Summary Judgment as to Claim Three*

  *Armstrong I* established that a private party can sue under the APA to obtain a declaration that an agency's recordkeeping practices are contrary to law.  *Armstrong I*, 924 F.2d at 297 ("[W]e affirm the district court's decision that the APA authorizes judicial review of plaintiffs' claim that the [agency's] recordkeeping guidelines and directives are arbitrary and capricious."). Here, plaintiff has established (and defendants have not seriously contested) that during the period that WAVES records were being internally deleted, DHS's recordkeeping practices did not comply with the FRA.  Defendant DHS (through its component the Secret Service) has admitted in declarations that WAVES records were deleted from agency record systems prior to October 2004.  (*See* Lyerly Decl. ¶¶10–11; Third Morrissey Decl. ¶18.)  Defendant had not submitted any schedules for disposal of records to the Archivist for approval[11] nor taken any of the other steps required by the FRA prior to destruction or alienation of records.  Defendants do not allege that the Archivist gave any type of permission for the records to be deleted from DHS's system.  In sum, plaintiff has established that there is no genuine issue of material fact as to the legality of DHS's pre–October 2004 WAVES retention practices, and defendant has failed

---

   [11]Defendant does not dispute that the two schedules that were submitted in 1990 and 1993, respectively, were withdrawn before they were approved.  (Pl.'s Statement of Mat. Facts ¶¶7–8; Defs.' Response to Pl's Statement of Mat. Facts ¶¶7–8.)

to identify any such issues.  DHS's practices were contrary to the FRA, and plaintiff is entitled to judgment as a matter of law.  Accordingly, the Court will grant summary judgment for plaintiff on Claim Three as to DHS's WAVES retention practices prior to October 2004.

Plaintiff has also established that VPR visit records had been deleted or otherwise removed prior to June 2006.  This policy was contrary to the FRA for the same reasons as the deletion of WAVES records.  Plaintiff will be awarded summary judgment on this point as well.

What plaintiff has not shown is that DHS's post–October 2004 retention of WAVES records, or its post–June 2006 maintenance of VPR records, is contrary to law.  As for WAVES records, all of the documentation submitted by plaintiff indicates that DHS ended its internal deletion in October 2004 at the request of the Archivist.  (*See, e.g.*, MOU ¶16.)  Admittedly, the Memorandum of Understanding assumes that visitor records are "Presidential Records" rather than "Agency Records," and stipulates that the post–October 2004 retention of WAVES records is "a temporary practice maintained until a legal determination [is] made confirming the propriety of handling [White House visitor records] as Presidential Records."  (*Id.* ¶¶16–17.)  This Court has since confirmed that WAVES records, as well as VPR visit records, are in fact agency records.  *See, e.g.*, *CREW v. DHS*, 527 F. Supp. 2d at 98; *Judicial Watch v. U.S. Secret Service*, --- F. Supp. 2d ---, 2008 WL 4405340, *5–*6 (D.D.C. Sept. 30, 2008) (Lamberth, J.).  DHS has not indicated that it would continue to delete WAVES records in the face of such a determination.  As for VPR records, the precise reason disposal was halted in June 2006 is unknown.  However, plaintiff has not asserted that record disposal continued thereafter.  Because plaintiff has not shown DHS's post–October 2004 retention of WAVES records or its post–June 2006 retention of VPR records to be contrary to law, the Court will not grant summary judgment

on those points.

ii.     *Summary Judgment on Claim Four*

With regard to Claim Four against the Archivist, plaintiff has established that the

Archivist was aware of DHS's pre–October 2004 deletion of WAVES records.  The fact that the

deletion was halted at the request of the Archivist shows the Archivist's awareness.  (*See* MOU

¶16.)  Defendants do  not contest this point.  (*See* Defs.' Response to Pl.'s Statement of Mat.

Facts ¶5 (admitting that the Archivist requested that DHS stop internal deletion).)  Defendants

have presented no evidence that the Archivist took any action in fulfillment of the statutory duty

to "initiat[e] action through the Attorney General for the recovery of WAVES records unlawfully

removed and for other redress provided by law."  44 U.S.C. § 2905(a).  Plaintiff has thus

established that (1) DHS deleted WAVES records without following FRA procedures and (2) the

Archivist did not fulfill the role mandated by the FRA in remedying that deletion.  Plaintiff has

carried its burden of establishing the absence of genuine issues of material fact, and under the

law of this Circuit is entitled to judgment as a matter of law.  Accordingly, the Court will grant

summary judgment for plaintiff on Claim Four with regard to the Archivist's response to DHS's

pre–October 2004 deletion of WAVES records.  The Archivist will be ordered to (1) request that

the Attorney General initiate legal action to recover the deleted WAVES records and (2) notify

Congress accordingly.

However, the Archivist did comply with the statutory duty to prevent further WAVES

record deletion after October 2004.  Again, plaintiff's evidence indicates that the Archivist

requested that the deletion of WAVES records be halted in October 2004, and that DHS agreed

to end the practice (albeit "temporar[ily]" pending judicial resolution of the records' character).

(*See* MOU ¶16.)  By successfully halting the deletion of WAVES records, the Archivist executed the mandatory duty to prevent further destruction or removal of federal records.  *Armstrong I* noted that the Archivist can use methods other than direct appeal to the Attorney General and still comply with the FRA: "[T]he FRA contemplates that the agency head and Archivist may proceed first by invoking the agency's safeguards against the removal or loss of records . . . and taking such intra-agency actions as disciplining the staff involved in the unlawful action, increasing oversight by higher agency officials, or threatening legal action."  *Armstrong I*, 924 F.2d at 296 n.12 (internal quotations omitted).  Here, a simple request prevented the future deletion of records.  Thus, because the Archivist has fulfilled her FRA obligations regarding DHS's WAVES retention practices from October 2004 to present, Court cannot declare that the Archivist's actions related to that period were or are contrary to law.

As for VPR records, plaintiff simply fails to show that the Archivist is now or has ever been aware of the deletion or removal of VPR records.  The FRA mandates that the Archivist contact the Attorney General only once the illegal recordkeeping practice "come[s] to his attention."  44 U.S.C. § 2905(a).  By failing to demonstrate the Archivist's awareness of DHS's pre–June 2006 retention practices for VPR visit records, plaintiff falls short of showing that the Archivist has a mandatory duty under the FRA and that therefore plaintiff is entitled to judgment as a matter of law.  Accordingly, the Court will not grant summary judgment for plaintiff as to the Archivist's response to DHS's pre–June 2006 VPR visit record retention practices with regard to those records.

**D.     Conclusion as to Claims Three and Four (FRA Claims)**

Plaintiff has established the DHS's pre–October 2004 nonretention of WAVES records and its pre–June 2006 nonretention of VPR visit records were contrary to the FRA, and the Court will declare as much.  Plaintiff has also established that the Archivist was aware of the nonretention of WAVES records and failed to (1) ask the Attorney General to initiate legal action to recover the deleted records and (2) notify Congress (as the FRA requires).  The Court will declare as much and will order the Archivist to make the request and notify Congress.  However, plaintiff has failed to show that DHS's post–October 2004 retention of WAVES records or its post–June 2006 retention of VPR visit records are in violation of the FRA.  Plaintiff has also failed to establish that the Archivist was aware of DHS's pre–June 2006 nonretention of VPR visit records, a necessary precursor to the Archivist's FRA-mandated duty to contact the Attorney General.

## III.  CONCLUSION

For the reasons stated above, the Court will deny defendants' motion [64] and grant plaintiff's motion [68] for summary judgment on Claims One and Two.  The Court will also grant in part and deny in part plaintiff's motion [51] for summary judgment on Claims Three and Four.  A separate order shall issue this date.

Signed by Chief Judge Royce C. Lamberth on January 9, 2009.